**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM, Derivatively on Behalf of Nominal Defendant THE BOEING COMPANY, | ) ) ) ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID L. CALHOUN, STEVEN M. MOLLENKOPF, LAWRENCE W. KELLNER, RONALD A. WILLIAMS, LYNN J. GOOD, ROBERT A. BRADWAY, LYNN M. DOUGHTIE, DAVID L. GITLIN, STAYCE D. HARRIS, AKHIL JOHRI, DAVID L. JOYCE, JOHN M. RICHARDSON, SABRINA SOUSSAN, STANLEY DEAL, STEPHANIE POPE, GREGORY D. SMITH, BRIAN WEST, BRETT C. GERRY, THEODORE ("TED") COLBERT III, LEANNE G. CARET, HOWARD MCKENZIE, MICHAEL DELANEY, MIKE FLEMING, ELIZABETH LUND, DARRIN A. HOSTETLER, and UMA M. AMULURU, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants, | ) | |
| | ) | |
| - and - | ) | |
| | ) | |
| THE BOEING COMPANY, | ) | |
| | ) | |
| Nominal Defendant. | ) | |

**<u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>**

## TABLE OF CONTENTS

I.   INTRODUCTION AND SUMMARY OF CLAIMS .......................................................... 1

II.  JURISDICTION ...................................................................................................... 5

III. PARTIES ............................................................................................................... 6

    A.   Plaintiff ........................................................................................................ 6

    B.   Nominal Defendant ..................................................................................... 6

    C.   Director Defendants .................................................................................... 6

    D.   Officer Defendants ...................................................................................... 8

IV.  THE INDIVIDUAL DEFENDANTS' DUTIES AND OBLIGATIONS ......................... 10

V.   SUBSTANTIVE ALLEGATIONS .......................................................................... 28

    A.   Boeing's History of Untended to Safety Issues Culminated in Two Tragic
        Crashes in 2018 and 2019 ....................................................................... 28

    B.   In Denying a Motion to Dismiss the Previous Shareholder Derivative Suit,
        the Delaware Court of Chancery Excoriated Boeing's Board for Its
        Failure to Oversee Safety ......................................................................... 33

    C.   Even After Boeing Committed to Additional Board-Level Safety
        Oversight, Problems with the Recertified 737 MAX Showed those
        Commitments Were Hollow ....................................................................... 44

    D.   The Alaska Airlines Flight 1282 Blowout Highlighted Boeing's
        Continued Pursuit of Profits Over Safety or Quality ............................... 53

    E.   One of Boeing's Major Quality and Safety Failures Is Continued Trouble
        with the 787 Dreamliner ........................................................................... 61

    F.   Alarming Number of Recent Safety Incidents Involving Boeing
        Commercial Aircraft Show that Safety Problems Are Widespread ..................... 70

    G.   Boeing Made False Statements and Compromised Safety Manufacturing
        the Osprey for the U.S. Military Resulting in Catastrophe .................... 74

    H.   Preliminary Findings by a Senate Investigation Reveal Further Details of
        Boeing's Longstanding and Continuing Systemic Safety Failures ..................... 77

    I.   Safety Regulators Find Boeing's Current Safety Culture and Practices Are
        Inadequate ............................................................................................... 104

J.      Boeing Agrees to Plead Guilty to Violating the DPA, While the SEC and
        DOJ Open Additional Inquiries that Could Result in Heavier Civil and
        Criminal Liability.................................................................................... 123

K.      Boeing Management Has Caused the Company to Issue Misleading
        Proxies that Tout the Company's Safety Record .................................. 126

L.      Boeing Directors and Officers Violate Their Fiduciary Duties of
        Oversight by Ignoring Red Flags ........................................................ 167

VI.     DAMAGES TO THE COMPANY.................................................................... 182

VII.    DERIVATIVE AND DEMAND ALLEGATIONS ....................................... 185

        COUNT I ............................................................................................... 188

        COUNT II .............................................................................................. 188

        COUNT III.............................................................................................. 189

        COUNT IV.............................................................................................. 191

VIII.   PRAYER FOR RELIEF ................................................................................ 191

IX.     JURY DEMAND ........................................................................................... 192

Plaintiff Oklahoma Firefighters Pension and Retirement System ("Oklahoma" or "Plaintiff"), by and through its undersigned counsel, brings this action derivatively on behalf of Nominal Defendant The Boeing Company ("Boeing" or the "Company") against certain current and former members of Boeing's Board of Directors (the "Board") and executive officers, seeking to remedy breaches of fiduciary duties from at least 2021 through the present (the "Relevant Period"). Plaintiff makes these allegations upon personal knowledge, as to the facts of its ownership of Boeing stock, and upon information and belief, as to all other matters, based upon an in-depth review of: (a) documents obtained pursuant to Delaware General Corporation Law Section 220, 8 *Del. C.* §220 ("Section 220") (the "220 Documents" or "220 Production"); (b) public filings made by Boeing and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (c) press releases and other publications disseminated by the Company and other related non-parties; (d) news articles, stockholder communications, and postings on Boeing's website concerning the Company's public statements; (e) the proceedings in related civil lawsuits based on the same underlying misconduct; and (f) other publicly available information concerning Boeing and the Individual Defendants (defined below).

## I.   INTRODUCTION AND SUMMARY OF CLAIMS

1.   Boeing is one of the world's two largest manufacturers of commercial aircraft and the largest exporter in the United States. Boeing's 737 MAX model and 787 model (dubbed the "Dreamliner") are key sources of revenue and profit for the Company. The absolute most critical component of commercial aircraft is safety, and any serious safety incidents, even when not fatal, can cause catastrophic consequences for a company – especially given the rarity of commercial airline crashes. Consumers are now used to and expect perfect airline safety, without any airline fatalities in most years.

1

2.      But in November 2018 and March 2019, two Boeing 737 MAX (series 8) aircraft crashed, within *five months* of each other and only one year after the MAX's rollout, which cost 346 passengers and crew their lives, the Company, its suppliers, and its customers billions of dollars, and Boeing's stockholders tens of billions of dollars in the wipeout of their capital after the second crash led to the worldwide grounding of the 737 MAX.  The worldwide grounding of the MAX lasted for almost two years.

3.      After the fatal 737 MAX crashes, Boeing went through a public wringer, was fined $2.5 billion dollars by, and entered a deferred prosecution agreement ("DPA") with, the U.S. Department of Justice ("DOJ"), and settled a shareholder derivative lawsuit for more than $237 million and corporate governance reforms.  The shareholder derivative suit revealed that despite how airplane safety was *the* central compliance, legal, and business risk of the Company, the Boeing Board exercised *no* safety oversight before the first fatal crash, and only offered sporadic oversight until the second fatal crash.  After the two crashes and the MAX fleet grounding, Boeing formed a Board-level Aerospace Safety Committee in the wake of the MAX crashes to ostensibly have more safety oversight over its planes.

4.      After the MAX fleet was grounded, Boeing publicly committed to improved safety oversight by restructuring their executive ranks to have a chief safety officer report directly to the Chief Executive Officer ("CEO"), firing the then-CEO Dennis Muilenburg ("Muilenburg"), and replacing him with Board member David L. Calhoun ("Calhoun") who committed to improving safety and quality, and electing new Board members with purported aerospace safety experience, designating safety as relevant criteria for Board membership, and creating the Aerospace Safety Committee.

5.     But even while the MAX fleet was grounded, news reports revealed that Boeing continued to have a workplace culture focused on pushing out planes quickly even at the expense of safety and quality.  Contemporaneously with the reports about the problems with the 737 MAX, there were reports about the rushed production process of the 787 Dreamliner (sometimes referred to herein as the "Dreamliner").  In addition, Boeing whistleblowers came out to discuss their concerns with rushed productions that disregarded safety concerns.

6.     Recent events further show that Boeing *still* prioritizes profit over safety or production quality.

7.     On January 5, 2024, a door plug blew out in the air on Alaska Airlines Flight 1282 ("AA Flight 1282").  The plane was able to land safely, with no fatalities.  But the plane was a 737 MAX (series 9) ("737 MAX-9"), which had only recently been certified, and this particular plane was very recently put into service.  The fact that a 737 MAX was again at the center of a near-catastrophe brought renewed scrutiny to Boeing's airplane safety, a month-long grounding of all 737 MAX-9 planes, and public reports, Congressional investigations, regulatory inquiries, and whistleblowers coming forward to highlight additional, ongoing safety and quality failures at Boeing.

8.     Indeed, following the Alaska Airlines incident, news has come out on an almost weekly basis showing Boeing's widespread production quality and safety failures.  This news has been buttressed by numerous other incidents involving Boeing aircraft, again occurring on an almost weekly basis during some periods.

9.     Moreover, Calhoun, rather than committing to improving safety oversight, has actually *decreased* oversight.  News reports indicate that whereas the CEO used to have monthly executive meetings to discuss operational and other issues, Calhoun made those meetings quarterly

in favor of a more hands-off approach.  News reports also indicate that Calhoun cannot even be bothered to go to Boeing's offices in person more than once a month, instead preferring to work from his homes in New Hampshire and South Carolina.  Indeed, while Calhoun attempted to deflect reports of his office absenteeism by discussing his frequent work travel, a large portion of his travel on corporate planes is actually personal, as reported in news analyses and in SEC filings.

10.     Plaintiff made a books and records inspection demand on the Company pursuant to Section 220 in January 2024, shortly after the Alaska Airlines incident.  In response, Boeing agreed to produce Board, Aerospace Safety Committee, and Final Audit Committee minutes/materials from January 1, 2022, to the present concerning airplane safety, airplane production issues, airplane quality control, airplane supplier oversight, the 737 MAX, and AA Flight 1282.  Those Board and committee meeting minutes and materials only further illustrate that while Boeing officers make a show of providing reports to the Board, no effective oversight has been done.  The proof of this lack of oversight is that despite a crippling crisis that occurred only five years ago, widespread safety and quality issues remain.

11.     Meanwhile, regulatory and public scrutiny of Boeing continues.  The Federal Aviation Administration ("FAA") has capped Boeing's production of 737 MAX planes to 38 per month (well below Boeing's target of 50 per month), and is holding weekly meetings with Boeing senior leadership.  The FAA has also opened a new investigation after a whistleblower testified in Congress about flawed practices in manufacturing the 787 Dreamliner that risk catastrophic failure of the planes in the future.  On July 7, 2024, the DOJ and Boeing notified the U.S. District Court for the Eastern District of Texas ("Texas Federal Court") that Boeing will plead guilty to a charge of conspiracy to defraud the United States in violation of the DPA.  Meanwhile, new whistleblowers continue to come out on a regular basis, and some whistleblowers who were

4

previously anonymous have come forth publicly.  The current safety and quality crisis, like the last one, is costing Boeing billions of dollars.

12.     Plaintiff now brings this action to help the Company remedy and receive compensation for the breaches of fiduciary duty by the Board and its officers through their failure to oversee mission-critical airplane safety.

## II.     JURISDICTION

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331, as well as Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. §78aa (the "Exchange Act"), over the claims asserted herein for, *inter alia*, violations of Sections 14(a) of the Exchange Act, 15 U.S.C. §§78(n)(a), and the rules promulgated thereunder.  This Court has supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. §1367.

14.     This Court has personal jurisdiction over each Defendant because each Defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this jurisdiction to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

15.     As to the Boeing officers and directors, the Court also has personal jurisdiction over them because they are directors and officers of a Virginia corporation.

16.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because many of the acts and practices complained of herein occurred in this District, and the Company conducts business in and maintains executive offices in this District.  Venue is proper in this Division because many of the acts and practices complained of herein occurred in this Division, and the Company conducts business in and maintains executive offices in this Division.

17.     In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the U.S. mail, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## III.    PARTIES

### A.    Plaintiff

18.     Plaintiff Oklahoma Firefighters Pension and Retirement System is a stockholder of Boeing and has continuously held its shares at all times relevant hereto, will continue to hold Boeing shares throughout the pendency of this action, and will fairly and adequately represent the interests of other stockholders and the Company in enforcing its rights.

### B.    Nominal Defendant

19.     Nominal Defendant Boeing is a Delaware corporation with its principal executive offices located at 929 Long Bridge Drive, Arlington, VA 22202.  It is one of the world's two largest manufacturers of commercial aircraft; its other businesses include defense aircraft manufacturing, aircraft servicing, and other aerospace-related fields.  As the largest U.S. exporter, Boeing makes approximately $60 billion in revenue every year.

### C.    Director Defendants

20.     Defendant David L. Calhoun has been the CEO of Boeing since January 2020, and he has served on the on the Board since 2009.

21.     Defendant Steven M. Mollenkopf ("Mollenkopf") has been a director since 2020, and he is currently Chair of the Board.  He is also a member of the Compensation Committee, the Governance & Public Policy Committee, and the Special Programs Committee.

22.     Defendant Lawrence W. Kellner ("Kellner") was a director from 2011 until May 2024.  He was the Chair of the Board from 2019 to 2024, and he was a member of the Aerospace

Safety Committee and Governance & Public Policy Committee. He was also the CEO of Continental Airlines from 2004 to 2009.

23. Defendant Ronald A. Williams ("Williams") has been a director since 2010. He is the Chair of the Governance & Public Policy Committee and a member of the Compensation Committee.

24. Defendant Lynn J. Good ("Good") has been a director since 2015. She is the Chair of the Compensation Committee and a member of the Audit Committee.

25. Defendant Robert A. Bradway ("Bradway") has been a director since 2016. He is the Chair of the Finance Committee and a member of the Governance & Public Policy Committee.

26. Defendant Lynn M. Doughtie ("Doughtie") has been a director since 2021. She is a member of the Audit Committee and Compensation Committee.

27. Defendant David L. Gitlin ("Gitlin") has been a director since 2022. He is a member of the Aerospace Safety Committee and the Finance Committee.

28. Defendant Stayce D. Harris ("Harris") has been a director since 2021. She is a member of the Aerospace Safety Committee, the Audit Committee, and the Special Programs Committee. She was also a U.S. Air Force Reserves Lieutenant General, retiring in 2019, and flew as a pilot for United Airlines on Boeing aircraft, including over 10,000 hours on Boeing 747, 757, 767, and 777 aircraft until her retirement in 2020.

29. Defendant Akhil Johri ("Johri") has been a director since 2020. He is Chair of the Audit Committee and a member of the Finance Committee.

30. Defendant David L. Joyce ("Joyce") has been a director since 2021. He is Chair of the Aerospace Safety Committee and a member of the Compensation Committee and the Special Programs Committee.

31.     Defendant John M. Richardson ("Richardson") has been a director since 2019.  He is Chair of the Special Programs Committee and a member of the Aerospace Safety Committee and the Finance Committee.  He was also Chief of Naval Operations in the U.S. Navy, retiring in 2019 as a four-star Admiral.

32.     Defendant Sabrina Soussan ("Soussan") has been a director since 2023.  She is a member of the Audit Committee and the Finance Committee.

33.     Defendants Calhoun, Mollenkopf, Kellner, Williams, Good, Bradway, Doughtie, Gitlin, Harris, Johri, Joyce, Richardson, and Soussan are collectively referred to herein as the "Director Defendants."

**D.     Officer Defendants**

34.     Defendant Calhoun has been the CEO of Boeing since 2020.

35.     Defendant Stanley Deal ("Deal") was Executive Vice President ("EVP") of the Company and CEO of Boeing Commercial Airplanes ("BCA") from 2019 until March 2024.

36.     Defendant Stephanie Pope ("Pope") is EVP of the Company, the Chief Operating Officer ("COO") of the Company, and is also currently the CEO of BCA.

37.     Defendant Gregory D. Smith ("Smith") was EVP and the Chief Financial Officer ("CFO") of Boeing until July 2021.

38.     Defendant Brian West ("West") has been EVP and the CFO of Boeing since 2021.

39.     Defendant Brett C. Gerry ("Gerry") has been EVP and the Chief Legal Officer ("CLO") of Boeing since 2020.

40.     Defendant Theodore ("Ted") Colbert III ("Colbert") has been EVP and CEO of Boeing Defense, Space & Security ("BDS") since March 2022, and was CEO of Boeing Global Services ("BGS") between 2019 to 2022.

41.     Defendant Leanne G. Caret ("Caret") was EVP and CEO of BDS from 2016 to 2022.

42.     Defendant Howard McKenzie ("McKenzie") is EVP and Chief Engineer of Boeing.

43.     Defendant Michael Delaney ("Delaney") has been Senior Vice President ("SVP") and the Chief Aerospace Safety Officer of Boeing since 2021.

44.     Defendant Mike Fleming ("Fleming") is SVP and General Manager of Airplane Programs and Customer Support for BCA, overseeing the production and delivery of all Boeing commercial aircraft.

45.     Defendant Elizabeth Lund ("Lund") is SVP of Quality for BCA, and the chair of the Enterprise Quality Operations Counsel, and was formerly the general manager of Airplane Programs for BCA.

46.     Defendant Darrin A. Hostetler ("Hostetler") is the Chief Compliance Officer ("CCO") of Boeing.

47.     Defendant Uma M. Amuluru ("Amuluru") has been EVP and Chief Human Resources Officer of Boeing since April 2024.  She was CCO of Boeing from March 2020 to April 2023, and Assistant General Counsel of BDS from April 2023 to April 2024.

48.     Defendants Calhoun, Deal, Pope, Smith, West, Gerry, Colbert, Caret, McKenzie, Delaney, Fleming, Lund, Hostetler, and Amuluru are collectively referred to herein as the "Officer Defendants."

49.     The Director and Officer Defendants are collectively referred to herein as the "Individual Defendants."

50.     The Individual Defendants and Boeing, the Nominal Defendant, are collectively referred to herein as the "Defendants."

## IV. THE INDIVIDUAL DEFENDANTS' DUTIES AND OBLIGATIONS

51. By reason of their positions as directors and officers of Boeing, and by virtue of their ability to control the business and corporate affairs of the Company, each of the Individual Defendants owed, and owes, Boeing and its shareholders the fiduciary obligations of loyalty, good faith, and candor and were, and are, required to use their utmost ability to control and manage the Company in a lawful, fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of Boeing and its shareholders, so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

52. Each Individual Defendant owes to Boeing and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company, and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

53. At all times relevant hereto, each Individual Defendant was the agent of each of the other Individual Defendants, and of the Company, and was at all times acting within the course and scope of such agency.

54. By virtue of their fiduciary duties of loyalty, good faith, and candor, each Individual Defendant was required to, among other things:

    a.    Exercise good faith to ensure that Boeing's affairs were conducted in an efficient, business-like manner;

    b.    Exercise good faith to ensure that the Company operated in a diligent, honest, and prudent manner, and complied with all applicable federal and state laws, rules, regulations, and requirements, and complied with all contractual obligations, including acting only within the scope of his or her legal authority;

      c.     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence; and

      d.     Remain informed as to how the Company conducted its operations, and upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith.

55.     The Director Defendants who were and are members of the committees of the Board assumed the responsibility to carry out the functions of their committees.

56.     The Individual Defendants knowingly or consciously breached their fiduciary duties of loyalty and good faith.  They did so by causing or allowing Boeing to fail to maintain a sufficient safety regime and violate federal safety and securities laws.  This misconduct has caused Boeing to be damaged both financially and reputationally.

57.     Furthermore, by virtue of their positions of control and authority as directors and/or officers of Boeing, the Individual Defendants were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent other of the Individual Defendants from their misconduct.

58.     In addition to general duties owed to the Company and its shareholders, the Individual Defendants were further bound by Company policies and guidelines.

59.     The Boeing Code of Conduct (the "Code of Conduct") states, in relevant part, the following:

> At The Boeing Company, ***our first commitment is to the people and customers who rely on our products and services*** to protect, connect, and explore our world and beyond. We are each personally responsible for honoring that commitment and for serving as stewards of our company's legacy of aerospace excellence and innovation. We do that by committing to our values, and by holding ourselves to the highest standards of conduct in how we do our work, and how we treat one

another. We understand that observing the highest ethical business standards is not only the right thing to do, but is critical to our long-term success as a company.

I commit that:

- ***I will comply with all applicable laws, rules, and regulations***. If I do not understand them, I will seek guidance.

- ***I will prioritize safety, quality, and integrity above profit, schedule, or competitive edge. If I see something that raises a safety concern, I will speak up immediately***.

- I will engage all regulators—including employees who act under delegated authority—and customers with candor, transparency, and respect at all times.

***

- ***I will promptly report any illegal, improper, or unethical conduct to my management or through other appropriate channels***.

[Emphasis added.]

60.     The Boeing Company Code of Ethical Business Conduct for Members of the Board

of Directors (the "Board Code") states, in relevant part:

This Code is intended to focus the Board and each Director on areas of ethical risk, provide guidance to help them continue to effectively recognize and deal with ethical issues, enhance existing mechanisms to continue the reporting of unethical conduct, and help to continue to foster and sustain a culture of honesty and accountability. ***Each Director must comply with the letter and spirit of this Code.***

***

No code or policy can anticipate every situation that may arise. Accordingly, this Code is intended to serve as a source of guiding principles. Directors are encouraged to bring questions about particular circumstances that may implicate one or more of the provisions of this Code to the attention of the Chair of the Board or the Chair of the Governance & Public Policy Committee, each of whom may consult with inside or outside legal counsel as appropriate.

***

Compliance with Laws, Rules and Regulations; Fair Dealing

***Directors shall comply with all applicable laws, rules and regulations***, including insider-trading laws. Transactions in Company securities are governed by the Company's Insider Trading Procedure (Procedure 12). Directors shall deal fairly

12

with the Company's employees, customers, suppliers and competitors. Directors shall not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice.

Encouraging the Reporting of any Illegal or Unethical Behavior

***Directors shall continue to promote ethical behavior*** and take steps to ensure that the Company continues to (1) encourage employees to talk to supervisors, managers and other appropriate personnel when in doubt about the best course of action in a particular situation; (2) encourage employees to report violations of laws, rules, regulations or the Company's Ethical Business Conduct Guidelines to appropriate personnel; and (3) inform employees that the Company will not allow retaliation for reports made in good faith.

Compliance Procedures

Any suspected violations of this Code should be communicated promptly to the Chair of the Board or the Chair of the Governance & Public Policy Committee.

[Emphasis added.]

61.    The Board's Corporate Governance Principles state, in relevant part:

The Board of Directors (the "Board") of The Boeing Company ("Boeing" or the "Company") has adopted the following corporate governance principles (the "Principles") to assist the Board in the exercise of its responsibilities and, along with Boeing's Certificate of Incorporation and By-Laws and charters of the committees of the Board, provide an effective framework for Boeing's governance.

\*\*\*

Boeing's business is conducted by its employees, managers and officers, led by the Chief Executive Officer ("CEO"), subject to the oversight of the Board. Directors' basic responsibility is to exercise their business judgment to act in what they reasonably believe to be the best interests of the Company and its shareholders. The Board selects the CEO and works with the CEO to both elect/appoint other officers and ensure that the long-term interests of the Company and its shareholders are being served. ***The Board and the officers recognize that the long-term interests of the Company and its shareholders are advanced when they take into account the concerns of employees, customers, suppliers and communities***.

Board Composition

\*\*\*

Selection of Nominees

13

The Governance & Public Policy Committee reviews annually the skills and characteristics required of directors in light of the Board's current composition, evolving business requirements, and the long-term interests of the Company and its shareholders. ***This assessment includes consideration of experience in areas that are relevant to Boeing's global activities, such as*** aerospace, engineering, manufacturing, ***safety***, risk management, software, operations, finance, marketing, sustainability, international business and affairs, government, and public policy, as well as other factors such as independence, diversity, age and absence of conflicts of interest. ***The Governance & Public Policy Committee shall ensure that at least three directors have knowledge, experience, and/or expertise with aviation/aerospace, engineering, and/or product safety oversight***.

\*\*\*

Board Responsibilities

Oversight Responsibilities

The Board's oversight responsibilities include: (1) evaluating the CEO's performance and reviewing the Company's succession plan for the CEO and senior management; (2) reviewing the long-range business plans of the Company and monitoring performance relative to achievement of those plans; (3) advising management regarding long-range strategic issues and risks facing the Company; (4) overseeing management in the execution of its risk management responsibilities and assessing the Company's overall approach to risk management; and (5) approving policies of corporate conduct that continue to promote and maintain the integrity of the Company. In addition, the Board shall be knowledgeable about the content and operation of Boeing's ethics and compliance program, and shall exercise oversight with respect to the program's implementation and effectiveness.

In discharging these responsibilities, the Board and its committees, as appropriate, shall have access to and are entitled to rely on the advice, reports and opinions of management and outside financial, compensation, legal or other advisors.

CEO Performance Evaluation

The Board is responsible for evaluating the performance of the CEO. On an annual basis, the Governance & Public Policy Committee shall review the CEO's business goals and objectives and evaluate the CEO's performance in light of those goals and objectives. The independent directors shall review the Governance & Public Policy Committee's evaluation and make final determinations with respect to the CEO's performance. The Compensation Committee shall, after consultation with the Aerospace Safety Committee and together with the other independent directors, make determinations with respect to the CEO's compensation based on the contents of the performance evaluation.

\*\*\*

14

Board Oversight

\*\*\*

Board Committees

The Board has established the following standing committees to assist the Board in discharging its responsibilities:

- Aerospace Safety
- Audit
- Compensation
- Finance
- Governance & Public Policy
- Special Programs

The Governance & Public Policy Committee shall periodically review and make recommendations to the Board, after consultation with the Chair of the Board, regarding the membership of each of the committees. The chairs and members of the six committees are rotated as appropriate.

All members of the Aerospace Safety, Audit, Compensation and Governance & Public Policy Committees shall be independent as defined by Boeing's Director Independence Standards as well as satisfy all applicable laws, rules, or exchange listing standards. All members of the Special Programs Committee shall possess applicable security clearances.

Each standing committee has a written charter, approved by the Board, which describes the committee's general authority and responsibilities. Shareholders may access a copy of each such committee charter at www.boeing.com/corp_gov/. ***The committee chairs report on the items discussed and actions taken at committee meetings to the Board following each committee meeting.*** Each standing committee shall review on an annual basis its charter and recommend appropriate revisions to the Board. The Board may, from time to time, establish and maintain additional committees.

The Audit Committee regularly meets in executive session with representatives of the Company's independent auditors. The Audit Committee also meets on a regular basis with the Company's vice president responsible for carrying out the internal audit function and the Company's vice president responsible for ethics and compliance programs. The Audit Committee shall report to the Board, no less than annually, with respect to the implementation and effectiveness of Boeing's ethics and compliance program to support the Board's oversight responsibility.

Director Orientation and Continuing Education

Each new director must participate in a comprehensive orientation program, which shall include presentations by senior management on the Company's business units, strategic plans, significant financial, accounting and risk management issues, compliance programs, sustainability matters, and code of ethical business conduct.

Directors shall be provided at Board or committee meetings as appropriate with continuing education on subjects to assist them in discharging their duties. In addition, directors shall receive training on at least an annual basis in conjunction with regularly scheduled Board meetings on topics relating to corporate governance policies and roles and responsibilities of Board members.

The Board shall have the opportunity to conduct at least one annual on-site visit to a Boeing operating unit, familiarizing directors with the operations of that unit and facilitating direct interaction between directors and operating personnel as appropriate. All directors are also encouraged to attend, at the Company's expense, outside continuing education programs for directors. The Corporate Secretary shall assist directors in identifying such programs.

[Emphasis added.]

62.     The Company's Aerospace Safety Committee Charter provides in relevant part:

Purpose

The Aerospace Safety Committee (the "Committee") is established by the Board of Directors (the "Board") of The Boeing Company (the "Company") for the purpose of assisting the Board in the oversight of the safe design, development, certification, production, maintenance, and operations, of the aerospace products and services of the Company.

Membership

The Committee shall consist of three or more independent directors. ***The Committee shall comprise to the extent possible members who have knowledge, experience and/or expertise in aviation/aerospace, engineering, safety systems oversight, and/or safe product design, development, manufacture, production, operations, maintenance, and/or delivery.*** The Chair and the other members of the Committee shall be elected annually by the Board, and the Board may remove one or more directors from the Committee at any time in its discretion.

Responsibilities

In furtherance of the Committee's purpose as set forth above, the Committee's responsibilities include the following:

1.     Review and, where appropriate, make recommendations to the Board with respect to the Company's:

    a.      Safety Management System, including Safety Policy & Objectives, Safety Risk Management, Safety Assurance, and Safety Promotion;

    b.      Global Aerospace Safety Initiative;

    c.      Aerospace Safety Analytics and Safety Experience at Boeing;

    d.      Quality Management System;

    e.      cyber-safety program insofar as it relates to the Company's products;

    f.      policies and processes for engaging with and supporting the requirements of commercial, defense, and space aviation safety regulatory authorities, including the Federal Aviation Administration (including the Company's Organization Designation Authorization (ODA) program), the National Transportation Safety Board, the Department of Defense, and the National Aeronautics and Space Administration;

    g.      engineering organization and its processes for the development, production, and support of the Company's products and services;

    h.      product development programs insofar as they relate to technical, compliance, or product safety considerations; and

    i.      participation in and support of investigations conducted by the National Transportation Safety Board and other domestic and international investigatory authorities, including the Company's responses to findings and conclusions of such investigations.

2.      Review and advise on the selection and removal of the Boeing ODA Ombudsperson, and review the status of the ODA program with the Boeing ODA Ombudsperson at least annually.

3.      Review with engineering leadership at least semiannually the Company's promotion and management of the "Speak Up" portal submissions process.

4.      Review with engineering leadership at least semiannually FAA airworthiness directives issued for Boeing airplanes; the issuance of FAA type certificates and/or production certificates; and any significant communications to or from the FAA.

5.      Provide a forum in executive session for the following individuals to directly communicate with the Committee:

    a.      Chief Aerospace Safety Officer

    b.      Chief Engineer

      c.       Vice President for Product and Services Safety

      d.       Chief Legal Officer

      e.       Boeing ODA Ombudsperson

      f.       Chief Compliance Officer

      g.       Chair of Boeing Quality Operations Council

      h.       Chair of Enterprise Manufacturing Operations Council

6.     Consult with and provide input to the Compensation Committee on the annual performance evaluation of the CEO and other executive officers.

7.     Periodically assess the adequacy of and need for additional continuing director education programs relevant to the Committee's responsibilities.

8.     Perform such other duties as may be delegated from time to time by the Board.

Meetings

The Committee meets in conjunction with the regular Board meetings and otherwise from time to time at the call of its Chair. The Committee meets in executive session as it deems necessary or appropriate. The results of Committee meetings and other actions of the Committee shall be reported to the full Board.

The Committee may invite to its meetings any member of management, including the Chief Executive Officer, the Chief Engineer, the Chief Aerospace Safety Officer, the Vice President for Product and Services Safety, the Chief Compliance Officer, and such other persons – inside or outside the Company – as it deems appropriate in order to carry out its duties and responsibilities. The Chief Engineer and Chief Aerospace Safety Officer shall ensure that each Committee meeting includes reporting and updates on significant safety issues, including significant safety events that have occurred since the prior Committee meeting. Such briefings shall include information sufficient to understand management's judgment in developing new safety policies and procedures, or in addressing significant safety events.

[Emphasis added.]

63.     The Company's Audit Committee Charter provides in relevant part:

Purpose

The Audit Committee (the "Committee") is established by the Board of Directors (the "Board") of The Boeing Company (the "Company") for the primary purpose of assisting the Board in oversight of the:

- Integrity of the Company's financial statements,

- ***Company's internal control environment and compliance with legal and regulatory requirements***,

- Independent auditor's qualifications and independence,

- ***Company's processes for assessing key strategic, operational and compliance risks***, and

- Performance of the Company's internal audit function and independent auditor.

***

Meetings

The Committee shall meet in conjunction with regular Board meetings and at such other times as called by or on behalf of its Chair. The Committee meets in executive session, including with its advisors and/or management, as it deems necessary or appropriate. ***The results of Committee meetings and other actions of the Committee shall be reported to the full Board***.

***

Responsibilities

In furtherance of the Committee's purpose as set forth above, the Committee's responsibilities include the following:

1. Appoint, retain, compensate, oversee, and replace, if necessary, the independent auditor, which auditor will report directly to the Committee. The Committee shall present its conclusions with respect to the independent auditor to the Board.

2. Review and pre-approve both audit and non-audit services to be provided by the independent auditor. The Committee Chair may pre-approve audit or non-audit services to be performed by the independent auditor according to the procedures approved by the Committee, provided that any such approvals are presented to the Committee at its next scheduled meeting.

3. Review and advise on the selection and removal of the VP-Corporate Audit. Additionally, the Committee will review, recommend changes to, and approve the Internal Audit Charter.

4.   Obtain and review, on an annual basis, a formal written report prepared by the independent auditor describing:

- The firm's internal quality-control procedures;

- Any material issues raised by the most recent internal quality-control review, or peer review, of the firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with such issues; and

- All relationships between the independent auditor and the Company (for purposes of assessing the auditor's independence), including discussion and evaluation of such relationships, and recommending that the Board take appropriate action in response to the independent auditor's report to satisfy itself of the independent auditor's independence.

5.   Discuss with the independent auditor:

- The Company's critical accounting policies;

- Any difficulties or problems encountered in performing the audit, including restrictions on the scope of the independent auditor's activities or access to requested information, and management's response;

- Any significant disagreements between management and the independent auditor;

- Material audit or accounting issues reviewed with the independent auditor's national office;

- Significant related-party transaction or other significant conflicts of interest;

- Critical audit matters proposed to be included in the independent auditor's annual audit report;

- All alternative treatments of financial information within generally accepted accounting principles related to material items that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor; and

20

- Other material written communications between the independent auditor and management, such as "management" or "internal control" letters or schedules of unadjusted differences.

6.    Review with the independent auditors, internal auditors, and members of senior management the adequacy and effectiveness of the Company's internal controls and financial reporting processes, including any significant deficiencies or material weaknesses, as well as significant changes in internal controls reported by the independent auditor or management.

7.    Meet periodically with management, the VP-Corporate Audit, and the independent auditors in separate executive sessions.

8.    Review the Company's internal audit plan, including the responsibilities, budget, and staffing of the Company's internal audit function, and receive regular reporting from the VP-Corporate Audit on audit activities and trends.

9.    Meet to review and discuss with management and the independent auditors, prior to filing, the Company's quarterly and annual reports filed with the SEC on Forms 10-Q and l0-K, including the Management's Discussion and Analysis of Financial Condition and Results of Operations, any management certifications as required by the Sarbanes-Oxley Act of 2002 and relevant reports rendered by the independent auditors.

10.   Review and discuss earnings press releases with management as well as financial information and earnings guidance provided to analysts and rating agencies. Discussions of earnings press releases as well as financial information and earnings guidance may be done generally (i.e., discussion of the types of information to be disclosed and the type of presentation to be made). Discussions need not occur in advance of each earnings press release or each instance in which earnings guidance is provided.

11.   Review the effect of regulatory and accounting initiatives, as well as off-balance-sheet structures, on the financial statements of the Company.

12.   Discuss with management the Company's policies, practices and guidelines with respect to risk assessment and risk management, including assessing key strategic, operational and compliance risks.

13.   At least annually receive reporting by the CCO on the Company's compliance with its risk management processes, and by the Company's Chief Legal Officer on pending Law Department

investigations of alleged or potentially significant violations of laws, regulations, or Company policies.

14. Review management's assessment of compliance with laws, regulations, and Company policies relative to payments to individuals or organizations retained as international service contractors.

15. Meet with the CCO to review the Company's ethics and business conduct programs and the Company's compliance with related laws and regulations.

16. Review significant pending and threatened litigation, the status of advancement of expenses to employees involved in company-related legal proceedings, and related indemnification.

17. Set clear hiring policies, compliant with governing laws or regulations, for the Company's hiring of employees or former employees of the independent auditor.

18. Establish and maintain procedures for:

- The receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters; and

- The confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

19. Perform an annual performance evaluation of the Committee.

20. Report regularly to the Board regarding the execution of the Committee's duties and responsibilities as well as any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditors, or the performance of the internal audit function.

21. Report regularly to the Board with respect to the implementation and effectiveness of the Company's ethics and compliance programs to support the Board's oversight responsibility.

22. Regularly review risk assessments from management with respect to cyber security, including assessments of the overall threat landscape and related strategies and investments.

23.      Prepare an annual committee report for inclusion in the Company's proxy statement.

24.      Periodically assess the adequacy and need for additional continuing director education programs relevant to the Committee's responsibilities.

25.      Perform such other duties as may be delegated from time to time by the Board.

[Emphasis added.]

64.      The Company's Governance and Public Policy Committee Charter provides in relevant part:

Responsibilities

The Committee's responsibilities include the following:

1.      Review and make recommendations to the Board with respect to:

     a.   the general responsibilities and functions of the Board and its members;
     b.   the organization, structure, size and composition of the Board;
     c.   Board procedures and operations;
     d.   the organization and responsibilities of the committees of the Board; and
     e.   the form and amount of compensation and benefits for nonemployee directors for service on the Board and its committees.

2.      Identify candidates who are qualified to become Board members under the criteria set forth in the Corporate Governance Principles, aid in attracting such candidates to the Board and recommend to the Board such candidates for election to the Board as appropriate.

3.      Review potential Board candidates recommended by shareholders or other third parties in light of the Board's criteria for director nominees.

4.      Evaluate, in consultation with the Chair of the Board, the ongoing contributions to the Board of each director eligible to be nominated for re-election to the Board and recommend to the Board whether the director should be so nominated.

5.      Assess the independence of each director and director nominee pursuant to the Company's Director Independence Standards and applicable laws, rules, or exchange listing standards and make recommendations to the Board with respect to such assessments.

6.    Recommend to the independent directors of the Board an independent director for election as Chair of the Board after each annual meeting of shareholders or otherwise as necessary.

7.    Review and monitor the orientation of new Board members and the continuing education of all directors, as well as assess the adequacy of and need for additional continuing director education programs relevant to the Committee's responsibilities.

8.    Review periodically the Board committee structure and recommend to the Board, after consultation with the Chair of the Board, directors to serve as members and chairpersons of each of the committees and to fill any vacancies.

9.    Review and oversee the annual performance evaluation process of individual directors, the Board, and each of its committees.

10.   Conduct an annual performance evaluation of the Committee.

11.   Review the continued appropriateness of Board membership for any director who fails to receive the required vote for re-election at the annual meeting of shareholders and recommend action to be taken, if any, to the Board.

12.   Review the continued appropriateness of Board membership for any director who retires or resigns from his or her principal employment or who experiences a significant change in his or her primary responsibilities and recommend action to be taken, if any, to the Board.

13.   Recommend to the Board nominees for election as Chief Executive Officer ("CEO") and nominees for election or appointment as officers.

14.   Monitor and review at least annually the performance of the CEO, and the Company's plans for CEO and senior management succession.

15.   Confer with the CEO with respect to elected officers' change of responsibilities and retirements.

16.   Review and approve directors' and elected officers' directorships in other for profit companies, as appropriate.

17.   Review on an annual basis the compliance of each director with the stock ownership requirements for directors and make recommendations as appropriate.

18.   Review and monitor the Company's political advocacy activities and expenditures and, where appropriate, make recommendations to the Board with respect to such activities and expenditures.

19.   Review and monitor the Company's practices relating to public policy and corporate sustainability, including matters related to environmental stewardship,

climate change, diversity, equity, and inclusion, philanthropic programs and community engagement; and, where appropriate, make recommendations to the Board with respect to such practices.

20.     Annually review the Company's By-Laws, Corporate Governance Principles, Director Independence Standards and Code of Ethical Business Conduct for Directors, and recommend any proposed changes to such documents to the Board for approval.

21.     Assess possible conflicts of interest of directors and executive officers, including the review and approval or ratification as is required from time to time of any transaction or proposed transaction in which the Company is or is to be a participant and the amount involved exceeds $120,000, and in which any director, executive officer, nominee for director or any immediate family member of a director, executive officer or any nominee for director has or will have an interest.

22.     Review developments and trends in corporate governance, political advocacy, and sustainability and, where appropriate, make recommendations to the Board with respect to such matters.

23.     Review shareholder proposals and make recommendations to the Board regarding responses to such proposals.

24.     Perform such other duties as may be delegated from time to time by the Board.

Meetings

The Committee meets in conjunction with the regular Board meetings and otherwise from time to time at the call of its Chair. The Committee meets in executive session as it deems necessary or appropriate. The results of Committee meetings and other actions of the Committee shall be reported to the full Board. The Committee may invite to its meetings any member of management, including the CEO, and such other persons as it deems appropriate in order to carry out its duties and responsibilities.

65.     The Company's Compensation Committee Charter provides in relevant part:

Responsibilities

The Committee's responsibilities include the following:

1.     Subject to the Company's By-Laws, annually review and approve, either as a Committee or together with the other independent directors as directed by the Board, the individual elements of total compensation for the Chief Executive Officer ("CEO") and other executive officers including base salary, incentive awards, equity-based awards, and any other long-term incentive awards.

2.      Review and approve, either as a Committee or together with the other independent directors as directed by the Board, any employment, severance or change-in-control agreements and other arrangements affecting any elements of compensation and benefits, and any other special or supplemental compensation, benefits or perquisites (in each case, whether to be provided during or after employment) for the CEO and other executive officers.

3.      Review and approve corporate goals and objectives relevant to CEO compensation and evaluate the CEO's performance in light of those goals and objectives (in each case, together with the Governance & Public Policy Committee), and after consultation with the Aerospace Safety Committee and together with the other independent directors, determine and approve the CEO's compensation based on this evaluation.

4.      Review and, after consultation with the Aerospace Safety Committee in connection with the safety review portion of performance evaluations, approve individual performance scores for executive officers other than the CEO.

66.     In addition to the formal duties outlined in Boeing's corporate governance documents, the Board, in particular, has a keen awareness of its responsibilities for overseeing airplane safety, and quality issues that impact safety, because, as detailed below, it had already approved a settlement of a shareholder derivative case relating to the 737 MAX crashes, which included specific commitments to enhance the Board's safety oversight.  In addition, in that case, the Court, in its decision denying the motion to dismiss as to the Board directors' safety oversight failures, explained the Board's oversight duties, and how it had failed to fulfil them, and outlined what would be proper oversight.

67.     Furthermore, numerous federal laws and regulations govern Boeing's obligations with respect to ensuring aircraft safety and quality, as well as documentation of the manufacturing process to ensure that aircraft are manufactured correctly and safely.  Some of the key laws and regulations include:

26

(a)      18 U.S.C. §38, Fraud involving aircraft or space vehicle parts in interstate or foreign commerce, provides for criminal penalties for making fraudulent representations or omissions concerning an aircraft part:

 a)      Offenses.—Whoever, in or affecting interstate or foreign commerce, knowingly and with the intent to defraud—

  (1)

   (A)      falsifies or conceals a material fact concerning any aircraft or space vehicle part;

   (B)      makes any materially fraudulent representation concerning any aircraft or space vehicle part; or

   (C)      makes or uses any materially false writing, entry, certification, document, record, data plate, label, or electronic communication concerning any aircraft or space vehicle part;

  (2)      exports from or imports or introduces into the United States, sells, trades, installs on or in any aircraft or space vehicle any aircraft or space vehicle part using or by means of a fraudulent representation, document, record, certification, depiction, data plate, label, or electronic communication; or

  (3)      attempts or conspires to commit an offense described in paragraph (1) or (2), shall be punished [with fines of up to $20 million per violation if the offender is an entity, such as Boeing].

(b)      49 U.S.C. §109, the statute governing the FAA, and 14 C.F.R., the regulations implemented by the FAA (under 49 U.S.C. §106), govern the substantive safety and reporting requirements Boeing is subject to.  Some of the key regulations include:

 i)      Aircraft manufacturers are required to maintain a quality management system "that ensures that each product and article conforms to its approved design and is in a condition for safe operation."  14 C.F.R. 21.137.

 ii)      The quality management system must include "[p]rocedures for inspections and tests."  12 C.F.R. 21.137(e).  After a manufacturer designs these procedures and secures FAA approval for them, they are required to "[m]aintain the quality system in compliance with" those procedures.  12 C.F.R. 21.146(b).

 iii)      The quality management system must include "[p]rocedures to ensure that only products or articles that conform to their approved design are installed on a type-certificated product.  These procedures must provide for the identification, documentation, evaluation, segregation, and disposition of

nonconforming products and articles. Only authorized individuals may make disposition determinations." 14 C.F.R. 31.137(h)(1). Quality systems must also include "[p]rocedures to ensure that discarded articles are rendered unusable." 14 C.F.R. 21.137(h)(2).

(c)     The Aircraft Certification Reform and Accountability Act of 2020 (H.R. 8408) requires ODA holders like Boeing to, among other things, submit Safety Management Systems to be approved by the FAA and submit to an expert review of their safety management processes.

(d)     49 U.S.C. §42121(a)(1) prohibits retaliation against employees of contractors of air carriers, such as Boeing, for complaints about activities that they reasonably believe violate an FAA order, regulation, or standard.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Boeing's History of Untended to Safety Issues Culminated in Two Tragic Crashes in 2018 and 2019

68.     Boeing has had a troubled history of major safety issues stretching back more than 20 years. In the 1990s, earlier models in the 737 line had highly publicized deadly crashes that killed over 150 people. The earlier 737 model had a flawed piloting system; the National Transportation Safety Board ("NTSB") found that the main rudder power control unit could move opposite the rudder pedals, which contributed to loss of rudder control. The problem was serious and widely known within the development team, as Boeing engineers held a meeting at which they discussed how to present a retrofit plan to senior management regarding this rudder control issue, noting that "[w]e have a problem" with the rudder valves and control system, the system relied on only a single sensor, which "doesn't meet fail-safe design intent," and while safety issues had not yet presented themselves, this "does not mean we don't need to fix it."

69.     In 2009, a Turkish Airlines 737-800 (of the 737-NG series, the one immediately preceding the 737 MAX) crashed because of a faulty altitude sensor that caused engines to idle, and Boeing subsequently made changes to the throttle system to prevent one erroneous altitude reading from causing a crash.

70.     A few years later, the 787 Dreamliner also was rushed to production, with managers emphasizing speed, discounting problems caused by sloppiness, and discouraging or even retaliating against employees for reporting safety concerns.  Even though Boeing was producing the plane in a new South Carolina plant, outside of Boeing's traditional base of Washington State, and where Boeing did not have an experienced or well-trained workforce to draw on, Boeing pressed its workforce to work faster to meet demand.

71.     Because of the rushed production, the rollout of the 787 Dreamliner was plagued by safety issues.  In 2013, shortly after the 787 Dreamliner began to fly, the entire flight was grounded because of battery fires in several jets.  The 787 Dreamliner was the last commercial airliner the FAA grounded before the 737 MAX.

72.     The grounding of the 787 Dreamliner and its subsequent repair did not result in better production standards.  As a result, sloppiness and safety issues have led to workers filing almost a dozen whistleblower complaints and, in addition, retaliation lawsuits.  In 2014, *Al Jazeera* recorded conversations on a hidden camera by workers stating they would never fly on these planes because of shoddy workmanship.

73.     This includes a 2016 lawsuit by William Hobek ("Hobek"), a quality manager at the South Carolina plant who alleged he was fired for repeatedly reporting defects up the chain of command.  One manager told him, "Bill, you know we can't find all defects," and Hobek then called over an inspector who found 40 problems almost on the spot.  These safety issues include the installation of faulty parts, the disappearance of hundreds of tools, and collection of debris near critical infrastructure – including metal shavings that could cut critical wiring.

74.     The defects have not gone unnoticed: the FAA has found debris in planes that Boeing certified as clean; and both the U.S. Air Force and Qatari Airlines have cancelled or held

29

up orders, criticizing Boeing for sloppiness.  Regulators were also concerned, with the FAA taking the unusual step of forcing workers to affirmatively demonstrate they were complying with regulations, and requiring that FAA employees directly sign off on all jets made at the South Carolina plant.

75.     In 2018 and 2019, before or immediately after the MAX crashes, the FAA also investigated and confirmed three safety complaints made by Boeing employees regarding the final stages of production of the 787 Dreamliner, including an investigation as late as March 2019 regarding a worker being pressured to sign off on work relating to the airworthiness of a jet.  In the wake of the 737 MAX crashes, a senior manager implored the South Carolina workers to be more careful, stating that '"[t]he company is going through a very difficult time right now[.]'" Furthermore, on May 22, 2019, the vice president of 787 Dreamliner operations, who ran the South Carolina factory, announced his departure from the Company.  Yet, Boeing spokespersons continued to insist that they followed proper safety protocols, despite federal prosecutors' expansion of their inquiry from the 737 MAX to the 787 Dreamliner in the wake of reports about safety violations at the South Carolina plant where the Dreamliner is manufactured.

76.     Boeing's history of safety issues, and especially the grounding of the 787 Dreamliner fleet, should have put management on high alert, but instead, they continued to fail to conduct oversight or willfully made decisions that compromised safety when it came to the development and marketing of the 737 MAX.

77.     Tragically, this failure to conduct safety oversight, while, instead, focusing on profits, led to a rushed rollout of the 737 MAX and severe design flaws.  These severe design flaws, in turn, led to two tragic crashes that resulted in all passengers and crew dying: Lion Air Flight 610 on October 29, 2018 (the "Lion Air crash"), killing 189 people; and Ethiopian Airlines

Flight 302 on March 10, 2019 (the "Ethiopian Airlines crash"), killing 157 people (together, the "MAX crashes").  In total, 346 people died in two deadly crashes that occurred within five months of each other.  The 737 MAX fleet was grounded worldwide shortly afterwards for almost two years.

78.     The root cause of the fatal 737 MAX crashes was Boeing's rush to develop and push through approval of the plane, starting in 2011, when Boeing was concerned it would lose ground to its competitor, Airbus.  After a major customer, American Airlines, told then-CEO James McNerney that it would split an order of hundreds of jets between Airbus and Boeing, the Company faced immense internal pressure to develop a competitor to the Airbus A320 Neo. Instead of taking the time to deliberate a prudent course, Boeing was in such a rush to compete with the Airbus A320 Neo that, within a single weekend, Boeing pivoted from its previous plan to develop an entirely new plane and instead made the decision to update the 737.  According to the *New York Times*, the pace was "frenetic," with engineers being pushed to submit technical drawings and designs twice as quickly as they normally would, which resulted in designers producing "sloppy blueprints" that left out important details, such as "instructions for the wiring[,] would be cleaned up later in the process."  Even after the plane came into service, some of the designs were still incomplete, such as "not specifying which tools to use to install a certain wire, a situation that could lead to a faulty connection."

79.     Because the MAX was a continuation of Boeing's long-standing strategy of repurposing the 737, it was a "patchwork plane" that lacked important safety features that other planes are equipped with.  For instance, other Boeing jet models have electronic checklists and alert systems that explain what is malfunctioning and recommend solutions; on the MAX and other 737s, pilots need to complete take-off checklists manually and flip through paper manuals to

diagnose problems in order to come up with solutions (with only an all-purpose alert light to give them a hint). As a former 737 MAX cockpit designer, who spent 19 years at Boeing, Ryan Ludtke said, "'Nobody was quite perhaps willing to say [the 737 MAX] was unsafe, but we really felt like the limits were being bumped up against[.]'"

80.    Adding further to the design pressures, Boeing executives emphasized that no design change could be allowed that would require significant additional pilot training, with an emphasis on avoiding additional flight-simulator training, so that they could boost orders by reducing ongoing costs. But this focus on avoiding training, while still needing to modify the plane to make it more fuel-efficient, led to Boeing hiding important changes from customers, regulators, and even other Boeing employees.

81.    Early on, Boeing engineers realized that one necessary modification – creating larger fuel-efficient engines that would have to be moved farther up in the airplane than previously required – could cause the plane to pitch upward and potentially stall. Ironically, months before Boeing began to develop the 737 MAX, then-CEO of BCA Jim Albaugh criticized Airbus's decision to upgrade the A320 with bigger engines, noting it would "'be a design change that will ripple through the airplane'" and suggested Airbus would "'find it more challenging than they think it will be[.]'" But Boeing then had to make the same change to match the A320 Neo's fuel efficiency. Boeing's solution to this problem was to create an automated software program: The Maneuvering Characteristics Augmentation System ("MCAS"). MCAS was written into the "control law," which is the operating system that keeps the plane in "trim," *i.e.*, the proper angle to prevent stalling, and thus would automatically push the plane's nose down if it sensed the plane's angle was creating a risk for a stall. The flawed design of the MCAS, attendant cost-

cutting measures, and Boeing's attempts to hide the scale of the changes, became the root cause of the tragic crashes in 2018 and 2019.

82.     Numerous lawsuits were filed in the wake of the fatal crashes, including a shareholder derivative suit that laid out Boeing's Board's total failure to exercise safety oversight. Furthermore, Boeing was criminally charged with misleading regulators, leading to a $2.5 billion fine and restitution payment plus a DPA with the DOJ, a $200 million settlement with the SEC, tens of billions of dollars of lost business, and a 20-month grounding of the entire 737 MAX fleet. Wrongful death suits relating to the 737 MAX crashes are ongoing.

**B.      In Denying a Motion to Dismiss the Previous Shareholder Derivative Suit, the Delaware Court of Chancery Excoriated Boeing's Board for Its Failure to Oversee Safety**

83.     The 737 MAX crashes and what they revealed about the Board's failure to oversee airplane safety at Boeing led to a shareholder derivative suit that was filed in Delaware Court of Chancery (the "Chancery"), *In re Boeing Co. Deriv. Litig.*, C.A. No. 2019-0907-MTZ (the "2019 Delaware Action").

84.     On September 7, 2021, the Chancery denied Defendants' motion to dismiss the 2019 Delaware Action as to the claims against the directors.  The Chancery noted, at the outset of its opinion: "Because the crashes . . . harm affected Boeing as a company, the claim against its leadership belongs to the Company. In order for the stockholders to pursue the claim, they must plead with particularity that the board cannot be entrusted with the claim because a majority of the directors may be liable for oversight failures.  This is extremely difficult to do."  *In re Boeing Co. Deriv. Litig.*, C.A. No. 2019-0907-MTZ, 2021 WL 4059934, at *1 (Del. Ch. Sept. 7, 2021).[1]

---

[1]     Unless otherwise noted, citations are omitted and emphasis is added.

85.     Despite this acknowledged difficulty, the Chancery found that "the Company's directors face a substantial likelihood of liability for Boeing's losses" because of "the directors' complete failure to establish a reporting system for airplane safety" and "turning a blind eye to a red flag representing airplane safety problems." *Id*.

86.     In summarizing the allegations of the 2019 Delaware Action, the Court observed: "Boeing did not implement or prioritize safety oversight at the highest level of the corporate pyramid.  None of Boeing's Board committees were specifically tasked with overseeing airplane safety, and every committee charter was silent as to airplane safety. The Board recognized as much: former director John H. Briggs, who retired in 2011, observed that the 'board doesn't have any tools to oversee' safety. This stood in contrast to many other companies in the aviation space whose business relies on the safety and flightworthiness of airplanes."  The judge noted how the plaintiffs had "identif[ied] board-level safety committees and control at Southwest Airlines, Delta Airlines, United Airlines, JetBlue, Spirit Airlines, and Alaska Airlines."  *Id.*, at *5 n.18.

87.     The Court observed that rather than devote specific oversight to safety, Boeing's Board relied on its Audit Committee as its "primary arbiter for risk and compliance" where the Audit Committee would have oversight or receive reports regarding overall risk management.  The Court further observed, "Although the Audit Committee was tasked with handling risk generally, it did not take on airplane safety specifically.  Its yearly updates regarding the Company's compliance risk management process did not address airplane safety. . . .  Specifically as to the 737 MAX, from its development through its grounding in 2019, the Audit Committee never mentioned 'safety.'  Nor did it address product safety issues related to the design, development, or production of the 737 MAX, or ask for presentations on the topic."  *Id.*, at *5.

88.     The Court further observed, "consistent with Boeing's emphasis on rapid production and revenue, the Audit Committee primarily focused on financial risks to the Company. . . . Its presentations centered on whether Boeing had liquidity, capital, and supply chain resources sufficient to fund aggressive production of the 737 MAX.  Even after the Lion Air Crash in 2018, chief compliance officer Sands's risk management update to the Audit Committee in December 2018 did not identify product safety as a 'compliance risk' for 2018."  *Id.*, at *6.  Furthermore, Boeing's enterprise risk assessment process also did not emphasize "airplane safety" but instead "focused on production and financial risks."  *Id.*

89.     Furthermore, the Court observed, "Airplane safety was not a regular set agenda item or topic at Board meetings.  Audit Committee and [enterprise risk review] materials reveal that airplane safety risks were not discussed.  While the Board sometimes discussed production line safety, the Board often met without mentioning or discussing safety at all."  *Id.*

90.     The Court further observed that management reports to the Board did not discuss safety: "Management's periodic reports to the Board did not include safety information.  Muilenburg sent the Board a monthly business summary and competitor dashboard, and management made occasional presentations at Board meetings.    Those management communications focused primarily on the business impact of airplane safety crises and risks."  *Id.*, at *7.

91.     Moreover, "the Board did not have a means of receiving internal complaints about airplane safety."  The Company's "principal internal safety reporting process . . . had no link to the Board and no Board reporting mechanism."  Moreover, that reporting system "operated below the level of the most senior officers; the complaints and concerns . . . were handled by Boeing's mid-level management like the Program Functional Chief Design Engineer, the Chief Pilot, the

Chief Project Engineer, and the Product Safety Chief Engineer and factory leaders.  Without a Board-level reporting mechanism, safety issues and whistleblower complaints reported to the [complaint reporting system] did not come to the Board's attention.  Neither the Audit Committee, nor any other Board committee, reviewed whistleblower complaints related to product safety." *Id.*

92.     Based on the plaintiffs' allegations, the Court determined that the majority of the Board faced a substantial likelihood of liability for failure to provide compliance oversight, and therefore, demand was futile as to the Board.  The Court held: "[A]irplane safety 'was essential and mission critical' to Boeing's business, and externally regulated.  Considering [Delaware Supreme Court precedent] mandate that the board rigorously exercise its oversight function with respect to mission critical aspects of the company's business, such as the safety of its products that are widely distributed and used by consumers [that case] identified as giving rise to the reasonable inference that the board faced a substantial likelihood of liability . . . I conclude that [p]laintiffs have carried their burden under Rule 23.1" that demand is futile.  *Id.*, at *26.

93.     The Court emphasized the following points in reaching the conclusion that demand was futile:

(a)     "The Board had no committee charged with direct responsibility to monitor airplane safety."  Instead, the Board had an Audit Committee with general "risk oversight" where "safety does not appear in its charter" and "its oversight function was primarily geared toward monitoring Boeing's financial risks."  Moreover, "Perhaps because the Audit Committee was not asked to do so, the pleading stage record indicates the Audit Committee did not regularly or meaningfully address or discuss airplane safety.  The yearly report the Audit Committee received on Boeing's compliance risk management process

did not include oversight of airplane safety."  To the extent "quality" or "safety" came up at all, it was "in passing."  *Id.*, at *27.

(b)     The Court further held, "The lack of Board-level safety monitoring was compounded by Boeing's lack of an internal reporting system by which whistleblowers and employees could bring their safety concerns to the Board's attention."  The Court noted that it was not until three months after the second fatal crash, of Ethiopian Airlines, that a Board member proposed to have safety concerns reported to a mid-level management group "be elevated to the Audit Committee, the CTO, and CFO, and thereafter be shared with the Board."  *Id.*

(c)     Furthermore, the Court held, "The Board did not monitor, discuss, or address airplane safety on a regular basis."  The Court based this holding on plaintiffs' allegations of "specific facts supporting the conclusion that the Board writ large did not formally address or monitor safety.  The Board did not regularly allocate meeting time or devote discussion to airplane safety and quality control until after the second crash.  Nor did the Board establish a schedule under which it would regularly assess airplane safety to determine whether legitimate safety risks existed."  *Id.*

(d)     The Court faulted how after the first fatal Lion Air crash, the Board did not discuss it until a month later and the meeting was "explicitly optional.  The crash did not appear on the Board's formal agenda until the Board's regularly scheduled December meeting; those board materials reflect discussion of restoration of profitability and efficiency, but not product safety, MCAS, or the AOA sensor.  The Audit Committee devoted slices of five-minute blocks to the crash, through the lens of supply chain, factory disruption, and legal issues—not safety."  Moreover, in February 2019, at the next full

Board meeting, the Board considered "factory production recovery and a rate increase, but not product safety or MCAS. At that meeting, the Board affirmatively decided to delay its investigation into the 737 MAX, notwithstanding publicly reported concerns about the airplane's safety. Weeks later, after the Ethiopian Airlines crash, the Board still did not consider the 737 MAX's safety. It was not until April 2019—after the FAA grounded the 737 MAX fleet—that the Board built in time to address airplane safety." *Id.*, at *28.

(e)     The Court also dismissed the Board's "passive invocations of quality and safety, and use of safety taglines," where the Board only mentioned "safety" in general terms, like how it was an "enduring value" for Boeing. The Court further held, "minimal regulatory compliance and oversight do not equate to a *per se* indicator of a reasonable reporting system. . . . The fact that Boeing's management was seeking minimal regulatory certification and periodically informing the Board of its progress in pursuit of production-based business objectives 'does not rationally suggest that the board implemented a reporting system to monitor [airplane] safety or [Boeing's] operational performance,' as '[t]he mundane reality that [Boeing] is in a highly regulated industry and complied with some of the applicable regulations does not foreclose any pleading-stage inference that the directors' lack of attentiveness rose to the level of bad faith indifference required to state a *Caremark* claim.' As *Marchand* made plain, the fact that the company's product facially satisfies regulatory requirements does not mean that the board has fulfilled its oversight obligations to prevent corporate trauma." *Id.* (quoting *Marchand v. Barnhill*, 212 A.3d 805 (Del. 2019); brackets in original).

(f)     The Court also held, "The Board had no regular process or protocols requiring management to apprise the Board of airplane safety; instead, the Board only

received *ad hoc* management reports that conveyed only favorable or strategic information." The Court held that as the plaintiffs alleged, "the Board did not simply fail to assess safety itself; it also failed to expect or demand that management would deliver safety reports or summaries to the Board on a consistent and mandatory basis. . . . [T]he Board received intermittent, management-initiated communications that mentioned safety in name, but were not safety-centric and instead focused on the Company's production and revenue strategy. And when safety was mentioned to the Board, it did not press for further information, but rather passively accepted management's assurances and opinions." *Id.*, at *29.

(g)     The Court held, "For mission-critical safety, discretionary management reports that mention safety as part of the Company's overall operations are insufficient to support the inference that the Board expected and received regular reports on product safety. Boeing's Board cannot leave 'compliance with [airplane] safety mandates to management's discretion rather than implementing and then overseeing a more structured compliance system.' An effective safety monitoring system is what allows directors to believe that, unless issues or 'red flags' make it to the board through that system, corporate officers and employees are exercising their delegated powers in the corporation's best interest." *Id.*

(h)     The Board's reliance on "intermittent" reports by management continued even after the Ethiopian Airlines crash, which led to the entire 737 MAX fleet being grounded. Moreover, "It was not until April 2019, the month following the Ethiopian Airline Crash, that Boeing's Vice President of BCA [Boeing Commercial Airplanes] Engineering and BCA's Vice President of Safety, Security & Compliance presented to the

Board.  This was the first time that the Board or any of its committees heard a presentation from either member of management, 'despite their roles leading engineering and safety, respectively, for Boeing's largest segment.'"  *Id.*, at *30.

(i)     Furthermore, the Court held, "The nature and content of management's *ad hoc* reports to the Board indicate that the Board had no regular process or protocols requiring management to apprise the Board of airplane safety.  Nothing . . . supports the inference that the Board requested those reports or expected those reports to contain safety information."  The Court further found, "Management's *ad hoc* reports were also one-sided at best and false at worst, conveying only favorable and optimistic safety updates and assurances that the quality of Boeing's aircraft would drive production and revenue."  The Court concluded, "The fact that management only communicated with the Board regarding safety on an *ad hoc* basis as necessary to further business strategy, and the fact that management only gave the board 'certain favorable information' but not 'important reports that presented a much different picture,' indicate that the Board failed to implement a reasonable reporting system to monitor the safety of Boeing's airplanes."  *Id.*, at *30-*31.

(j)     The Court also held, "Management saw red, or at least yellow, flags, but that information never reached the Board."  The Court held, "Where management received reports that contained what could be considered red, or at least yellow, flags, and the board minutes of the relevant period revealed no evidence that these were disclosed to the board, it is reasonable to infer the absence of a reporting system."  The Court found, "Boeing management knew that the 737 MAX had numerous safety defects, but did not report those facts to the Board."  Management's knowledge included "formal complaints from employees who questioned the safety of the 737 MAX."  Moreover, "Boeing's Internal

Safety Analysis found that if a pilot took more than ten seconds to identify and respond to the MCAS activation, the result would be catastrophic."  But before the first fatal crash, "there is no evidence that management apprised the Board of the AOA disagree sensor's malfunctions or the probability of catastrophic failure."  After that first crash, Boeing "performed a risk assessment that concluded an unacceptably high risk of catastrophic failure. . . .  But management told the Board the 737 MAX was safe, and did not brief the Board on the risks of MCAS."  The Court concluded, "safety concerns known to management failed to make their way to the Board, supporting the conclusion that the Board failed to establish a reporting system."  *Id.*, at *31-*32.

(k)     The Court also held, "the pleading-stage record supports an explicit finding of scienter."  The Court drew this conclusion from how Board directors, then director (Arthur) Collins and now CEO Calhoun, had discussed with each other how they needed to "devote the entire board meeting . . . to a review of quality within Boeing" to "underscore the board's (and management's) unwavering commitment to quality and safety above all other performance criteria" and how Calhoun had served on another public company board, Medtronic, where each board meeting began "with a review of product quality/safety— before any discussion of financial performance, market share/competitive activities, new product development timetables, and certainly stock price[]" because then "everyone in the corporation understood that nothing was more important to the CEO and the board than quality/safety[.]"  *Id.*, at *18 (quoting Collins email to Calhoun).

(l)     The Court further held, "that the Board knowingly fell short is also evident in the Board's public crowing about taking specific actions to monitor safety that it did not actually perform."  Calhoun came under particular criticism by the Court: "Calhoun hustled

41

to '[p]osition the Boeing Board of Directors as an independent body that has exercised appropriate oversight.' He falsely touted that the Board was immediately contacted and met 'very, very quickly' after the Lion Air Crash; participated in evaluating the 737 MAX's safety risks; considered grounding the 737 MAX after the Lion Air Crash; met within twenty-four hours of that crash to consider grounding; and recommended grounding. Each of Calhoun's public representations was knowingly false. They evidence that at least Calhoun knew what the Board should have been doing all along." *Id.*, at *32.

(m)     The Court also found that after the first fatal crash, the Board also ignored red flags. The Court found, "the Board did not require an internal system to learn about the Lion Air Crash and the attendant MCAS failures. The Lion Air Crash and its causes were widely reported in the media; those reports reached the Board; and the Board ignored them. . . . The Lion Air Crash was a red flag about MCAS that the Board should have heeded but instead ignored. The Board did not request any information about it from management, and did not receive any until November 5, 2018, over one week after it happened. In that communication, [then CEO] Muilenburg advanced management's position that the 737 MAX was safe, and the Board passively accepted that position. The November 12 *WSJ* Article circulated the theory that MCAS had serious engineering defects that were concealed from regulators and pilots, which required immediate investigation and remediation. The Board was aware of that article, but did not question management's contrary position. . . . When the Board finally convened to address the Lion Air Crash, the call was optional. The full Board did not anchor the tragedy as an agenda item until it met for its regularly scheduled Board meeting in December 2018, and its focus at that meeting was on the continued production of the 737 MAX, rather than MCAS, potential remedial

steps, or safety generally.  And when the Board eventually considered whether it should investigate the causes of the Lion Air Crash [which occurred in October 2018], at the February 2019 Board meeting, the Board formally resolved to 'delay any investigation until the conclusion of the regulatory investigations or until such time as the Board determines that an internal investigation would be appropriate.'" *Id.*, at *34.

(n)    Furthermore, in criticizing the Board for ignoring red flags, the Court further held, "Electing to follow management's steady misrepresentations that the 737 MAX fleet was safe and airworthy, the Board treated the crash as an 'anomaly,' a public relations problem, and a litigation risk, rather than investigating the safety of the aircraft and the adequacy of the certification process.  The Board's declination to test the modicum of information it received and seek the truth of the 737 MAX's safety, despite reported information calling it into question, do not indicate a mere 'failed attempt' to address a red flag. . . .  [T]he Board was aware or should have been aware that its response to the Lion Air Crash fell short." *Id.*

94.    Shortly after the Court denied the motion to dismiss, the parties entered mediation with the Hon. Layn R. Phillips, Ret.  The result of that mediation was a $237 million settlement. This was one of the largest settlements of a shareholder derivative suit ever.  The sheer size of the settlement and the trauma upon which it was based makes it reasonable to infer that the Board directors are all made aware of this decision and their obligations to oversee safety.  But as recent events and the 220 Documents show, the Board offered only window dressing instead of real oversight.

**C.**     **Even After Boeing Committed to Additional Board-Level Safety Oversight, Problems with the Recertified 737 MAX Showed those Commitments Were Hollow**

95.     On November 5, 2021, the parties in the 2019 Delaware Action filed their settlement agreement with the Delaware Court of Chancery.  The settlement included payment of $237.5 million in cash paid to Boeing from directors' and officers' liability insurance policies, as well as corporate governance reforms, including:

a)     "Addition of a Director with Aviation/Aerospace, Engineering, or Product Safety Oversight Expertise";

b)     "Separation of Chief Executive Officer and Chair Roles Memorialized in By-Laws";

c)     Require that the Board's Governance & Public Policy Committee to "ensure that at least three (3) directors have knowledge, experience, and/or expertise with aviation/aerospace, engineering, and/or product safety oversight" and require those directors to be independent;

d)     "Mandatory Safety Reporting to Board of Directors and Aerospace Safety Committee" that includes reports from the Chief Engineer and Chief Aerospace Safety Officer, who "shall ensure that each Committee meeting includes reporting and updates on significant safety issues, including significant safety events that have occurred since the prior Committee meetings.  Such briefings will include information sufficient to understand management's judgment in developing new safety policies and procedures, or in addressing significant safety events[]"; reports to the Committee will be "regular, and at least semiannual"; the Chief Aerospace Safety Officer will "report to the full Board at least twice annually on the performance of Boeing's safety management system and other significant safety initiatives[]"; and "Consistent with applicable disclosure laws, the

44

Company shall report to shareholders in its annual proxy statement that the Board has received and discussed reporting from management, including the Chief Aerospace Safety Officer, regarding the performance of Boeing's safety management system and other significant safety initiatives[]";

e)     "Consideration     of     Safety     Metrics     in     Determining     Executive Compensation";

f)     Require that the Aerospace Safety Committee be comprised of three or more independent directors, not to include the CEO, and that the members "have knowledge, experience and/or expertise in aviation/aerospace, engineering, safety systems oversight, and/or safe product design, development, manufacture, production, operations, maintenance, and delivery";

g)     Require "[p]ublic Disclosure of Safety Enhancement Programs";

h)     Establish an Ombudsperson Program for employees to raise work-related concerns, which reports to the Chief Aerospace Safety Officer; and

i)     Maintain these reforms for at least four years.  Most of these reforms are Board-level, and therefore, it is reasonable to infer that the Board was and is being continually informed of its commitments to the settlement.

96.     Unfortunately, these reforms proved to be nothing more than hollow words, because even during the pendency of the settlement new quality and safety problems arose with the 737 MAX that the Company took a whack-a-mole approach to, did not fix in the long run, and have now blown up into a whole new crisis.

97.     These issues began with and in large part focus on quality issues relating to products from a former Boeing unit, Spirit AeroSystems Holdings, Inc. ("Spirit"), and Boeing's lack of

supervision until the quality issues reached crisis levels.  In 2021, Boeing again had to halt production of the 737 MAX when various quality issues arose during the manufacturing process, which Boeing blamed on manufacturing problems at Spirit.

98.     Spirit was formerly a part of Boeing, centered in a factory in Wichita, Kansas, which manufactured fuselages for Boeing planes.  In 2005, as part of Boeing's push to shift costs off its balance sheet, and thus juice its revenues and its stock price, Boeing spun off the Wichita operation as a standalone company, Spirit.  Spirit continued to manufacture fuselages primarily for Boeing, though it also had a small order book for Airbus.

99.     Manufacturing at Spirit was plagued by many of the same problems that have plagued the other Boeing factories.  Conveniently for Boeing, because Spirit was now a separate company, Boeing could scapegoat the new company management for the problems rather than acknowledge that Spirit imported a shoddy manufacturing culture from Boeing, its former parent company.

100.     Boeing, furthermore, acknowledged that it knew of widespread defects at Spirit because it had in place a team that found and fixed defects in fuselages built by Spirit.  Indeed, one of these attempts at such fixes led to the AA Flight 1282 incident, further described and defined below.

101.     According to a securities suit filed against Spirit, *Li v. Spirit AeroSystems Holdings, Inc.*, No. 1:23-cv-03722-PAE (S.D.N.Y. Dec. 19, 2023) (the "Spirit Action"), Boeing had placed Spirit on probation because of its pervasive quality problems since 2018.  Thus, Boeing was long aware of the problems at Spirit.

102.     The Spirit Action also noted that "Boeing and Spirit entered into long-term supply agreements under which Spirit would be, and has remained, Boeing's exclusive supplier for

substantially all the products and services that Spirit previously provided when it was still a part of Boeing.  Those supply agreements include products for Boeing's 737, 747, 767, 777, and 787 aircraft programs, and the agreements cover the life of those programs including any commercial derivative models of the aircraft."  Furthermore, "Spirit's agreements require Boeing to purchase from Spirit all its requirements for various products including fuselages, struts/pylons, and nacelles (including thrust reversers), wings and wing components, as well as tooling.  Spirit is the sole supplier to Boeing of nearly all of the products it sells to Boeing."  Thus, the quality and the care of Spirit's manufacturing process is critically important to Boeing, since if the quality of products from Spirit suffers, Boeing would have no alternative and would itself then be producing defective airplanes that violate regulations and ruin reputations.

103.    Furthermore, Boeing has a further incentive to control Spirit's quality because, as the Spirit Action pointed out, Boeing has already been fined twice recently by the FAA for installing nonconforming components on its planes: in December 2019, the FAA announced a proposed civil penalty of $3.9 million against Boeing for installing nonconforming components supplied by Spirit on approximately 133 planes; and in January 2020, less than a month later, the FAA proposed an additional $5.4 million penalty against Boeing for installing nonconforming parts supplied by Spirit on approximately 178 737 MAX planes.  The defects had to do with brittle slat tracks, which are located on plane wings and used to guide the movements of slats, which are panels that provide additional lift during takeoff and landing.  Moreover, according to the FAA, Boeing knew about this situation for more than a year because it was informed by Spirit around September 11, 2018.

104.    In April 2023, Boeing warned the public that production and delivery of a "significant" number of 737 MAX planes could be delayed because of problems with Spirit's

production of fuselages.  Spirit had found that two of its suppliers for fittings on the vertical stabilizer used non-standard manufacturing processes and, thus, created flawed fittings.  Boeing claimed there was no safety issue from the manufacturing flaw and the FAA "validated" this assessment "based on the facts and data Boeing presented[.]"  However, though Spirit told Boeing about the flaw in 2023, it was believed to date back to 2019.

105.    In August 2023, Boeing identified another manufacturing defect that could impact delivery of the 737 MAX: improperly drilled fastener holes in the aft pressure bulkhead of some 737 MAX fuselages.  In October 2023, Boeing and Spirit disclosed that they would expand the scope of their ongoing inspections.  Boeing claimed that the manufacturing defect did not affect safety, and that 737 MAX planes already in service could keep flying, even though the aft pressure bulkhead, being responsible for maintaining pressure when planes are at a cruising altitude, is a key component of the plane that allows safe flying.  Boeing promised to conduct more inspections at Spirit.

106.    Also in October 2023, Spirit's then-CEO, Tom Gentile, was replaced by Patrick Shanahan ("Shanahan"), a former Boeing executive.  Shanahan claimed to be more safety-oriented, and told investors that while "it isn't as though there's a silver bullet" to fix the quality problems, the organization as a whole was going to change.  Shanahan claimed that he had the "mindset . . . that we can eliminate all defects[.]"  The AA Flight 1282 incident that occurred a few months later showed that Shanahan was better at messaging than at implementing.

107.    Boeing, showing its full awareness of the problems at Spirit, agreed to invest $100 million in Spirit to build its production capacity, while Spirit would improve its quality control.

108.    Joshua Dean ("Dean"), a former quality inspector at Spirit, who came forward in the Spirit Action by name, and whose allegations were also widely reported in news media, alleged

that problems were widespread at Spirit's plant but were simply not being reported.  He told *National Public Radio* ("NPR"): "We're having a pizza party because we're lowering defects. . . . But we're not lowering defects.  We just ain't reporting them, you know what I mean?"  He said that there was a "culture" of pressuring employees not to report defects so that planes could leave the factory more quickly, and that while he wasn't "saying they don't want you to go out there and inspect a job[,]" management also did not want quality inspectors to "make too much trouble[.]"

109.    Dean was fired in April 2023 in retaliation for flagging improperly drilled holes in the aft pressure bulkhead of fuselages.  Though Spirit denied Dean's allegations, in February 2024, Boeing announced that 50 jets where the fuselages were made at Spirit's factory would need additional work because of improperly drilled holes, the very issue that Dean had flagged.  Dean died from a sudden illness in May 2024.

110.    Dean's account was confirmed by another former Spirit employee and Dean's auditing teammate, Lance Thompson ("Thompson"), in a recent report in the *Seattle Times*.  Thompson also emphasized how at Spirit, management emphasized meeting production deadlines rather than safety and quality, and that managers wanted fewer defects to be flagged, which led to mechanics not disclosing them.  Thompson told the *Seattle Times*, "The culture is just really sick. . . .  I almost quit because I was being asked to rush through the audits so we can stay on schedule . . . I was getting to a point where I was going to have to tell my management – you know, be insubordinate – because I couldn't rush through that fast."

111.    Thompson described how Spirit's culture discouraged addressing the root cause of manufacturing flaws, instead having mechanics fix individual errors rather than record it as a recurring flaw.  Dean took a more hands-on inspection approach that caught specific problems.  While this resulted in his finding out about the aft bulkhead error, Dean's attention to some details

may have also led him to miss another systemic error – when another auditor found that approximately 40% of the fittings attached to the fuselage's vertical tail fin had cracks.  Spirit terminated Dean ostensibly for claiming that he had conducted audits of these fittings but did not.  However, Thompson thought Dean's firing, coming after he persistently flagged problems that the management would not address, was more likely a result of scapegoating.  Thompson also said that Dean's firing led to others being even more reluctant to point out manufacturing flaws.

112.   "FE1" in the Spirit Action recently came forth publicly.  Santiago Paredes ("Paredes"), who worked at Spirit conducting final inspections on 737 fuselages before they were shipped to Boeing, gave an interview to CBS News where he stated it was "rare" to "not find any defects" and that he would find "hundreds" of defects every day.  In the Spirit Action, "FE1" had noted the widespread presence of foreign object debris ("FOD") in planes, and also noted that this problem was known at Boeing because it "provid[ed] frequent feedback about the occurrence of FOD in the delivered fuselages."

113.   Indeed, Paredes pointed out in the Spirit Action how Boeing placed Spirit on probation in 2018 because the large number of defects in Spirit products was slowing down Boeing's own production process due to the time the latter would have to take to identify and fix these defects.  Paredes also pointed out in the Spirit Action that during the probation, Boeing would send Spirit daily or weekly emails that included pictures of defects Boeing found on fuselages received from Spirit.  Paredes believed that Boeing's years-long tolerance of Spirit's defective fuselages was "a recipe for disaster" where "it was just a matter of time before something bad happened."  Recently, Paredes told news media that when it came to the fuselages he was inspecting, "Everything I was seeing was like a ticking time bomb."  Paredes also detailed how he

was pressured to keep quiet about the numerous defects, with Spirit management even nicknaming him "Showstopper" because his defect reports would delay deliveries.

114.     *CBS News* corroborated Paredes' account by speaking to other Spirit employees or ex-employees, as well as having reviewed documents that showed dented fuselages, missing fasteners, and a wrench that was left behind in a supposedly ready-to-deliver component.

115.     Another former Spirit employee, an internal quality auditor, "FE2" in the Spirt Action, detailed other defects in the Spirit manufacturing process that would have been obvious to Boeing.   "FE2" and other quality auditors repeatedly found torque wrenches in mechanics' toolboxes that were improperly calibrated, which would mean that fasteners are not being tightened correctly, which then threatens the structural integrity of the parts being fastened. Almost 10% of toolboxes audited had this problem.  FE2 also observed that many inspectors only cursorily reviewed mechanics' work.

116.     Furthermore, FE2 also observed an alarming amount of foreign object debris ("FOD") in fuselages being shipped to Boeing.  All of these are issues that have serious safety implications, and the apparent fact that Boeing would just let this slide for years was further evidence of the safety culture failures at Boeing.  The fact that these defects merely slid by Boeing and that Boeing never took the next step – to withdraw the supplier – after years-long probation – even after Boeing faced its first safety crisis after the 737 MAX crashes and made public commitments to improve its safety oversight – further illustrate how Boeing's words were hollow, and not followed with action.

117.     Following the AA Flight 1282 incident, Calhoun said in an interview with *CNBC* that after Boeing began inspecting every Spirit-produced fuselage, it reduced the number of fuselages with defects, or "nonconformities" by about 80%.  Boeing also stated that on March 1,

2024, it moved its inspection and rework team to Wichita and has since allowed only fully inspected fuselages to be shipped to Boeing.  But these actions come too little too late, as Boeing has known about the quality problems at Spirit for years.  Boeing's action also took place almost two months after the AA Flight 1282 incident, and only in the wake of mounting investor and regulatory pushback.

118.     Furthermore, Boeing's purportedly thorough inspection of Spirit has turned out to be less thorough than Boeing represented.  Most recently, Spirit's and, by extension, Boeing's, lack of quality controls has come into further question when titanium that was falsely certified has made its way into the fuselage manufacturing process at Spirit.  Spirit and the FAA are both investigating this problem, which arose when a supplier to Spirit found small holes in the material from corrosion.  Potentially substandard titanium, which could affect the structural integrity of the planes, could be in planes that were built between 2019 to 2023, including Boeing 737 MAX and 787 Dreamliner planes.  Components where this titanium has been used include 787 Dreamliner passenger entry doors, cargo doors, and a component that connects the engine to the plane's frame.  For the 737 MAX, affected parts include a heat shield that protects a component connecting a jet's engine to a frame.  But the fact that this issue remained undetected for several years – having originated with a supplier from at least 2019 – again reinforces that Boeing had and continues to have shoddy quality control.

119.     Boeing's proposed solution to the problems at Spirit is to attempt to acquire the company, ostensibly to provide more supervision.  On July 1, 2024, Boeing announced that it would acquire Spirit for approximately $4.7 billion in Boeing stock, as well as assumption of Spirit's debt (for a total of approximately $8.3 billion).  Airbus, which Spirit also supplies, will be compensated with $559 million for Spirit, and will pay only $1 to purchase Spirit assets relating

to production for Airbus.  Spirit's CEO, a Boeing veteran, is one of the candidates to succeed Calhoun as CEO.

120.    Boeing's proposed solution is itself problematic given its own safety culture problems.  This is illustrated, in part, by how Boeing's prior "solution" to the earlier production problems at Spirit – namely, sending one of Boeing's own executives, Shanahan, to serve as CEO of Spirit.  Indeed, when quality issues at Spirit were widely reported in April and August 2023, Calhoun rejected the very "solution" he now touts – at that time, he said, "I don't think you acquire a company to solve it[.]"  Now, Calhoun's tune has changed and in his June 2024 Senate testimony he touted how Boeing will better supervise Spirit by acquiring it.  Shanahan, meanwhile, though quality problems continued under his tenure at Spirit, now can potentially succeed Calhoun as Boeing's CEO, which again illustrates Boeing management's lack of seriousness in reforming its flawed safety culture.

**D.    The Alaska Airlines Flight 1282 Blowout Highlighted Boeing's Continued Pursuit of Profits Over Safety or Quality**

121.    The aftermath of the 737 Max crashes and its 20-month grounding did not result in an improvement in safety oversight.  Unfortunately, significant problems remained, especially with airplane quality.

122.    This became clear when, on January 5, 2024, the door plug blew out mid-flight on Alaska Airlines Flight 1282 (the "AA Flight 1282 incident").  A passenger took a picture of the missing door plug and provided it to regulators:



123.    The plane was a Boeing 737 MAX-9.  While the incident did not result in any
fatalities, and the plane was able to land safely, seven passengers and one flight attendant were
injured, and it appears that by sheer luck no one was sitting in the aisle where the door plug was
located, as they would have been sucked out of the plane.  The NTSB is investigating this incident.
The NTSB explained that the door plug, when properly installed, is secured by four bolts.  In its
preliminary accident report, the NTSB concluded that the bolts were not installed, and its
preliminary determination was that Boeing personnel had removed the bolts to fix damaged rivets
on the door plug, but then when they replaced the door plug, they did not replace at least three of
the four bolts.

124.    While striking a note of contrition publicly, Calhoun showed how Boeing's safety
culture remained deficient despite its binding commitments to improve safety oversight.  Calhoun

referred to the incident as a "quality escape," as if this major safety failure was merely a small and routine problem rather than indicative of serious lapses in quality that impact safety.

125.    And in emphasizing how Boeing would now slow down production or even halt production to ensure better quality, Calhoun tacitly admitted that Boeing was rushing production at the cost of safety, or of quality to the extent that there were safety problems, even though Boeing had publicly committed to emphasize quality and to increase safety oversight following the 737 MAX crashes and a lengthy recertification process.

126.    Boeing also belatedly adjusted its compensation metrics to align with quality, now holding that operational performance (which includes safety and quality metrics) would consist of 60% of the score to determine annual bonuses in the commercial planes division, while it was formerly 25% (with 75% of compensation being tied to financial incentives).  However, in the defense and services divisions, financial metrics will remain 75% of bonus metrics, while the 25% relating to operations will focus solely on quality and safety.  Bonuses for executives will be based on an average of financials, safety, and quality.

127.    The FAA again grounded the 737 MAX, this time the 737 MAX-9 (approximately 100 planes in all), for approximately one month.  Even though this grounding was relatively brief compared to the previous grounding, many more safety problems have recently become public.  Indeed, in some weeks, multiple safety incidents involving Boeing have been reported.  These numerous safety issues indicate that Boeing's Board has not implemented the safety oversight that it is required of it by Delaware law and, more specifically, was mandated under its settlement of the previous shareholder derivative suit.

128.    On February 4, 2024, Boeing disclosed that it had learned of manufacturing flaws in rivet holes in approximately 50 undelivered 737 MAX planes.  Boeing blamed the problem on

Spirit, but has not explained why it took so long to ramp up inspection and discover widespread problems, especially after other defects by Spirit were already discovered previously by Boeing, including a drilling problem on aft pressure bulkheads and another issue with tail-fin fittings, with both issues having contributed to slowed deliveries of 737 MAX planes in 2023.

129.    Meanwhile, even old safety issues from decades ago have resurfaced.  In the 1990s, a failure of the rudder on earlier 737 models caused two fatal crashes, and NTSB at the time found a failure that could cause the rudder to swing to one side, making the plane difficult to control. Boeing attempted to fix that issue by redesigning the rudder.  But then in 2019, 737 NGs also suffered rudder failures at least twice, which Boeing again attempted to fix by replacing components.  And in February 2024, on a 737 MAX (series 8) aircraft that has an identical rudder, pilots said the pedals of a rudder got stuck when they attempted to land, prompting yet another NTSB investigation of the 737 MAX (series 8).  This is despite the repeated issues with the rudder that goes back decades, and despite a worldwide grounding of the MAX (series 8) after the crashes that was supposed to be the opportunity to fix all outstanding issues with the aircraft.

130.    In March 2024, the *New York Times* reported on how Boeing's culture remained oriented toward speed rather than quality even after the MAX crashes.  It reported that in February 2023, a Boeing 737 MAX, on one of its first flights, took off when an automated stabilizing system appeared to malfunction.  Less than two months later, a 737 MAX with only eight hours of flight time had to be grounded when it faced a problem with its fire detection system.  In November 2022, the engine on a just delivered 737 MAX failed at 37,000 feet.  Joe Jacobsen, an engineer and aviation safety expert who worked for Boeing for more than 10 years and for the FAA for more than 25 years, stated: "There's a lot of areas where things don't seem to be put together right

in the first place. . . .   The theme is shortcuts everywhere – not doing the job right[.]"   Rather than improve safety, it is apparent that the inspection process at Boeing has been weakened.

131.     In late March 2024 at an investor conference, West, Boeing's CFO who joined in 2021, admitted, "For years, we prioritized the movement of the airplane through the factory over getting it done right, and that's got to change[.]"

132.     Belatedly, Boeing has announced several departures: in late March, the departure of Stanley Deal, the head of commercial planes; about a month earlier, the departure Ed Clark, the head of the MAX program; the retirement of the Board Chair, Larry Kellner, who did not stand for re-election at the annual meeting; and by year end, the retirement of Calhoun as the CEO.

133.     Calhoun, far from being the safety-focused CEO Boeing has publicly portrayed, actually was just as focused on production speed as his predecessor was, and not as focused on safety.   After the AA Flight 1282 incident, *Bloomberg* revealed that after Calhoun took over as CEO, in the middle of the grounding of the entire 737 MAX fleet due to two fatal crashes, Calhoun actually ***decreased*** safety oversight at the executive level, which necessarily meant that Board-level safety oversight also decreased.   Calhoun shifted executive committee meetings from monthly to quarterly sessions, and thus, decreased his and senior management's ability to detect problems in a timely manner.

134.     The *Wall Street Journal* also revealed that despite Boeing's company-wide push to have employees return to the office after the worst of the COVID-19 pandemic passed, Calhoun himself rarely appeared at Boeing's headquarters.   Rather, when Calhoun was not traveling for business, he mostly worked from his homes in South Carolina and New Hampshire.   West also rarely worked at Boeing's headquarters, choosing instead to work from an office the Company built for his use in Connecticut.

135.   Moreover, though Boeing faced heavy criticism for an earlier decision to move its corporate headquarters away from its main manufacturing facilities, locating its headquarters in Chicago rather than Seattle, Boeing management in 2022 moved the corporate headquarters even further away from Seattle – to Arlington, Virginia.   Many interpreted this move as Boeing's attempt to be closer to Washington, D.C., so that its leadership could more effectively lobby its regulators.   Thus, in the face of criticism that Boeing too heavily sought to capture regulators at the expense of understanding its operations, Boeing management doubled down and sought to further capture its regulators while creating even more distance between headquarters and its main manufacturing facilities in Seattle.

136.   More and more employees have come forward raising concerns with Boeing's manufacturing and quality inspection processes.   Employees pointed to practices that they witnessed that focused on speed over quality.   A quality manager in Washington state who left Boeing in 2023 stated that workers assembling planes would sometimes try to install parts that had not been logged or inspected, but this violated quality procedures meant to detect and take out defective or substandard components.   He personally witnessed an employee sending parts from a receiving area straight to the factory worker before a required inspection.   A current worker at the 787 Dreamliner plant in North Charleston, South Carolina, described how planes were assembled with wires being routed incorrectly, which raised the risk that they could rub against each other and be damaged.   That worker also stated that employees would go "inspector shopping" to find someone who would approve their work.   These current concerns echo those of whistleblowers in South Carolina who had complained back in 2019 after the MAX grounding.   Furthermore, employees and ex-employees in South Carolina and in Washington stated that mechanics building planes were allowed to sign off on their own work, which was "self-verification" that removed

quality control.  Boeing responded that it had eliminated self-inspections in South Carolina in 2021 and that the practice accounted for less than 10% of inspections at other sites, but that raises the question of why Boeing took so long to reduce this practice, and why it allows this practice at all. Boeing's condonation of lax quality practices is especially jarring because since the pandemic, many of its more experienced workers retired or took buyouts, so that its overall workforce is less experienced now.  And according to one quality inspector in Washington, Boeing has failed to provide adequate training to its workers, at a time those workers needed the expertise of their more experienced colleagues to learn from.  Furthermore, only now Boeing refuses to accept substandard products from Spirit, previously taking such products with the plan to fix them later so that it could keep to its production schedule.

137.     In March 2024, the *Wall Street Journal* reported on how Boeing allowed "traveled work," which is when work is done out of order in the interest of keeping to the production schedule, even though this increases the likelihood of errors or missed inspections or quality checks.  "Traveled work" is a problem because each station in the assembly line has different tools, crew training and experience, and platforms, so attempting a fix later in the process is a problem because the workers there may lack the tools or experience to make a proper repair.  Sometimes the work is not done until the "flight line," when the plane has already left the factory and is being parked to await delivery.

138.     "Traveled work" was the likely cause of the AA Flight 1282 incident, because while workers spotted the faulty rivets right away, they handed the fuselage over to other parts of the assembly line and did not make the repairs until 19 days later, when they failed to replace the bolts that held the plug door to the plane.  Calhoun acknowledged this practice, as well as how "It creates opportunities for failures" and how "in light of what happened with [AA Flight 1282] . . . we've

got to make a step change on this one."  "Traveled work" has been a top concern of Boeing employees.  And Boeing leadership was aware of "traveled work" as a top five safety issue after the MAX crashes and stated that it would try to eliminate the practice.  Yet the practice persists, and Calhoun's comments indicate that even now he only wanted to "change" rather than totally eliminate the practice.

139.    Boeing has also frequently been cavalier in its federally-mandated recordkeeping. For example, for the AA Flight 1282 plane, some news reports indicated that Boeing workers had not formally recorded the repair work that was needed, but instead kept an informal record.  Boeing later told the NTSB that no records were made at all, despite this being a requirement by the Company's own processes.  Because of the lack of records, Boeing inspectors did not even know to check the final assembly to ensure that everything was done correctly.

140.    Most recently, as discussed below, a whistleblower, Sam Mohawk ("Mohawk"), complained about retaliation to the Occupational Safety and Health Administration ("OSHA"). One of Mohawk's allegations was that Boeing purposely did not document certain non-conforming parts.  His complaint was disclosed by the Senate Permanent Subcommittee on Investigations ("PSI") in advance of a hearing on June 18, 2024, when Calhoun would testify.

141.    Boeing's quality problems are also extremely expensive for the Company. According to *Fortune*, Boeing still holds in inventory 200 MAX aircraft and 50 787 Dreamliners, which Calhoun mentioned take more time to maintain than to manufacture.  The planes in inventory also require expensive maintenance and rework.  This huge inventory is in large part due to Boeing constantly having to pause production and delivery to fix repeated quality issues, as well as the long grounding period of the 737 MAX fleet after the crashes, a period that lasted a

long time in part because Boeing had so many quality issues to fix that it had to continually push back the time table for getting the planes back in service.

142.    In February 2024, after the AA Flight 1282 incident, Boeing created a position "senior vice president overseeing quality control and quality assurance efforts," appointing Elizabeth Lund, the general manager of airplane programs for the commercial planes, to that position.  But it was under Lund's watch that problems at the 737 MAX and 787 Dreamliner plants continued to fester even after the MAX was grounded in 2019.

### E.    One of Boeing's Major Quality and Safety Failures Is Continued Trouble with the 787 Dreamliner

143.    The development and rollout of the 787 Dreamliner was plagued by delays, a fact that was widely publicized, and as discussed above, had already resulted in a fleetwide grounding in 2013 owing to battery fires.  Furthermore, as discussed above, before and after the 737 MAX crashes, further problems with the Dreamliner were revealed continually through FAA penalties, whistleblower complaints, and investigative journalism.

144.    In summer 2020, Boeing disclosed to its regulators that "nonconforming" sections of the rear fuselage failed to meet Boeing's engineer standards.  Though Boeing claimed that there was no safety problem, coming as it did while the 737 MAX was still grounded, these problems, which themselves were discovered and disclosed as part of revamped processes Boeing implemented in response to the FAA and as conditions for the 737 MAX recertification, led the FAA to consider enhanced inspections that could cover as many as 900 of the approximately 1,000 Dreamliners that had been delivered to date.

145.    Moreover, Boeing had also recently discovered another assembly-line defect, and the two problems together prompted Boeing to determine that eight of the 787 Dreamliners in circulation did not meet structural-soundness "requirements for safe flight and landing," and to

voluntarily tell its airline customers to ground those eight planes for immediate repairs.  Boeing's disclosures prompted the FAA to announce publicly that it was "investigating manufacturing flaws affecting certain Boeing 787 jetliners" and that "it is too early to speculate about the nature or extent of any proposed airworthiness directives that might arise" from the investigation.

146.    The FAA had by then determined how one of the flaws arose: Boeing did not test how it produced shims, which were the materials that filled gaps between barrel-shaped sections of the jets' fuselages, produced at Boeing's North Charleston, South Carolina, factory.  Boeing's process to make shims was "not validated prior to implementation into the production process" and lacked a quality check to verify if the final product "meets the engineering requirements," according to an FAA memo quoted by the *Wall Street Journal*.  Moreover, the FAA questioned Boeing's request for more time to resolve issues because the FAA held that "adds to the risk of the fleet."  The shim defect was identified by Boeing in August 2019, which then reactivated a computerized quality check, and the second defect was detected only a year later as part of an internal review.  The two defects together meant that composite sections would not fit together properly, and minute imperfections that resulted could nevertheless result in a hazard under extreme flying conditions.  This problem also was found soon after Boeing had to revamp quality checks to prevent workers from leaving debris inside finished planes, including the 787 Dreamliner, the 737 MAX, and KC-46A military air-refueling tankers.

147.    But the 2019 and 2020 findings were only the beginning of Boeing's recent problems with the Dreamliner.  As the *Wall Street Journal* reported in April 2022, "Boeing Looked for Flaws in Its Dreamliner and Couldn't Stop Finding Them."  The *Journal* reported that in the years before the MAX crashes, Boeing and the FAA "handled 787 Dreamliner deliveries as though the perfect was the enemy of the good."  The FAA would allow Boeing "to deliver the wide-body

jets with some minor flaws, so long as there was no immediate threat to safety.  The expectation was that Boeing would fix such defects after the planes began carrying passengers, according to government officials and current and former Boeing executives."  But after the 737 MAX crashes, as the FAA tightened scrutiny, Boeing found many flaws in the 787 Dreamliner, which has resulted in "a string of Dreamliner delays that have become headaches for both Boeing and the airlines waiting for delivery of scores of 787s worth more than $25 billion.  Production snafus have popped up one after the other.  Some of the latest involve titanium parts, glue and fasteners[.]"  Dreamliner deliveries were largely halted in October 2020 while Boeing worked through these and other issues it would find.  This led to a delivery halt that spanned almost two years.

148.    In February 2022, the FAA instituted a policy of checking each new Dreamliner jet individually, rather than let Boeing make the routine final safety checks, which the FAA had previously allowed for years.  In April 2022, Boeing submitted a plan to the FAA that it hoped would address all the problems with the 787 Dreamliner, and Calhoun expressed hope that this would provide a resolution: "It's been a long, hard run, but I feel really good about where we are[.]"  In July 2022, the FAA approved Boeing's plan, by which time Boeing had accumulated 120 undelivered Dreamliners.   In August 2022, Boeing finally resumed deliveries of the Dreamliner, almost two years after they were mostly halted (except for a delivery of about 14 planes in May 2021, until the FAA again halted deliveries on May 28, 2021, because it had concerns about Boeing's inspection method).  Effectively, these problems meant that Dreamliner deliveries were halted for even longer than the MAX, which was grounded in March 2019 and recertified in November 2020, a period of approximately 20 months.  Dreamliner delivery was almost completely halted for 22 months.  Meanwhile, the FAA continued to inspect each aircraft manufactured before approving delivery.

149.    But mere months later, in January 2023, Boeing again had to halt delivery of the 787 Dreamliner because of the FAA's concern that Boeing did not properly document structural issues.  Boeing stated, "In reviewing certification records, Boeing discovered an analysis error by our supplier related to the 787 forward pressure bulkhead[.]"  The FAA emphasized, "Deliveries will not resume until the FAA is satisfied that the issue has been addressed. . . .  The FAA is working with Boeing to determine any actions that might be required for recently delivered airplanes."  In March 2023, Boeing was allowed to resume deliveries.  But in June 2023, Boeing announced another delivery delay (this time lasting approximately one month) as it found yet another issue with the 787 Dreamliner; this time, a "nonconforming condition related to a fitting on the horizontal stabilizer."

150.    After the AA Flight 1282 incident, a jarring glitch also happened on a flight on a Boeing 787 for LATAM Airlines, Flight 800 from Syndey, Australia, to Santiago, Chile, with a stop in Auckland Airport, on March 11, 2024.  Mid-flight, purportedly a switch was accidentally hit, which led the plane to drop suddenly and caused at least 50 injuries on board.  There were no fatalities and the plane landed safely.  Boeing asked pilots to check their cockpit seats, because it believed a problem with the seat likely pushed a pilot into the controls, which led to the incident. Initial regulatory findings were that a LATAM Airlines flight attendant hit a switch on the seat while serving a meal, which led a motorized feature to push the pilot into the controls, even though the switch is usually covered and is not supposed to be used when a pilot is sitting.  This appeared to be yet another quality issue because the cause was likely that the switch was uncovered when it was supposed to be covered when manufactured.  It was also reminiscent of the information deficit that occurred with the MCAS because Boeing did not inform airlines or pilots of this potential problem before the incident.

151.    On January 19, 2024, a lawyer representing an undisclosed veteran Quality Engineer of Boeing Company, wrote FAA head, Mike Whitaker ("Whitaker"), detailing allegations that Boeing took manufacturing shortcuts to increase production rates of Boeing 787 and Boeing 777 Airplanes.  These shortcuts created "serious safety issues" that allowed for potentially "catastrophic" structural flaws on Boeing 787 and 777 planes, to which the whistleblower believes almost 1,000 787s and about 400 777s currently flying were at risk of premature fatigue damage and structural failure.  The Boeing Quality Engineer "repeatedly reported" to Boeing management "serious concerns" about Boeing's current production and quality control processes but Boeing "dismissed and ignored" the whistleblower's safety complaints.  The letter further stated Boeing's response, or lack thereof, to his grave safety concerns were "reflective of a company-wide pattern of prioritizing speed of production and delivery over the investigation and remediation of significant safety risks and of discouraging employees from raising safety concerns."  The Boeing whistleblower wished to remain anonymous in addressing these allegations to the FAA until protections were in place as he had already faced escalating harassment and retaliation from Boeing officials in response to raising safety concerns.

152.    In early April 2024, current Boeing employee and Quality Engineer Sam Salehpour ("Salehpour") publicly came forward as the letter's whistleblower.  Since 2007, Salehpour has worked for Boeing in various engineering capacities for the Boeing 747, 767, 777, and 787 programs, and his current responsibilities as Quality Engineer include monitoring production activities for defects as well as develop processes and corrective actions to ensure defects were addressed and prevented.  At the news conference, Salehpour described Boeing's answer to manufacturing issues that led to the grounding of the 787 Dreamliner in 2020 was to "make it appear like the gaps didn't exist" and the solution Boeing developed "hid rather than fixed the

problem." Specifically, these gaps were incorrectly measured because Boeing engineers were permitted to push together pieces of fuselage with excessive force during final assembly, rather than shimming together – a widely accepted process that was much more time-consuming and less cost effective. Consequently, this use of excessive force by the Boeing engineers during assembly, Salehpour explained, creates excessive wear and causes premature failure of the structure and "can cause a catastrophic failure."

153.    Salehpour was invited to testify before the Senate Committee on Homeland Security and Governmental Affairs in a hearing convened by Senator Richard Blumental of Connecticut to "examine Boeing's broken safety culture, focusing on first hand accounts" which was held on April 17. Salehpour testified that "the safety problems I have observed at Boeing, if not addressed, could result in a catastrophic failure of a commercial airplane that would lead to the loss of hundreds of lives." Further declaring "[d]espite what Boeing officials state publicly, there is no safety culture at Boeing and employees like me who speak up about defects with its production activities and lack of quality control are ignored, marginalized, threatened, sidelined, and worse."

154.    Salehpour testified to what he personally observed while working on the 787 and 777 airplanes represented a "broader pattern of Boeing ignoring and suppressing safety and quality issues." Salehpour observed "Boeing workers using improper and untested methods to align parts in the 777, such as using cranes and inappropriate heavy equipment, and in one instance *even jumping on pieces of the airplane to get them to align*." [Emphasis added.] While industry engineering standards required Boeing to shim gaps using minimal force to avoid causing deformities, Salehpour stated Boeing disregard these requirements, increasing the force used to "*approximately 165 times the recommended level*." [Emphasis added.] Ignoring the industry

accepted shimming standards resulted for Boeing in an expedited assembly process and significantly reduced cost.  Boeing disregarded the reality that the use of excessive force creates excessive wear and causes premature failure of the structure and "could result in a catastrophic failure" in favor of a process that was more beneficial to Boeing's bottom line.

155.    When Salehpour pressed Boeing officials to hear and respond to safety issues he observed and raised over the course of three years, he was met with "increasingly hostile" responses from his supervisor and other managers – "the more I pushed for answers, the greater the retaliation would be."  Salehpour was "ignored," "told not to create delays," "told, frankly, to shut up," physically threatened, and subsequently reassigned, as a result of raising serious safety issues.  Salehpour described the attitude at Boeing "from the highest level is just push the defective parts regardless of what it is," creating a culture where employees are quite reluctant to come forward.  Salehpour recounted one incident where his supervisor took him aside to reprimand him after he'd raised safety concerns at a meeting; the supervisor said, "I would have killed anyone who said what you said if it was from some other group, I would tear them apart."  When asked how far up the chain did he go to express his safety concerns and who knew of his concerns, Salehpour replied "I have gone as high as Mark Stockton [senior director for 787 engineering] and Lisa Fahl [Boeing vice president]."  Salehpour has found Boeing's response is to "threaten you, sideline you, transfer you" and to "retaliate to make your life miserable" when a Boeing employee chooses to do the right thing and expresses concerns related to safety.  Owing to the constant retaliation he has faced, including physical threats, Salehpour has suffered from nightmares of getting stabbed and has sought psychological help.

156.    Yet another whistleblower came forward in late April 2024, Merle Meyers ("Meyers"), a Boeing quality overseer at the Everett, Washington, plant, who retired after a 30-

year career, backed with hundreds of pages of documents and emails, stated that over the years quality was no longer the top priority: "Now, it's schedule that takes the lead." He stated that the pressure to speed production was so great that workers at the Everett facility would find unauthorized ways to get the parts they needed, such as taking parts assigned to other planes, or taking newly delivered components before they were inspected or logged or trying to recover scrapped parts. Recently, in 2021, his team found multiple instances where employees removed parts from receiving areas before they could be inspected, including one employee who took parts and disposed of the associated paperwork and shipping crates, and another instance where several 787 Dreamliner bulkheads were removed from a receiving area without the knowledge of quality inspectors. Meyers was retaliated against for repeatedly flagging these issues for corporate investigators, who he often had to push when they would at first say his findings were unsubstantiated, and then they would take additional action. But in 2023, Meyers received a written reprimand that he was responsible for creating "defective work product, service or output" but provided no details about what he had done improperly. He was then offered a buyout, which he took. In a follow-up television interview with *CNN* in July 2024, Meyers further estimated that, over approximately a 10-year period, more than 50,000 parts "escaped" quality control and were used to build planes. Meyers also stated, based on conversations with current employees since he left the Company, unapproved parts are still being used in manufacturing: "Now they're back to taking parts of body sections – everything – right when it arrives at the Everett site, bypassing quality, going right to the airplane[.]"

157.    Furthermore, on June 1, 2024, the *Guardian* reported that management at Boeing's Everett, Washington, plant are in a "panic" and have been pressuring employees to keep quiet about quality concerns. In addition, the Everett facility is responsible for fixing flaws in 787

Dreamliner jets, which need to be flown there from South Carolina (where they are initially built), prompting one mechanic to tell the *Guardian*, "There is no way in God's green earth I would want to be a pilot in South Carolina flying those from South Carolina to here. . . .  Because when they get in here, we're stripping them apart."

158.    A union official further told the *Guardian* for its June 1, 2024 report, that a "very robust union-containment strategy" was backfiring on Boeing, as cost-cutting measures in the non-union South Carolina plant, such as not hiring union mechanics, and reducing the number of workers who write instructions for machinists, and outsourcing, have led to an inadequately trained workforce that produces planes at a rate of only approximately 1/5 to 1/3 the rate of the unionized Everett workforce.  Furthermore, the shift to managers based on relationships with another manager, instead of the most senior, experienced factory worker, means that a lot of managers are unequipped to control for quality because they do not know how to build planes.

159.    Furthermore, also in June 2024, another whistleblower, Roy Irvin, a quality inspector at the South Carolina plant from 2011 to 2017, told news media that his supervisors reprimanded him for being "insubordinate" when he flagged safety and quality issues on the 787 Dreamliners he inspected.  Irvin highlighted how required devices were either not installed or done so improperly: "Missing safety devices on hardware or un-tightened hardware means that you're not going to be able to control the airplane if those fall. . . .  The safety device is on there.  If the fastener is not secured correctly, it's going to fall off and you're not gonna [sic.] be able to control the airplane."  The safety issues were so severe that Irvin "pushed back" almost every day on serious safety and quality issues he found on the "flight line" (those that had already left the factory floor and were supposed to have been thoroughly checked already).

160.    In advance of early June 2024 testimony by Whitaker to the Senate, Boeing disclosed that it would conduct additional inspections of some of its 787 Dreamliner jets, as yet undelivered, because fasteners on their fuselages may have been incorrectly installed.  Boeing claims that 787 Dreamliners in service are safe to fly and that this error was identified as part of its quality management system.

161.    Most recently, another whistleblower came forward with allegations that further confirm the testimony of earlier whistleblowers.  Richard Cuevas, who worked for a Spirit subcontractor, said that he would see "critical drilling and sealant issues" on 787 Dreamliners, where fastener holes located in the plane's forward pressure bulkhead were drilled to be slightly larger than they were supposed to be.  These improper fasteners could have "devastating consequences" because they could "compromise power and air pressure on the planes."  Cuevas alleged that after he complained to Spirit, and then to Boeing, Spirit fired him in 2024.

**F.    Alarming Number of Recent Safety Incidents Involving Boeing Commercial Aircraft Show that Safety Problems Are Widespread**

162.    The manufacturing and safety concerns of Boeing commercial aircraft not only plague the production process but create consequences extending far beyond the Boeing production floor.  Regretfully, the January 5, 2024 mid-flight blow out aboard a Boeing 737 MAX (series 9) due to shoddily installed door plugs was not an isolated occurrence.  Far from it.  In the past 18 months, the AA Flight 1282 incident was just one in a series of more than a dozen publicly reported incidents involving Boeing commercial aircraft.

163.    In February 2023, a new Southwest Airlines Boeing 737 MAX plane, on one of its first commercial flights, experienced an automatic stabilizing system appearing to malfunction. Pilots were forced to make an emergency landing shortly after takeoff.

164.    In April 2023, an Alaska Airlines 737 MAX plane, with eight hours of total flight time, was grounded less than two months later due to a problem with a fire detection system.

165.    In November 2023, an engine on a just-delivered United Airlines 737 MAX plane failed at 37,000 feet.

166.    On January 14, 2024, an ANA Boeing 737 plane had to turn around and land in Japan after a crack was found on the cockpit window midair.

167.    On January 18, 2024, Atlas Air pilots were forced to make an emergency landing less than an hour after departure after one of the engines on a Boeing 747 cargo plane failed.  The plane experienced an in-flight engine fire and a softball-sized hole was later found about its engine.

168.    On January 23, 2024, a Delta Air Lines Boeing 757 plane lost its nose tire while taxiing for takeoff at Hartsfield-Jackson Atlanta International Airport.  The plane's nose gear tire and rim had come loose, with the nose wheel having rolled down a nearby hill before take-off.

169.    On February 6, 2024, after landing at Newark Liberty International Airport, United Airlines Boeing 737 MAX pilots experienced failure of rudder controls and pedals on the plane were stuck as they tried to keep the plane in the center of the runway during landing.

170.    On February 21, 2024, a United Airlines Boeing 757 had to land in Denver due to wing damage.  Boeing officials said the plane landed to "address an issue with the slat" on one of its wings.

171.    On March 15, 2024, a United Airlines Boeing 737 plane landed in Medford, Oregon, where it was discovered that a panel from the plane was missing.  The panel is believed to have fallen off the plane mid-flight.

172.    On March 7, 2024, a United Airlines Boeing 777 plane lost a tire after takeoff that same day, forcing the pilot to make an abrupt landing at Los Angeles International Airport.

173.    On March 11, 2024, a LATAM Airlines Boeing 787 unexpectedly went into a midair nosedive, injuring some 50 passengers bound for Auckland, New Zealand.  Passengers described being thrown to the ceiling and then falling to the floor as the aircraft lost altitude, before the plane readjusted.  The airline described the event as a "technical malfunction."

174.    On March 18, 2024, an Alaska Airlines Boeing 737 plane landed and cracked its windshield in Portland, Oregon.

175.    On April 7, 2024, a Southwest Airlines Boeing 737 MAX plane experienced an engine cover fly off and strike a wing flap during takeoff.  The plane was forced to immediately return to Denver International airport and was placed out of service for maintenance review.

176.    On May 15, 2024, a Garuda Indonesia Boeing 747 plane experienced a sudden engine fire while attempting takeoff.  As one of the wheels began to lift off the runway, video showed one of the engines becoming engulfed in flames.  Pilots were able to immediately land the aircraft and return to the airport.

177.    On May 22, 2024, a United Airlines Boeing 737 MAX plane made an emergency landing at Denver International Airport due to a potential mechanical problem.

178.    On May 25, 2024, a Southwest Airlines Boeing 737 MAX plane dropped at a rate of more than 4,000 feet per minute and came within 400 feet of slamming into the ocean off the coast of Hawaii, before pilots pulled the plane back up safely.  This incident was not widely reported until June 2024, when news reports stated that the FAA is investigating the incident to see what caused the incident, which included rocking movements that damaged the plane, called a "Dutch roll."  The incident is a result of a pilot attempting to land during inclement weather, when he accidentally pushed forward the control column.  But normally, a plane's yaw dampener would correct the rocking movement that leads to the "Dutch roll."  Thus, Boeing is now working

with the FAA and NTSB, presumably because the regulators need to determine if a manufacturing flaw contributed to this incident.

179.     On May 27, 2024, a Virgin Atlantic Boeing 787-9 was forced to turn back mid-flight after its windscreen cracked at 40,000 feet.  At that altitude, the plane could not have been hit by a bird; instead, this appears to be a manufacturing or design defect where the glass could not withstand the cold temperature at that altitude.

180.     On June 14, 2024, a Sun Country Airlines Boeing 737's engine shut down on a flight from Seattle to Minneapolis St. Paul.  The shutdown forced the aircraft to divert to Spokane for an emergency landing.

181.     On June 19, 2024, a Southwest Airlines Boeing 737-800 came within 525 feet of crashing into an Oklahoma town before regaining altitude, an incident that the FAA is currently investigating.

182.     On June 23, 2024, a KLM Boeing 777 returned to Amsterdam after taking off because of unspecified technical problems.

183.     Also on June 23, 2024, a Korean Air 737 MAX (series 8) dropped 25,000 feet in five minutes, approximately half-an-hour after takeoff, when it experienced a problem with its pressurization system.  Though the plane returned safely, 13 passengers were hospitalized for injuries.

184.     On July 8, 2024, a United Airlines 757 lost a landing gear wheel during takeoff in Los Angeles and was forced to land in Denver.

G. **Boeing Made False Statements and Compromised Safety Manufacturing the Osprey for the U.S. Military Resulting in Catastrophe**

185. Boeing's safety and quality problems extend beyond its commercial airplanes segment. Boeing has also manufactured unsafe planes for the U.S. military, as part of Boeing's defense business.

186. Boeing serves as a defense contractor for the U.S. military and is responsible for manufacturing, in a joint service partnership, the Bell Boeing V-22 Osprey. In recent years, the V-22 Osprey, which Boeing describes as a joint service multirole combat aircraft utilizing tiltrotor technology to combine the vertical performance of a helicopter with the speed and range of a fixed-wing aircraft, has been involved in a number of fatal military aircraft crashes. On March 18, 2022, all four crew members, U.S. Marines, were killed in an Osprey crash in Norway during a NATO training exercise. That same year, on June 8, five U.S. Marines died after an MV-22 Osprey (the variant of the aircraft produced for use by the U.S. Marine Corps) crashed during a training mission near Glamis, California. A subsequent Marine investigation found the crash was caused by a "catastrophic" and "unanticipated" mechanical failure from "hard clutch engagements." Further, the Marine command investigation found that "there was nothing these Marines or the Marine maintenance team could have done to prevent the aircraft from crashing in eastern Southern California."

187. The assembly of the Osprey's engine to its proprotor gear box creates early fatigue, causing a series of clutch malfunctions. As a result, these "hard clutch engagements" cause the clutch to momentarily slip from its position, often resulting in severely damaging key components of the dual-engine aircraft and causing the aircraft to lurch. This uncontrollable roll or slide can result in the "complete loss of aircraft control with little or no time for the pilots to react." U.S. Air Force Special Operations Command experienced two hard clutch engagement incidents within

six weeks in 2022, and as a result grounded all of its Ospreys for two weeks.  An undisclosed number of Ospreys across the military were grounded again in February 2023 as work began on clutch replacements.

188.    On September 28, 2023, Boeing agreed to pay $8.1 million to the DOJ to resolve "allegations that it violated the False Claims Act by submitting false claims and making false statements in connection with contracts with the U.S. Navy to manufacture the V-22 Osprey."  The 2023 civil settlement included the resolution of claims brought under the *qui tam* or whistleblower provisions of the False Claims Act by former employees of Boeing who worked in composites fabrication and autoclave operations with the V-22 program who alleged Boeing was falsifying records certifying testing adhered to U.S. Department of Defense specifications.

189.    In August 2023, a Marine MV-22B Osprey carrying 23 U.S. Marines crashed off the coast of Darwin, Australia, during a routine training exercise, killing three servicemen.  Less than three months later, all eight Air Force crew members were killed after an Osprey aircraft crashed off the shores of Yakushima Island, Japan, on November 29, 2023.  Immediately after the November 2023 crash, the government of Japan, the only international partner flying the Osprey, grounded its fleet and further requested "officially of Washington" to stop flying Ospreys over Japan until the aircraft could be confirmed safe.  On December 6, 2023, the U.S. Air force grounded all 51 CV-22s (the variant of the aircraft designed for use by the U.S. Air Force) after an operational stand-down order amid the crash investigations.  The next day, the U.S. Navy directed all Marine Corps and Navy V-22 Ospreys to be grounded.  This extraordinary step of grounding the entire fleet of Ospreys in the U.S. military was ordered after a preliminary investigation of the November crash indicated "a materiel failure — that something went wrong with the aircraft — and not a mistake by the crew led to the deaths."  More than three months

passed until the U.S. military lifted the grounding of the Osprey fleet in March 2024, even though the investigation of "the why" remains ongoing.

190.    In the wake of the Osprey crash off the coast of Japan, the House Oversight Committee has opened an investigation, and in a letter sent to the U.S. Defense Secretary on December 21, 2023, the committee expressed concern with the "safety and performance issues surrounding the Osprey program" and wanted more information "to better understand the Osprey program's performance, safety, and oversight."

191.    Boeing's defense and space business has suffered from other quality issues that have safety implications, as well.  Most notably, outside of the deadly crashes involving the Osprey, Boeing has had numerous problems launching its Starliner spacecraft for NASA.  Ever since Boeing was contracted by NASA in 2014 to provide spacecraft capable of ferrying astronauts to and from the International Space Station, Boeing's Starliner program has faced numerous problems and has cost the Company more than $1 billion.  The first Starliner test mission, flown in late 2019 after the MAX crashes had brought increased scrutiny over Boeing plane safety, was marred by software problems that caused the spacecraft to misfire in orbit.  This was followed by additional software issues and problems with the spacecraft's thrusters in a second test flight in 2022.  When, after several more abortive attempts, Starliner finally carried astronauts to the International Space Station in June 2024, helium leaks discovered in the spacecraft, as well as the failure of five of the spacecraft's 28 reaction-control system thrusters, have now caused the delay (and potential stranding, if problems are not fixed) of the return of these astronauts.  The return trip is already risky because returning spacecraft must return at a high speed through Earth's atmosphere, causing friction that generates heat that an exterior may not be able to withstand.

**H.      Preliminary Findings by a Senate Investigation Reveal Further Details of Boeing's Longstanding and Continuing Systemic Safety Failures**

192.     On June 18, 2024, Calhoun testified to the PSI.  While Calhoun acknowledged that MCAS was an "engineering" mistake, and that the AA Flight 1282 incident resulted from a "manufacturing" mistake, he steadfastly maintained that Boeing has done its utmost to improve safety since the 737 MAX crashes and that he was "proud of our safety record" and "proud of every action we've taken."  Moreover, Calhoun testified, "I don't think we could have taken any more dramatic steps than we've taken," even though Boeing's safety plan presented to the FAA, in response to the FAA Expert Report's criticisms and the numerous issues the FAA audit pointed out would indicate that far more "dramatic" steps need to be taken by Boeing.

193.     Thus, the session was presented with the jarring disconnect between Calhoun on the one hand, facing and apologizing on behalf of Boeing to the families of the victims of the 737 MAX crashes, who were sitting behind him, and on the other hand, repeatedly blaming problems on things that occurred before he became CEO (though he failed to acknowledge that he had been on the Board since 2009), and insisting that even though the safety culture was not "perfect," maintaining that Boeing listened to complaints and did not retaliate against whistleblowers, even as he was faced with a torrent of whistleblowers, many of whom have come forth publicly.  And rather than resign, Calhoun cast his decision to stay till the end of the year as "sticking this through" to help Boeing navigate the crisis.  Calhoun also acknowledged that Boeing did not adequately cooperate with the Congressional investigation, when he admitted that Senator Richard Blumenthal's characterization of Boeing's production to Congress as "gobbledygook" was correct and that he "can't justify it."

194.     During the hearing, Senator Blumenthal put up a poster comparing proposed actions in Boeing's new safety plan compared to the plan it submitted as part of an earlier 2015

settlement with the FAA, and pointed out that Boeing was doing "virtually nothing" except for "recycling old ideas." Notably, in 2015, Boeing had committed to implementing a Safety Management Systems ("SMS") plan, which became an even more urgent task in 2020 after the 737 MAX crashes, and yet to this day, in its new safety plan, implementing an SMS continues to be a goal.

195. Calhoun also acknowledged the business challenges presented by Boeing's multiple safety crises. In response to questions about Boeing's profits, he stated there were "none" since he became CEO, and he also responded that the stock price has been down since he became CEO. Yet, he had no answer as to why he deserved a compensation package of $33 million in 2023 that was actually a 45% increase over 2022.

196. Numerous whistleblowers have come forward and their accounts have been published by the Senate PSI staff in a memorandum released publicly on June 18, 2024 ("PSI Memo"). The Senate PSI staff found the following troubling systemic problems at Boeing: 1) "improperly documenting, tracking and storing parts that are damaged or otherwise out of specification, and that those parts are likely being installed on airplanes"; 2) "conceal[ing] evidence from the FAA"; 3) a "bootleg form" to track "nonconforming" parts taken from a reclamation area; and 4) eliminating quality inspections and instead relying on workers building the planes to check their own work. The PSI Memo states, "Documents and accounts provided by whistleblowers familiar with Boeing's production at facilities in Washington and Charleston, South Carolina, paint a troubling picture of a company that prioritizes speed of manufacturing and cutting costs over ensuring the quality and safety of aircraft. These misplaced priorities appear to contribute to a safety culture that insufficiently values and addresses the root causes of employee concerns and insufficiently deters retaliation against employees that speak up."

197.    The first major area the PSI Memo highlighted was Boeing's "alarming mismanagement of nonconforming parts."  The PSI Memo highlighted:

> Whistleblower reports spanning more than a decade raise questions about Boeing's ability to timely source and track aircraft parts and ensure that damaged or inadequate parts ("nonconforming parts") are not used in aircraft production.  [The PSI memo further explained:] The tracking and disposition of aircraft parts that do not conform to their quality or design specifications is heavily regulated, and criminal penalties apply to knowing or intentional falsification, concealment, or materially fraudulent misrepresentation in connection with records documenting the disposition of aircraft parts.  Aircraft manufacturers are required to maintain a written quality system that includes "[p]rocedures to ensure that only products or articles that conform to their approved design are installed on a type-certificated product.  These procedures must provide for the identification, documentation, evaluation, segregation, and disposition of nonconforming products and articles.  Only authorized individuals may make disposition determinations."  Aircraft manufacturer quality systems must also prescribe "[p]rocedures to ensure that discarded articles are rendered unusable."  At Boeing, when parts are deemed "nonconforming," they are marked with a red tag or red paint and stored in a secure area of the factory called the Material Review Segregation Area ("MRSA").

198.    The PSI Memo disclosed, for the first time, an OSHA whistleblower complaint and testimony from a current Boeing Quality Assurance investigator at the MRSA in Renton, Sam Mohawk.  Mohawk's job entails handling nonconforming parts, which became more complex and demanding following the resumption of 737 MAX production after the FAA recertified the plane. Mohawk claimed that MRSA experienced a 300% increase in nonconformance reports and "the 737 program was losing hundreds of non-conforming parts."  Instead of fixing the problem, factory management, according to Mohawk, "ordered the majority of the parts that were being stored outside to be moved to another location to intentionally hide improperly stored parts from the FAA."  Furthermore, instead of attempting to reduce the number of nonconforming parts, Boeing management ordered Mohawk and others to eliminate or "cancel" the records of nonconforming parts (the "nonconformance report" or "NCR").  And this was not just an order from factory management.  Rather, during an August 2023 meeting, the head of Boeing's Material Review

Board for the 737 MAX program, according to Mohawk, "reiterated his order for everyone to cancel and delete NCRs, and not to keep a written record of non-conforming parts," which violated Boeing's policies and federal regulations.  Mohawk filed a "Speak Up" report in response, but no actions appear to have been taken, and Mohawk expressed concern that his report was directed to the same group of managers his report complained about.

199.     The PSI Memo also detailed further allegations and documentation from Merle Meyers, whose concerns were originally reported by the *New York Times*.  Meyers told the PSI that Boeing employees regularly retrieved nonconforming parts from a "reclamation" area, which was where parts were supposed to be disposed.  He showed PSI staff a "bootleg form" where personnel would track who signed for what parts from the reclamation area.  Meyers stated that the bootleg form would often state, as a pretext, that the parts were sent to reclamation "in error." The parts could be either large or small, and appeared to justify using these parts because using the proper parts would be more expensive or would take more time.  But Meyers alleged that this "bootleg" process circumvented a "robust, documented process . . . for removing scrapped parts from reclamation."

200.     John Barnett ("Barnett"), a whistleblower who filed a suit against Boeing for retaliation years ago, and who recently died from suicide, alleged similar mismanagement of nonconforming parts in Charleston, South Carolina, in the Dreamliner plant.  Before he left the Company in 2017, Barnett was responsible for disposing of non-conforming parts placed in the MRSA in the South Carolina plant between 2015 to 2017.  Barnett alleged that Boeing's overriding priority was to push production quickly, and therefore, plant workers felt pressure to use nonconforming parts even though they violated FAA regulations and Boeing's own policies.  He knew that scrap parts were being used because they were tagged or painted red, and he saw red-

painted or tagged parts in the production line.  Barnett also said he was told not to report to the FAA.  Moreover, manufacturing employees had keys to MRSA and parts were being pulled out to be used in such a widespread manner that "[i]t was just totally out of control."  Furthermore, while nominally Boeing encouraged employees to "speak up. . . .  But then, when you actually do it is when you start getting actions that, you know, you're a troublemaker or you're . . . just trying to hold up production."  Furthermore, the FAA substantiated some of Barnett's allegations in 2017.  The PSI Memo included the FAA's report, which stated: "45 nonconforming part records have been researched so far and . . . has identified 53 nonconforming parts that are considered lost."  While "176 nonconforming parts records need to be researched[,]" the FAA already concluded that the South Carolina "personnel did not follow approved quality system processes to track and disposition nonconforming parts.  As a result, 53 nonconforming parts are known to have been lost."

201.    The PSI Memo also reported that for almost a decade, Boeing has been cutting down on quality inspections even though it has been warned against this practice by the FAA.  Barnett, in his deposition, also discussed how he protested against this policy being proposed at the South Carolina plant when he was there.  Quality inspections are traditionally handled by trained quality inspectors, who serve as a second set of eyes on a plane before it is ready for delivery.  But from at least 2016 or earlier, Boeing has increasingly shifted those duties to the very mechanics who do the assembly work, thus making those who do the work check their own work, and decreasing the number of trained quality inspectors in a bid to increase speed and decrease costs.  But the FAA requires Boeing to maintain a quality management system "that ensures that each product and article conforms to its approved design and is in a condition for safe operation."  Quality inspectors, who serve as a "second set of eyes," and must sign off formally on work and

state they are comfortable that the plane is in conformance (or "acceptance"), are an important part of this process.

202.    The PSI Memo states: "As early as 2016, the FAA sent Boeing a formal compliance action request following an FAA audit that alleged that a Boeing policy adopted in 2015 'creat[ed] a process that bypasse[d] the Quality organization and allow[ed] . . . Manufacturing Technician[s] to accept' certain tests of airplanes' functionality without holding the requisite authority to do so."

203.    While Boeing promised to correct the problem and blamed it on "unclear" language in its policy documents, in November 2017, the FAA again sent multiple letters to Boeing raising similar concerns about quality inspections.  A November 8, 2017 letter observed that two new Boeing policies seemed to "'modify and/or **circumvent**' the requirement that planes be properly inspected and tested in part by replacing quality inspections—which involve direct, physical examinations of planes—with 'verifications'—which instead involve '[i]ndirectly demonstrating' compliance 'by the use of data and analytical tools.'  The November 8 letter again raised concern about allowing employees without the required training (and thus without the appropriate authority) to perform product acceptance."  [Emphasis in original.]  The FAA stated: "Grant[ing] acceptance responsibility without appropriate training is unacceptable to the Quality requirements. . . . [R]emoving inspections and replacing them with verifications . . . is not acceptable and does not meet the minimum requirements of [FAA regulations]."

204.    A November 17, 2016 letter then "explicitly rebuked Boeing's practice of using non-FAA approved practices to contravene the policies the FAA did approve."  The FAA noted that in 2015, Boeing had promised to take corrective actions in response to a 2015 FAA audit of the Everett factory that identified documents that had appeared to circumvent approved policies. But just five months after the FAA accepted Boeing's corrective actions, in a subsequent 2017

audit, "the FAA again discovered important safety documents that Boeing had not cleared with the agency, and thus the FAA informed Boeing of its '**failure to implement**' and '**unsatisfactory implement[ation]' of its promised actions**.'" [Emphasis in original.] The FAA subsequently "identified similar problems" in a November 20, 2017 letter.

205.    Yet, just over one year later, according to the PSI Memo, even after the October 2018 Lion Air 737 MAX crash, Boeing continued its problematic practices regarding quality inspections:

> Boeing's effort to remove quality inspection apparently continued[.] . . . In January 2019, *The Seattle Times* reported that Boeing aimed to eliminate a total of 900 inspector positions across their Washington state factories in 2019 and 2020—a nearly one-third reduction in inspector headcount. At the time, Boeing claimed that new, automated tools were so accurate that they made quality inspections unnecessary. Boeing's manufacturing union, District 751 of the International Association of Machinists and Aerospace Workers, on the other hand, argued that Boeing had artificially depressed the number of recorded defects in order to justify eliminating inspections by pressuring inspectors to approach mechanics informally to repair defects rather than formally document them, **"essentially masking defects."** . . . By 2019, the FAA had substantiated several instances of Boeing failing to document defects[.]

[Emphasis in original.]

206.    Furthermore, the PSI Memo stated that Boeing's Vice President of Quality, Ernesto Gonzales-Beltran, who the three 2017 FAA letters were addressed to, "was 'spearhead[ing]' the inspection removal effort, which aimed to shift from having inspectors 'check[ing] every airplane' to now only 'check[ing] once every 100 parts or every 1,000 parts.' Boeing said it was 'trying to walk away from' 'everybody [being] dependent on a second person,' and instead have 'the mechanic . . . verify their own work'—in doing so, Boeing observed that 'wait time is eliminated.'"

207.    The PSI Memo also detailed how Barnett's testimony confirmed that similar quality inspection removal was at the South Carolina plant. He stated that while in Washington, a quality inspector would cover nine mechanics, in South Carolina, there were times when one inspector

might cover 50-100 mechanics on two airplanes.  When he insisted that the factory allow for quality inspections, management "chew[ed] [him] out about stopping production" and management "put [him] in the corner. . . .  And there's about five of them standing over [him] with their arms crossed.  Where does it say we can't do this?"

208.    In 2021, about two years after the second deadly MAX crash of Ethiopian Air Flight 302, the FAA sent another letter stressing several problems with Boeing's systemic push to reduce quality inspections, which Boeing called "Verification Optimization."  The problems FAA pointed out include:

a)    "Boeing procedures are not adequate for determining the required inspections and tests used to ensure the product conforms to its approved design."

b)    A program that removed inspections by quality inspectors and instead had manufacturing employees perform inspections did "not meet Boeing quality system requirements or FAA regulatory requirements."

c)    "The FAA found no process that describes how Boeing determines appropriate business decisions to justify the removal of mandatory Quality inspections."

d)    When certain procedures allowed in-person quality inspection to be removed, "[t]he FAA determined Quality cannot accept a completed function test[] by relying on document review alone.  If the Quality organization does not witness the functional test, then it cannot verify the accuracy of the information collected."

e)    "The FAA found evidence that Boeing inappropriately delegated inspection authority to Manufacturing personnel who did not have the appropriate training or certification, inappropriately delegated Quality inspections associated with certain engineering requirements to Manufacturing personnel, and allowed the indication of

production verification and acceptance with a Manufacturing stamp, in violation of the Boeing quality system requirements."

209.    Furthermore, the PSI Memo observed that an anonymous whistleblower stated that Boeing continues to use verification optimization but under a different name.  Instead of allowing mechanics to now inspect their own work, after late 2022, Boeing has instead allowed mechanics, at least in South Carolina, to inspect each other's work (though they do not have the proper qualifications or training that a quality inspector would have).

210.    In Attachment 1 of the PSI Memo, which is Mohawk's OSHA whistleblower complaint, he also confirmed the removal of quality inspection, through buying out senior quality inspectors, and "Boeing created a program of mechanics buying off their own work[.]"

211.    Mohawk's complaint also details how the workload for the pared down quality inspection staff increased after the MAX grounding and COVID-19 pandemic because even though for a time, planes were not being delivered, parts were still being made and delivered to Boeing, and planes were still being assembled and parked.  The inspectors had fewer staff support but as demand picked up, the Company pushed to have more planes out the door as quickly as possible, which contributed to "quality lapses and failures."  Mohawk further observed that an increased number of mistakes resulting from this push to deliver more planes include: "many defective parts removed from airplanes were not documented per PRO-5500.  Parts were left in MRA boxes for Mohawk to pick up or just thrown into a hanger/storage with no segregation control."  When Mohawk emailed his supervisors about the violations he was seeing, he alleges that management told him to "just pick up the parts."

212.    Mohawk further alleged that by the winter of 2022, so many nonconforming parts were piling up, with attendant NCRs, his management was merely "cancel[ing]" these reports.

Mohawk observed: "Of note, there is no process for allowing lost parts. Every aircraft part must be accounted for, pursuant to the regulations. All NCRs should be part of the aircraft build record. The primary purpose of the build record is to determine whether the aircraft meets the FAA's definition of airworthy: if the aircraft 'meets its type design, or properly altered condition,' and if 'the aircraft is in a condition for safe operation.' A review of the aircraft records is the usual starting point for a FAA Designated Airworthiness Representative (DAR) to evaluate the status of an aircraft and determine its eligibility for FAA certification." But Mohawk was concerned that because of the huge increase in NCRs (300% from before the MAX grounding) and decrease in quality inspection staff, nonconforming parts were improperly accounted for: "Of great concern, the 737 program was losing hundreds of nonconforming parts. Mohawk feared that non-conforming parts were being installed on the 737s and that it could lead to a catastrophic event." In early spring 2023, Mohawk raised his concerns to his managers. Instead of acting on his response, Mohawk's supervisors and their business-side counterparts sought to actively conceal non-conforming parts from FAA inspectors. Moreover, "the head of the Material Review Board (MRB) for the 737 MAX program" held a meeting with other Boeing management where either this head or another equivalent-rank executive (the names are redacted in the OSHA complaint) emphasized:

> [H]e **did not want the FAA to know how many parts were missing**, or that Boeing was having this quality control issue. [redacted name] then reiterated his order for everyone to cancel and delete NCRS, and to not keep a written record of non-conforming parts. **Notably, NCRS are required to be part of the aircraft build record of the aircraft and every non-conforming part should be identified as such**. Moreover, the cancelling of NCRs is not a process included in the Boeing Process Instructions (BPI). [redacted name] refused to write a process or BPI for such an action, purportedly because any challenges to BPIs must be authorized by the FAA, which would go against Boeing's goal of hiding the lost parts from the FAA. Furthermore, the FAA would not authorize such egregious conduct that allows for an incomplete aircraft build record, misleads customers, and places the flying public at risk.

[Emphasis in original.]

213.    Mohawk further described the large number of lost non-conforming parts and deleted records:

> [I]t was discovered that approximately 300-400 non-conforming 737 MAX aircraft parts were lost, and the majority of the records that were once kept of these parts were deleted from Boeing's internal aircraft build record system known as CMES. CMES is the computer system used at Boeing's Renton[, Washington,] Plant to track and monitor all work performed and all parts installed in 737 MAX aircraft, and to identify all defects discovered and document remedial actions taken in the building of each 737 MAX aircraft. Notably, there is a backup system known as DCAC, wherein deleted records could be retrieved. Additionally, as Boeing Whistleblower John Barnett noted at his time on the 787 MRSA, keys are presently floating around and being used by unauthorized personnel to take non-conforming parts out of the lock boxes and cages at the Renton MAX site. The Whistleblower (Barnett?) once observed an individual using a bottle cap to pick the lock on a box, and there are rumors that employees are making copies of the keys at the nearby Home Depot.

214.    Mohawk reported his concerns to various levels of management, and then in October 2023, made a report via Boeing's Speak Up program. Mohawk alleged that his report appeared to have been ignored for months, but then in December of that year the "report went to the same management group that Mohawk reported on. . . . Mohawk was extremely worried that a Speak Up about illegal activity was being given to the same group he reported on." Mohawk further alleged that Boeing's response, which was to propose a "material return to stores (MRS)" procedure, "was never intended to control non-conforming parts. Only PRO-5500 was allowed to be used for this control process and it was not being followed. Mohawk pushed back by asking for an opinion on the legality of Boeing's action and by refusing to close his Speak Up until he received an answer as to whether the process was legal or illegal."

215.    Mohawk further alleged, after he returned from a vacation, the AA Flight 1282 incident occurred, and his Speak Up concerns were brushed aside by a new manager:

The Senior Manager who was handling Mohawk's Speak Up, [name redacted], suddenly left the company, and a new Senior Manager, [redacted name] took over. [Redacted name] brushed Mohawk's concern for non-compliance issues to the side and placed his Speak Up on hold. Mohawk reached out to HR and asked for his Speak Up to be moved to a different management group since he thought it was a conflict whereby the perpetrators were the ones who were investigating and that they were in fact stonewalling.

216.     Mohawk then alleged, even as Boeing was facing withering public scrutiny over its safety and quality controls, his manager was still pushing non-compliance and retaliating against him: "Upon assuming his role as senior manager, [redacted name] made clear that they were to move the parts regardless of compliance. Beginning around early 2024, Mohawk became the focus of what was 'not working' in MRS. Mohawk experienced harassment and intimidation, which left him feeling that management was trying to force him out of the company by either making his work unbearable or by finding any issue and elevating them to Correct Actions (CAMs) in order for Boeing to fire him."

217.     Mohawk further alleged that Boeing's improper handling of nonconforming parts has continued after the AA Flight 1282 incident and continues to this day, and that when he reported such behavior and proposed an investigation, he was instead given the impossible task of conducting this investigation himself as a form of retaliation for speaking up:

Over the past eight months, Mohawk reported a number of non-compliant parts making their way back to the airplanes for installation. He retrieved as many of these parts as he could from the line and segregated them in MRSA. Following that, he went to Senior Manager [redacted name] for guidance and required a Corrective Action investigation to be conducted to prevent such quality escapements in the future. In Early April, [redacted name] directed Mohawk to complete Corrective Action (CA) investigations himself, something he had never previously performed, and not within his job responsibilities. An email was sent to Mohawk by [redacted] on Tuesday, April 16 giving him two days (by Thursday) to complete the CA investigations. Mohawk explained that because of the second shift's lack of staffing, his need to actively support production on a daily basis, his training his new Rework Investigators, and his handling of emergent issues, he was unable to complete the CA investigations within two days. Mohawk emailed [redacted name] and indicated he could complete the CA investigations over the

following weekend during overtime since the CA investigations would take hours of concentration to complete.  He did not receive a response to his email.  That following Monday . . . Mohawk was summoned into a meeting and asked to bring a Union Steward.  In a meeting [redacted name] threateningly attempted to issue a CAM against Mohawk for not obeying a direct order (on the grounds of insubordination, which is an offense subject to termination).  Based on the circumstances and the fact that Mohawk completed the CA investigations, [redacted name] was forced to withdraw his CAM.

218.    Mohawk further emphasized: "Making Mohawk responsible for completing the CA investigation with an impossible deadline was done in retaliation for Mohawk bringing up issues of non-compliance.  In his duties as MRSA Lead, Mohawk runs into quality escapements daily that need to be investigated as required by federal law, but he has not received support from his management to remedy the situation.  Mohawk fears that any issues with non-compliance will be thrown back into his lap to deal with and that if he does not complete them in a timely manner, he will face the CAM process which includes termination."

219.    Indeed, Mohawk details how recently, he received a CAM because of his urging Boeing to fix the problem and the possibility of regulatory action: "Mohawk had previously informed his management group that MRSA's non-compliance could lead to an FAA audit finding and possible penalties.  On May 16, 2024, Mohawk again emailed his management regarding MRSA's lack of staffing, space, and organization.  In response, on May 17, 2024, Mohawk was issued a disciplinary CAM.  In a meeting regarding the CAM, Senior Manager [redacted] told Mohawk that by threatening to go to the FAA to report non-compliance issues, he was causing people to be afraid and to feel threatened.  This CAM is retaliatory on its face and was issued in an attempt to silence Mohawk from raising non-compliance issues under the threat of a CAM and termination."

220.     Meanwhile, Mohawk alleged, "As of the filing of this Complaint [dated June 11, 2024], Boeing continues to lose non-conforming parts and is out of compliance regarding control of non-conforming parts per PRO-5500."

221.     The PSI Memo also includes a May 18, 2021 letter from the FAA to Boeing encapsulating audit findings regarding Boeing's Verification Optimization, Process Surveillance, Manufacturing Assurance and Process Surveillance, and Functional Test Surveillance programs (which the PSI Memo had mentioned were Boeing's attempts to reduce its quality inspection staff by shifting those duties to the mechanics who do the actual assembly).   The audit letter reminds Boeing of its obligations under Title 14 of the Code of Federal Regulations and Boeing's FAA-approved quality system.   The FAA issued 10 critical findings with the above-described system:

a)      "Boeing Process Surveillance as implemented on the Model 777X program, does not meet FAA regulatory requirements for inspection or recording inspection status to ensure that each completed product or article conforms to its approved design and is in a condition for safe operation.   Process Surveillance is a process audit using a sampling approach (not statistically based) to establish audit frequencies, and is not intended for product verification.     Process Surveillance does not meet Boeing quality system requirements or FAA regulatory requirements related to inspection or recording inspection status."   The letter further emphasizes, "the FAA found Boeing procedures are not adequate for determining the required inspections and tests used to ensure the product conforms to its approved design and for documenting the inspection and test status of products manufactured to show the product conforms to its approved design."

b)      The FAA also found, "Boeing implemented Process Surveillance (i.e., Manufacturing Assurance and Process Surveillance (MAPS)) on the Model 787 program

by removing required in-process Quality inspections."  The FAA further found that because "Process Surveillance (i.e., MAPS) is a process audit not intended for product verification and acceptance to ensure conformance to FAA-approved design data," the FAA "concluded Process Surveillance does not meet Boeing quality system requirements or FAA regulatory requirements related to product verification and acceptance in support of ensuring conformance to the FAA-approved design data."  Boeing's attempted revision of its policy from September 2019 "circumvents" its previously approved policy "by enabling the removal of in-process and end-item inspections performed by Quality Inspectors and assigns in-process inspections to manufacturing personnel for acceptance."

c)      The FAA further found "Boeing product 'inspection authority' was given to manufacturing personnel without qualification or authorization."  This conclusion stems from how "FAA found evidence that Boeing inappropriately delegated inspection authority to Manufacturing personnel who did not have the appropriate training or certification, inappropriately delegated Quality inspections associated with certain engineering requirements to Manufacturing personnel, and allowed the indication of product verification and acceptance with a Manufacturing stamp, in violation of the Boeing quality system requirements.  BPI-[redacted] circumvents PRO-[redacted] and BPI-[redacted] by enabling Quality Engineering to delegate product acceptance to Manufacturing personnel a 'Conformance Decision' as the determination of acceptance or rejection, which is an 'Inspection Status.'  Per PRO-[redacted] and BPI-[redacted], 'Inspection Status' can only be recorded using an Endorsed Authority Media (i.e., Quality stamp) held by Quality personnel or Self Inspection and Acceptance (SI&A) per PRO-[redacted] and BPI-

[redacted] by allowing Authority Media (i.e., Manufacturing stamp) to be used for product acceptance (i.e., Inspection Status)."

       d)      The FAA also found, "Boeing assigned inspection 'conformance decision' to manufacturing personnel without the training or controls necessary to perform product acceptance."   The FAA further "determined Manufacturing personnel do not have the required qualification or certification and training necessary to perform the product verification and acceptance tasks assigned to them and make the associated conformity decisions."  Moreover, "FAA also determined Manufacturing personnel use Manufacturing stamps to indicate product verification and acceptance, which is in violation of the Boeing quality system procedures."   The FAA cited a Boeing policy that "circumvent[ed]" other Boeing policies "by assigning the conformance decision (i.e.[,] Inspection Status) to the process operator not the quality departments.   A process operator is not a defined role assigned to compare objective evidence to the requirements and make conformance decisions.   A process operator is not granted product acceptance as defined in [Boeing policies].   A process operator is not an authorized person in an authorized process as defined by job code or skill code per [Boeing procedure].   Manufacturing is not granted product acceptance as defined in [Boeing policy and procedure]."   Furthermore, "FAA found these Manufacturing personnel did not have the appropriate inspection certification and training necessary to conduct Quality inspection steps and make conformity decisions (i.e., product verification and acceptance) as required by the Boeing product definition data, BAC specifications and BSS training requirements, and Boeing quality system requirements."

e) The FAA further found, "Boeing assigned product inspection to Manufacturing personnel that are not authorized to performance product acceptance. BPI-[redacted] allows the replacement of inspections without defined requirements." But "FAA determined there are no process[es] or procedures in the quality system that defines mandatory inspection requirements to support Boeing's position that required inspections are only defined by an engineering requirement that specifically states, 'inspection required,' for an Endorsed Authority Media held by the Quality department or delegate to be used for product acceptance." Moreover, "FAA found no process that describes how Boeing determines potential risk of removing an inspection. Without a defined process to determine potential risk or issues beyond those specified by engineering requirements, the FAA found these points were not adequately considered when business decisions were made to remove inspections from work orders and inspection plans (IP). The FAA found no process that describes how Boeing determines appropriate business decisions to justify the removal of mandatory Quality inspections."

f) The FAA also found, "Boeing assigned product inspection and acceptance to Manufacturing personnel that are not authorized to perform inspections or product acceptance." As evidence, "FAA found numerous examples where Boeing assigned Manufacturing personnel to perform product acceptance without an endorsed authority media and without authorization by job role, job code or skill code to perform product, article or process verification activities as required per BPI-[redacted], PRO-[redacted] and BPI-[redacted]." Furthermore, "[t]he Manufacturing Job Role description does not include product acceptance or conformance decision as an assigned responsibility. Manufacturing

personnel are not authorized to perform the process of acceptance or conformance decisions per PRO-[redacted] and PRO-[redacted]."

g) Furthermore, the FAA found, "Boeing removed in-process and end-item inspections performed by Quality Inspectors, and assigned in-process inspections to Manufacturing personnel." When the FAA investigated, it "found the use of Process Surveillance performed by manufacturing personnel as part of Boeing verification systems and in place of Quality inspections performed by Quality inspectors does not comply with Boeing quality system requirements and FAA regulations." Moreover, "FAA determined that the assignment of in-process Quality inspections to Manufacturing personnel and use of an authority media (i.e., Manufacturing stamp) to indicate acceptance does not comply with Boeing quality system requirements." Even more troubling, "FAA found evidence where IPs were inappropriately changed using the Inspection Record Change Requests (IRCRs), allowing product acceptance authority to be given to manufacturing personnel without an endorsed authority media (i.e., Quality stamp)." A Boeing policy "circumvents" another Boeing procedure "by enabling the removal of in-process and end-item inspections performed by Quality Inspectors and assign in-process inspections of acceptance to Manufacturing personnel." One policy does not reference another policy "where determining risk, business decisions, or engineering requirements when making changes to Installation plans (IP)." And it "also does not reference" other policies and procedures "for determining appropriate assignment of product acceptance (i.e.[,] Inspection Status) to the appropriate personnel." Moreover, "FAA found in-process and end-item inspections performed by Quality Inspectors using IRCRs were removed from

94

the approved process, and that in-process inspections and acceptance are assigned to manufacturing personnel who are not qualified to make conformance decisions."

h)      The FAA also found, "Boeing inappropriately changed IPs by using IRCRs to remove Quality inspections without the acceptance and required signature of Quality Engineering, in violation of BPI-[redacted], section C.3, thus allowing product acceptance authority to be given to manufacturing personnel without an endorsed authority media and without the qualifications to make conformance decisions or perform product acceptance."

i)      The FAA also criticized how one Boeing policy "references Aviation Maintenance Technician Inspector (AMTI), but not manufacturing personnel[,]" which the FAA found to be "contradictory and ambiguous.  Manufacturing personnel should not be authorized to inspect and accept work performed by themselves, as AMTIs are not authorized to do so as stated in" that policy.

j)      Finally, the FAA found, "Boeing implemented Process Surveillance on Functional Test manufacturing planning in a supplemental writing that removed Quality Inspection and assigned Product Acceptance to Manufacturing personnel for Boeing Legacy programs, which does not meet the requirements of the Boeing Quality Manual (BQM)."  Furthermore, "FAA found Boeing implemented functional test surveillance to replace certain Quality inspections in the manufacturing planning documents for product acceptance and recording of inspection status."  The FAA also "found numerous examples where Manufacturing personnel were assigned to perform functional test acceptance without an endorsed authority media and without authorization by job role, job code or skill code to perform product, article or process verification activities as required per [Boeing policies and procedures].   The Functional Test manufacturing planning

supplemental writing also circumvents the BQM and Verification System procedure by enabling the removal of a Quality inspection/witnessing of the from functional tests." Moreover, "FAA determined Quality cannot accept a completed functional test[] by relying on document review alone.  If the Quality organization does not witness the functional test, then it cannot verify the accuracy of the information collected during the functional test to confirm product verification and acceptance.  Acceptance through verification by analysis applies to Boeing Defense and Space (BDS) only."  Furthermore, the FAA found that Boeing misapplied one of its own policies to circumvent the application of another policy and procedure.  The FAA noted, "A process operator is an undefined role assigned to compare objective evidence to the requirements and make conformance decisions.  A process operator is not a defined role assigned to compare objective evidence to the requirements and make conformance decisions.  A process operator is not granted product acceptance as defined in [Boeing policies].  A process operator is not an authorized person in an authorized process as defined by job code or skill code per [Boeing procedure], Manufacturing is not granted product acceptance as defined in [Boeing policy and procedure]."  The FAA also "determined that Boeing's implementation of functional test Surveillance for the manufacturing processes in place of Quality inspections (acceptance) does not meet Boeing's quality system requirements for ensuring product conformance or recording the test status of a functional test to the FAA-approved design or the associated FAA regulatory requirements."

222.    The PSI Memo also released far more details concerning Barnett's whistleblower case against Boeing and the problems at the 787 Dreamliner factory in South Carolina, which have been going on for at least a decade.  Barnett was forced to resign after facing a hostile environment

for years: he stated that he received hostile retaliatory actions or meetings or speech almost once a week.   Recent whistleblowers, such as Salehpour, have vindicated Barnett's allegations concerning how the Dreamliner factory retaliated against workers for speaking up, had a poor-quality inspection process in place, and pushed production at the cost of speed.   Some of the more damaging testimony to come out of Barnett's deposition transcripts, released publicly by the PSI Memo when they previously were not made available publicly, include:

a)      Barnett testified that management attempted "to allow the mechanics to buy off their own work so they could do away with quality in that area."   Barnett and his fellow inspectors pushed back against that proposal because South Carolina was a "green site" with "brand-new employees that never built an airplane in the commercial airplane division at Boeing" and "didn't have the experience, the knowledge, the training" to inspect and sign off on their work without some "oversight[.]"   Barnett also pointed out that while the Company's position was that this self-inspection would only occur in areas that did not affect safety, he and other quality inspectors felt that Boeing took too cabined a view of what affected safety.   He raised as an example that "one of the things that we really pushed back on was removing inspection requirements for, like, torque verifications of fasteners. And when I saw the [737 MAX (series 9)] door plug blow out [on AA Flight 1282], and that the fasteners weren't installed, it's like, That's exactly what we were talking about."

b)      MRSA was seen as being a "parts store" rather than as part of the main manufacturing process.   Nevertheless, nonconforming parts from MRSA were improperly included in the manufacture of the airplanes, which Barnett knew because nonconforming parts were painted red, and Barnett would see red-painted parts in the production line. Barnett also alleged that nonconforming parts were being stored in a warehouse outside of

MRSA and "manufacturing had free access to them."  He also alleged, "after I took over MRSA and – and we found that all these lost nonconforming parts were going out, I performed a key audit.  And all the MRSA cages have locks on them.  And just the people that worked the cage are supposed to have the keys so we can keep control on the nonconforming parts.  So I did a key audit. . . .  And I found out that manufacturing managers had keys.  Manufacturing lead had keys.  And they were just able to walk in, unlock the cage, and take any part they wanted."  This violated Boeing's internal policies because "if you followed the BPI it – it tells you that if MRSA is going to release a part, then it has to be released to quality, so quality can take that part down, write the NCR and attach it to that airplane, so you don't lose track of it."  Even after he had new keys issued, "we noticed lost nonconforming parts were disappearing again.  We found parts pulled out of our scrap bin that was out on the production floor being used. . . .  It was just totally out of control."

c)       He alleged that his supervisor told him he would "push [him] until [he] broke."  Some of these instances of retaliation included telling him he had two days to complete an investigation of 400 nonconforming parts that would take weeks, or giving him a large volume of work that would require a team to do, and then pull off members of Barnett's team to work on other matters.

d)       Other employees who spoke out were demoted or otherwise retaliated against.  Barnett mentioned one employee who opposed the self-inspection proposal was put on a performance improvement plan, and survived without being terminated only when he "took a downgrade back to Washington to get out of Charleston."

e)      His supervisor told him, in an email, "learn the ar[t] of working in the gray areas and help find a way, while maintaining compliance or the intent of the procedure." He also instructed Barnett "not to document defects, not to put quality concerns in writing." Barnett was also told, in writing, "we need to be flexible to do what is necessary, regardless of the swim lane."

f)      Employees would be told to transfer parts from one production line to another, without completing the required documentation.  Moreover, the direction to do so violated Boeing's production certificate as well as internal policies.  Barnett further emphasized that people could be "criminally charged" for violating the documentation rules and, indeed, it would be a "felony offense."

g)      His manager appeared to have told him to ignore FOD by reminding him of the cost to replace parts, without paying attention to the larger costs associated with FOD damaging a plane.

h)      Barnett also highlighted an incident where he understood Boeing to have a policy where new suppliers, as part of their vetting process, would need to have their work inspected by Boeing.  Other employees, including Barnett's supervisor, however, said that Boeing merely had to "verify" the work, and Barnett pointed out that "you can't verify it without inspecting it."  At that point, Barnett was told, "all we have to do is make sure they stamp the paperwork to verify it."  This occurred in a tense meeting where "they put me in the corner, in a chair.  And there's about five of them standing over me with their arms crossed."

i)      Barnett also testified that in South Carolina, production speed was so highly prioritized that quality inspectors were "not allowed to tell manufacturing no[.]"  Rather,

quality inspectors were "just a support organization" and should "support what [manufacturing] want[ed] to do."  One supervisor even "put it in writing."  His supervisors would "chew [him] out" when he told manufacturing the correct process to get things done because they accused Barnett of "holding up production and slowing things down.  We don't have time to follow processes; we're building airplanes. . . .  [T]hat was a common theme all the time[.]"  When Barnett tried to emphasize how the correct "paperwork was just as important as the hardware, pretty much the whole room started laughing at me[.]"  Barnett testified that "at least once or twice a week" he was being pushed to violate Boeing process and procedures.

j)      In another instance of corner cutting, Barnett recalled how his supervisor told him the quality inspection team would only "inspect the parts that engineering called out" even though the quality management system ("QMS") "has hundreds of different inspection requirements that are required, that the FAA's approved" that "[Boeing] can't just eliminate[.]"

k)      Barnett believes this practice of "eliminating those inspection points" and "essentially leaving it up to the mechanic to buy off their own work" contributed to the improper shimming of fuselages that was reported in the news in 2012 and where improper joining together of fuselage parts was also a point Salehpour made in recent Senate testimony.

l)      Barnett also testified that there are "countless" instances of the falsification of paperwork, or failure to do the paperwork at all, in the South Carolina plant, which included how quality inspectors were not really signing off on inspections, but rather mechanics were self-inspecting.  Barnett explained that accurate paperwork or establishing

an accurate "build record" was critically important: "It's critical to the aircraft . . . and this goes back to the quality management system.  It's all about configuration control, knowing what . . . you're delivering . . . knowing what you're actually sending out to the flying public[.] . . .  [A]nything that's not documented correctly . . . if you don't apply a stamp when you were supposed to, that's a violation.  If you apply a stamp and the work wasn't done, that's a violation.  If you buy off an operation that . . . didn't actually get inspected. . . .  So it's just exponential[.]"  He testified that it was "absolutely" true that "stamping violations were systemic throughout Boeing South Carolina" because "one inspector [was] covering 50 mechanics" and that was impossible to sustain.  Widespread falsification in the form of claiming inspections were done when they were not, or in the case of mechanics, doing a job when it was not actually done, occurred because "manufacturing was so pressured to get their bean count."  Explaining why this is "dangerous[,]" Barnett testified: "[D]epending on what you're buying off . . . if that part's a critical component of the airplane or it holds a critical component of the airplane, and it's not actually installed, then anything could fail. . . .  And something we were taught very, very early in my career is, it only takes one defect to – to cause – to bring down a plane."

        m)     Barnett also testified that while there was formal encouragement to raise safety concerns, practically speaking it was not effective because of widespread retaliation: "So we actually implemented what's called, Raise Your Hand.  You know, see an issue, raise your hand.  And, again, they pitched it and they talked it.  But they didn't practice it, you know.  And that's the breakdown, is, you know, they can tell you all day long, Raise your hand.  But then, when you do raise your hand and you receive some type of retaliation or some type of, you know, disciplinary action or lower PM score – or any of that adds into

it, to where, okay, so I'll never raise my hand again, you know."  He also testified that when he raised concerns, which was what he and other employees were formally encouraged to do, he would be labeled a "troublemaker . . . just trying to hold up production."  Barnett testified that he heard of one employee who was physically assaulted for raising safety concerns: a colleague told him about another colleague "pushing her to work outside the procedures.  And she told me that he actually put his arm against her and pushed her against the wall and was pointing in her face and telling her to get on board and this was a good ol' boys' program, or something like that."

n)      Barnett also testified as to a widespread safety issue that Boeing has not resolved, based on his personal knowledge and the discovery in his case: he and his team had earlier identified 75 defective oxygen squibs on planes.  But while he has seen representations by Boeing to the FAA that it had conducted a thorough investigation, he believed, based on his own knowledge coupled by Boeing's discovery, that Boeing had not done so.  He also believes that Boeing conceals evidence from the FAA.  He also testified that defective oxygen squibs are actually a major safety concern because "the slightest little contamination inside the system will actually cause it to react with the pure oxygen and – and could cause it to explode.  So this is very concerning because this shows, by objective evidence, that he took an oxygen – a contaminated oxygen tube out of the – out of the scrap bin and gave it to production to install.  So we could very well have a contaminated oxygen tube out there on an airplane right now that, if that part of the system is activated, it will bring the whole plane down."

o)      Barnett also testified as to an anti-union attitude at Boeing.  One of the comments on a performance review he got expressed that "leadership would give hugs and

high fives of his departure. . . .  It's known most [of] his QTs have signed cards."  The signed cards refer to cards where members expressed their support for unionizing the plant. He also received anti-union training where he was told he could not accept union election-support cards, "you, have them put it on a desk.  And if you accidentally knock them off in the trash, oh, well, you know, so be it[.]"

223.     Furthermore, the PSI Memo includes a report where the FAA investigated some of Barnett's allegations and substantiated two of them, which was that "BSC [Boeing South Carolina] failed to[] [f]ollow their quality system for nonconformance records . . . [and] [p]roperly track nonconforming parts."  FAA interviews with Boeing South Carolina personnel concluded, in an internal investigation, that "nonconforming parts lacked sufficient documentation to determine if they were scrapped or reworked to meet design requirements.  The FAA determined the location of these parts is unknown and they are considered lost."  The FAA also found that approximately four-fifths of the nonconforming parts records still "need to be researched."  As a result, "FAA concluded, after review of the BSC investigation documentation/records and BCA nonconforming parts processes, the BSC personnel did not follow approved quality system processes to track and disposition nonconforming parts.  As a result, 53 nonconforming parts are known to have been lost."  Thus, "[a] violation of a regulation or standard of the FAA **was substantiated**."  [Emphasis in original.]

224.     Summarizing the Senate PSI staff's findings thus far, which are only the tip of the iceberg, Senator Richard Blumenthal stated that Boeing's "culture . . . continues to prioritize profits, push limits, and disregard its workers.  A culture where those who speak up are silenced and sidelined while blame is pushed down to the factory floor. . . .  A culture that enables retaliation

against those who do not submit to the bottom line. A culture that desperately needs to be repaired."

### I.   Safety Regulators Find Boeing's Current Safety Culture and Practices Are Inadequate

225.    An FAA Expert Panel issued a report (the "FAA Expert Report") shortly after the AA Flight 1282 incident covering inspections from the period after the 737 MAX crashes, which further criticized the disconnect between Boeing's nominal commitment to safety and the on-the-ground reality of a culture that continued to focus on rushing production. The FAA Expert Report was required under the 2020 Aircraft Certification, Safety, and Accountability Act, which was passed after the 737 MAX crashes. This law required an expert panel to review the safety management processes of each holder of the Organization Designation Authorization ("ODA"), which allowed airplane manufacturers to be delegated authority under the FAA.

226.    The FAA Expert Report, issued in late February 2024, was highly critical of Boeing's safety culture. The Expert Panel's work spanned approximately one year, from approximately March 2023 to February 2024, when the Expert panel reviewed Boeing documents, visited Boeing facilities, and interviewed Boeing employees. The Expert Panel identified 27 specific areas where Boeing had safety issues, the most notable of which include: 1) management who determined employees' compensation also oversaw those employees' safety concerns; 2) there was inadequate knowledge or awareness at all levels of the Company by employees of the Company's safety culture practices and procedures, and they did not understand their roles, their purpose, and were skeptical the systems would last; 3) there was not a consistent and clear process for employees to report safety concerns; 4) the documentation of the SMS was complex and constantly changed; and 4) Boeing did not successfully retain key staff who oversaw the self-certification process.

227.     The FAA Expert Report found "a disconnect between Boeing's senior management and other members of the organization on safety culture.  Interviewees, including ODA Unit Members (UM), also questioned whether Boeing's safety reporting systems would function in a way that ensures open communication and non-retaliation."  The FAA Expert Report also observed "inadequate and confusing implementation of the five components of a positive safety culture (Reporting Culture, Just Culture, Flexible Culture, Learning Culture, and Informed Culture)."  And while the FAA Expert Report did conclude that at least nominally, Boeing's Safety Management Systems ("SMS") procedures "reflect[ed]" the FAA's SMS framework, the "Boeing SMS procedures are not structured in a way that ensures all employees understand their role in the company's SMS.  The procedures and training are complex and in a constant state of change, creating employee confusion especially among different work sites and employee groups.  The Expert panel also found a lack of awareness of safety-related metrics at all levels of the organization; employees had difficulty distinguishing the differences among various measuring methods, their purpose, and outcomes."

228.     The FAA Expert Report further found that while "Boeing's restructuring of the management of the ODA unit decreased opportunities for interference and retaliation against UMS," it "still allows opportunities for retaliation to occur, particularly with regards to salary and furlough ranking."  Furthermore, the FAA Expert Report concluded that there were "additional issues at Boeing that affect aviation safety, which include inadequate human factors consideration commensurate to its importance to aviation safety and lack of pilot input in aircraft design and operation."  And while the Expert Panel was not required to investigate specific incidents, "on several occasions during the Expert Panel's activities, serious quality issues with Boeing products

became public.  These quality issues amplified the Expert Panel's concerns that the safety-related messages or behaviors are not being implemented across the entire Boeing population."

229.  Further explaining its findings, the FAA Expert Report explained that the FAA has adopted a safety culture assessment model based on five components, which Boeing has also nominally adopted: Reporting Culture, Just Culture, Flexible Culture, Learning Culture, and Informed Culture.  But "Boeing seems to have focused its safety culture implementation efforts on the Just Culture and Reporting Culture components" while neglecting other components. Furthermore, "the Expert Panel observed throughout the discovery and assessment process that [Boeing's leadership's] attention was given to Speak, with little or no attention given to Seek or Listen."  The Expert Panel noted that Boeing did not take the opportunity to seek its input on safety culture, SMS, or ODA.

230.  Furthermore, the Expert Panel also criticized Boeing for "a lack of awareness of safety-related metrics at all levels of the organization, and significant skepticism expressed by Boeing employees regarding the lasting power of the SMS implementation."  Moreover, Boeing's safety culture was focused too much on maintaining existing systems: "During interviews, Boeing employees highlighted that SMS implementation was not to disrupt existing safety program or systems."  Moreover, the Expert Panel found that SMS was too cabined rather than being suffused throughout the organization: "SMS operating procedure documents spoke of SMS as the overarching safety program but then also provided segregation of SMS-focused activities from legacy safety activities (often referred to within Boeing as Safety Review Board or SRB activities)."  Boeing also focused on counting the number of employees who received SMS training rather than whether they really learned: "No measures of competency were included in the training measures."

231.     The Expert Panel also expressed concern with the declining experience level of ODA employees: "Current personnel are sufficient, but the ability to ensure adequate experience with aviation safety requirements, processes, and procedures is declining.  Similarly, sufficient, relevant, and/or current experience in the manufacturing and engineering arenas decreased as the more seasoned staff left or took retirement during the pandemic."  Furthermore, there was insufficient organization to ensure that expertise was properly deployed: "The reliance on dispersed engineering experience, expertise, and guidance does not appear to be coordinated or consistently monitored for sufficiency in numbers, experience, expertise, or communication channels."  This was a worse problem outside Washington, where engineers often felt isolated or unsupported: "Some Engineering Unit Members (E-Ums) outside the Washington state area felt isolated in work and decision-making processes; they reported feeling less supported, with little organized mentoring or knowledge sharing.  The lack of ability in some organizations to openly exchange information with E-Ums during the design phase of a certification project may be hampering the engineering process."  These problems "present[] difficulty in fulfilling multiple roles for the more experienced members of the ODA units.  The reliance on the limited experience and expertise is troubling when recruitment is difficult for the entire aviation industry.  It also lessens the opportunity for knowledge to pass from one generation to the next when the more advanced experts are required to perform more and more delegated functions."  Moreover, while "[t]he ability to comply with the ODA's approved procedures is present; however, the integration of the SMS processes, procedures, and data collection requirements has not been accomplished."

232.     The Expert Panel also flagged Boeing's decline in incorporating human factors into safety considerations, by highlighting how during the development of earlier plane models 757 and 767, "BCA's human factors in flight deck design and operations were the gold standard with

pilots, engineers, product support, and human factors specialists. These human factors specialists worked closely and collectively in the Seattle area. Since then, the role of human factors and its influence eroded due to a series of administrative decisions at Boeing, which includes reorganization, decentralization, downsizing, and relocating the company's headquarters."

233. In a section detailing its findings, the Expert Report highlighted many criticisms and concerns (with only a few findings being positive). Among the criticisms the Expert Panel had were:

a)    "[M]any Boeing employees did not demonstrate knowledge of Boeing's enterprise-wide safety culture efforts, nor its purpose and procedures."

b)    "[A] majority of Boeing employees did not have skillful awareness with the concepts of Just Culture and Reporting Culture. . . . Employees were less aware of daily activities or company actions that demonstrated the components of Informed, Flexible, and Learning Culture."

c)    Boeing had a reporting system in its Washington-area unionized workplaces, but not in all sites, which the Expert Panel observed would be helpful for supporting SMS.

d)    Boeing structurally risked allowing retaliation by having supervisors also investigate safety complaints: "The Expert Panel learned managers that are authorized to oversee employee performance evaluations, salary decisions, promotions, and disciplinary actions might also be tasked with investigative duties in the SMS framework. This arrangement could lead to a manager investigating a report within their own reporting chain, potentially compromising Boeing's commitment to a non-retaliatory and impartial

environment.  This dual responsibility and authority create, among some employees, hesitation in reporting safety concerns for fear of retaliation."

e)       Furthermore, the Expert Panel raised concerns about the reporting process in Boeing: "The Expert Panel could not identify a consistent and clear safety reporting channel or process within the business unit, nor a successful process in which the employee is informed of the outcome of the report.  Employees did not understand how to utilize the different reporting systems, which reporting system to use and when.  Employees also preferred to avoid all reporting systems, including Speak Up, and favored to report issues to their manager.  The Expert Panel is concerned that this confusion about reporting systems may discourage employees from submitting safety concerns."  Furthermore, the fact that Speak Up is a relatively new program also makes employees skeptical of it: "Speak Up is viewed within Boeing as a new reporting program (though it was established in 2019), associated with the SMS program, and is consistent with the intent of the Reporting Culture component of Boeing's positive safety culture effort.   Boeing's governing document for SMS states its commitment to Speak Up as a preferred method of reporting for employees.  Employee interviews revealed distrust in the anonymity of the Speak Up program, which questions the effectiveness of this reporting program.   Ultimately, employees prefer to report safety issues to their managers."

f)       Moreover, the Expert Panel was concerned whether reports to management were being handled consistently and comprehensively: "The Expert Panel could not verify whether safety concerns reported directly to the management chain were captured and resolved in a systematic manner.  The Expert Panel observed that both company and contract employees use the management chain to report most concerns. . . .   When

employees report through the management chain, the reports are not consistently submitted into Boeing's SMS."

g)     "[M]any Boeing employees did not demonstrate knowledge of Boeing's SMS efforts, nor its purpose and procedures."

h)     "Boeing primarily focused its SMS implementation efforts on safety risk management (SRM), which is only one fundamental pillar of the ICAO or Boeing SMS structure.  To some extent, Boeing also focused on the pillar of safety policy.  ICAO guidance offers SMS is intended to be implemented as an integrated structure.  Successful implementation requires all pillars of the ICAO SMS structure, which are safety policy and objectives, safety risk management, safety assurance, and safety promotion.  The Expert Panel observed that these pillars have not been fully implemented."

i)     "The Expert Panel found the complexity and amount of SMS documentation, the constant state of document changes, and the lack of clarity in the revision descriptions, creates employee confusion.  This contributes to the delay and improper development of SMS at Boeing."

j)     "Boeing employs a SMS dashboard to track information on safety goals with key performance indicators (KPI's) addressing SMS, conformity, compliance, and safety assurance.  The Expert Panel found that there is little awareness among employees and some managers of the existence and differences among the various measuring methods, their purpose, and outcomes."  Furthermore, "[t]he Expert Panel is unable to distinguish between legacy tracking methods and the SMS measures.  The continued separation of the legacy reporting systems is adding to the ineffectiveness to the KPIs under its SMS.  The

Expert Panel found that survey responses and interviews reflected this confusion. There is also a lack of development of measures that feed into Boeing's SMS."

k)      "Boeing employees across all disciplines and roles expressed concerns over the lasting power of the SMS program and safety initiatives. This raises concerns about the sustainability of SMS. The lack of feedback and/or delay in providing feedback jeopardizes the longevity of SMS." Moreover, "[s]ustainability is additionally challenged by Boeing's strategy to not disrupt legacy safety processes."

l)      The Expert Report also noted Boeing's cabined approach to SMS: "The ICAO Safety Management Manual describes the benefits of comprehensively applying an integrated SMS across an organization. Boeing provided evidence that it is using its SMS to evaluate product safety decisions and some business decisions. The Expert Panel's review of Boeing's SMS documentation revealed detailed procedures on how to use SMS to evaluate product safety decisions, but there are no detailed procedures on how to determine which business decisions affect safety or how they should be evaluated under SMS."

m)      The Expert Report expressed concern with whether the FAA would be able to provide effective oversight of Boeing's implementation of expanding SMS regulations, and also noted: "Interviews with FAA employees and managers also conveyed concerns about the sustainability of Boeing's SMS."

n)      "The ODA reorganization and Boeing's UM interference training measures did not eliminate the potential for negative behavior toward UMs (e.g., limited career growth) when UMs raise safety concerns or exercise delegated functions that result in decision not favorable to the company. . . . Some UMs reported changes in behavior from

111

their leadership and unrequested changes in assignments."  Moreover, "[o]ther non-UMs and UMs not performing delegated functions shared their hesitancy to collaborate with each other on compliance discussions.  Some interviewees indicated discussions between UMs and the applicant were perceived as interference when the conservation around the showing of compliance became contentious."

o)      The Expert Panel also raised concerns that Boeing was on paper implementing measures that it did not try to implement in reality: "Boeing undertook many measures to ensure the capability of its ODA unit to make reasonable and appropriate decisions regarding its delegated functions.  However, Boeing did not provide the Expert Panel with metrics or KPIs relative to those initiatives when asked for such data.  Boeing did not produce quantifiable measures which led Expert Panel members to conclude Boeing is not actively monitoring the efficacy of these initiatives.  Consequently, the Expert Panel cannot ascertain the tangible impact of Boeing's measures or to what degree Boeing instilled a commitment to safety above all other priorities among its employees supporting ODA functions."

p)      "The Expert Panel is concerned that Boeing is not taking sufficient actions to maintain and expand its UM pipeline. . . .  [T]here is a major concern that experienced personnel are leaving and not being replaced and efforts to retain them are not effective or timely. . . .  Given the timeframe required to properly train a UM, and taking sufficient actions to maintain and expand its UM pipeline will be key for Boeing to maintain or expand its current production rates."

q)      "ODA organizational structure changes are not yet fully implemented. Some E-UMs report having little to no interaction with their new supervisors and instead

still report to their previous supervisory structure, despite the 'on paper' change in reporting."  Moreover, "None of the written procedures the Expert Panel reviewed defines how Boeing achieves its work as reflected in the new organizational structure.  Instead, the documents still refer to the previous organizational structure, exacerbating the lack of effectiveness of the organizational change."

r)       The ODA evaluation system creates conflicts by having one's manager whose business one is supposed to oversee also be the one who evaluates the overseer: "As required by FAA Order 8100.15B, Boeing as the ODA holder conducts annual self-audits that evaluate the E-UMs.  Boeing's current method involves both ODA and non-ODA personnel to assess each E-UMs performance of their authorized functions.  The involvement of the E-UM company supervisor, who has authority over the E-UM's compensation, career path, and annual assessment of their performance of authorized functions, could present a conflict and erode an E-UM's independence and protection from interference."

s)       The Expert Panel "found a variation among UMs regarding how well they felt supported by ODA management when performing their delegated functions.  Specifically, non-Renton and non-Everett sites felt less supported by ODA management.  The physical separation between the sites causes employees to feel communication is not at the same level as the main sites.  Boeing does not appear to effectively mitigate the results of a physical separation of employees."

t)       "[I]nstances were described where Boeing, as the applicant, had agreements with FAA management personnel that overruled the OMT and UM decision without their consultation."

u)      "[P]ilot inputs within Boeing are neither directly nor consistently delivered to the highest-level decision venues where pilots did not occupy a seat at the table.  Some interviewees believed that pilots views of being heard was dependent on the individuals occupying executive positions within Boeing and the organizational structure.  Concerns were expressed during interviews that the chief pilot position does not reside within the organizational structure affording it the authority and responsibilities commensurate with the position equivalent to the chief engineer."

v)      "The Expert Panel could not find command media that ensured the pilot's safety of flight concerns are adequately addressed independent of the individual occupying executive leadership positions.  The Expert Panel recognizes Boeing's pilots are uniquely qualified to identify safety issues and hazards inherent to the aircraft design that may affect the safe operation of an aircraft."

w)      "Although Boeing provided the Expert Panel a roadmap to implement ODA and SMS program enhancements, at the time of the Expert Panel's review, the SMS and ODA changes described in the roadmap were not yet completed."

234.    In Senate testimony in April 2024, members of the Expert Panel emphasized just how problematic Boeing's culture was.  In written testimony, member Javier de Luis wrote that he found it "distressing" that Boeing's leadership had not "gotten it" that safety should be a priority over production speed after the MAX crashes, but rather, after the AA Flight 1282 incident, their CFO, West, admitted that speed was a priority "over getting it done right."  He also stressed how the "disconnect" that the Expert Report pointed out about Boeing's management's verbal commitment to safety and the lived experience of Boeing's workforce was "present at almost all levels and almost all worksites."  de Luis explained that Boeing workers "hear 'safety is our

number one priority,' but they see that that is only true as long as you meet your production milestones.  They hear 'speak up if you see anything unsafe,' but they see that when they do, there's little feedback, and if they insist, they may find themselves on the short end of the stick next time raises are distributed, or worse."  In his oral testimony, de Luis added that among Boeing workers who raised safety concerns, "there was a very real fear of payback and retribution if you held your ground."

235.    Furthermore, an FAA Audit of Boeing after the AA Flight 1282 incident, though the report has not been publicly released, concluded that Boeing failed almost one-third of its safety commitments.  On March 4, 2024, the FAA announced a summary of its findings.  The FAA stated that it "found multiple instances where [Boeing and Spirit] allegedly failed to comply with manufacturing quality control requirements."  It found "non-compliance issues in Boeing's manufacturing process control, parts handling and storage, and product control."

236.    The *New York Times* reviewed a presentation of these audit findings, and reported that out of 89 product audits specific to Boeing, the FAA found that Boeing failed 33 of them – more than one-third.  The FAA also conducted 13 product audits for Spirit, which failed seven of them.  The FAA has thus far declined to release the full audit report because it is still actively investigating Boeing in response to the AA 1282 incident.  Moreover, even as the FAA found so many problems, its investigation was related only to the 737 MAX and not to Boeing's other planes, despite their well-documented safety and quality issues.  Mike Whitaker, the FAA administrator, said at a news conference, "It wasn't just paperwork issues, and sometimes it's the order that work is done. . . .  Sometimes it's tool management – it sounds kind of pedestrian, but it's really important in a factory that you have a way of tracking tools effectively so that you have the right tool and you know you didn't leave it behind.  So it's really plant floor hygiene, if you

will, and a variety of issues of that nature."  And the *Times* reported that concerning the specific issue in AA Flight 1282, where Boeing workers did not replace bolts in a door plug, that problem may have been systemic because Boeing failed the product audit relating to that part of the manufacturing process.  Whitaker has also stated that audits may broaden if FAA determines there are more systemic issues.  Whitaker also told Congress that it is conducting enhanced scrutiny of Boeing.

237.    The audit also found that Spirit used unorthodox methods such as dish soap as a lubricant or hotel key cards to check a door seal, which was not documented in the production order, but which was approved by Boeing.

238.    Also in March 2024, in testimony before the Senate, the NTSB Chair, Jennifer Homendy ("Homendy"), expressed frustration with Boeing's lack of cooperation with the NTSB's investigation and shoddy process.  She noted that while the work relating to door plugs was performed by a team of 25 people and a manager at the Renton facility, Boeing to date had not given NTSB the names of these personnel, despite repeated requests.  Moreover, Boeing had, despite repeated requests, not provided the documentation that would establish the paper trail for the process to show how the door plug was installed or how the work was carried out.  Homendy also stated that NTSB had been unable to interview the team's manager, who was out on medical leave.  Homendy testified, "We don't have the records. . . .  We don't have the names of the 25 people in charge of doing that work in that facility.  It is absurd that two months later, we don't have that."   After the hearing, Boeing stated that "in response to a recent request," it has "now provided the full list of individuals on the 737 door team."

239.    But Boeing also claimed that the door plug's removal was "undocumented," even though such documentation was required by Boeing's own processes.  Boeing also claimed that it

only received a request for those 25 names a few days before, on Saturday, March 2 (when the hearing was on March 6), thus repeating its long pattern of deflection and denial.  This followed Senator Ted Cruz of Texas castigating Boeing for its refusal to cooperate and asking Chair Homendy to provide those 25 names in a week's time, and Chair of the Senate Commerce Committee, which held the hearing, Washington Senator Maria Cantwell, stating that this lack of cooperation was inconsistent with what Calhoun had personally pledged to her to "work transparently with" regulators.

240.    Also in March 2024, Boeing said it was unable to find records or video of work on the Alaska Airlines plane, because, Boeing claimed, the footage was overwritten as part of Boeing's standard practice to maintain video recordings on a rolling 30-day basis, even though NTSB had been requesting information since four days after the accident in January 2024.  Moreover, that same plane had undergone rivets repair just a few months earlier.  Homendy wrote in a letter to the Senate, "[t]o date, we still do not know who performed the work to open, reinstall, and close the door plug on the accident aircraft.  Boeing has informed us that they are unable to find the records documenting this work."  Moreover, "[a] verbal request was made by our investigators for security camera footage to help obtain this information; however, they were informed the footage was overwritten."  Homendy concluded, "[t]he absence of those records will complicate the NTSB's investigation moving forward."  Moreover, while Boeing gave NTSB investigators the names of individual employees, it "did not identify which personnel conducted the door plug work[.]"  When pressed, Calhoun told Homendy that there were no records of the work performed.  Homendy further wrote, "I have become increasingly concerned that the focus on the names of individual front-line workers will negatively impact our investigation and

discourage such Boeing employees from providing NTSB with information relevant to this investigation[.]"

241.    In May 2024, Boeing released its third annual safety report, which showed that since the AA Flight 1282 incident four months earlier, there was a 500% increase in employee complaints about safety and quality, compared to the year before, lodged through Boeing's Speak Up tool.  This safety report came approximately one day after FAA Administrator Mike Whitaker warned, in a TV interview with *ABC News*, that Boeing has a "long road to get back to where they need to be making safe airplanes."

242.    On May 30, 2024, Boeing submitted its safety plan to the FAA but offered only a few scant details to the public.  At a press conference announcing receipt of the safety plan, FAA Administrator Mike Whitaker emphasized, "The 90-day plan . . . is not a finish line. . . .  We will not approve production increases beyond the current cap until we're satisfied," which he estimated would take at least a few months.  Boeing's built-up quality problems and its belated attempt to begin to remedy them have slowed production to below the cap, so that on average it has only been producing 21 planes over the last three months.  CFO West said on May 23 that the Company expects to spend more money than it makes, with a $4 billion cash burn expected in the fourth quarter alone.

243.    In describing the safety plan, COO and BCA CEO Stephanie Pope stated that it "includes major investments to expand and enhance workforce training, simplify manufacturing plans and processes, eliminate defects at the source, and elevate our safety and quality culture, along with specific measures to monitor and manage the health of our production system."  Pope's email to employees, also published by Boeing, included some details, such as that Boeing added 300 hours of training material and deployed trainers and coaches to the production lines; cleared

more time for managers to spend more time on the factory floor by reducing their meetings and tasks, as well as "simplifying 400 quality-related command media[,]" "[i]mplemented quality inspection and approval of 737 fuselages before shipment from supplier" and "[r]e-established daily compliance sweeps[,]" and instituted a "[p]ilot program to make sure airplanes are 'move ready' as way to manage traveled work" and "[r]e-launched Employee Involvement Teams."

244.    But the specific steps that Boeing detailed raise more questions, such as why Boeing would have eliminated "daily compliance sweeps" or "Employee Involvement Teams" in the first place, when the 737 MAX groundings, the repeated quality and safety issues since that time, and its commitments to enhance safety oversight in the 2019 Delaware Action would have all indicated that Boeing should never have *reduced* safety and quality oversight to begin with. Similarly, even though the quality issues with Spirit had been known for *years*, it is troubling that Boeing has only now implemented inspection and approval of 737 fuselages *before* shipment from the supplier.

245.    Whitaker also emphasized how the FAA would continue to provide enhanced oversight, including meeting with Boeing every week "to review their performance metrics, progress and any challenges they're facing in implementing the changes."  Whitaker further emphasized, "We need to see a strong and unwavering commitment to safety and quality that endures over time.  This is about systemic change, and there's a lot of work to be done."

246.    This enhanced oversight, however, maintains one feature that had caused previous problems, which is that Boeing appears to be able to determine its terms.  Boeing sets the targets by which it is to be measured.  Whitaker confirmed at the press conference that *Boeing* set six KPIs by which the FAA will measure improvements.  Meanwhile, the Company has released almost no specific details of the plan, and Whitaker demurred when asked about details, saying

that is up to Boeing.  Among the few details the Company has released are that it would work to purchase new tools and equipment, implement daily compliance sweeps, deploy more workforce coaches, retain more trainers and training, and have managers spend more time on the factory floor.

247.    The FAA's press release regarding what steps it is requiring or has required Boeing to do also raises further questions, because it indicates that many basic safety measures at Boeing were not implemented before.  For example, the FAA states, "Boeing is now required to have a mandatory Safety Management System, which will ensure a structured, repeatable, systematic approach to identifying hazards and managing risks."  But this raises the question of why an SMS was optional or even nonexistent for Boeing after it made commitments to enhance safety oversight as part of the previous shareholder derivative suit and after its 737 MAX fleet was grounded for almost two years, as well as the intermittent two-year production or delivery halts for the 787 Dreamliner due to the latter's quality issues.  Furthermore, the "actions" Boeing is required to take appear to be late and should have been taken beforehand, because they include such elementary items as:

- Strengthening its Safety Management System, including employee safety reporting[;]

- Simplifying processes and procedures and clarifying work instructions[;]

- Enhanced supplier oversight[;]

- Enhanced employee training and communication[;]

- Increased internal audits of production system[.]

248.    Recently, the FAA told *Bloomberg News* that it received 11 times as many whistleblower reports concerning Boeing in the first five months of 2024 compared to all of 2023. The increased number of complaints by Boeing employees and ex-employees coincides with the

FAA conducting "multiple active investigations" into the Company, as Whitaker testified to at a June 2024 Senate hearing. The Company itself admitted that its "Speak Up" program received five times as many submissions in the first two months of 2024 as the same period in 2023. But the FAA Expert Report had pointed out that many employees did not trust that the program was truly anonymous.

249.    Also in May 2024, the FAA announced an inquiry into whether Boeing completed required inspections that ensured that the 787 Dreamliner fuselages were properly built, after Salehpour came forward regarding how Boeing workers would use blunt force to force together parts, which threatened the long-term stability of the plane. Boeing also was required to reinspect all 787 Dreamliner planes still in its production system and to create a plan to address the fleet that is already in service.

250.    The FAA inquiry was triggered by Boeing disclosing that it may not have conducted all the required quality inspections on the bonding between the wings and fuselage of some 787 Dreamliners. The FAA, therefore, "is investigating whether Boeing completed the inspections and whether company employees may have falsified aircraft records[.]" Boeing's own disclosure, arising from an April 29, 2024 memo circulated internally by Scott Stocker, the head of the 787 Dreamliner Program, came after Salehpour's explosive whistleblower testimony in the Senate more than a month earlier. The FAA also ordered Boeing to reinspect the 787 Dreamliners still in production, which may lead to further delivery delays.

251.    Recently, in late June 2024, the NTSB sanctioned Boeing for improperly sharing information of the AA Flight 1282 incident while NTSB's investigation is pending. During a press tour of Boeing's Renton facility led by Lund, she told reporters about problems with the AA Flight 1282 jet fuselage and discussions between Spirit and Boeing regarding what to do about five

nonconforming rivets.  Lund stated that it was determined that a door plug would need to be removed, but in violation of Boeing's policies, paperwork documenting the work was not created. Lund also stated that when another Boeing crew closed the door plug, "[t]hey did not reinstall the retaining pins. . . .  That is not their job.  Their job is just close it, and they count on existing paperwork."  NTSB took the rare step of sanctioning Boeing for sharing this non-public information and speculating about the cause of the accident; for "blatantly violating" NTSB's rules regarding active investigations, Boeing has now been barred from having further access to the agency's investigative information and will no longer be allowed to ask questions at an investigative hearing NTSB will hold in August.

252.    But in addition to the blame-shifting Lund engaged in, and angering the NTSB by leaking investigative details in an attempt to color reporters' perception of Boeing's culpability, Lund made a startling admission about the Company's continued failure to exercise safety oversight after the MAX crashes.  According to a *New York Times* report of the factory tour, Lund said that while the earlier MAX crashes led Boeing to reform its engineering practices, the AA Flight 1282 incident spurred improvements to the production process, and she spun this as, "[w]hen this accident came along, it gave us a chance to look at a different area[.]"  This amounts to a startling admission of Boeing management's whack-a-mole approach to safety oversight where it cabined its reforms to one area even though the MAX crashes revealed a failure of safety oversight that should have led to a broader reexamination of Boeing's practices that impact safety, of which the production process would have been the most obvious, because as the MAX crash crisis unfolded, there were simultaneous reports about Boeing's rushed production process, including Congressional testimony by Ed Pierson, a former Boeing employee, and part of the

reason FAA delayed the recertification of the MAX was its examination of Boeing's manufacturing rather than just the design of the plane.

253.    On July 8, 2024, the FAA issued an airworthiness directive that ordered inspection of 2,600 Boeing 737-NG and MAX planes for an issue relating to passenger oxygen masks, after multiple reports that these units were shifting out of position, which could result in an inability to provide oxygen to passengers if the plane suffers from depressurization.  Boeing had issued a bulletin to airlines on June 17, 2024, to request visual inspections, when it found out that an adhesive introduced on these straps in August 2019 caused these shifts.  Boeing states that it has since reverted to using the previous adhesive on new deliveries.

**J.    Boeing Agrees to Plead Guilty to Violating the DPA, While the SEC and DOJ Open Additional Inquiries that Could Result in Heavier Civil and Criminal Liability**

254.    On May 9, 2024, the SEC opened an inquiry into whether Boeing executives made misstatements regarding the Company's safety practices, both from before and after the AA Flight 1282 incident.

255.    This inquiry follows a settlement of $200 million in September 2022 reached after the 737 MAX (series 8) crashes where the SEC already alleged that Boeing had misleadingly stated, after both crashes, that the plane was safe, despite knowing that the problems with the MCAS design posed an ongoing safety problem.

256.    In March 2024, the DOJ opened a criminal inquiry into the AA Flight 1282 incident, and the FBI began to notify passengers that they may be a "possible victim of a crime."

257.    On May 14, 2024, the DOJ (through its Criminal Division, Fraud Section, and the U.S. Attorney's Office for the Northern District of Texas) informed the Texas Federal Court, where the DPA is docketed, that the U.S. government "has determined that Boeing breached its obligations under [the] DPA . . . by failing to design, implement, and enforce a compliance and

ethics program to prevent and detect violations of US fraud laws throughout its operations." Therefore, "Boeing is subject to prosecution by the United States for any federal criminal violation of which the United States has knowledge, including, but not limited to, the offense described in Paragraph 1 of the DPA and charged in the one-count Criminal Information that accompanied the DPA (ECF No. 1), or violations related to conduct described in the DPA's Statement of Facts."

258.    Families of the MAX crash victims have continued to press the DOJ to bring charges against Boeing and its executives, viewing a DPA as akin to a slap on the wrist.  The families have asked the DOJ to seek or impose the maximum fine of almost $25 billion against Boeing, and only waive a portion of the fine if Boeing agrees to an independent corporate monitor and further improvements to its safety program, while a lawyer for the families characterized Boeing's conduct as "the deadliest corporate crime in U.S. history."

259.    At the end of June 2024, the DOJ informed Boeing that it will criminally charge Boeing with conspiracy to defraud the United States for violating the DPA.  Late on July 7, 2024, Boeing and the DOJ informed the Texas Federal Court that Boeing will agree to plead guilty to a felony charge of conspiracy to defraud the United States.  The DOJ will seek a three-year probation term for Boeing, and as a condition of this probation, will require Boeing to retain an independent compliance monitor to ensure that Boeing improve its safety practices.  In addition, Boeing will invest at least $455 million in compliance and safety programs.  Boeing will also pay a fine of approximately $487.2 million (the maximum under the law), though the DOJ asked the Texas Federal Court to give Boeing credit for the $243.6 million paid earlier under the DPA.  The Board will also meet with the crash victim's families.  The guilty plea does not confer immunity to individuals, including executives, nor does it prevent charges from being filed relating to other conduct, such as wrongdoing relating to the AA Flight 1282 incident.  There is also no cap to

restitution.  A guilty plea may bar Boeing from defense and other government contracts, though Boeing can seek a waiver.  Boeing's defense business accounts for approximately one-third to two-fifths of Boeing's total revenues; last year, it was awarded contracts with the U.S. Department of Defense valued at $22.8 billion.

260.    According to Paul Cassell, a lawyer for families of the MAX crash victims, they will oppose the plea deal, because they view it as being too lenient, and they instead seek a public jury trial for "the facts surrounding the case [to] be aired in a fair and open forum[.]"  Another attorney for the MAX crash victims, Erin Applebaum, stated, "We are extremely disappointed that DOJ is moving forward with this wholly inadequate plea deal. . . .  [This] is still nothing more than a slap on the wrist and will do nothing to effectuate meaningful change within the company[.]" The families asked the DOJ to seek or impose the maximum fine of almost $25 billion against Boeing, and only waive a portion of the fine if Boeing agrees to an independent corporate monitor and further improvements to its safety program, while a lawyer for the families characterized Boeing's conduct as "the deadliest corporate crime in U.S. history."

261.    Boeing and the DOJ will file the final plea agreement by July 19, 2024, and afterwards, it will be heard by the Texas Federal Court.  Crash victims' families will be entitled to be heard.  The Texas Federal Court will then have to decide whether to accept the plea agreement, so Boeing remains at risk of facing greater criminal liabilities over the MAX crashes.

262.    Meanwhile, the DOJ is still criminally investigating Boeing over the AA Flight 1282 incident.

**K.      Boeing Management Has Caused the Company to Issue Misleading Proxies that Tout the Company's Safety Record**

263.    Boeing management further caused the Company to issue misleading proxies in 2022 through 2024 that tout the Company's safety record and quality even though they knew this to not be the case.

264.    In the Chair's letter to Boeing stockholders for its Definitive Proxy Statement filed with the SEC on March 11, 2022 (the "2022 Proxy"), Kellner wrote, "2021 was an important rebuilding year as our actions to improve performance began to take hold and we focused on our core values of safety, quality, integrity and sustainability. . . .  With every action, we are strengthening engineering excellence and driving stability in our operations while holding ourselves accountable to the highest standards."  He touted Boeing's Board refreshment, noting: "Since the 2019 Annual Meeting, we have added six independent directors who collectively bring significant experience in aerospace, safety, engineering, cyber/software, risk oversight, audit, supply chain management and finance.  Most recently, in June and August 2021, Lieutenant General Stayce D. Harris and David L. Joyce joined the Board.  General Harris is a highly accomplished leader with decades of experience flying Boeing aircraft and a demonstrated commitment to safety and integrity.  Mr. Joyce is a recognized aerospace industry leader who brings a track record of safety leadership, engineering expertise and operational excellence to our Board."  He also stated, "We remain committed to safety, quality, and transparency in everything that we do."

265.    The 2022 Proxy called for several stockholder actions, including electing the directors, approving (in an advisory capacity) senior executive compensation, approving the Company's Global Stock Purchase Plan, ratifying the appointment of Deloitte & Touche LLP as the Company's independent auditors, and voting on several other shareholder proposals.

266.    In building support for these actions, the 2022 Proxy repeatedly touted the

Company's safety oversight and commitment.

267.    In a section entitled, "Commitment to Safety and Quality," the 2022 Proxy states:

Safety and quality are the foundation of all that we do, and we continue to make significant progress in further strengthening our culture, processes and systems to ensure we always meet the highest standards. . . .

We have enhanced our policies and practices in several ways as part of our effort to strengthen safety, quality and engineering excellence. For example, our Board has deepened its safety, engineering and manufacturing experience, as well as enhanced its oversight of our engineering, design, development, manufacture, production, operations, maintenance and delivery of aerospace products and services through its Aerospace Safety Committee. Operationally, we brought together more than 50,000 engineering teammates into a single, integrated global organization to increase innovation, transparency, collaboration and accountability across all engineering designs and decisions. We also made key leadership and organizational appointments, including the appointment of our Chief Aerospace Safety Officer, as well as the establishment of our four operations councils overseeing all Boeing manufacturing, quality, supply chain and program management teams.

In addition, we are advancing our enterprise-wide Safety Management System, or SMS, and Quality Management System, or QMS, each designed to fully embed safety and quality in every aspect of how we design, build and support our products. The FAA formally accepted our SMS for the Commercial Airplanes business at the end of 2020, and in 2021 the FAA determined that the SMS meets regulatory expectations and is operating as intended.

We have also worked to foster and strengthen an inclusive workplace environment that is grounded in openness and trust and that encourages and rewards teammates for voicing concerns and sharing ideas. We have rolled out new reporting tools and, in 2021, we launched our Seek, Speak & Listen initiative to further encourage and empower employees to share ideas with both senior management and the Board. Also in 2021, we incorporated product safety, employee safety, and quality in order to tie executive compensation to performance in these areas.

268.    In a section entitled, "737 MAX Return to Service and 787 Progress," the 2022

Proxy states:

As we have taken action to sharpen our focus on safety, quality and transparency, the Boeing team has been steadfast in our commitment to safely return the 737 MAX to service through a comprehensive, robust and transparent certification process. We have worked closely with airlines throughout each of their return-to-

service processes, while continuing to support and follow the lead of our global regulators.

The 737 fleet is now safely flying in nearly every jurisdiction around the globe. With approximately 300,000 revenue flights and more than 720,000 flight hours completed between late 2020 and the end of 2021, the fleet is delivering reliability equal to or better than any fleet flying. Concurrently, we have received new 737 MAX orders from key customers at encouraging levels, as well as increased deliveries and steadily increased production—all with a singular focus on safety and quality.

\*\*\*

We are applying this same disciplined and detailed focus to the 787 program. As a result, we have identified areas where we and our suppliers can improve, and we engaged in a comprehensive effort to ensure every airplane in our production system conforms to our exacting specifications. While none of the identified issues represent immediate safety-of-flight concerns, we are working to ensure that our team and the FAA have plenty of time to complete the rigorous process to return to deliveries and establish stability and predictability going forward. While this work will continue to impact our near-term deliveries and financial results, it is a clear sign of our unwavering commitment to safety and quality and is the right thing to do for our customers and our future.

269.    These statements were materially misleading, as recent events have revealed that the 737 MAX is not "safely flying" because it continues to be plagued by safety problems in its manufacturing process, and that similar safety problems plague the 787 Dreamliner and its manufacturing process.   Thus, statements touting Boeing's positive safety culture are both affirmatively misleading, and misleading in that they omit material information, such as continued safety problems with Boeing planes, or the red flags that Boeing's Board ignored.

270.    In asking for shareholders to vote for their re-election, the directors touted their oversight of the Company, in particular with regard to safety:

**Governance Highlights**

| Board Structure and Independence | |
|---|---|
| | ✓ Independent Board Chair, hard-coded into our Corporate Governance Principles beginning in 2020 (page 16) |
| | ✓ Average independent director tenure of approximately four years |
| | ✓ Balanced and diverse group of independent Board nominees, the majority with tenure of fewer than three years (page 8) |
| | ✓ 10 of 11 director nominees are independent and all committees are composed entirely of independent directors |
| | ✓ Executive sessions of independent directors conducted after every regularly scheduled Board meeting |

| Board Oversight | |
|---|---|
| | ✓ Robust succession planning process for senior leadership positions, including in-depth meetings between individual directors and senior executives other than the CEO |
| | ✓ Extensive Board oversight of key strategic, operational and compliance risks, with a sharpened focus on risks related to safety and quality, cybersecurity, and climate change (page 21) |
| | ✓ Significant Board involvement in strategy development, such as efforts to reduce emissions in our production facilities, develop targeted community engagement strategies and enhance workforce diversity |
| | ✓ Regular visits to Boeing production sites by each director (with reduced frequency and added safety controls recently due to COVID-19) |
| | ✓ Board oversight of global ethics and compliance efforts, corporate culture, political advocacy, public policy, corporate sustainability, diversity, equity and inclusion, and charitable contributions |

| Strong Corporate Governance Practices | |
|---|---|
| | ✓ Active shareholder engagement throughout the year (page 17) |
| | ✓ Comprehensive annual evaluations of the Board, each of the committees, and individual directors (page 22) |
| | ✓ 100% attendance at all Board and committee meetings during 2021 (page 23) |
| | ✓ Robust Board refreshment process focused on diversity, expertise, and evolving Company priorities, resulting in strategic Board turnover |
| | ✓ Limits on director service on outside boards (page 7) |
| | ✓ Publicly disclosed policies and practices regarding political advocacy, including disclosure of trade association contributions of $25,000 or more (see www.boeing.com/company/key-orgs/government-operations/#/political) |
| | ✓ Directors required to hold equity-based compensation until they leave the Board |
| | ✓ Mandatory director retirement policy (page 26) |
| | ✓ Board and committees may hire outside advisors independently of management |
| | ✓ Annual Sustainability Report and Global Equity, Diversity and Inclusion Report outline our commitment to environmental, social and governance matters |
| | ✓ Strong Code of Ethical Business Conduct for the Board, with separate Code of Conduct for all employees |
| | ✓ Publicly disclosed Code of Basic Working Conditions and Human Rights, reflecting our commitment to the protection and advancement of human rights worldwide |

| Shareholder Rights | |
|---|---|
| | ✓ Robust proxy access right for shareholders seeking to nominate directors (page 87) |
| | ✓ Majority voting for all directors, each of whom is elected for a one-year term and is subject to a resignation policy in the event he or she fails to receive a majority vote |
| | ✓ No supermajority voting requirements |
| | ✓ Shareholder right to call special meetings |
| | ✓ No poison pill and any future poison pill must be submitted to shareholders |

[Emphasis added.]

271.    These statements were materially misleading because Boeing directors actually did not conduct the extensive safety oversight that they claimed to have done.  Rather, the Boeing directors' oversight failed to follow up on years-long red flags, and was narrowly cabined to a few issues that came in front of them.

272.    Furthermore, several of the director biographies, similarly, emphasized the directors' experience with safety oversight or risk management:

(a)    For Bradway, the 2022 Proxy reads: "Mr. Bradway brings to the Board critical skills in the areas of high technology, product development, financial oversight, product safety, and risk management. His experience as a senior executive in the

biotechnology industry, including as Chief Executive Officer, Chief Operating Officer, and Chief Financial Officer of Amgen, provides him with an extensive understanding of the strategic considerations and challenges associated with meeting the requirements of numerous safety and regulatory compliance regimes around the world. In addition, he previously served as a director of Norfolk Southern Corporation, one of the nation's largest railroad transportation companies, where virtually every aspect of operations is heavily regulated and subject to strict safety-related oversight. In recognition of Mr. Bradway's experience in corporate finance, risk management, and executive leadership, the Board elected him to serve as Chair of the Finance Committee."

(b)     Calhoun's biography emphasizes his experience in the aviation industry and his role in leading businesses through key transformations: "Mr. Calhoun brings a diverse skill set to the Board, including deep and long-standing aviation industry experience as Boeing's President and Chief Executive Officer, former Boeing Chair of the Board and independent Lead Director, and a multi-year tenure as the leader of GE's transportation and aircraft engines businesses. He also brings experience leading businesses through periods of change, having led Nielsen's transformation into a leading global information and measurement company. In addition, Mr. Calhoun brings to Boeing strong leadership and valuable insight and perspective on a wide array of strategic and business matters, stemming from his vast executive, management and operational experience at Blackstone, as well as at Nielsen and GE. Mr. Calhoun's significant global aerospace, manufacturing and high-technology industry expertise, as well as leadership experience on the boards of Caterpillar and Gates Industrial Corporation, position him well to serve on the Board and lead Boeing as President and Chief Executive Officer."

(c)     Doughtie's biography emphasizes her compliance and risk management experience: "Ms. Doughtie brings insights and expertise from her extensive experience in the accounting profession and executive experience leading a Big Four public accounting firm. She began her career in KPMG's audit practice in 1985 and held various national, regional, and global leadership roles, including lead partner for several of KPMG's major clients. Ms. Doughtie has had significant exposure to issues facing complex, global companies and has expertise in risk management, internal controls, culture change and regulatory compliance. Ms. Doughtie also previously served on the boards of Catalyst, Inc. and Chief Executives for Corporate Purpose and has been recognized for her leadership in inclusion and diversity and values leadership. Ms. Doughtie's financial expertise, executive leadership experience, risk management and regulatory skills, and experience driving culture change bring significant value to the Board."

(d)     Similarly, for Good, her biography emphasizes: "Ms. Good brings to the Board substantial experience in executive leadership, safety, corporate governance, financial management and accounting, as well as operational expertise in a highly regulated, capital-intensive industry. Ms. Good's record as Chief Executive Officer and Chairman of Duke Energy, one of the nation's largest grid and generation operators, enables her to advise management on a wide range of strategic, financial and governance matters, including the challenges associated with safety performance, large-scale capital projects, transformative technologies and crisis management."

(e)     For Lieutenant General Harris, her biography similarly emphasizes safety experience: "Lieutenant General Harris brings extensive aerospace and aviation experience to the Board. General Harris is an experienced Boeing 747 pilot, with over 10,000 flight

hours safely transporting passengers and cargo worldwide for United Airlines before her retirement in 2020. Her extensive experience as a pilot, together with her deep knowledge of safety protocols and flight procedures, adds to the Board's expertise in aviation safety and provides hands-on familiarity with pilots' and crew interaction with complex aerospace systems, including in particular Boeing aircraft."

(f)    Similarly, Johri's biography emphasizes: "Mr. Johri also brings to the Board unique insights relating to his senior leadership experience at United Technologies, a major supplier to aerospace companies like Boeing. In addition, as an independent director and audit committee member at Cardinal Health, Mr. Johri brings to the Board experience in risk oversight and corporate governance of a large company in a highly regulated industry."

(g)    Joyce's biography also emphasizes safety and regulatory experience: "Mr. Joyce brings to the Board vast aerospace, engineering and manufacturing expertise, as well as a demonstrated track record of safety leadership and operational excellence. He developed his in-depth knowledge of the challenges and opportunities facing the aerospace industry at General Electric Company. With 40 years of experience at GE Aviation including 12 years of service as President and CEO and four years as Vice Chairman of GE. He began his career at GE as a product engineer spending more than a decade designing and building both military and commercial engines. Mr. Joyce is recognized for his proficiency in product development, product management, and product support founded on an industry-leading safety management system, and focused on the military and airline customers."

(h)    The Board also emphasized Kellner's safety and regulatory experience: "Mr. Kellner brings to the Board extensive airline industry experience developed during

his 14 years of service in key leadership positions at Continental Airlines, including Chairman, Chief Executive Officer, Chief Financial Officer and Chief Operating Officer. Mr. Kellner possesses a deep understanding of strategic planning, customer requirements and operational management in the airline industry. As CEO of Continental Airlines, Mr. Kellner led a highly regulated global airline committed to safety through strong training programs, as well as coordination and integration among pilots, civil aviation authorities and other internal and external stakeholders. He also has deep experience in meeting the requirements of numerous safety and regulatory compliance regimes around the world. In addition, Mr. Kellner has detailed finance and accounting knowledge gained principally from his experience as Chief Financial Officer at Continental Airlines and American Savings Bank. Mr. Kellner also brings to the Board corporate governance expertise from his service as lead director of Marriott, as former chairman of Sabre, and on the boards of other Fortune 500 companies. As a result of his leadership experience in the airline industry, his record of independent leadership at Boeing and his distinguished service on other corporate boards, the Board elected Mr. Kellner to serve as Chair of the Board."

(i)     Mollenkopf's biography emphasizes his experience in risk management: "Mr. Mollenkopf's experience as the Chief Executive Officer and Chief Operating Officer of Qualcomm, an engineering-driven, high-technology manufacturing company, enables him to bring critical insights to the Board in areas such as engineering leadership, risk management, leading a complex business with a global reach and oversight of large-scale efforts to develop and test new technologies. A long-time engineer who started with Qualcomm over 25 years ago, Mr. Mollenkopf also possesses expertise and direct

leadership experience in precision engineering, project management, manufacturing, quality control and designing testing regimes for complex systems."

(j)      Admiral Richardson's biography places emphasis on his risk management, crisis management, and safety experience: "Admiral Richardson brings deep expertise in safety, regulation and oversight of complex, high-risk systems, as well as extensive crisis management and national security experience. During his 37 years of service in the U.S. Navy, Admiral Richardson served as the Director of the Naval Nuclear Propulsion Program, a joint activity of the Navy and Department of Energy, serving the Navy and as Deputy Administrator in the National Nuclear Security Administration. In this capacity, he exercised all responsibilities, including applicable regulatory authorities, over related facilities, radiological controls, environmental safety and health matters, as well as selection, training, and assignment of personnel supporting over 100 nuclear power plants operating on nuclear-powered warships around the world. Operationally, Admiral Richardson brings extensive experience managing operations on a global basis. He commanded the submarine USS Honolulu and served as naval aide to the President of the United States. As Chief of Naval Operations, he was responsible for the management of 600,000 sailors and civilians, 290 warships, and over 2,000 aircraft worldwide. As a result of his safety and operational knowledge, the Board elected Admiral Richardson to the Aerospace Safety Committee, as well as Chair of the Special Programs Committee."

(k)      Williams' biography also emphasizes his risk management experience: "Mr. Williams brings to the Board significant strategic, leadership, operations and management experience from his tenure at Aetna, including as Chairman and Chief Executive Officer. With more than 25 years of experience in the health care industry, Mr.

Williams provides valuable insight into health insurance and employee benefits best practices, as well as the many related areas associated with managing the requirements of companies in industries with large numbers of employees in U.S. and non-U.S. locations. Mr. Williams also brings experience in significant corporate transformations from his time at Aetna. In addition, his service as lead director and chair of the risk committee of American Express has enhanced his expertise in risk management at large, global companies. Mr. Williams' executive leadership and experience in corporate governance matters at Aetna and through his service on other boards of directors enable him to serve a crucial role as Chair of the Governance & Public Policy Committee and as a member of the Compensation Committee."

273.    This emphasis on the individual director-nominees' safety-related qualifications was materially misleading because Boeing omitted how, in fact, these nominees' qualifications were merely paper qualifications, and did not lead them to conduct more careful oversight of safety, as evident by their ignoring red flags or failing to follow up on such issues, as the 220 Documents illustrate.

274.    In further encouraging shareholders to vote for the director nominees, the 2022 Proxy also states, under "Corporate Governance," that the Board has enhanced its safety oversight: "As we discuss elsewhere in this proxy statement, we have made several recent enhancements to our practices and policies, including changes designed to sharpen our focus on safety and formalize oversight of public policy, political advocacy and corporate sustainability matters."

275.    The 2022 Proxy further highlights the Board Aerospace Safety Committee and how it provides direct oversight in safety:

Aerospace Safety Committee

The Aerospace Safety Committee is responsible for directly overseeing our engineering, design, development, manufacture, production, operations, maintenance and delivery of aerospace products and services, in order to ensure the safety of our commercial, defense, space and other aerospace products and services.

In order to fulfill this responsibility, the Aerospace Safety Committee provides direct oversight of our: safety-related policies and processes; certification activities; Safety Management System; policies and processes for engaging with and supporting the regulatory oversight of the FAA, the Department of Defense, the National Aeronautics and Space Administration, and non-U.S. commercial, defense, and space aviation safety regulators; participation in and support of accident investigations conducted by the National Transportation Safety Board and other domestic and international investigatory authorities, including our responses to material findings and conclusions of such investigations; pilot training programs and services; and cybersecurity with respect to our aerospace products.

In addition, the Aerospace Safety Committee consults with the Compensation Committee in connection with the safety review portion of individual executive performance evaluations, as well as in connection with identifying metrics that are best suited to encourage strong oversight of safety improvements and product safety. See "Compensation Discussion and Analysis" beginning on page 36. Each meeting of the Aerospace Safety Committee includes updates on significant safety issues, including significant safety events that have occurred, as well as information sufficient to understand management's judgment in developing new safety policies and procedures, or in addressing significant safety events. In 2021, the Board has received and discussed reporting from management, including the Chief Aerospace Safety Officer, regarding the performance of Boeing's Safety Management System and other significant safety initiatives. The Aerospace Safety Committee is composed entirely of independent directors.

276.    In a section entitled "Risk Oversight[,]" the 2022 Proxy emphasizes that the Board helps ensure that Boeing does not take undue risks, and that Boeing places its "core values of safety [and] quality . . . at the forefront":

As a company at the forefront of innovation, Boeing takes measured risks each day. It is the responsibility of the Board and senior management to ensure that we avoid imprudent risks and mitigate the many strategic, technological, operational, and compliance risks we face, all with our core values of safety, quality, integrity and sustainability at the forefront.

277.    In emphasizing the risk oversight responsibilities for the Board's standing committees, the 2022 Proxy states that the Aerospace Safety Committee "[e]valuates key risks related to the safety of the Company's aerospace products and services[.]"

278.   These statements were materially misleading because, as alleged elsewhere in this Complaint, Boeing's Board did not in fact conduct the safety oversight that they were required to do under the law, as evident from their failing to follow up on years of red flags concerning various production and other safety issues.

279.   The 2022 Proxy also emphasizes safety as a part of Boeing's commitment to sustainability.  It states, "Boeing is committed to protecting, connecting, and exploring our world and beyond, safely and sustainably."  In a subsection, entitled, "Compliant and Ethical Business," the 2022 Proxy states that as part of its safety commitment, the Company also encourages employees to speak up:

> At Boeing, we believe that how we do our work is just as important as the work we do.  Safety, quality, integrity, and sustainability must be at the forefront as we design, build and service our products.  Every year, all employees sign the Boeing Code of Conduct, reaffirming our commitment to integrity, transparency, safety, and respect, and pledging to comply with all applicable laws, regulations and company policies.  In 2022, we refreshed the Code of Conduct to make it simpler, more connected to our mission, and reflective of what we have learned as a Company over the past years.  The manner in which we learn from our mistakes, overcome challenges and make decisions now will help shape our future.

> We believe that compliance and ethical behavior are everyone's responsibilities. That means we must hold ourselves accountable, and also help each other identify opportunities for improvement.

> It is for that reason Boeing is also committed to creating an open and accountable workplace, and why Boeing leadership has encouraged employees to proactively seek out issues, speak up to report concerns and engage with transparency. In 2021, Boeing launched Seek, Speak & Listen to empower teammates to connect across differences, learn from one another and make better decisions. These habits help us to strengthen our teams, achieve better business outcomes and build a culture of trust, care and connection. As part of this initiative, our workforce implemented Seek, Speak & Listen habits into their daily practice, and formal training was made available to all employees. In response to employee surveys, 84% of employees report using Seek, Speak & Listen habits in their day-to-day interactions.

280.   Furthermore, two of Boeing's sustainability goals specifically relates to safety: "Employee Safety and Well-Being" and "Global Aerospace Safety."



281.    The 2022 Proxy also devotes a section to "Employee Safety and Well-Being" – including: "Nothing is more important than safety—in the workplace and in the products we design, build and support. We are committed to keeping our employees safe by fostering a positive safety culture and strengthening our safety processes through continuous improvement, learning and innovation. As part of the steady progress in our continuous journey toward implementing an enterprise Safety Management System, or SMS, in 2021 the FAA completed an evaluation and determined our Commercial Airplanes SMS is meeting regulatory expectations and operating as intended. Since its rollout, a vast majority of employees have already completed mandatory SMS awareness training. Every employee is empowered and encouraged to speak up if they have any safety or quality concern. As we drive continuous improvement, a positive safety culture and top-level commitment from Company leadership are foundational to the effectiveness of our SMS."

282.    But the statements concerning employee safety are materially misleading, as numerous whistleblowers coming forward show that while Boeing on paper encouraged employees to speak up, in reality whistleblowers were discouraged and retaliated against.

283.    In the Company's Definitive Proxy Statement filed with the SEC on March 3, 2023 (the "2023 Proxy"), Kellner again issued a letter that claimed that Boeing placed the utmost emphasis on safety: "Safety remains paramount and we have taken actions across Boeing to strengthen our safety culture further and to meet our obligations to those who depend on the safety of our products. Among other steps, we have matured our enterprise-wide Safety Management

System, continued to enhance our Quality Management System, and issued our first Chief Aerospace Safety Officer Report to ensure continued transparency in our safety-related efforts."

Kellner's letter also claims that safety is a key expertise of the Board and one of the key results of its sustainability efforts:

> **Highly Skilled and Experienced Board.** Our Board has worked closely with management to help rebuild our company over the past few years. We have focused on adding directors with a wide range of experience, particularly with in-depth expertise in aerospace, safety, engineering/technology and complex manufacturing. Since the 2019 Annual Meeting, we have added seven independent directors including, most recently, David Gitlin in June 2022. Mr. Gitlin currently serves as Chair and CEO of Carrier and brings to the Board more than 20 years of aerospace industry experience. In addition, we are pleased that Sabrina Soussan, Chairman and CEO of Suez SA, has agreed to be nominated for election to the Board at this year's meeting, and would bring to the Board an international perspective and extensive experience in areas of heavy manufacturing, cybersecurity, digitalization, environmental sustainability, product safety and human capital management. Our robust refreshment efforts also reflect our commitment to equity, diversity and inclusion; we are particularly proud that 46% of our director nominees are diverse with respect to gender, race and/or ethnicity.

> **Sustainable Aerospace Together.** Our commitment to sustainability is rooted in our core values and our stakeholders' expectations. In June 2022, we released our second annual Sustainability Report, which further defines the Company's sustainability goals and includes key metrics to measure progress of our core enterprise priorities. The aerospace industry and our company face significant climate change-driven risks that underscore the need to decarbonize for sustained long-term growth. We are focused on sustainable aerospace and we continue to invest across our four pillars of fleet renewal, operational efficiency, renewable energy and advanced technology to help meet industry-wide goals. We also remain dedicated to supporting the safety and well-being of our employees and investing in the communities where our employees live and work.

[Emphasis in original.]

284.    The 2023 Proxy called for shareholders to vote on Board re-election.

285.    In support of the Board's re-election, the 2023 Proxy touted the Board's safety oversight, including, under the "Board Oversight" section, bullets about "Extensive Board oversight of key strategic, operational and compliance risks, with a sharpened focus on risks related to safety and quality, cybersecurity, and climate change"; "[r]egular visits to Boeing

production sites by each director"; and "Board oversight of global ethics and compliance efforts, corporate culture, political advocacy, public policy, sustainability, equity, diversity and inclusion, and charitable contributions."

286.    And specifically in support of director elections, the 2023 Proxy lists safety experience (or relatedly, aerospace industry and regulatory compliance) as one of the qualifications for a director that the Governance and Public Policy Committee considers:

> Experience. The GPP Committee considers each candidate's experience and leadership record in areas such as aerospace, engineering, manufacturing, safety, risk management, software, operations, finance, marketing, sustainability, human capital management, international business and affairs, government and public policy.

> Industry Expertise. The GPP Committee ensures that a number of directors possess aerospace and/or defense industry, as well as technology, expertise. This broad industry expertise allows the Board to assess Company performance and provide strategic guidance with respect to each of our principal businesses.

> Safety. The Board is committed to safety as a core value of the Company—both with respect to our aerospace products and services and our employees in the workplace. One manifestation of this commitment is ensuring that the Board includes members with a wide range of experience in areas where safety is paramount.

> Professional Reputation. As set forth in our Corporate Governance Principles, our directors are expected to have a reputation for personal and professional integrity, honesty and adherence to the highest ethical standards.

> Regulatory Compliance. All director nominees must satisfy regulatory requirements for Board service, including those with respect to any committee on which such director would be asked to serve.

287.    The biographies for the director nominees also touted their experience with safety, product quality, risk management, and regulatory compliance:

(a)     The 2023 Proxy discloses that Bradway "brings to the Board critical skills in the areas of high technology, product development, financial oversight, product safety and risk management. His experience as a senior executive in the biotechnology industry,

including as Chief Executive Officer, Chief Operating Officer and Chief Financial Officer of Amgen, provides him with an extensive understanding of the strategic considerations and challenges associated with meeting the requirements of numerous safety and regulatory compliance regimes around the world. . . .  In addition, he previously served as a director of Norfolk Southern Corporation, one of the nation's largest railroad transportation companies, where virtually every aspect of operations is heavily regulated and subject to strict safety-related oversight."

(b)     The 2023 Proxy states Calhoun brings "deep and long-standing aviation industry experience as Boeing's President and Chief Executive Officer, former Boeing Chair of the Board and independent Lead Director, and a multi-year tenure as the leader of GE's transportation and aircraft engines businesses.  He also brings experience leading businesses through periods of change, having led Nielsen's transformation into a leading global information and measurement company.  In addition, Mr. Calhoun brings to Boeing strong leadership and valuable insight and perspective on a wide array of strategic and business matters, stemming from his vast executive, management and operational experience at Blackstone, as well as at Nielsen and GE.  Furthermore, Mr. Calhoun served as chair of Caterpillar's Public Policy and Governance Committee, which oversees the company's environmental, health and safety activities, including with respect to climate and sustainability."

(c)     Doughtie "has had significant exposure to issues facing complex, global companies and has expertise in risk management, internal controls, culture change and regulatory compliance."

(d)      Gitlin "has extensive senior-level experience in the aerospace industry as well as in manufacturing, safety and sustainable innovation. . . .  Mr. Gitlin developed extensive expertise in aerospace safety (including the development and manufacture of aircraft engines and power systems), manufacturing and operational excellence.  As a result, he brings to our Board unique perspectives on aerospace safety, aerospace supplier management and manufacturing in a highly regulated environment.  In recognition of Mr. Gitlin's record of achievement in these disciplines, the Board has appointed him to the Aerospace Safety Committee."

(e)      Good "brings to the Board substantial experience in executive leadership, safety, corporate governance, financial management and accounting, as well as operational expertise in a highly regulated, capital-intensive industry.  Ms. Good's record as Chief Executive Officer and Chairman of Duke Energy, one of the nation's largest grid and generation operators, enables her to advise management on a wide range of strategic, financial, sustainability and governance matters, including the challenges associated with safety performance, large-scale capital projects, transformative technologies and crisis management."

(f)      The 2023 Proxy also touts how "Lieutenant General Harris brings extensive aerospace and aviation experience to the Board. General Harris is an experienced Boeing 747 pilot, with over 10,000 flight hours safely transporting passengers and cargo worldwide in the Boeing 747, 757, 767 and 777 aircraft for United Airlines before her retirement in 2020. Her extensive experience as a pilot, together with her deep knowledge of safety protocols and flight procedures, adds to the Board's expertise in aviation safety and provides hands-on familiarity with pilots' and crew interaction with complex aerospace

systems, including in particular Boeing aircraft. Before retiring from the Air Force in 2019, she was a United States Air Force Reserve Lieutenant General, serving in several senior roles, including most recently as Inspector General of the Air Force and, before that, the Assistant Vice Chief of Staff of the Air Force. General Harris was the first African American woman to command an Air Force operational flying squadron, wing and numbered Air Force. Her military and aviation expertise, extensive leadership experience, and demonstrated record of leading teams with honor and integrity as paramount values all bring significant value to the Board."

(g)     Johri "brings to the Board extensive aerospace industry expertise from his more than 30 years at United Technologies, as well as critical skills developed while serving as Chief Financial Officer at multiple Fortune 500 companies.  These skills enable Mr. Johri to provide critical insights to the Board in areas as diverse as financial strategy, strategic operations, the dynamics of managing a complex, global supply chain, articulating corporate strategy to investors and other stakeholders and mitigating risks associated with the development of new products and services at a large industrial manufacturer.  Mr. Johri also brings to the Board unique insights relating to his senior leadership experience at United Technologies, a major supplier to aerospace companies like Boeing. In addition, as an independent director and audit committee member at Cardinal Health, Mr. Johri brings to the Board experience in risk oversight and corporate governance of a large company in a highly regulated industry."

(h)     Joyce "brings to the Board vast aerospace, engineering and manufacturing expertise, as well as a demonstrated track record of safety leadership and operational excellence.  He developed his in-depth knowledge of the challenges and opportunities

facing the aerospace industry at General Electric Company. Mr. Joyce has 40 years of experience at GE Aviation including 12 years of service as President and CEO and four years as Vice Chairman of GE. He began his GE career as a product engineer, spending more than a decade designing and building engines for both military and commercial customers. Mr. Joyce is recognized for his proficiency in product development, product management and product support founded on an industry-leading safety management system and ever more efficient products."

(i) Kellner "brings to the Board extensive airline industry experience developed during his 14 years of service in key leadership positions at Continental Airlines, including Chairman, Chief Executive Officer, Chief Financial Officer and Chief Operating Officer. Mr. Kellner possesses a deep understanding of strategic planning, customer requirements including with respect to products that improve fuel efficiency and reduce emissions, operational management, and sustainable aviation fuels in the airline industry. As CEO of Continental Airlines, Mr. Kellner led a highly regulated global airline committed to safety through strong training programs, as well as coordination and integration among pilots, civil aviation authorities and other internal and external stakeholders. He also has deep experience in successfully navigating numerous safety and regulatory compliance regimes around the world. In addition, Mr. Kellner has detailed finance and accounting knowledge gained principally from his experience as Chief Financial Officer at Continental Airlines and American Savings Bank. Mr. Kellner also brings to the Board corporate governance expertise from his past service as lead director of Marriott, chairman of Sabre, and on the boards of other Fortune 500 companies. As a result of his leadership experience in the airline industry, his record of independent

leadership at Boeing and his distinguished service on other corporate boards, the Board elected Mr. Kellner to serve as Chair of the Board."

(j)     Mollenkopf's "experience as the Chief Executive Officer and Chief Operating Officer of Qualcomm, an engineering-driven, high-technology manufacturing company, enables him to bring critical insights to the Board in areas such as engineering leadership, risk management, leading a complex business with a global reach and oversight of large-scale efforts to develop and test new technologies.  A long-time engineer who started with Qualcomm over 25 years ago, Mr. Mollenkopf also possesses expertise and direct leadership experience in precision engineering, project management, manufacturing, quality control and designing testing regimes for complex systems."

(k)     "Admiral Richardson brings deep expertise in safety, regulation and oversight of complex, high-risk systems, as well as extensive crisis management and national security experience.  During his 37 years of service in the U.S. Navy, Admiral Richardson served as the Director of the Naval Nuclear Propulsion Program, a joint activity of the Navy and Department of Energy, serving the Navy and as Deputy Administrator in the National Nuclear Security Administration.   In this capacity, he exercised all responsibilities, including applicable regulatory compliance, over related facilities, radiological controls, environmental safety and health matters, as well as selection, training and assignment of personnel supporting over 100 nuclear power plants operating on nuclear-powered warships around the world.  Operationally, Admiral Richardson brings extensive experience managing operations of a diverse team on a global basis.  He commanded the submarine USS Honolulu and served as naval aide to the President of the United States. As Chief of Naval Operations, he was responsible for the management of

600,000 sailors and civilians, 290 warships and over 2,000 aircraft worldwide.  As a result of his safety and operational knowledge, the Board elected Admiral Richardson to the Aerospace Safety Committee, as well as Chair of the Special Programs Committee.  At Constellation Energy Corporation, Admiral Richardson is a member of the Risk Committee as well as the Nuclear Oversight Committee, where he has oversight over a number of sustainability issues related to the company's nuclear facilities and operations."

(l)      Soussan "would bring to the Board unique perspectives from her multiple CEO roles following a career of over 20 years at Siemens AG.  With extensive international leadership experience, she would also bring a fresh non-U.S. perspective to our Board.  In her current role, Ms. Soussan serves as Chairman and CEO of Suez SA, a French-based utility company specializing in water and waste management, where climate change is a key focus area. In addition to her role at Suez SA, Ms. Soussan has extensive experience as an engineer and a senior leader in heavy manufacturing, transportation, automotive industry, building technologies and security access control systems, cybersecurity, digitalization, environmental sustainability, product safety and human capital management.  During her lengthy career at Siemens AG, she also held multiple leadership positions as Division CEO, Business Unit CEO and as an engineer in areas such as transportation, automation, and energy management."

(m)      Williams "brings to the Board significant strategic, leadership, operations and management experience from his tenure at Aetna, including as Chairman and Chief Executive Officer.  With more than 25 years of experience in the health care industry, Mr. Williams provides valuable insight into health insurance and employee benefits best practices, as well as the many related areas associated with managing the requirements of

companies in industries with large numbers of employees in U.S. and non-U.S. locations. Mr. Williams also brings experience in significant corporate transformations from his time at Aetna.   As co-founder and director and chairman of the agilon health board, Mr. Williams is responsible for overseeing the company's overall ESG strategy and the company released its inaugural ESG report in August 2022, outlining its enterprise-wide ESG actions, programs and investments. In addition, his service as lead director and chair of the risk committee of American Express has enhanced his expertise in risk management at large, global companies.  Mr. Williams' executive leadership and experience in corporate governance matters at Aetna and through his service on other boards of directors enable him to serve a crucial role as Chair of the Governance & Public Policy Committee and as a member of the Compensation Committee."

288.   But, as the 220 Documents illustrate, these directors did not in fact use their safety experience to conduct better safety oversight, and therefore, the above touting of their experience was misleading.

289.   The 2023 Proxy highlights the role of the Aerospace Safety Committee, as part of Board oversight that supports the director nominees' elections:

The Aerospace Safety Committee is responsible for directly overseeing our engineering, design, development, manufacture, production, operations, maintenance and delivery activities, in order to ensure the safety of our commercial, defense, space and other aerospace products and services.

In order to fulfill this responsibility, the Aerospace Safety Committee provides direct oversight of:

- safety-related policies and processes;
- certification activities;
- our Safety Management System;
- policies and processes for engaging with and supporting the regulatory oversight of the FAA, the Department of Defense, the National Aeronautics and Space Administration, and non-U.S. commercial, defense and space aviation safety regulators;

- participation in and support of accident investigations conducted by the National Transportation Safety Board and other domestic and international investigatory authorities, including our responses to material findings and conclusions of such investigations;
- pilot training programs and services; and
- cybersecurity with respect to our aerospace products.

In addition, the Aerospace Safety Committee consults with the Compensation Committee in connection with the safety review portion of individual executive performance evaluations, as well as in connection with identifying incentive plan metrics that are best suited to drive safety improvements and ensure overall product safety. Each meeting of the Aerospace Safety Committee includes updates on significant safety issues, including significant safety events that have occurred, as well as information sufficient to understand management's judgment in developing new safety policies and procedures, or in addressing significant safety events. The Board also regularly receives and discusses reporting from management, including the Chief Aerospace Safety Officer, regarding the performance of Boeing's Safety Management System and other significant safety initiatives. The Aerospace Safety Committee is composed entirely of independent directors.

290.    The 2023 Proxy also highlights the role of the Audit Committee, including how "[i]ts principal responsibilities include oversight of . . . our internal control environment and compliance with legal and regulatory requirements; . . . [and] . . . our processes for assessing key strategic, operational and compliance risks[.]"   The 2023 Proxy further states, "The Audit Committee also oversees key strategic, operational and compliance risks on behalf of the Board[.]"

291.    The 2023 Proxy also discusses the Board's "Risk Oversight."

As a company at the forefront of innovation, Boeing takes measured risks each day. It is the responsibility of the Board and senior management to ensure that we avoid imprudent risks and mitigate the many strategic, technological, operational and compliance risks we face, all with our core values of safety, quality, integrity and sustainability at the forefront. Senior management is responsible for day-to-day management of risk, including the creation of appropriate risk management policies and procedures. The Board is responsible for overseeing management in the execution of its risk management responsibilities and for assessing the Company's approach to risk management. The Board regularly assesses significant risks to the Company in the course of reviews of corporate strategy and the development of our long-range business plan including significant new development programs.

As part of its responsibilities, the Board and its standing committees also regularly review strategic, operational, financial, compensation and compliance risks with senior management. Examples of risk oversight activities conducted by the Board's

committees, subject to committee report-outs and full discussion at the Board level, are set forth below.

Aerospace Safety Committee Risk Oversight

- Evaluate key risks related to the safety of the Company's aerospace products and services

***

Audit Committee Risk Oversight

- Evaluate overall risk assessment and risk management practices

- Perform central oversight role with respect to financial statement, disclosure and compliance risks

- Evaluate the effectiveness of our ethics and compliance program, including through regular reports from our Vice President and Chief Compliance Officer

- Lead the Board's oversight of risks related to cybersecurity

- Meet in executive session after every meeting with Deloitte & Touche LLP, our independent auditors, as well as regularly with one or more of our Executive Vice President and Chief Financial Officer, our Senior Vice President, Controller, our Chief Legal Officer and Executive Vice President, Global Compliance, our Vice President and Chief Compliance Officer and our Vice President, Corporate Audit to discuss financial and compliance risks and report any findings to the Board

Compensation Committee Risk Oversight

- Evaluate risks in connection with the design and oversight of compensation programs, in consultation with the Committee's independent compensation consultant and the Aerospace Safety Committee[.]

292. These statements were materially misleading because, as alleged elsewhere in this Complaint, Boeing's Board did not in fact conduct the safety oversight that they were required to do under the law, as evident from their failing to follow up on years of red flags concerning various production and other safety issues.

293.    For further support of the director nominees' election, the Board also touts its commitment to sustainability, which also includes safety: "Boeing aspires to protect, connect and explore our world and beyond safely and sustainably to meet the needs of our key stakeholders." Furthermore, Boeing claims that its sustainability goals include building a "Compliant and Ethical Business" – entailing:

> At Boeing, we believe that safety, quality, integrity and sustainability must come first, and we are committed to putting these values above everything else as we design, build and service our products. Every year, all employees reaffirm this commitment by signing the Boeing Code of Conduct, and pledging to comply with applicable laws, regulations and company policies. As a company, we set the expectation that compliance is everyone's responsibility.

> We are working together to foster a culture of continuous improvement and enhance performance by creating an environment where employees are comfortable identifying gaps, seeking help and speaking up without fear of retaliation. In 2022, we enhanced our employee reporting capabilities, redesigned high-priority compliance trainings, and emphasized and enforced the Company's anti-retaliation protections. The Company continued localizing risk management and compliance engagements utilizing site-specific data to identify risk and drive mitigation. As part of these efforts, we placed Site Compliance and Ethics Officers at major sites and expanded the Ethics Ambassador Program—comprised of emerging leaders within the business—to listen to employee concerns and promptly elevate issues to site leadership. In 2022, 94% of employees expressed a strong personal commitment to integrity, and 93% indicated they are comfortable discussing concerns with their manager.

294.    The 2023 Proxy also claims that Boeing will take care of "Employee Safety and Well-Being."

> Nothing is more important at Boeing than safety—in the workplace and in the products we design, build and support. The Safety Guiding Principles provide a framework toward the goal of zero workplace injuries—so every person who works at or visits a Boeing site leaves as safe as when they arrived. Boeing's workplace safety program, Go for Zero, is a holistic approach to prevent injuries at work and at home, stemming from the belief that every injury is preventable. Achieving zero injuries is a constant endeavor. By continually identifying gaps and measuring progress using industry standard approaches, Boeing's internal compliance requirements often exceed those set by government regulations. Every employee has the responsibility to make safety and quality top priorities. Through valuing human life and well-being above all else and taking action accordingly, Boeing will

continue to foster an open culture where people are empowered and encouraged to speak up about any concerns with the assurance that they will be taken seriously.

295.    But the statements concerning employee safety are materially misleading, as numerous whistleblowers coming forward show that while Boeing on paper encouraged employees to speak up, in reality, whistleblowers were discouraged and retaliated against.

296.    The Company's 2024 Definitive Proxy Statement, filed with the SEC on April 5, 2024 (the "2024 Proxy"), came out after the AA Flight 1282 Incident, and thus reflected a time when the Board faced a serious risk of not being re-elected.  In that context, the Board, through the 2024 Proxy, doubled down on touting its safety oversight and improvements.

297.    In his letter to shareholders in the Proxy, the new Board Chair, Mollenkopf, sought to reassure investors about the Company's safety record:

To My Fellow Boeing Shareholders,

The months and years ahead are critically important for The Boeing Company to take the necessary steps to regain the trust lost in recent times, to get back on track and perform like the company we all know Boeing can and must be, every day. I recently accepted the role of independent Chair of the Board because I am acutely aware of how important this task is for the future of not just Boeing, but every single stakeholder who depends on us being successful. The world needs a healthy, safe, and successful Boeing. And that is what it is going to get.

I thank my fellow Board members for the privilege of serving in this role. I thank Dave Calhoun for his tireless work both as a member of the Board and as CEO. I thank Larry Kellner for his 13 years of remarkable dedication to the Company as a Board member and as its Chair. And, most important of all, I thank our employees for all their hard work and dedication, because without them we are nothing at all.

I promise that I personally, and we as a Board, will leave no stone unturned in our efforts to get this company to where it needs to be. And the work of renewal has already begun.

Now let me cover some important topics that are in full focus for all of us at Boeing.

**Commitment to Safety**. Safety is, of course, our top priority. While we have made progress in strengthening our safety management and quality control systems and processes in the last few years, recent events make it absolutely clear that we have more work to do and must improve every day.

The Board is fully engaged and has worked with management to take immediate actions to continue strengthening our safety, quality and risk management systems. Among other steps, we brought in Admiral Kirkland Donald as an independent special advisor to Boeing President and CEO Dave Calhoun. Admiral Donald and his team of outside experts are conducting a thorough assessment of our Quality Management System for Commercial Airplanes, including quality programs and practices in our manufacturing facilities and its oversight of commercial supplier quality. His recommendations will be provided to Dave and to our Board's Aerospace Safety Committee, which is comprised solely of independent directors. In addition, our teams have added additional inspections throughout the build process, we have opened our factories to 737 operators for additional oversight inspections, and are restructuring the approach and frequency of our sessions with teams to refocus and recommit on quality and compliance. As we navigate the year ahead, we will continue to work transparently with and follow the lead of our regulators.

**Empowering our Employees**. Our employees are the foundation of our success and the key to product safety. We believe a culture in which our employees are heard, trained and supported will produce safe and reliable airplanes. We remain determined to create a safe, innovative and inclusive culture. The safety of our employees in the workplace is a top priority and we are continually improving our practices and policies to strive to prevent workplace injuries. We support employees' professional development through leadership trainings, tuition assistance and upskilling opportunities. We have a diverse workforce that is increasingly representative of the communities where we live and work.

**Maintaining a Highly Qualified and Skilled Board**. Our Board is composed of highly qualified and dedicated directors who exhibit the right balance of skills and experiences to oversee our evolving business needs and strategic priorities. Our commitment to Board refreshment has resulted in adding directors with extensive safety, complex manufacturing, engineering and aerospace expertise. Since our 2019 annual meeting, we have added eight new directors, five of whom have engineering degrees. Our refreshment efforts have also resulted in a diverse Board (45% of nominees are diverse with respect to gender, race and/or ethnicity) that balances fresh perspectives with longer-tenured experience. I would like to extend my personal thanks to Ron Williams, who has reached the Board's mandatory retirement age. We are grateful for his leadership and example over the years.

*** 

Above all, we remain committed to our core values of safety, quality, transparency and sustainability. While there is still considerable work ahead, the Board is confident we are on the right path with a clear focus on what needs to be accomplished.

Sincerely,

Steve Mollenkopf
Independent Chair of the Board[.]

[Emphasis in original.]

298.    The 2024 Proxy then devoted a section to "Building Trust Through Action and Transparency" to discuss the Board's response to the AA Flight 1282 incident:



BUILDING TRUST THROUGH ACTION AND TRANSPARENCY

- Enhanced quality focus through leadership changes including electing Stephanie F. Pope as the new leader of Commercial Airplanes, effective March 25, 2024, and the creation of a new position of Senior Vice President, Quality for Commercial Airplanes to lead quality control and quality assurance efforts, as well as the quality initiatives within our commercial airplanes business and the supply chain.

- Opened our factories to 737 operators for additional oversight inspections to review our production and quality procedures.

We make ourselves accountable for what happens on our factory floors and throughout our operations. That mindset was demonstrated in the actions and decisions taken in our executive compensation program. Our CEO, Mr. Calhoun, informed the Board in early February 2024 that he was declining to be considered for any annual incentive payout for 2023. The Board honored Mr. Calhoun's request and approved a zero incentive payout for the year. For our other named executive officers, Mr. Calhoun recommended, and the Compensation Committee approved, individual performance scores that reflected their individual leadership efforts and the overall performance of the business unit or function they led during 2023; for our commercial airplanes and defense leaders, these scores resulted in significant reductions to their incentive payouts for the year. See page 62 for additional information.

The Compensation Committee also took swift action to make significant design changes to our annual incentive metrics for 2024. These metrics will determine payouts not only for our executive officers but our entire executive team and over 110,000 of our employees around the world and across all three business units. These changes were informed by shareholder feedback and are intended to drive our collective performance towards achieving the challenging safety and quality goals set by the Compensation Committee for 2024. For our commercial airplanes business in particular, operational performance against pre-set metrics in the areas of product safety, quality and employee safety will be the primary driver of incentive plan outcomes for 2024, accounting for 60% of the payout score that will be determined in early 2025. More information on our 2024 annual incentive plan changes can be found on page 66.

In our long-term incentive program, the Compensation Committee determined that the value of executive officer awards would be reduced by the percentage decline in our stock price between January 5, 2024, the day of the Alaska Airlines accident, and the award grant date. This resulted in a 22% reduction in long-term incentive award values for our executive officer leadership team, including all of our named executive officers. These awards, which were issued in early March 2024, were granted 45% in restricted stock units and 55% in performance restricted stock units, which will pay out based on performance against three-year free cash flow goals and—new for 2024—pre-set operational metrics focused on quality and safety. More information on these decisions can be found on page 67.

Throughout this process, our independent Board Chair, Aerospace Safety Committee Chair and members of senior management have engaged with key stakeholders, including shareholders, customers, regulators and employees. We are committed to ensuring every Boeing airplane meets design specifications and the highest safety and quality standards, and doing everything we can to ensure our customers and their passengers can have complete confidence in Boeing airplanes.

 2024 Proxy Statement   2

## SAFETY & QUALITY

    

| Our Values | Our Mission | Trust and Transparency | Continuous Learning | Governance and Compliance |
|---|---|---|---|---|
| In everything we do, we make safety our top priority, strive for first-time quality and hold ourselves accountable to the highest ethical standards. | To foster a culture that ensures the safety, quality and compliance of our products and services for those who depend on, operate, build and maintain our products. | We are engaging with each other and all of our stakeholders with greater transparency and accountability in every aspect of the business. | We remain committed to listening, learning with humility and continuous improvement. | We operate in a manner that upholds our values, emphasizes accountability, and ensures an unrelenting focus on product integrity and compliance. |

Boeing is dedicated to its unwavering commitment to safety, quality, integrity and transparency. Our goal is to prevent accidents, injury or loss of life with our culture and actions rooted in safety. We continue to enhance oversight of our safety processes and procedures.

The Aerospace Safety Committee assists the Board in the oversight of the safety of company products and services. The Chief Aerospace Safety Office, which was established in 2021, has developed a comprehensive strategy to strengthen Boeing's safety practices and culture and is collaborating with global regulators, airline operators and other industry stakeholders to improve the aerospace safety ecosystem.

The oversight mechanisms in place include formal lines of communication which ensure safety and potential safety issues are evaluated, discussed and addressed during Safety Reviews with business unit presidents, our Chief Engineer, functional and program leaders and members of the FAA. Nothing is more important at Boeing than safety—in the workplace and in the products we design, build and support.

| The Chief Aerospace Safety Office, with oversight by the Board of Directors and the Aerospace Safety Committee, has established a comprehensive safety strategy at Boeing | | |
|---|---|---|
| **Excellence in Engineering and Quality Processes** | **Culture of Accountability** | **Collaboration Within and Beyond the Industry** |
| > Single integrated engineering organization, reporting to the Chief Engineer | > Quality and safety metrics included in annual incentive plan | > Annual Boeing Aviation Safety Conference with industry leaders to share knowledge, best practices and lessons learned |
| > Online Engineering Handbook for onboarding, training and learning | > Enterprise Safety Management System (SMS) for managing safety risks with processes to ensure issues or risks are escalated appropriately | > Partner and advisor to commercial customers through trainings, workshops and onsite advisors |
| > Standard method to capture, protect and share critical technical and engineering knowledge through Design Practices | > Confidential reporting channel, Speak Up, encouraging employees to report concerns | > Advanced training for pilots and mechanics, including competency-based training and assessment courses and experimental training |
| > Technical Design Reviews focused on identifying risks and issues early in the design process | > Annual SMS training for all employees that focuses on the vital role each employee plays in speaking up about product safety issues and ideas | > Process to ensure fleet performance data is incorporated in design process |
| > Safety analytics platform, Boeing Safety Intelligence, delivers real-time insights from advanced modeling techniques and machine learning algorithms | > Seek, Speak & Listen habits to build stronger teams, achieve better business outcomes and strengthen a culture of inclusion | > Partnership with Embry-Riddle Aeronautical University for a research center to drive safety improvements throughout the industry |
| | > Annual Code of Conduct signing and recommitment remind all employees of the obligation to speak up and be a voice for others when something does not align with our values | |
| | > Digital learning platform provides a collaborative forum for sharing product safety information | |
| | > Weekly safety reviews of all safety and potential safety-related issues | |
| | > Dedicated Organization Designation Authorization (ODA) ombudsperson who serves as an additional channel for ODA unit members to raise concerns | |

**ONGOING FOCUS ON CONTINUOUS IMPROVEMENT TO IDENTIFY GAPS, SOLICIT FEEDBACK AND ENHANCE INITIATIVES TO STRENGTHEN OUR SAFETY STRATEGY**

3    2024 Proxy Statement

SAFETY & QUALITY

## Aerospace Safety and Quality

We invest in our people, systems, processes and infrastructure to deliver high-quality products and services that our customers expect and deserve. We continue to mature our enterprise Safety Management System (SMS), an integrating framework for managing safety risks. Recognized as an industry best practice, airlines around the world have been using SMS for nearly a decade, gathering data to evaluate systems, make decisions and investigate issues to support the safety of the fleet.

Our SMS collects and monitors data from multiple internal and external data sources — operational data from the global fleet, employee reporting, audit findings and design and manufacturing data — to identify and mitigate product safety risks. Acquiring data is the first step to risk mitigation. In 2023, we established SMS boards within program and functional organizations responsible for design, build and fleet support as part of a bottom-up approach in identifying and resolving potential safety risks. We also have expanded external safety data sources and jointly developed with the FAA machine learning algorithms to mine the tremendous amount of data to identify trends, patterns and safety risks proactively and predictively.

Following data collection, the SMS team and business partners apply industry-standard methods and tools to identify hazards, assess risk and develop mitigation actions. Ultimately, SMS brings data into the appropriate forums with people at the right level to make data-driven, risk-based decisions that result in safer products. It is a system of continuous improvement informed by existing data and ongoing development of increasingly better safety analytics.

Our Quality Management System (QMS) is based on AS9100, the internationally recognized standard for QMS in aerospace. Our QMS and SMS work together and are built into our organizational structure, policies, processes, procedures and resources. In addition to the comprehensive actions we have taken recently to strengthen quality assurance and controls across our factories, we have taken important steps in recent years to strengthen the foundation of our QMS and its layers of protection. For example, we updated more than 250 policies and procedures to improve alignment to regulatory requirements for product conformance, including a new procedure document that incorporates SMS-based risk assessment for inspection and test management. In 2023, we provided enhanced stamping and certification training to 62,000 mechanics and inspectors to emphasize their crucial role and underscore the importance of personal accountability. We also established a data sharing portal to provide key metrics and performance measures to the FAA to increase transparency and production oversight.

## Employee Safety

Beyond product safety, employee safety plays a critical role in our safety strategy. Our Safety Guiding Principles are the foundation of workplace safety at Boeing. Each principle addresses a specific aspect of a healthy safety culture. Built around the concepts of safe decision-making and a commitment to protecting each other, our Safety Guiding Principles and our workplace safety program, Go4Zero, represent a holistic approach to prevent injuries at work and at home, stemming from the belief that every injury is preventable. By continually identifying areas where improvements can be made and measuring progress using industry standard approaches, our internal compliance requirements often exceed those standards set by government regulations. Every employee has the responsibility to make safety and quality top priorities. Through valuing human life and well-being above all else and acting accordingly, we will continue to foster an open culture where people are empowered and encouraged to speak up about any concerns with the assurance that they will be taken seriously.

 *BOEING*  2024 Proxy Statement  4

299.    The 2024 Proxy again touts the Board's oversight – in "Governance Highlights" in "Board Oversight" the 2024 Proxy states that the Board provides "Extensive Board oversight of key strategic, operational and compliance risks, with an intense focus on risks related to safety and quality" and there is "Board involvement in strategy development, including safety initiatives[.]"

300.    The 2024 Proxy also claims that "Safety and Quality" are part of Boeing's Sustainability goals.

In 2023, Boeing advanced its sustainability goals as follows:



| Safety & Quality | · Renewed our Safety Promise to prioritize workplace safety during the 10-year anniversary of Go4Zero |
| --- | --- |
| | · Introduced a digital learning platform for employees to reflect, learn and apply product safety lessons to their work |
| | · Conducted product safety training for more than 160,000 employees |
| | · Enhanced stamping and certification training for 62,000 mechanics and inspectors |
| | · Updated more than 250 policies and procedures to improve alignment to regulatory requirements for product conformance |

301.    These statements were materially misleading because, as alleged elsewhere in this Complaint, Boeing's Board did not in fact conduct the safety oversight that they were required to

do under the law, as evident from their failing to follow up on years of red flags concerning various production and other safety issues.

302.    The misleading proxies contributed to the directors' elections.  The most recent election was on May 17, 2024, and because of the misleading statements the Board issued on its behalf, they presented a misleadingly positive picture of their oversight that overcame significant institutional resistance to their re-election.

303.    Specifically, as to the Election of Directors, the Board recommended voting for the 11 director nominees, and the 2024 Proxy made the following safety, compliance, or quality-related statements in support.

304.    Regarding specific directors, the biographies emphasize their safety and regulatory experience:

(a)    Bradway has "critical skills in the areas of high technology, product development, financial oversight, product safety and risk management. His experience as a senior executive in the biotechnology industry, including as Chief Executive Officer, Chief Operating Officer and Chief Financial Officer of Amgen, provides him with an extensive understanding of the strategic considerations and challenges associated with meeting the requirements of numerous safety and regulatory compliance regimes around the world. At Amgen, Mr. Bradway has also overseen a number of sustainability initiatives. In addition, he previously served as a director of Norfolk Southern Corporation, one of the nation's largest railroad transportation companies, where virtually every aspect of operations is heavily regulated and subject to strict safety-related oversight. In recognition of Mr. Bradway's experience in corporate finance, risk management and executive leadership, the Board elected him to serve as Chair of the Finance Committee."

(b)     Calhoun has "deep and long-standing aviation industry experience as Boeing's President and Chief Executive Officer, former Boeing Chair of the Board and independent Lead Director, and a multi-year tenure as the leader of GE's transportation and aircraft engines businesses. He has experience leading businesses through periods of change, having led Nielsen's transformation into a leading global information and measurement company. In addition, Mr. Calhoun brings to Boeing strong leadership and valuable insight and perspective on a wide array of strategic and business matters, stemming from his vast executive, management and operational experience at Blackstone, as well as at Nielsen and GE. Furthermore, Mr. Calhoun served as chair of Caterpillar's Public Policy and Governance Committee, which oversees the company's environmental, health and safety activities, including with respect to climate and sustainability. Mr. Calhoun's significant global aerospace, complex manufacturing and high-technology industry expertise, as well as leadership experience on the boards of Caterpillar and Gates Industrial Corporation, position him well to serve on the Board and lead Boeing as President and Chief Executive Officer."

(c)     Doughtie, through her senior executive experience in the professional services firm KMPG, "has had significant exposure to issues facing complex, global companies across industries and has deep expertise in risk management, internal controls, culture change and regulatory compliance."

(d)     Gitlin "has extensive senior-level experience in the aerospace industry as well as in manufacturing, safety and sustainable innovation. As Chairman and CEO of Carrier, Mr. Gitlin oversees a world leader in heating, air conditioning and refrigeration solutions, which is committed to cost-effective climate mitigation strategies in both its

products and operations. Prior to joining Carrier, Mr. Gitlin was President and COO of Collins Aerospace and President of UTC Aerospace Systems. In these roles, as well as in prior leadership roles at Hamilton Sundstrand, Mr. Gitlin developed extensive expertise in aerospace safety (including the development and manufacture of aircraft engines and power systems), manufacturing and operational excellence. As a result, he brings to our Board unique perspectives on aerospace safety, aerospace supplier management and manufacturing in a highly regulated environment. In recognition of Mr. Gitlin's record of achievement in these disciplines, the Board has appointed him to the Aerospace Safety Committee."

(e)     Good has "substantial experience in executive leadership, safety, corporate governance, financial management and accounting, as well as operational expertise and cybersecurity in a highly regulated, capital-intensive industry. Ms. Good's record as Chief Executive Officer and Chair of Duke Energy, one of the nation's largest grid and generation operators, enables her to advise management on a wide range of strategic, financial, sustainability and governance matters, including the challenges associated with safety performance, large-scale capital projects, transformative technologies and crisis management. . . .  Ms. Good also serves as past-chair of the Institute of Nuclear Power Operations, a not-for-profit organization responsible for promoting the highest levels of safety and reliability in nuclear plant operations. Ms. Good earned Bachelor of Science degrees in systems analysis and accounting from Miami University."

(f)     Lt. Gen. Harris "brings extensive aerospace and aviation experience to the Board. General Harris is an experienced Boeing 747 pilot, with over 10,000 flight hours safely transporting passengers and cargo worldwide in the Boeing 747, 757, 767 and 777

aircraft for United Airlines before her retirement in 2020. Her extensive experience as a pilot, together with her deep knowledge of safety protocols and flight procedures, adds to the Board's expertise in aviation safety and provides hands-on familiarity with pilots' and crew interaction with complex aerospace systems, including in particular Boeing aircraft. Before retiring from the Air Force in 2019, she was a United States Air Force Reserve Lieutenant General, serving in several senior roles, including most recently as Inspector General of the Air Force and, before that, the Assistant Vice Chief of Staff of the Air Force. General Harris was the first African American woman to command an Air Force operational flying squadron, wing and numbered Air Force. Her military and aviation expertise, extensive leadership experience and demonstrated record of leading teams with honor and integrity as paramount values all bring significant value to the Board."

(g)     Johri has "extensive aerospace industry expertise from his more than 30 years at United Technologies, as well as critical skills in areas of financial reporting, internal controls and risk management developed while serving as Chief Financial Officer at multiple Fortune 500 companies. These skills enable Mr. Johri to provide critical insights to the Board in areas as diverse as financial strategy, strategic operations, the dynamics of managing a complex, global supply chain, articulating corporate strategy to investors and other stakeholders and mitigating risks associated with the development of new products and services at a large industrial manufacturer. Mr. Johri also brings to the Board unique insights relating to his senior leadership experience at United Technologies, a major supplier to aerospace companies like Boeing. In addition, as an independent director and audit committee member at Cardinal Health, Mr. Johri brings to the Board experience in risk oversight and corporate governance of a large company in a highly regulated industry.

In recognition of Mr. Johri's extensive experience in corporate finance and strategic matters, the Board elected him to serve as Chair of the Audit Committee."

(h)     Joyce has "vast aerospace, engineering and manufacturing expertise, as well as a demonstrated track record of safety leadership and operational excellence. He developed his in-depth knowledge of the challenges and opportunities facing the aerospace industry at General Electric Company. Mr. Joyce has 40 years of experience at GE Aviation including 12 years of service as President and CEO and four years as Vice Chair of GE. He began his GE career as a product engineer, spending more than a decade designing and building engines for both military and commercial customers. Mr. Joyce is recognized for his proficiency in product development, product management and product support founded on an industry-leading safety management system and ever more efficient products."

(i)     Mollenkopf brings his "experience as the Chief Executive Officer and Chief Operating Officer of Qualcomm, an engineering-driven, high-technology manufacturing company, enables him to bring critical insights to the Board in areas such as engineering leadership, risk management, leading a complex business with a global reach and oversight of large-scale efforts to develop and test new technologies. A long-time engineer who started with Qualcomm over 25 years ago, Mr. Mollenkopf also possesses expertise and direct leadership experience in precision engineering, project management, manufacturing, quality control and designing testing regimes for complex systems. Mr. Mollenkopf is a published IEEE (Institute of Electrical and Electronics Engineers) author and an inventor on 38 patents. He holds a bachelor's degree in electrical engineering from Virginia Tech and a master's degree in electrical engineering from the University of Michigan. As a result of his complex manufacturing expertise, his engineering background and his record of

independent leadership at Boeing, on March 24, 2024, the Board elected Mr. Mollenkopf to serve as independent Chair of the Board."

(j)     Adm. Richardson "brings deep expertise in safety, regulation, cybersecurity and oversight of complex, high-risk systems, as well as extensive crisis management and national security experience. During his 37 years of service in the U.S. Navy, Admiral Richardson served as the Director of the Naval Nuclear Propulsion Program, a joint activity of the Navy and Department of Energy, serving the Navy and as Deputy Administrator in the National Nuclear Security Administration. In this capacity, he exercised all responsibilities, including applicable regulatory compliance over related facilities, radiological controls, environmental safety and health matters, oversight of cybersecurity issues, as well as selection, training and assignment of personnel supporting over 100 nuclear power plants operating on nuclear-powered warships around the world. Operationally, Admiral Richardson brings extensive experience managing operations of a diverse team on a global basis. He commanded the submarine USS Honolulu and served as naval aide to the President of the United States. As Chief of Naval Operations, he was responsible for the management of 600,000 sailors and civilians, 290 warships and over 2,000 aircraft worldwide. As a result of his safety and operational knowledge, the Board elected Admiral Richardson to the Aerospace Safety Committee, as well as Chair of the Special Programs Committee."

(k)     Soussan "has extensive experience as an engineer and a senior leader in heavy manufacturing, transportation, automotive industry, building technologies and security access control systems, cybersecurity, digitalization, environmental sustainability, product safety and human capital management."

305.     But, as the 220 Documents illustrate, these directors did not in fact use their safety, regulatory, or risk management experience to conduct better safety oversight, and therefore, the above touting of their experience was materially misleading.

306.     The 2024 Proxy also discussed the oversight of specific committees, specifically touting the safety oversight of the Aerospace Safety Committee, which "assists the Board in the oversight of the safe design, development, certification, production, maintenance and operations of our aerospace products and services."  Its "principal responsibilities include reviewing and, where appropriate, making recommendations to the Board with respect to our":

- Safety Management System, including Safety Policy & Objectives, Safety Risk Management, Safety Assurance and Safety Promotion;

- Global Aerospace Safety Initiative;

- Aerospace Safety Analytics and Safety Experience at Boeing;

- Quality Management System;

- cyber-safety program with respect to our aerospace products;

- policies and processes for engaging with and supporting the regulatory oversight of the requirements of commercial, defense and space aviation safety regulatory authorities, including the Federal Aviation Administration (FAA) (including the Company's Organization Designation Authorization (ODA) program), the National Transportation Safety Board (NTSB), the Department of Defense, and the National Aeronautics and Space Administration;

- engineering organization and its processes for the development, production and support of our products and services;

- product development programs insofar as they relate to technical, compliance or product safety considerations; and

- participation in and support of investigations conducted by the NTSB and other domestic and international investigatory authorities, including our responses to findings and conclusions of such investigations.

At least semiannually, the Aerospace Safety Committee reviews with engineering leadership:

- the promotion and management of the "Speak Up" portal submissions process;

- FAA airworthiness directives issued for Boeing airplanes;

- the issuance of FAA type certificates and/or production certificates; and

- any significant communications with the FAA.

The Aerospace Safety Committee also reviews and advises on the selection and removal of the Boeing ODA Ombudsperson, and reviews the status of the ODA program with the Boeing ODA Ombudsperson at least annually.

In addition, the Aerospace Safety Committee consults with and provides input to the Compensation Committee on the annual performance evaluation of the CEO and the other executive officers, as well as in connection with identifying incentive plan metrics that are best suited to drive safety improvements and ensure overall product safety. The Chair of the Aerospace Safety Committee also serves as a member of the Compensation Committee to help ensure that safety considerations are consistently and effectively incorporated into the compensation-setting process for our executive officers.

Each meeting of the Aerospace Safety Committee includes updates on significant safety issues, including significant safety events that have occurred since the prior Committee meeting, as well as information sufficient to understand management's judgment in developing new safety policies and procedures, or in addressing significant safety events. Executive sessions provide a forum for the Chief Aerospace Safety Officer, Chief Engineer, Vice President for Product and Services Safety, Chief Legal Officer, Boeing ODA Ombudsperson, Chief Compliance Officer, Chair of Boeing Quality Operations Council and Chair of Enterprise Manufacturing Operations Council to communicate directly and separately with the members of the Aerospace Safety Committee. The Board also regularly receives and discusses reporting from management, including the Chief Aerospace Safety Officer, regarding the performance of Boeing's Safety Management System and other significant safety initiatives. The Aerospace Safety Committee is composed entirely of independent directors.

| Recent Activities and Key Focus Areas |
|---|
| • Overseeing management's response to the Alaska Airlines Flight 1282 accident and engaging with management on strengthening and developing new safety policies and procedures and enhancing quality assurance and control. See "Building Trust Through Action and Transparency" beginning on page 1 for additional details about the Aerospace Safety Committee's actions following the accident |
| • Worked with management to engage Admiral Kirkland Donald, special advisor to the CEO, to conduct a thorough assessment of our Quality Management System |
| • Reviewed and recommended for Board approval extensive amendments to the Committee's charter to further define the Committee's responsibilities |
| • Regularly reviewing in-service safety reports and updates on Safety Management System implementation and risk register, Speak Up program, safety policy, development programs safety certification updates, Global Aerospace Safety initiative update, product security, design practices system and regulatory affairs |
| • Overseeing cyber-safety risks related to our products and services |

307.   The 2024 Proxy also touts the Board and the Company's risk oversight and management:

Risk Oversight

With over 100 years at the forefront of innovation, Boeing takes measured risks each day and has established processes to identify, assess, mitigate and manage these risks. It is the responsibility of the Board and senior management to ensure that we avoid imprudent risks and mitigate the many strategic, technological, operational and compliance risks we face, all with our core values of safety, quality, integrity and sustainability at the forefront. Senior management is responsible for day-to-day management of risk, including the creation of appropriate risk management policies and procedures, and implementing effective risk management controls. The Board is responsible for overseeing management in the execution of its risk management responsibilities and for assessing the Company's approach to risk management.

The Board has delegated to the Audit Committee primary responsibility for oversight of the Company's policies, practices and guidelines with respect to risk assessment and risk management, including assessing key strategic, operational and compliance risks. Our enterprise risk management (ERM) process considers key strategic risks, such as those relating to product safety, geopolitics, airline health, reputation, long-term competitiveness, talent and sustainability, and key operational risks, such as those relating to development program execution, supply chain, production system health and quality, cybersecurity, liquidity, significant legal items and business continuity, as well as mitigation efforts. Our compliance risk management (CRM) process evaluates the Company's current and emerging compliance risks, such as those relating to design and certification, production and quality, cybersecurity, industrial security, financial accounting and procurement integrity. All business units and functions participate in both the ERM and CRM on an annual basis to assess and prioritize the most critical risks facing the Company, evaluate the effectiveness of mitigation strategies and controls and identify important emerging risks. Both our ERM and CRM processes are continually evolving in the detection and response to risks, including through increased reliance on data. The results of the ERM and CRM processes are reviewed with both the Audit Committee and the full Board at least annually.

Our Safety Management System (SMS) is an integrating framework for managing safety risks throughout the life cycle of a product or service by identifying hazards, mitigating product safety risks, continuously improving safety performance and other activities designed to promote and sustain a positive safety culture and shape policies that uphold our commitment to aerospace safety. The SMS infrastructure is comprised of four components designed to create a disciplined environment to manage safety risks and promote a positive safety culture: Safety Policy and Objectives, Safety Risk Management, Safety Assurance and Safety Promotion. Our SMS is continually evolving and improving. Our SMS includes a risk elevation

process pursuant to which our business unit presidents regularly review safety risks, the associated risk mitigation and corrective action plans, and the relevant safety metrics to determine if additional resources and/or mitigation activities are necessary. Our business unit presidents determine those risks that will be briefed to our Chief Executive Officer during his SMS reviews, which occur at least bi-monthly. The Aerospace Safety Committee reviews SMS performance and the SMS Risk Register at every meeting. For more information on our SMS, see "Aerospace Safety and Quality" on page 4.

308.    The 2024 Proxy also sought to assure investors about the personal attention the Board paid to safety after the AA Flight 1282 incident: "The Board and the Aerospace Safety Committee is actively engaged in overseeing the Company's actions following the January 5, 2024 Alaska Airlines Flight 1282 accident through regular update calls and communications, special meetings of the Board and the Aerospace Safety Committee, and multiple informal meetings, inspections and engagements, including at the 737 factory. *See* "Building Trust Through Action and Transparency" on page 1 for more information."

309.    The 2024 Proxy also claims that the Board made "[r]ecent enhancements" to its oversight, including that it: "Sought additional opportunities for directors to set the tone at the top and reiterate the criticality of safety and quality, such as participating in Seek, Speak & Listen events, supplier quality calls with global partners to discuss actions necessary for first-time quality, and a Safety Exchange broadcast available to all employees"; and "Continued Board refreshment, adding Ms. Soussan in 2023, who brings an international perspective and extensive experience in areas of heavy manufacturing, cybersecurity, digitalization, environmental sustainability, product safety and human capital management[.]"

310.    The 2024 Proxy further claims, "[a]t Boeing, our core values of safety, quality, integrity and transparency guide us as we design, build and service our products. Each year, Boeing employees affirm their commitment to these values by signing our Code of Conduct, a process through which we each pledge to adhere to all applicable laws, regulations and company policies.

The Code also serves as a powerful reminder that to earn the trust of our customers, regulators and the flying public, we must foster a workplace where we hold ourselves accountable to make the right decisions and operate according to the very highest standards."  Furthermore, "The Board expects directors, officers and employees to act ethically, including by adhering to all applicable codes of conduct, at all times. The codes of conduct are available at www.boeing.com/company/general-info/corporate-governance."   Furthermore, "In 2023, we continued our work to create an environment where each team member is encouraged to feel comfortable identifying issues, seeking guidance and speaking up without fear of retaliation. Through the local teams we established with our Site Compliance and Ethics Officers and Ethics Ambassador programs—and using site-specific data—we drove improvements across our locations and business units. Additionally, we have prioritized and enhanced our compliance training, manager engagements and communications with employees to emphasize each teammate's personal responsibility for compliant and ethical behavior."

311.    But the above statements concerning the Board's safety oversight and improvements are materially misleading.  As the 220 Documents show, the Board in fact did not conduct the safety oversight it was required to do, because it ignored red flags for years and failed to follow up on what they knew or should have known were systemic issues by instead taking a very narrowly cabined view of investigating or hearing reports of only specific incidents. Furthermore, the statements concerning how Boeing encourages workers to speak up and will not retaliate are misleading, as recent whistleblowers coming forth with detailed allegations of retaliation demonstrate.

312.    In spite of the 2024 Proxy's attempts to paint a rosy picture of the Board's oversight and Calhoun's competence as a director and officer, 22% of the votes cast at the annual meeting

were against Calhoun's re-election as a director.  This year, major proxy advisor Institutional

Shareholder Services ("ISS") advised shareholders to vote for Calhoun and the other directors' re-

election.  Glass Lewis, the other major proxy advisor, advised shareholders to vote against Calhoun

and the directors who chaired the Company's Audit and Aerospace Safety Committees because of

"significant concerns regarding the board's oversight of the company's safety culture and its

attempts to overhaul it."  If it had not been for the misleading disclosures claiming that the Board

conducted adequate oversight and is conducting better oversight of safety and quality after the AA

Flight 1282 incident, both major proxy advisors, as well as major institutional holders, may have

voted against the director nominees' re-election, given that a large portion of stockholders already

voted against Calhoun as a director.

313.    But recently revealed events show that the 2024 Proxy's claims that the Board has

improved its safety oversight are false.  Boeing's safety plan, released to the FAA on May 30,

2024, two weeks after the directors were re-elected, showed that Boeing previously was not taking

even basic steps in safety oversight.  FAA Administrator Whitaker implied the same, when he said

in a press release announcing receipt of the plan that the plan was only the "beginning" rather than

the "end," the FAA would continue enhanced oversight of Boeing for the foreseeable future,

including weekly meetings with Boeing, and it would likely be months before the FAA could

consider removing the production cap of Boeing 737 MAX planes.

## L.    Boeing Directors and Officers Violate Their Fiduciary Duties of Oversight by Ignoring Red Flags

314.    220 Documents produced in response to Oklahoma's demand show that while the

Board has nominally implemented safety oversight, which Boeing officers are charged with

implementing, the Individual Defendants have ignored red flags that demonstrate serious problems

with its safety oversight.  These directors' and officers' failure to implement safety oversight

through ignoring red flags is especially egregious because they knew they had the duty to implement robust safety oversight as a result of the previous shareholder derivative settlement.

315.   If anything, Boeing's Board's oversight has appeared to take a whack-a-mole approach that responded to public or regulatory pressure only after a problem became serious enough to draw such scrutiny, but the Board failed to proactively prevent problems.   Minutes reviewed in the 220 Production show that the Board rarely followed up on safety oversight commitments, instead moving from issue to issue and crisis to crisis.

316.   █████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████

317.   █████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████████

318.   █████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████







319.

320. 

321.

322.

323. ████████████████████████████████████████████

324. ████████████████████████████████████████████

325.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

326.   ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████

327.   ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

175

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████.

328.   ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



329.





332.    The 220 Documents show that the Director Defendants, during their respective tenures on the Board, were aware of red flags and therefore had a fiduciary duty to follow-up and to attempt to remedy the systemic safety violations that the red flags illustrated were occurring. Their failure to address these red flags constitute a breach of their fiduciary duty of loyalty to the Company.

333.    Similarly, the Officer Defendants also had a fiduciary duty to oversee either the Company or their respective business units, and failed to do so when they ignored red flags in the Company or in their respective divisions.  It can be inferred that the Officer Defendants, owing to

their positions directly managing either the Company or their respective business units, knew of the red flags that have now been reported publicly or are detailed in the 220 Documents, and their failure to address these red flags constitutes a breach of their respective fiduciary duties.  The scope of the Officer Defendants' duties encompasses, respectively:

a)     For Calhoun, as the CEO of Boeing, it is reasonable to infer he would know of all the red flags reported publicly or discussed in the 220 Documents, or that he should have known given his responsibility to manage the entire company.  That Boeing aircraft have suffered and continue to suffer from systematic safety and quality issues, and Boeing personnel have violated the law through improperly documenting manufacturing or retaliating against whistleblowers, among other things, shows that he has violated his fiduciary duty to ensure the safety and quality of Boeing aircraft and that Boeing and its personnel comply with the law.

b)     For West and Smith, during their respective tenures, it is reasonable they would or should also have known of all the red flags reported publicly or discussed in the 220 Documents, owing to their positions supervising the finances of the Company.  That Boeing aircraft have suffered and continue to suffer from systematic safety and quality issues shows that they have violated their fiduciary duty to ensure the safety and quality of Boeing aircraft.

c)     For Gerry, it is reasonable that he would or should have known of all the red flags reported publicly or discussed in the 220 Documents, owing to his position as the CLO of the Company.  Gerry especially had a heightened duty to pay attention to red flags and to ensure that Boeing met its legal responsibilities for ensuring safety and quality because he became CLO in the wake of the MAX crashes, which had a catastrophic impact

on the Company's reputation and business.  That Boeing aircraft have suffered and continue to suffer from systematic safety and quality issues, and Boeing personnel have systematically violated the law by, for example, improperly documenting manufacturing, or retaliating against employees for raising safety concerns, shows that he has violated his fiduciary duty to ensure that Boeing personnel follow the law.

d)       For Amuluru and Hostetler, during their respective tenures as CCO, it is reasonable to infer that they would or should have known of all the red flags reported publicly or discussed in the 220 Documents, owing to their duty to oversee and ensure compliance throughout the Company.  That Boeing has widespread compliance problems, such as the failure to properly document manufacturing steps, shows that they have violated their fiduciary duty to ensure compliance among Boeing personnel.

e)       McKenzie, as the Chief Engineer of Boeing, is responsible for "oversight of all aspects of safety and technical integrity of Boeing products and services[,]" according to his official Company biography.  Thus, it is reasonable to infer that he would or should have been keenly aware of all the red flags reported publicly or discussed in the 220 Documents.  That Boeing aircraft have suffered and continue to suffer from systematic safety and quality issues shows that he has violated his fiduciary duty to ensure the safety and quality of Boeing aircraft.

f)       Delaney, as the Chief Aerospace Safety Officer, also is responsible for the safety of Boeing's aircraft, and it is reasonable to infer that he would or should have known of all the red flags publicly reported or discussed in the 220 Documents since 2021, and had a duty to address and correct them.  That Boeing aircraft have suffered and continue to

suffer from systematic safety and quality issues shows that he has violated his fiduciary duty to ensure the safety and quality of Boeing aircraft.

g) Fleming and Lund, in their roles overseeing manufacturing and delivery of planes in BCA, would or should have known of all red flags publicly reported or discussed in the 220 Documents relating to Boeing's commercial aircraft, such as the 737, the 737 MAX, and the 787 Dreamliner. They also have a duty to address these red flags and to ensure the safety of Boeing's commercial aircraft. That Boeing commercial aircraft continue to suffer from safety problems and have done so during Fleming's and Lund's respective tenures overseeing BCA products and services, shows that they have violated their fiduciary duties with respect to ensuring the safety and quality of Boeing commercial aircraft.

h) Caret and Colbert, during their respective tenures leading BDS, would or should have known of all the red flags concerning the Osprey, and had a duty to address those red flags and ensure the safety of the Osprey aircraft. That they have not done so, and instead the Osprey has been an improperly built aircraft that continues to suffer from defects that have led to fatal crashes, means that Caret and Colbert have violated their fiduciary duties in managing BDS.

## VI.   DAMAGES TO THE COMPANY

334.   Damages to the Company could total several billion by the time this latest scandal runs its course. In the first quarter of 2024, Boeing reported a loss of $355 million, due in part to spending $4 billion in cash. A large portion of those expenses was spent in relation to the AA Flight 1282 incident and related fallout.

335.    Furthermore, the FAA has capped Boeing's production of 737 planes to 38 per month, owing to the many issues that have come to light with the production of those planes and related safety concerns.  FAA Administrator Whitaker has estimated that it will be at least several months before the FAA may consider removing this cap.  In any event, increased regulatory scrutiny has slowed Boeing's production down to approximately 21 planes per month.  As a result of this increased regulatory scrutiny and the reputational and business fallout, Boeing is unlikely to reach its goal of producing 50 737's and 10 787's per month by next year.  After the Company announced its first-quarter result, Moody's downgraded its debt to its lowest investment-grade rating, Baa3.  Boeing's commercial division, which manufactures the 737's and 787's (among other planes), reported an operating loss of $1.1 billion, which was offset by a $151 million operating profit in its defense division and $916 million profit in its services division (which provides maintenance to airlines).

336.    Alaska Airlines has, to date, claimed $162 million in compensation and United Airlines has claimed an undisclosed but likely similar or larger amount (due to its larger fleet) in compensation for costs related to the grounding of the MAX (series 9) plane and other regulatory and reputational fallout.

337.    Boeing's long-term ability to finance its business has also been severely damaged by its inattention to safety.  Boeing's credit rating has been cut to the lowest investment grade rating, and is now being threatened with a cut to junk rating.  All three of the major credit rating agencies – S&P Global Ratings, Moody's, and Fitch Group – have reduced Boeing's credit rating to Baa3 or BBB-minus since April 2024 – and have lowered their outlooks to "negative."  This is due both to Boeing's high cash burn – $4 billion in the first quarter alone – and the downward

trend of the business, including the FAA's production cap.  Boeing's credit rating has declined from A2 or A just six years ago, before the first fatal MAX crash.

338.    Lurching from crisis to crisis has also led Boeing to lose its lead to Airbus among the most profitable commercial planes and narrow-body jets, and has also reduced its flexibility in when to develop a new plane from the ground-up, which would need to last for at least 50 years.

339.    Meanwhile, Boeing's scandals also impact its long-term health in that even though Calhoun has announced that he will step down, the brand has become so toxic that the Company is having trouble finding a successor for Calhoun when he steps down at the end of the year. Boeing has approached various candidates, including GE CEO Larry Culp and current Board member David Gitlin, who have all declined to take over as the Company CEO.  Meanwhile, internal candidates such as Stephanie Pope, or former Boeing executive and current Spirit CEO, Pat Shanahan, have had their credibility damaged by Boeing's scandals, weakening their ability to take over.

340.    Boeing has also lost the trust of its primary regulator, the FAA.  Whitaker admitted at a Congressional hearing in June 2024 that, previously, "the FAA's approach was too hands-off, too focused on paperwork audits and not focused enough on inspections. . . .  We have changed that approach over the last several months, and those changes are permanent."  Having lost its trust of Boeing to conduct its delegated oversight, the FAA now uses more in-person inspections, and its oversight includes the production cap that will remain in place until the agency is satisfied with the Company's safety and quality control measures.  The FAA will also continue to maintain an on-site presence at Boeing and Spirit factories, including more than 30 aviation safety inspectors.

341.    Finally, Boeing may be subject to further criminal liability.  On July 7, 2024, the DOJ and Boeing informed the Texas Federal Court that Boeing will agree to plead guilty to

conspiracy to defraud the United States (in violation of the DPA), retain an independent compliance monitor the DOJ will choose, and incur approximately $700 million in fines and compliance spending commitments.  By pleading guilty to a felony, Boeing also runs the risk of being barred from federal contracts, of which federal defense contracts comprise approximately one-third to two-fifths of its total business.  Furthermore, Boeing's guilty plea will not shield it from criminal exposure arising from conduct after the MAX crashes, including that related to the AA Flight 1282 incident.

## VII.   DERIVATIVE AND DEMAND ALLEGATIONS

342.   Plaintiff brings this action derivatively in the right and for the benefit of Boeing to redress the breaches of fiduciary duty and other violations of law committed by the Individual Defendants, as alleged herein.

343.   Plaintiff will adequately and fairly represent the interests of Boeing and its stockholders in enforcing and prosecuting the Company's rights, and Plaintiff has retained counsel experienced in prosecuting this type of derivative action.  Plaintiff has continuously held Boeing stock throughout the Relevant Period and will continue to hold Boeing stock through the resolution of this action.

344.   Demand is futile as to the Board because a majority of the Board faces a substantial likelihood of liability for failure to conduct oversight into mission-critical areas of airplane safety and quality, as discussed in detail above.

345.   All the Director Defendants (11 defendants out of 11 current directors) face a substantial likelihood of liability for failure to conduct oversight because they have served on the Board since at least 2023, when the latest production snags at Spirit occurred, and ▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

346.    In addition, all the Director Defendants except for Soussan, who joined in 2023, also ███████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████.  As regulatory scrutiny of Boeing has increased after the AA Flight 1282 incident occurred, the 787 has also faced increased scrutiny as previously unreleased whistleblower testimony has become public, and new whistleblowers have come forward revealing severe problems with the manufacturing process and retaliation against speaking up at the 787 South Carolina plant.  Thus, 10 of the 11 Director Defendants breached their fiduciary duties by ignoring safety red flags regarding the 787-manufacturing process, which in turn means they do not have the requisite independence or disinterest to consider a litigation demand against them.

347.    Furthermore, nine out of 11 Director Defendants also were aware ███████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████████████, which in turn means they do not have the requisite independence or disinterest to consider a litigation demand against them.

348.    In addition, directors Bradway, Calhoun, Good, and Richardson were on the Board before or in the immediate aftermath of the 737 MAX crashes, and during the grounding of the 737 MAX, and thus knew from public reporting, as well as internal meetings, that safety and quality were the paramount concerns of the Company.  By the time the 2019 Delaware Action had settled in March 2022, directors Doughtie, Gitlin, Harris, Johri, Joyce, and Mollenkopf had also joined, and as a result, would have attained similar knowledge.  Thus, 10 out of 11 directors would have had an especially strong knowledge of their safety oversight duties due to their knowledge of the 2019 Delaware Action and its settlement, which included specific oversight commitments by the Board.  Despite this knowledge, they still failed to implement safety oversight at the Board level, and to the extent that they did purport to exercise nominal safety oversight, they ignored red flags that arose.

349.    Demand is futile as to Calhoun for the above reasons, but also for the additional reasons that: 1) he personally understood the importance of safety based on other Board service and due to his longer tenure on the Boeing Board than any other present director; and 2) as the CEO of Boeing since 2019, he both knew and had the responsibility to stay informed of more information concerning safety and quality than the rest of the Board.

350.    Demand is further futile as to Calhoun because, as the CEO, he answers to the Board and the Board only in terms of whether he can be terminated, and as to his compensation, and therefore, he cannot independently assess a demand against the other directors.

**COUNT I**
**Breach of Fiduciary Duty**
**(Against the Director Defendants in Their Capacities as Directors)**

351.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

352.     By virtue of their positions as directors of Boeing, the Director Defendants owed fiduciary duties of care, loyalty, and good faith to Boeing and its stockholders.  They breached those duties by, *inter alia*, willfully abdicating their oversight responsibilities, with respect to mission-critical plane safety, and failing to have any oversight mechanism into plane safety at all, except for very brief mentions of safety accomplishments in Board presentations.

353.     As a result of the Director Defendants' actions or inactions, the Company has been damaged.

354.     The Director Defendants' breaches of fiduciary duty directly and proximately caused substantial losses to the Company in an amount to be proven at trial.

355.     The Director Defendants are liable to the Company as a result of the acts alleged herein.

**COUNT II**
**Breach of Fiduciary Duty**
**(Against the Officer Defendants in Their Capacities as Officers)**

356.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

357.     By virtue of their positions as officers of Boeing, the Officer Defendants owed fiduciary duties of care, loyalty, and good faith to Boeing and its stockholders.  The Officer Defendants breached those duties when, *inter alia*, they failed to conduct systematic oversight, or any oversight, with respect to mission-critical airplane safety.

358.     As a result of the Officer Defendants' actions or inactions, the Company has been damaged.

359.     The Officer Defendants' breaches of fiduciary duty directly and proximately caused substantial losses to the Company in an amount to be proven at trial.

360.     The Officer Defendants are liable to the Company as a result of the acts alleged herein.

**COUNT III**
**Violation of §14(a) of the Exchange Act**
**(Against All of the Director Defendants)**

361.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

362.     SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. §240.14a-9(a).

363.     The Director Defendants, during their respective tenures on the Board. exercised control over Boeing and either negligently or knowingly caused Boeing to disseminate the false and misleading proxy statements in 2022 (except Gitlin and Soussan), 2023 (except Soussan), and 2024 (all Director Defendants).  These proxy statements materially misrepresented Boeing's commitment to safety by, *inter alia*, highlighting at various points the role of safety, regulatory compliance, aerospace industry experience, product quality, and risk management as qualifications

for Boeing directors, as well as the Board's actions in overseeing safety and quality, but materially omitting how Boeing's Board actually implemented inadequate safety oversight through ignoring red flags or by taking a whack-a-mole approach to address limited problems without conducting systemic overviews when warranted or by continuing to focus on business without paying mind to regulatory implications of safety and quality problems.

364.    As stated herein, these proxy statements contained untrue statements of material facts and omitted material facts necessary to make the statements that were made not false and misleading in violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.   These misleading disclosures regarding safety oversight were material because airplane safety is mission-critical to Boeing's business and, therefore, is a material factor that shareholders consider in voting whether to elect or re-elect director nominees.   The misleading disclosures, therefore, induced shareholders to vote to elect or re-elect the director nominees. These false statements and omissions were, therefore, essential links in the re-election of each of the directors.

365.    The written communications made by and/or caused to be made by the Director Defendants as described herein constitute violations of Rule 14a-9 and §14(a) because such communications were materially false and/or misleading and were provided in a negligent manner.

366.    At all relevant times to the dissemination of the materially false and/or misleading proxy statements, the Director Defendants were aware of, and/or had access to, the facts concerning Boeing's repeated failure to address and disclose numerous safety and quality assurance violations within the manufacturing process of airplanes at the Company.

367.    Boeing, as a result, has been injured by this conduct and is entitled to damages and equitable relief.

## COUNT IV
### Violation of §29(b) of the Exchange Act
### (Against All of the Director Defendants)

368.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

369.     The Director Defendants each received incentive compensation and fees, including stock awards, while engaging in conduct that violates §14(a) of the Exchange Act.  The Director Defendants' incentive compensation and fees should be rescinded under §29 of the Exchange Act because these Defendants violated §14(a) by issuing false and misleading reports to Boeing shareholders regarding the nature of, and responsibility for, violations of federal law and regulations.  All of the payments the Director Defendants received are therefore voidable by Boeing under §29(b) of the Exchange Act.

370.     Boeing is in privity with the Director Defendants with respect to the incentive compensation and fees provided by Boeing to these Defendants.  The Director Defendants have engaged in prohibited conduct in violation of the securities laws as alleged herein.

371.     Boeing has been severely injured by the misconduct of the Director Defendants.  Accordingly, Boeing is entitled to damages, *i.e.*, rescission of the incentives, compensation, and fees granted to the Director Defendants.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Declaring that Plaintiff may maintain this derivative action on behalf of Boeing and that Plaintiff is a proper and adequate representative of the Company;

B.     Declaring that the Individual Defendants have breached their fiduciary duties of care, loyalty, and good faith to Boeing;

C.      Determining and awarding to Boeing the damages sustained by the Company, as a result of the breaches of fiduciary duty and other claims as set forth above, from each of the Individual Defendants, jointly and severally;

D.      Awarding to Boeing restitution from the Individual Defendants and ordering disgorgement of all profits, benefits, and other compensation obtained by them, including all profits, special benefits, and unjust enrichment they have obtained as a result of their unlawful conduct, payment of incentive compensation (whether in the form of cash bonuses, stock awards, or stock option grants), and common stock sale proceeds;

E.      Directing Boeing to take all necessary actions to reform and improve its corporate governance and internal procedures, enable the Company to comply with its existing governance obligations and all applicable laws, and protect the Company and its stockholders from a recurrence of the damaging events described herein, including, but not limited to, requiring the Company to implement additional audit, compliance, and internal control procedures, and retaining a consultant to monitor and improve the Company's safety and quality practices, procedures, and policies;

F.      Awarding to Plaintiff costs and disbursements of this action, including reasonable attorneys' and other advisors' fees;

G.      Awarding pre- and post-judgment interest; and

H.      Granting such other and further relief as the Court deems just and equitable.

## IX.    JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

Dated: July 9, 2024

Respectfully submitted,

**WILLIAMS & SKILLING, P.C.**

/s/ *Charles L. Williams*
Charles L. Williams (VA Bar No. 23587)
7104 Mechanicsville Turnpike, Suite 204
Mechanicsville, Virginia 23111
Telephone: (804) 447-0307
Facsimile:  (804) 447-0367
cwilliams@williamsandskilling.com

*Counsel for Plaintiff Oklahoma Firefighter Pension and Retirement System*

Geoffrey M. Johnson
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Telephone: (216) 229-6088

Donald A. Broggi
Jing Li-Yu
Kassandra Nelson
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, New York 10169
Telephone: (212) 223-6444

Maxwell R. Huffman
Joseph A. Pettigrew, *Of Counsel*
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565

*Counsel for Plaintiff
Oklahoma Firefighters Pension
and Retirement System*

## **VERIFICATION**

I, CHASE RANKIN, hereby declare as follows:

1.      I am the Executive Director of the Oklahoma Firefighters Pension and Retirement System ("Oklahoma"), and am duly authorized to act on behalf of Oklahoma.

2.      Oklahoma is the derivative plaintiff in this action.  I verify that I have reviewed the Verified Shareholder Derivative Complaint (the "Complaint") to be filed in this action and that the facts stated in the Complaint, as they concern Oklahoma, are true to my personal knowledge.  I believe the facts pleaded in the Complaint on information and belief or investigation of counsel are true.

3.      Oklahoma has not received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this action except: (i) such fees, costs, or other payments as the Court expressly approves to be paid to Oklahoma; or (ii) reimbursement, by its attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 9th day of _____July_____, 2024

_____
CHASE RANKIN
Executive Director
Oklahoma Firefighters Pension and Retirement System