**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM, STATE TEACHERS RETIREMENT SYSTEM OF OHIO, and OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM, Derivatively on Behalf of Nominal Defendant THE BOEING COMPANY, | ) ) ) ) ) ) ) | Civil Action No. 1:24-cv-1200 (LMB/WEF) |
| | ) ) | |
| Plaintiffs, | ) ) | **JURY TRIAL DEMANDED** |
| v. | ) ) ) | |
| DAVID L. CALHOUN, STEVEN M. MOLLENKOPF, LAWRENCE W. KELLNER, ROBERT A. BRADWAY, LYNNE M. DOUGHTIE, LYNN J. GOOD, DAVID L. GITLIN, STAYCE D. HARRIS, AKHIL JOHRI, DAVID L. JOYCE, JOHN M. RICHARDSON, SABRINA SOUSSAN, RONALD A. WILLIAMS, STANLEY DEAL, STEPHANIE POPE, BRETT C. GERRY, HOWARD MCKENZIE, MICHAEL DELANEY, MIKE FLEMING, ELIZABETH LUND, DARRIN A. HOSTETLER, UMA M. AMULURU, MARK C. FAVA, ELISABETH C. MARTIN, THOMAS GALANTOWICZ, MICHAEL D'AMBROSE, KIMBERLY S. PASTEGA, EDWIN J. CLARK, SCOTT A. STOCKER, and DAVID LOFFING, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **REDACTED – FILED ON THE PUBLIC DOCKET** |
| | ) ) ) | |
| Defendants, | ) ) | |
| - and - | ) ) | |
| THE BOEING COMPANY, | ) ) ) | |
| Nominal Defendant. | ) | |

**CONSOLIDATED AMENDED VERIFIED**
**SHAREHOLDER DERIVATIVE COMPLAINT**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     PARTIES AND NON-PARTIES ...................................................................... 8

        A.      Plaintiffs ................................................................................................... 8

        B.      Nominal Defendant ................................................................................. 10

        C.      The Demand Board Director Defendants ............................................... 10

        D.      The Non-Demand Board Director Defendants ....................................... 12

        E.      The Officer Defendants ........................................................................... 12

        F.      Relevant Non-Parties .............................................................................. 18

        G.      Relevant Whistleblowers ........................................................................ 18

III.    JURISDICTION .............................................................................................. 21

IV.     FACTUAL BACKGROUND ........................................................................... 24

        A.      Boeing Operates in a Highly Regulated Industry. ................................. 24

        B.      The Birth of Boeing's Toxic Culture: The Boeing's C-Suite Changes from
                Engineers to Financiers. ......................................................................... 25

        C.      The Toxic Culture Spreads: Boeing Rushes the Development of the
                Dreamliner. ............................................................................................. 26

        D.      Boeing's Toxic Culture Leads to a 2015 Settlement Agreement with the
                FAA. ........................................................................................................ 28

        E.      Boeing Rushes the Development of the 737 MAX. ................................ 29

        F.      Boeing's Prioritization of Profits over Safety Results in Two Tragic 737
                MAX Crashes. ......................................................................................... 34

        G.      The MAX Crashes Lead to a Regulatory Firestorm. ............................. 35

        H.      The MAX Crashes Lead to Meritorious Shareholder Derivative
                Litigation. ............................................................................................... 41

        I.      Additional Safety Issues with the Dreamliner Arise During the Pendency
                of *Boeing I*. ............................................................................................. 47

J.      Additional Safety Issues with the 737 MAX Arise During the Pendency of *Boeing I* .................................................................................................... 49

K.      Boeing Makes Surface Changes, But the Tone at the Top Remains the Same ................................................................................................................ 51

L.      Boeing Quickly Returns to Business as Usual—Pursuing Profits over Safety. .............................................................................................................. 56

M.      After the MAX Crashes and the Delaware Settlement, Boeing Continues to Cut Corners to Pursue Unsafe Production Schedules. ...................................... 65

N.      Boeing Retaliates Against Those Who Hold Up Production Schedules ............. 104

O.      Boeing's Unsafe Production Schedules Result in a Steady Drumbeat of Safety Issues ........................................................................................................ 110

P.      Boeing Continues to Minimize Safety Issues and Rush to Get Its Planes Back in the Air. ................................................................................................... 112

Q.      A Door Plug Blowout Brings Boeing's Ongoing and Extensive Quality and Safety Issues to the Fore. .............................................................................. 113

R.      The Door Plug Blowout Leads to Heightened Scrutiny from Lawmakers and Regulators. ..................................................................................................... 123

S.      Faced with Crushing Regulatory and Public Scrutiny, Boeing Finally Makes Some Long-Overdue Changes. ............................................................... 141

T.      Boeing Pleads Guilty to a Felony for Failing to Comply with the DPA. ........... 149

U.      The Proxy Defendants Violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 By Causing Boeing to File Materially Misleading Proxy Statements. .......................................................................................................... 152

V.      The 10(b) Defendants Violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by Knowingly or Recklessly Issuing Materially False and Misleading Statements. ....................................................................................... 155

W.      The 10(b) Defendants Made the Statements with Scienter. ............................... 165

X.      The 10(b) Defendants' Misstatements and Omissions Cause Boeing To Repurchase Its Stock at Inflated Prices. ............................................................. 168

Y.      The Individual Defendants' Breaches of Fiduciary Duty Lead Directly to the Latest Boeing Corporate Trauma. ................................................................. 173

V.      DERIVATIVE ALLEGATIONS ................................................................................... 179

VI.    DEMAND FUTILITY ALLEGATIONS ........................................................ 179

       A.    The Demand Board Cannot Impartially Evaluate Count I, Which Alleges
             Breaches of Fiduciary Duty by the Director Defendants.................................. 191

       B.    The Demand Board Cannot Impartially Evaluate Count II, Which Alleges
             Breaches of Fiduciary Duty by the Officer Defendants.................................. 202

       C.    The Demand Board Cannot Impartially Evaluate Count III, Which
             Alleges Violations of Section 14(a) of the Exchange Act and SEC Rule
             14A-9 by the Proxy Defendants............................................................. 203

       D.    The Demand Board Cannot Impartially Evaluate Count IV, Which
             Alleges Violations of Section 10(b) of the Exchange Act and SEC Rule
             10B-5 by the 10(b) Defendants............................................................. 204

       COUNT I ........................................................................................ 205

       COUNT II ....................................................................................... 206

       COUNT III....................................................................................... 207

       COUNT IV....................................................................................... 208

VII.   REQUEST FOR RELIEF .................................................................... 210

VIII.  JURY DEMAND ............................................................................. 211

1.     Plaintiffs Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, and Oklahoma Firefighters Pension and Retirement System (together, "Plaintiffs"), by and through their undersigned counsel, bring the following Consolidated Amended Verified Shareholder Derivative Complaint (the "Amended Complaint") derivatively on behalf of Nominal Defendant The Boeing Company ("Boeing" or the "Company"), against (i) certain current and former members of Boeing's Board of Directors (the "Board") and (ii) certain current and former Boeing executive officers, for numerous breaches of fiduciary duty and violations of the federal securities laws they committed during the period from at least 2021 through the present (the "Relevant Period").

2.     This Amended Complaint's allegations are based on Plaintiffs' knowledge as to themselves, including personal knowledge concerning their Company stock ownership, and on information and belief, including the investigation of counsel, a review of publicly available information—such as public filings made by the Company with the U.S. Securities and Exchange Commission (the "SEC"); press releases and other publications disseminated by the Company and others; news articles, shareholder communications, and postings on Boeing's website concerning the Company's public statements; and the proceedings in civil lawsuits based on similar misconduct—and a review of Company books and records produced in response to Plaintiffs' demands for inspection pursuant to Section 220 of the Delaware General Corporation Law (the "Section 220 Production"), as to all other matters.

## I.     INTRODUCTION

3.     Boeing and Airbus are the world's two largest manufacturers of commercial aircraft. Since the late 1990s, Boeing and Airbus have held a "duopoly" and essentially controlled the market for large passenger jets. In 2019, Boeing and Airbus received 99% of the world's large plane orders. Boeing claims to be the largest exporter in the United States by dollar value.

4.    The most critical component of passenger aircraft is safety.  Millions of lives are on the line daily.  Unsurprisingly, manufacturers of commercial passenger aircraft are heavily regulated by government agencies around the world, including the Federal Aviation Administration (the "FAA"), which is part of the U.S. Department of Transportation.  Government regulations cover every aspect of commercial airplane manufacturing—from design to production to operation.  Detailed and accurate recordkeeping is vital to demonstrating regulatory compliance and is itself a regulatory requirement.

5.    For Boeing, regulatory compliance is mission-critical.  Noncompliance threatens the safety of hundreds of thousands of travelers.  It also risks harsh penalties and a disruption of Boeing's business.

6.    Notwithstanding the obvious importance of regulatory compliance to Boeing's business, for decades, the Company's fiduciaries have fostered a toxic corporate culture of noncompliance and concealment.  Boeing executives developed, and the Board approved, unrealistic production schedules that Boeing could not meet while maintaining safety and compliance.  The production schedules were part of Boeing's intentional prioritization of profits above safety and regulatory compliance.  When employees raised safety and regulatory issues that threatened to derail the schedule, management retaliated against them.  *See infra* Section IV.A.

7.    Things used to be different.  Boeing was once synonymous with safety and quality. It was known as a Company of engineers who took pride in their designs, manufacturing, and assembly work.  In the late 1990s, that reputation started to change.  Corporate financiers replaced the engineers at the highest levels of Company management.  A new CEO from outside Boeing intentionally shifted Boeing's focus from engineering to profit-seeking.  *See infra* Section IV.B.

8.    Boeing's new culture showed itself in the development and operation of Boeing's 787 aircraft, dubbed the Dreamliner.  Starting with Dreamliner, Boeing began outsourcing the

production of airplane components to scores of third-party suppliers.  That approach improved margins but sacrificed quality.  As a result, the Dreamliner experienced numerous quality and safety issues.  *See infra* Section IV.C.

9.      In 2015, Boeing experienced what should have been a wakeup call.  In response to more than a dozen FAA investigations, Boeing agreed to pay the largest fine the FAA had imposed to that point.  Boeing also committed to implementing a safety management system and other reforms.  But Boeing did not meet its obligations, and the FAA imposed additional penalties.  *See infra* Section IV.D.

10.     Boeing' new culture showed itself again in the development of the next generation of Boeing's 737 aircraft, dubbed the 737 MAX.  Boeing rushed the development of the 737 MAX to keep in lockstep with Airbus' offerings.  Boeing cut corners, ignored its safety inspectors, and even lied to the FAA to get the 737 MAX in the air sooner.  *See infra* Section IV.E.

11.     Boeing's safety-last culture ended in disaster.  Two 737 MAX aircraft crashed— one in late 2018, the second in early 2019—killing everyone on board.  *See infra* Section IV.F. The crashes led to a regulatory firestorm.  Congress opened investigations.  The SEC fined Boeing $200 million for false and misleading disclosures in public filings.  The U.S. Department of Justice ("DOJ") brought criminal charges against Boeing that were paused through a deferred prosecution agreement (the "DPA").  The Boeing directors understood that the DPA required strict compliance with its terms.  *See infra* Section IV.G.

12.     The crashes of the two 737 MAX aircraft resulted in derivative litigation in the Delaware Court of Chancery (the "Court of Chancery") in the matter styled *In re the Boeing Co. Derivative Litigation*, Consol. C.A. No. 2019-0907-MTZ (Del. Ch.) (hereinafter "*Boeing I*").  The *Boeing I* defendants moved to dismiss the plaintiffs' claims.  On September 7, 2021, the Court of Chancery denied the motion to dismiss.  In a well-reasoned opinion, the Delaware court explained

the oversight duties the Boeing directors owed to the corporation and the numerous ways in which the well-pled allegations of the complaint showed that the Boeing directors failed to meet those duties.  *See generally In re Boeing Co. Derivative Litig.*, No. 2019-0907-MTZ, 2021 WL 4059934 (Del. Ch. Sept. 7, 2021).  Unsurprisingly, the Court of Chancery found that product safety was a mission-critical issue for Boeing.  The motion to dismiss opinion in *Boeing I* put the Boeing directors on notice of exactly what Delaware law required of them.  Shortly thereafter, the defendants settled *Boeing I* for an insurance payment of $237.5 million and numerous corporate governance reforms (the "Delaware Settlement").  *See infra* Section IV.H.[1]

13.     The 737 MAX crashes, the DPA, *Boeing I*, and the Delaware Settlement should have changed the tone at the top at Boeing.  It did not.  Boeing management made surface-level changes and started using safety buzzwords, but the chase for profits through unsafe production schedules remained.  *Boeing I* showed Boeing's need for mandatory reporting to the Board of mission-critical issues.  But the Board remained passive and left reporting to management's discretion.  *See infra* Section IV.K.

14.     The COVID-19 pandemic gave Boeing the opportunity to slow down and work on its culture.  In fact, the pandemic made slowing down a necessity.  The pandemic constrained supply chains.  Boeing's subcontractors could not provide parts as quickly as Boeing's master schedule demanded them.  When the subcontractors provided parts, they often had defects.  Spirit Aerosystems Holdings Inc. ("Spirit"), the company that manufactured many of Boeing's fuselages, was particularly deficient.  Boeing simply pushed Spirit and its other subcontractors to work faster. *See infra* Section IV.L.

---

[1] During the pendency of *Boeing I*, the Dreamliner and the 737 MAX experienced additional safety issues.  *See infra* Section IV.I–J.

15.     Management's unwillingness to slow down its production schedules meant Boeing had to cut corners.  Noncompliant and unsafe practices remained the norm and became even worse. Those practices included:

- Moving planes through the assembly line regardless of whether the work normally conducted at each station had been completed, *see infra* Section IV.M.1;

- Accepting defective parts from subcontractors and reworking them at Boeing's factories, *see infra* Section IV.M.1;

- Establishing "shadow factories" outside of the buildings at Boeing's Washington factories where Boeing employees performed rework or out-of-sequence work, *see infra* Section IV.M.1–2;

- Skipping federally mandated recordkeeping or even falsifying records, *see infra* Section IV.M.3;

- Eliminating inspector positions and the overall number of inspections, *see infra* Section IV.M.4;

- Using nonconforming or scrapped parts when proper parts were unavailable, *see infra* Section IV.M.5;

- Borrowing parts from other planes to perform tests before returning the parts to their original planes, *see infra* Section IV.M.6;

- Using parts as soon as they arrived at the factory and before the parts were inspected or logged, *see infra* Section IV.M.7;

- Going inspector shopping to obtain certifications, *see infra* Section IV.M.8;

- Permitting manufacturing employees to self-inspect their work, *see infra* Section IV.M.9;

- Accepting defective parts from suppliers, *see infra* Section IV.M.10; and

- Violating proper tool management practices, *see infra* Section IV.M.11.

Boeing's directors and officers knew about these unsafe practices. Instead of changing them, Boeing's fiduciaries maintained the requirements and incentives that led to them. In fact, Boeing's fiduciaries cut corners in their own areas of responsibility. *See infra* Section IV.M.12.

16.     Certain courageous Boeing employees tried to stand up against these unsafe and noncompliant practices. Management viewed them as enemies because they threatened the production schedules. As confirmed by numerous and well-publicized whistleblowers over a decade, Boeing has a long-standing culture of ignoring, marginalizing, and even threatening employees who were unwilling to cut corners. That culture was on full display during the Relevant Period. *See infra* Section IV.N.

17.     Boeing's broken culture led to a steady drumbeat of quality and safety issues with the 737 MAX and the Dreamliner. *See infra* Section IV.O. When issues arose, Boeing minimized them and rushed to get its planes back in the air. *See infra* Section IV.P.

18.     In January 2024, the toxicity of Boeing's culture exploded onto the national and international scene when a piece of a 737 MAX fuselage blew out at 16,000 feet (defined below as the "Door Plug Blowout"). Boeing initially tried to minimize the incident and get its planes back in the air. But the FAA had finally had enough. *See infra* Section IV.Q.

19.     The Door Plug Blowout led to another firestorm. Congress became involved and held hearings. The FAA, the DOJ, and the National Transportation Safety Board (the "NTSB") all opened investigations. The media began reporting on every safety incident involving a Boeing plane. *See infra* Section IV.R.

20.     Faced with this crushing pressure, Boeing started making some long-overdue changes.  Most importantly, Boeing was forced to slow down when the FAA imposed a production cap, which the FAA will not remove until Boeing demonstrates a material improvement in key aspects of its safety systems.  Boeing belatedly began clamping down on defects at the Company's subcontractors, especially Spirit.    Boeing ultimately determined to acquire Spirit.    The compensation committee of the Board (the "Compensation Committee") adjusted compensation metrics to hold executives accountable for their failure to end out-of-sequence work or close Boeing's shadow factories.  Management started reporting to the Aerospace Safety Committee key performance indicators that previously went only to the CEO.  These are only baby steps, and it remains to be seen whether Boeing's directors and officers will finally get serious about changing Boeing's broken, recidivist culture.  *See infra* Section IV.S.

21.     After the Door Plug Blowout, the DOJ announced that Boeing had not complied with the DPA.  The DOJ specifically called out Boeing's noncompliance with respect to: (i) out-of-sequence work; (ii) completeness of records; and (iii) stamping issues in build records.  In July 2024, the DOJ and Boeing announced that Boeing had agreed to plead guilty to one felony count of fraud on the United States.  If the plea agreement is approved, it will require Boeing to: (i) pay a criminal fine of $243.6 million; (ii) be subject to a government-approved Independent Compliance Monitor for three years; and (iii) invest at least $455 million in its compliance, quality, and safety programs within three years.  *See infra* Section IV.T.

22.     Boeing's systemic safety and compliance issues during the Relevant Period belied numerous statements that Boeing's directors and officers had made, or caused to be made, on those issues.  The numerous false and misleading statements violated federal securities laws, in addition to constituting breaches of fiduciary duty.  *See infra* Section IV.U–W.

23. The false and misleading disclosures wrongfully inflated Boeing's public stock price during the Relevant Period. During the period of inflated stock prices, Boeing repurchased stock from certain Boeing employees, including defendants in this lawsuit. Boeing purchased these shares at the wrongfully inflated prices—harming Boeing. *See infra* Section IV.X.

24. The failure of Boeing's directors and officers to implement and oversee Boeing's safety and compliance functions in good faith led to incalculable damage to Boeing's relationships with its regulators, customers, lenders, potential employees, and the flying public. In addition to the harm summarized above, Boeing currently faces the prospect of significant liability for violations of federal securities laws that Boeing's fiduciaries caused Boeing to commit. Boeing has further been harmed by the massive costs associated with the FAA's production cap, and the enhanced regulatory oversight that these wrongful actions have incurred. Boeing has suffered, and will suffer, hundreds of millions—and probably billions—of dollars of damages before the current corporate trauma ends. *See infra* Section IV.Y.

25. Boeing suffered these damages because of its directors' and officers' wrongful actions. This lawsuit is brought derivatively to hold Boeing's unfaithful directors and officers liable for the harm they caused Boeing.

## II. PARTIES AND NON-PARTIES

### A. Plaintiffs

26. Plaintiff Ohio Public Employees Retirement System (the "Ohio PERS") has been a beneficial owner of Boeing common stock since at least 2010. The Ohio PERS currently owns 259,266 Boeing shares with a market value of more than $40.1 million based on current trading prices. Since 1935, the Ohio PERS has meant security and peace of mind to millions of Ohio's retired public workers and their families. The Ohio PERS is an instrumentality of the State of Ohio, created under Chapter 145 of the Ohio Revised Code. Under that statute, the Ohio PERS

provides retirement, disability, and survivor benefit programs to public employees in Ohio who are not covered by another state or local retirement system.  The Ohio PERS is the largest state pension fund in Ohio and the fourteenth-largest state pension fund in the United States.  Together with the Ohio STRS, the Ohio PERS has been successfully representing investor rights through class and derivative litigation for decades—obtaining hundreds of millions of dollars for investors and the companies in which they have invested.

27.     Plaintiff State Teachers Retirement System of Ohio (the "Ohio STRS") has been a beneficial owner of Boeing common stock since at least 1994.  The Ohio STRS currently owns 458,454 Boeing shares with a market value of more than $71 million at current market prices.  Since 1920, the Ohio STRS has provided Ohio's public educators a foundation for their financial security.  The Ohio STRS is an instrumentality of the State of Ohio, created under Chapter 3307 of the Ohio Revised Code.  Under that statute, the Ohio STRS provides retirement, disability, and other benefits to more than 500,000 active, inactive, and retired Ohio public educators.  The Ohio STRS is one of the largest public pension funds in the United States.  Together with the Ohio PERS, the Ohio STRS has been successfully representing investor rights through class and derivative litigation for decades—obtaining hundreds of millions of dollars for investors and the companies in which they have invested.

28.     Plaintiff Oklahoma Firefighters Pension and Retirement System ("Oklahoma") has been a beneficial owner of Boeing common stock since at least 2017.  Oklahoma is an instrumentality of the State of Oklahoma, created under Title 11, Section 49-100.2 of the Oklahoma Statutes.  Under that statute, Oklahoma manages and administers retirement funds for active and retired firefighters.

**B.      Nominal Defendant**

29.      Nominal Defendant Boeing is a Delaware corporation with its principal executive offices located at 929 Long Bridge Drive, Arlington, Virginia 22202.   Through its Boeing Commercial Airplanes segment ("BCA"), Boeing is one of the world's largest manufacturers of commercial aircraft.   Through its other three business segments, Boeing engages in defense aircraft manufacturing, aircraft servicing, and other aerospace-related fields.   Boeing claims to be the largest exporter in the United States by dollar value.

**C.      The Demand Board Director Defendants**

30.      When this action was filed on July 9, 2024, the Board (the "Demand Board") had eleven directors (the "Demand Board Director Defendants").   Those directors are the relevant directors for the demand futility analysis for Plaintiffs' derivative claims.   *See Braddock v. Zimmerman*, 906 A.2d 776, 786 (Del. 2006); *see also United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1047–49 (Del. 2021).   The Demand Board Director Defendants are the following.

31.      Robert A. Bradway ("Bradway") joined the Board in 2016.   From 2016 to 2020, Bradway served on the Audit Committee.   In 2024, Bradway joined the Compensation Committee.

32.      David L. Calhoun ("Calhoun") was a member of the Board from 2009 to August 8, 2024.   Calhoun was Board Chair from October to December 2019.   Calhoun also served as Boeing's President and CEO from January 2020 to August 8, 2024.

33.      Lynne M. Doughtie ("Doughtie") joined the Board on January 15, 2021. Throughout her tenure on the Board, she has served on the Audit Committee.   In 2024, Doughtie became the Chair of the Audit Committee.   In 2023, she joined the Compensation Committee.

34.      David L. Gitlin ("Gitlin") joined the Board on June 21, 2022.   Gitlin has served on the Aerospace Safety Committee since 2022.   From 2018 to 2019, Gitlin was the President and

COO of Collins Aerospace Systems ("Collins").  From 2015 to 2018, Gitlin was the President of UTC Aerospace Systems, which merged with Rockwell Collins, Inc. to become Collins Aerospace Systems in 2018.  As further described below, *see infra* ¶ 115 n.3, Collins played a significant role in the underlying causes of the MAX Crashes (defined below), supplying both the components that created erroneous data leading to the crashes and the software that caused the crashes based on that data.  Collins continues to be a major supplier of airplane components for Boeing, including a supplier of dangerously defective components.  *See infra* ¶ 424.

35.     Lynn J. Good ("Good") joined the Board in 2015.  She has served on the Audit Committee since 2015, serving as Chair in 2019 and 2020.  In 2019, Good also served on the Aerospace Safety Committee.  In 2020, Good joined the Compensation Committee.  She became Compensation Committee Chair in 2021.

36.     General Stayce D. Harris ("Harris") joined the Board on June 30, 2021.  Throughout her tenure on the Board, Harris has served on the Aerospace Safety Committee.

37.     Akhil Johri ("Johri") joined the Board on April 27, 2020.  Throughout his tenure on the Board, Johri has served on the Audit Committee, including as Chair in 2021, 2022, and 2023.

38.     David L. Joyce ("Joyce") joined the Board on August 31, 2021.  Throughout his tenure on the Board, Joyce has served as Chair of the Aerospace Safety Committee.  In 2021, 2022, and 2023, Joyce served on the Compensation Committee.

39.     Steven M. Mollenkopf ("Mollenkopf") joined the Board on April 27, 2020.  Throughout his tenure on the Board, Mollenkopf has served on the Compensation Committee.  On May 17, 2024, Mollenkopf became Board Chair.  In 2020, Mollenkopf served on the Aerospace Safety Committee.

40.     Admiral John M. Richardson ("Richardson") joined the Board on October 25, 2019. Throughout his tenure on the Board, Richardson has served on the Aerospace Safety Committee.

41.     Sabrina Soussan ("Soussan") joined the Board on April 18, 2023.  Since 2023, Soussan has served on the Audit Committee.

### D.     The Non-Demand Board Director Defendants

42.     Lawrence W. Kellner ("Kellner") was a member of the Board from 2011 to May 17, 2024.  From December 23, 2019 to May 17, 2024, Kellner was Board Chair.  Until 2019, Kellner served on the Audit Committee, including as Chair in 2017 and 2018.  Kellner served on the Aerospace Safety Committee from 2019 until he left the Board.

43.     Ronald A. Williams ("Williams") served as a director from 2010 to May 17, 2024. Williams reportedly left the Board after reaching the Board's mandatory retirement age.  From 2017 through 2020, Williams served on the Audit Committee.

44.     This Amended Complaint refers to Kellner and Williams as the "Non-Demand Board Director Defendants."  This Amended Complaint refers to the Demand Board Director Defendants and the Non-Demand Board Director Defendants collectively as the "Director Defendants."

45.     This Amended Complaint refers to Director Defendants Bradway, Calhoun, Doughtie, Gitlin, Good, Harris, Johri, Joyce, Kellner, Mollenkopf, Richardson, and Williams as the "2023 Proxy Defendants."  This Amended Complaint refers to Director Defendants Bradway, Calhoun, Doughtie, Gitlin, Good, Harris, Johri, Joyce, Kellner, Mollenkopf, Richardson, Soussan, and Williams as the "2024 Proxy Defendants."

### E.     The Officer Defendants

46.     Uma M. Amuluru ("Amuluru") became Boeing's Chief Human Resources Officer and Boeing's Executive Vice President, Human Resources in April 2024.  She is a member of the

Company's Executive Council.  From April 2023 to April 2024, she was Vice President and Assistant General Counsel for Boeing Defense, Space & Security.  From May 2020 to April 2023, she was Boeing's Chief Compliance Officer and Vice President, Global Compliance.  In these roles, Amuluru was responsible for ensuring compliance and safety within her areas of oversight. This included compliance with respect to non-retaliation against whistleblowers.  Amuluru routinely attended and participated in Board and committee meetings, including as a presenter on the DPA.

47.   Calhoun was Boeing's CEO from January 2020 to August 8, 2024.  In that role, Calhoun was ultimately responsible for all of Boeing's operations, including Boeing's compliance with all laws and the safety of Boeing's commercial aircraft.

48.   Edwin J. Clark ("Clark") became the director of the 737 MAX program in April 2009.  He continued in that role until he was pushed out in February 2024.  In this role, he was responsible for ensuring compliance and safety within his areas of oversight.  Clark attended and participated in several Aerospace Safety Committee meetings.

49.   Michael D'Ambrose ("D'Ambrose") was Boeing's Executive Vice President and Chief Human Resources Officer from July 2020 to February 2024.  In this role, D'Ambrose was responsible for ensuring compliance and safety within his areas of oversight.  This included compliance with respect to non-retaliation toward whistleblowers.  D'Ambrose routinely attended and participated in Board meetings, including as a presenter on hiring and employee issues.

50.   Stanley Deal ("Deal") served as a Boeing Executive Vice President and BCA's CEO from 2019 to March 2024.  In that role, Deal was ultimately responsible for all of BCA's operations, including BCA's compliance with all laws and the safety of BCA's commercial aircraft.  Deal routinely presented to the Board and its committees concerning BCA business.

51.     Michael Delaney ("Delaney") became Boeing's Chief Aerospace Safety Officer in 2021.  He is the Company's Senior Vice President of Global Aerospace Safety and a member of the Company's Executive Counsel.  He is responsible for strengthening Boeing's safety practices and culture and advancing the Company's comprehensive Global Aviation Safety strategy, including integrated responsibility for Product & Services Safety, Aerospace Safety Analytics, and Global Aviation Safety System.  Earlier in his career, Delaney was Vice President and Chief Product Engineer for the 787 Program.  In these roles, he was responsible for ensuring compliance and safety within his areas of oversight.  Delaney routinely attended and participated in Board and committee meetings, including as one of the primary presenters on safety issues.

52.     Mark C. Fava ("Fava") is a Boeing Vice President and the Ombudsperson for more than 1,300 Boeing employees who have delegated responsibilities to act on behalf of the FAA through the Organization Designation Authorization ("ODA") program at Boeing.  Fava assumed this role in June 2022.  From May 2020 to June 2022, Fava was Chief Counsel, Boeing Engineering, Regulatory & South Carolina Operations.  In these roles, he was responsible for ensuring compliance and safety within his areas of oversight.  This includes compliance with respect to non-retaliation toward Boeing employees who raised safety issues.  Fava routinely attended and participated in Board and Aerospace Safety Committee meetings—often meeting with the directors in executive session.

53.     Mike Fleming ("Fleming") is BCA's Senior Vice President and General Manager of Airplane Programs and Customer Support.  He oversees the 737, 767, 777/777X, and 787 production programs.  He is responsible for the production and delivery of all commercial aircraft, including with respect to safety and quality.  He also leads the enterprise Program Management Operations Council.  Fleming is a member of the Company's Executive Counsel.  He previously led Boeing's Commercial Derivative Programs, where he was responsible for program

14

management of new derivative airplanes from initial offering through certification and entry into service.  Between 2008 and 2016, Fleming oversaw the introduction and support of the 787 in-service fleet.  In these roles, he was responsible for ensuring compliance and safety within his areas of oversight.  Fleming routinely attended and participated in Board and Aerospace Safety Committee meetings, including as a presenter on Boeing's safety programs.

54.    Thomas Galantowicz ("Galantowicz") became Boeing's Product and Services Safety Executive ("P&SSE") in May 2021.   In this role, he was responsible for ensuring compliance and safety within his areas of oversight.   Galantowicz routinely attended and participated in Board and Aerospace Safety Committee meetings, including as a presenter on compliance and regulatory affairs issues.

55.    Darrin Hostetler ("Hostetler") is Boeing's Chief Compliance Officer and Vice President of Global Compliance.  He is a member of the Company's Executive Counsel.  Hostetler joined Boeing in 2015.  As Chief Compliance Officer, Hostetler was responsible for ensuring that Boeing and its subsidiaries complied with all laws, including safety regulations.   Hostetler routinely attended and participated in Board and committee meetings, including as a presenter on compliance issues.

56.    David Loffing ("Loffing") became BCA's Vice President, Chief Engineer in March 2023.  Before that, Loffing held various roles with the 777/777X Program.  In these roles, he was responsible for ensuring compliance and safety within his areas of oversight.  Loffing routinely attended and participated in Aerospace Safety Committee meetings, including as a presenter on technical and manufacturing issues.

57.    Elizabeth Lund ("Lund") became BCA's Senior Vice President of Quality in December 2021.  She is the Chair of Boeing's Enterprise Quality Operations Council and a member of the Company's Executive Council.  From April 2019 to February 2022, she was the

Vice President and General Manager of Commercial Airplane Supply Chain.  From April 2013 to March 2019, Lund was the Senior Vice President and General Manager of Airplane Programs for Commercial Airplanes, where she oversaw the 737, 747, 767, 777/777X, and 787 programs.  In these roles, she was responsible for ensuring compliance and safety within her areas of oversight.  Lund routinely attended and participated in Board and committee meetings, including as a presenter concerning BCA business.

58.      Elisabeth C. Martin ("Martin") became Boeing's Vice President, Enterprise Safety & Mission Assurance in February 2020.  In this role, she was responsible for ensuring compliance and safety within her areas of oversight.  Martin routinely attended and participated in Aerospace Safety Committee meetings, including as a presenter on regulatory and compliance issues.

59.      Howard McKenzie ("McKenzie") is Boeing's Chief Engineer and its Executive Vice President of Engineering, Test & Technology.  From August 2021 to March 2023, McKenzie was BCA's Chief Engineer.  In March 2023, he left BCA and was promoted to the position of Boeing's Chief Engineer.  McKenzie's responsibilities as Chief Engineer included oversight of all aspects of safety and technical integrity of Boeing products and services.  He is a member of the Company's Executive Council.  In these roles, he was responsible for ensuring compliance and safety within his areas of oversight.  McKenzie routinely attended and participated in Board and Aerospace Safety Committee meetings, including presenting on technical and manufacturing issues.

60.      Kimberly S. Pastega ("Pastega") became BCA's Vice President of Manufacturing and Safety at BCA in January 2024, reporting directly to Pope.  She leads BCA's efforts on Environment, Health and Safety, including workplace safety initiatives.  From December 2022 to January 2024, Pastega was a Boeing Vice President responsible for the 767 program.  From April 2020 to December 2022, she was a Vice President and the General Manager for Boeing

Fabrication, the largest supplier to BCA.  In these roles, she was responsible for ensuring compliance and safety within her areas of oversight.  She attended the May 30, 2024 Aerospace Safety Committee meeting.

61.     Stephanie Pope ("Pope") replaced Deal as BCA's CEO in March 2024.  She has been Boeing's Chief Operating Officer ("COO") since January 2024.  From April 2022 to December 2023, she was CEO of Boeing Global Services.  From December 2020 to March 2022, she was BCA's Vice President and Chief Financial Officer ("CFO"), with responsibility for the financial management and strategic, long-range business planning for the business unit.  Before that, she was Vice President and CFO of Boeing Global Services, where she oversaw all financial activities for the business unit.  Pope also served as Vice President and Controller for Boeing Defense, Space & Security, with responsibility for the regulatory compliance of the business unit as well as ensuring the accuracy, transparency, and timeliness of its financial disclosures.  In these roles, she was responsible for ensuring compliance and safety within her areas of oversight.  She routinely attended and participated in Board and committee meetings, including as a presenter on BCA business.

62.     Scott A. Stocker ("Stocker") became the General Manager of the 787 Program in December 2023.  In this role, he leads the team that designs, builds, and delivers the 787 aircraft.  From October 2021 to January 2024, Stocker was a BCA Vice President, Manufacturing and Safety.  Before that, he was BCA's Vice President of Operations.  In these roles, he was responsible for ensuring compliance and safety within his areas of oversight.   Stocker attended several Aerospace Safety Committee meetings.

63.     This Amended Complaint refers to Defendants Amuluru, Calhoun (in his capacity as CEO), Clark, D'Ambrose, Deal, Delaney, Fava, Fleming, Galantowicz, Hostetler, Loffing, Lund, Martin, McKenzie, Pastega, Pope, and Stocker collectively as the "Officer Defendants."

64.     This Amended Complaint refers to the Demand Board Director Defendants, the Non-Demand Board Director Defendants, and the Officer Defendants collectively as the "Individual Defendants."

65.     This Amended Complaint refers to Defendants Amuluru, Bradway, Calhoun, Clark, D'Ambrose, Deal, Delaney, Doughtie, Fava, Fleming, Galantowicz, Gitlin, Good, Harris, Hostetler, Johri, Joyce, Kellner, Lund, Martin, McKenzie, Mollenkopf, Pope, Richardson, Stocker, and Williams as the "10(b) Defendants."

66.     This Amended Complaint refers to the Individual Defendants and Nominal Defendant Boeing collectively as the "Defendants."

### F.     Relevant Non-Parties

67.     Robert "Kelly" Ortberg ("Ortberg") joined the Board on August 8, 2024, the same day he became Boeing's President and CEO.  Before joining Boeing, Ortberg worked at Collins for more than three decades.  As further described below, *see infra* ¶ 115 n.3, Collins played a significant role in the underlying causes of the MAX Crashes (defined below), supplying both the components that created erroneous data leading to the crashes and the software that caused the crashes based on that data.  Collins continues to be a major supplier of airplane components for Boeing, including dangerously defective components. *See infra* ¶ 424.  Ortberg was Chair of the Rockwell Collins, Inc. Board of Directors from 2015 to 2018, and he was the CEO of Collins from 2018 through February 2020.

### G.     Relevant Whistleblowers

68.     Notwithstanding Boeing's long-standing culture of retaliation against whistleblowers, certain Boeing employees have been willing to expose the Company's unsafe practices.  Boeing's whistleblowers are noteworthy for their courage.  Boeing has a history of retaliating against them.  Two Boeing whistleblowers died suddenly after blowing the whistle on

Boeing's practices, including one purported suicide between days of deposition testimony in a lawsuit against Boeing. To this day, many Boeing employees fear that crossing the Company will endanger their physical safety.

69.     Some Boeing whistleblowers are anonymous. The ones below have identified themselves. The positions these whistleblowers held and the long period in which they worked at Boeing are noteworthy.

70.     John Barnett ("Barnett") is an especially noteworthy whistleblower. From 2015 to 2017, he was a Boeing quality manager responsible for disposing of non-conforming parts at Boeing's 787 factory in South Carolina. When he tried to enforce the FAA's rules concerning the storage and disposal of non-conforming parts, he was repeatedly mocked and threatened. After Barnett was fired, he filed a retaliation suit with the Occupational Safety and Health Administration ("OSHA") that continued into 2024. Barnett was found dead in his truck the morning of what was supposed to be the third day of his deposition. A purported suicide note blamed his demise on Boeing's ongoing harassment of him.

71.     Richard Cuevas ("Cuevas") performed work for Spirit at Boeing's factory in Everett, Washington, where he worked on 787 aircraft in 2023 and 2024. Cuevas observed substandard manufacturing and maintenance practices on the 787's forward pressure bulkhead— a dome-shaped piece located in the jet's nose that is critical to maintaining cabin pressure. After Cuevas raised the defects with Spirit and then with Boeing, Spirit fired him.

72.     Joshua Dean ("Dean") was a quality inspector at a major Boeing supplier, Spirit. Dean disclosed the pressure Spirit management put on inspectors not to report defects to increase production. In April 2023, Spirit fired Dean in retaliation for flagging improperly drilled holes in the aft pressure bulkhead of Spirit fuselages. Boeing later confirmed his reports. Dean mysteriously died in May 2024—supposedly from natural causes.

73.     William Hobek ("Hobek") was a quality manager at Boeing's 787 factory in South Carolina.  In 2016, he was fired for repeatedly reporting the installation of faulty parts, the disappearance of hundreds of tools, and the collection of debris near critical infrastructure.

74.     Roy Irvin ("Irvin") was a quality inspector at Boeing's 787 factory in South Carolina from 2011 to 2017.  In 2014, his supervisors reprimanded him for being "insubordinate" when he flagged serious quality and safety issues, including issues in planes that had already left the factory and were being prepared for delivery.

75.     Merle Meyers ("Meyers") was a Quality Manager at Boeing's factory in Everett, Washington, which works on Boeing's 747, 767, 777, and 787 aircraft.  He estimated that, in the decade before his pressured retirement in March 2023, more than 50,000 parts "escaped" quality control and were used to build airplanes, including numerous parts that quality inspectors had marked as scrap.

76.     Sam Mohawk ("Mohawk") is a quality assurance investigator at Boeing's factory in Renton, Washington, which produces 737 MAX aircraft.  In 2024, Mohawk exposed to a congressional committee that Boeing management ordered him to delete records regarding non-conforming parts and to move non-conforming parts off-site to hide them from the FAA.  Mohawk filed a complaint in Boeing's internal reporting system, but the complaint went straight to the managers about whose conduct Mohawk was complaining.

77.     Santiago Paredes ("Paredes") was an inspector at Spirit for twelve years.  He was responsible for conducting the final inspections on the fuselages of the 737 MAX.  He received the nickname "Showstopper" because his inspections delayed deliveries to Boeing when he uncovered hundreds of defects.

78.     Ed Pierson ("Pierson") was a senior manager at Boeing's factory in Renton, Washington, which produces 737 MAX aircraft.  He urged Boeing to close the factory due to

safety issues before the two fatal crashes of Boeing 737 MAX aircraft in late 2018 and early 2019. Since leaving Boeing, he has dedicated much of his time to monitoring and reporting on Boeing's 737 MAX program.   He maintains a website—https://www.edpierson.com/—with news and insight about Boeing and its safety record.   Pierson has testified numerous times before congressional committees.

79.     Sam Salehpour ("Salehpour") is a quality inspector at Boeing.  He has more than forty-years of experience in the aerospace industry.  He has worked at Boeing for seventeen years in various engineering capacities on the 747, 767, 777, and 787 programs.  In 2024, Salehpour testified to a congressional committee regarding the numerous safety and quality issues he observed while working on the 787 program at Boeing's factory in South Carolina.

80.     Lance Thompson ("Thompson") was Dean's auditing teammate at Spirit. Thompson confirmed Dean's reports that Spirit management pressured employees not to disclose defects, which led to many inspectors engaging in only cursory inspections.

## III.    JURISDICTION

81.     This Court has jurisdiction over the subject matter of Plaintiffs' federal securities law claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiffs' state-law breach-of-fiduciary-duty claims pursuant to 28 U.S.C. § 1367.

82.     This Court also has jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1332 because this is an action between citizens of different states and the amount in controversy exceeds $75,000.

a)      Plaintiffs the Ohio PERS and the Ohio STRS are instrumentalities of the state of Ohio.

b)      Plaintiff Oklahoma is an instrumentality of the state of Oklahoma.

c)      Nominal Defendant Boeing is a Delaware corporation.

d)      Defendant Amuluru is a citizen of Illinois.

e)      Defendant Bradway is a citizen of California.

f)      Defendant Calhoun is a citizen of New Hampshire or South Carolina.

g)      Defendant Clark is a citizen of Washington.

h)      Defendant D'Ambrose is a citizen of Florida.

i)      Defendant Deal is a citizen of Washington.

j)      Defendant Delaney is a citizen of Arizona.

k)      Defendant Doughtie is a citizen of Virginia.

l)      Defendant Fava is a citizen of South Carolina.

m)      Defendant Fleming is a citizen of Washington.

n)      Defendant Galantowicz is a citizen of Washington.

o)      Defendant Gerry is a citizen of Washington.

p)      Defendant Gitlin is a citizen of Florida.

q)      Defendant Good is a citizen of North Carolina.

r)      Defendant Harris is a citizen of California.

s)      Defendant Hostetler is a citizen of Virginia.

t)      Defendant Johri is a citizen of Connecticut.

u)      Defendant Joyce is a citizen of Florida.

v)      Defendant Kellner is a citizen of Texas.

w)      Defendant Loffing is a citizen of Washington.

x)      Defendant Lund is a citizen of Washington.

y)      Defendant Martin is a citizen of California.

z)      Defendant McKenzie is a citizen of Washington.

aa)     Defendant Mollenkopf is a citizen of California.

bb)   Defendant Pastega is a citizen of Washington.

cc)   Defendant Pope is a citizen of Texas.

dd)   Defendant Richardson is a citizen of Virginia.

ee)   Defendant Soussan is a citizen of France.

ff)   Defendant Stocker is a citizen of Washington.

gg)   Defendant Williams is a citizen of Florida.

83.   This Court has personal jurisdiction over each Defendant because each Defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this jurisdiction to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

84.   As to Boeing's directors and officers, the Company's operative certificate of incorporation identifies this District as a proper forum for the adjudication of federal and derivative claims like the ones asserted in this Action.

85.   Venue is proper in this District pursuant to 28 U.S.C. § 1391 because many of the acts and practices complained of herein occurred in this District, and the Company conducts business in and maintains executive offices in this District.  Venue is proper in this Division because many of the acts and practices complained of herein occurred in this Division, and the Company conducts business in and maintains executive offices in this Division.

86.   In connection with the acts and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of the national securities markets.

IV.    **FACTUAL BACKGROUND**

A.    **Boeing Operates in a Highly Regulated Industry.**

87.    More than 10,000 Boeing commercial jetliners are currently in service.  Each day, hundreds of thousands of travelers rely on the safety of Boeing commercial aircraft for their business, their recreation, and their lives.  To ensure the safety of all those passengers, Boeing must exhibit the utmost care in designing, manufacturing, and operating its planes.  In the words of a now-deceased Boeing whistleblower, "it only takes one defect to . . . bring down a plane."

88.    As the Company admits in its public filings, signed annually by the Board, "[o]ur business is heavily regulated in most of our markets."  Given the awesome stakes, it is no surprise that Boeing is heavily regulated by governments around the world.  In the United States, the Company is subject to oversight by numerous regulators and agencies, including the FAA.  The regulations applicable to Boeing are all-encompassing.  Boeing's commercial aircraft products are required to comply with FAA regulations governing design and manufacturing certifications, production and quality systems, airworthiness and installation approvals, repair procedures, and continuing operational safety.  At every step of the way, Boeing is subject to strict regulation and must document every action its engineers and mechanics take to ensure the safety of its aircraft.

89.    The reason for this extensive regulatory regime is simple: absent airworthy products, passengers will inevitably be killed.  Therefore, Boeing's Board understands that regulatory compliance is mission-critical and a practical necessity.  Indeed, the Board understands that if the Company fails to comply with the law, Boeing will be subject to harsh penalties, including massive fines, civil and criminal penalties, increased regulatory requirements, and even a total shutdown of operations.

90.    Despite the Company operating in a heavily regulated industry, for decades the Company's fiduciaries have fostered a toxic corporate culture of noncompliance, concealment,

and retaliation.  This is the product of Boeing's decades-long corporate focus on prioritizing profit, speed, and cost-cutting at the expense of safety and compliance.  As discussed below, the Company's toxic culture is the product of intentional design that started in the 1990s.  Despite passenger deaths and repeated rebukes by government regulators, congressional committees, and media outlets demanding that Boeing clean up its rotten corporate culture, the Board and senior management, time and again, have utterly failed to root out this systemic and sustained problem at the Company.

   **B.    The Birth of Boeing's Toxic Culture: The Boeing's C-Suite Changes from Engineers to Financiers.**

   91.    Boeing was founded in 1916.  For approximately eighty years, Boeing functioned as "an association of engineers."   Boeing's executives were conversant in engineering requirements, and Boeing's culture emphasized engineering and safety.  Boeing's executives would often walk the factory floor in Washington to observe manufacturing and assembly first-hand.

   92.    In 1997, Boeing acquired McDonnell Douglas Corporation ("McDonnell Douglas"), a company that was known for pushing profits and shirking quality control.  After the merger, Boeing installed McDonnell Douglas's CEO, Harry Stonecipher, as CEO of the combined company.   Stonecipher intentionally altered the Company's corporate culture.  In an op-ed published in *The Chicago Tribune* in 2004, Stonecipher stated explicitly: "When people say I changed the culture of Boeing, *that was the intent*, so *it's run like a business rather than a great engineering firm*.  It is a great engineering firm, but people invest in a company because *they want to make money*."

   93.    Boeing's focus soon shifted from safety-first, to profits-first, with that reprioritization infecting Boeing's culture from top to bottom.  Ever since then, Boeing has been

fixated on cutting costs, instead of designing airplanes.  According to one Boeing physicist, "Wal-Mart perfected its particular version of the cost-cutting business model.  Amazon adapted that model to its industry.  Boeing has adapted it to high-end manufacturing."

94.     Boeing has yet to return to its engineering roots.

**C.     The Toxic Culture Spreads: Boeing Rushes the Development of the Dreamliner.**

95.     In January 2003, Boeing began designing the airplane that became known as the 787 Dreamliner.  In an attempt to quickly compete with the rival Airbus A380, Boeing engaged in "unprecedented" outsourcing, with 70% of the design, engineering, and manufacturing of entire modules outsourced to more than fifty strategic partners.  For example, the nose-and-cockpit section was outsourced to Spirit in Wichita, Kansas, the forward fuselage was outsourced to Kawasaki Heavy Industries, Ltd. in Japan, the center fuselage was outsourced to Alenia Aeronautica in Italy, and the after fuselage was outsourced to Vought Aircraft Industries, Inc. in North Charleston, South Carolina.

96.     Spirit was originally part of Boeing.  It manufactured fuselages for Boeing planes in a factory in Wichita, Kansas.  In 2005, as part of Boeing's push to shift costs off its balance sheet and thus juice its revenues and stock price, Boeing spun off the Wichita operation as a standalone company, Spirit.  Spirit continued to manufacture fuselages primarily for Boeing, though it also had a small book of business with Airbus.

97.     In July 2007, Boeing rolled out the first "assembled" Dreamliner for a grand premiere.  Unknown to the public, the plane was a hollow shell and the wing slats were painted wood.

98.     Boeing produced the 787 away from Boeing's traditional base in Washington—in a new plant in South Carolina.  Boeing's South Carolina workforce had less experience and was

26

less well trained.  But Boeing pressed its workforce to move even faster to meet demand and make up for production delays.

99.     The first Dreamliner flight occurred in December 2009.  The Dreamliner immediately exhibited serious defects.  In less than eighteen months, the Dreamliner experienced battery fires, landing gear malfunctions, engine corrosion, electrical failures, fuel line and fuel leak problems, a cracked windscreen, and computer glitches leading to faulty brakes.  In 2013, the entire Dreamliner fleet was grounded because of battery fires in several jets.

100.    Boeing did not learn its lesson from the grounding of the Dreamliner or improve its production standards.  In 2014, *Al Jazeera* journalists used a hidden camera to record conversations with Boeing workers, who stated they would never fly on the planes they were manufacturing because of shoddy workmanship.  In 2016, a quality manager at Boeing's South Carolina plant, William Hobek (previously defined as "Hobek"), filed a lawsuit alleging that he was fired for repeatedly reporting defects up the chain of command.  Hobek reported a host of major defects, including the installation of faulty parts, the disappearance of hundreds of tools, and the collection of debris near critical infrastructure—including metal shavings that could cut critical wiring.  In response to Hobek's concerns, one manager told him, "Bill, you know we can't find all defects."

101.    In 2018 and 2019, the FAA investigated and confirmed three safety complaints made by Boeing employees regarding the final stages of production of the 787 Dreamliner, including an investigation as late as March 2019 regarding a worker being pressured to sign off on work relating to the airworthiness of a jet.

102.    The *Wall Street Journal* described the 787 Program in this way:  "Boeing Looked for Flaws in Its Dreamliner and Couldn't Stop Finding Them."  According to the *Journal*, Boeing and the FAA "handled 787 Dreamliner deliveries as though the perfect was the enemy of the good."  The FAA would allow Boeing "to deliver the wide-body jets with some minor flaws, so

long as there was no immediate threat to safety.  The expectation was that Boeing would fix such defects after the planes began carrying passengers, according to government officials and current and former Boeing executives."

**D.    Boeing's Toxic Culture Leads to a 2015 Settlement Agreement with the FAA.**

103.    On December 18, 2015, the FAA and Boeing entered into a settlement agreement to resolve thirteen FAA Enforcement Investigative Reports ("EIRs") (the "2015 Settlement"). According to the FAA, most of the cases under the EIRs "involve[ed] apparent failures of corrective action."  In connection with the 2015 Settlement, Boeing agreed to pay a $12 million civil fine, with the potential to pay another $12 million if Boeing did not comply with the 2015 Settlement.  The fines levied against Boeing in connection with the 2015 Settlement were the highest the FAA had ever imposed up to that point.  Boeing would later set additional dubious records.

104.    In addition to imposing a historic fine, the 2015 Settlement placed non-monetary requirements on Boeing in twelve areas: (i) Safety Management; (ii) Regulatory Compliance Plan; (iii) ODA and Internal Auditing System for Regulatory Compliance; (iv) Specification Improvement; (v) First Article Verification; (vi) Problem Solving and Sustainment; (vii) Accuracy of Stamping and Other Verifications; (viii) Quality of Submissions; (ix) Timeliness of Submissions; (x) Audits of BCA Suppliers for Acceptance of Work Performed; (xi) Sustained Effectiveness of Implemented Letter of Investigation (LOI) Corrective Actions; and (xii) Compliance Reporting.  As part of the 2015 Settlement, Boeing was required to implement a safety management system ("SMS").  Notably, Boeing did not have an SMS before the 2015 Settlement.

105.    Boeing did not comply with the 2015 Settlement.  Boeing's obligations under two of the settlement agreement's twelve sections ended in 2017—leaving only ten sections operative.

On December 29, 2020, the FAA informed Boeing that the Company had failed to comply with five of the ten remaining sections of the 2015 Settlement—(i) ODA and Internal Auditing System for Regulatory Compliance; (ii) Regulatory Compliance Plan; (iii) Accuracy of Stamping and Other Verifications; (iv) Quality of Submissions; and (v) Timeliness of Submissions.

106.    As further punishment for Boeing's failure to comply with the 2015 Settlement, the FAA assessed a deferred civil penalty of $5.4 million.  That penalty was 33% higher than the FAA would have otherwise imposed because it determined "that Boeing's shortfalls in one of these sections, *Regulatory Compliance Plan*, were numerous, varied, and called into question Boeing's performance under several other sections of the [settlement] [a]greement."  With settlement costs, Boeing was required to pay a total amount of $6.6 million.

107.    In a February 21, 2021 press release, then-FAA Administrator Steve Dickson explained, "Boeing failed to meet all of its obligations under the settlement agreement, and the FAA is holding Boeing accountable by imposing additional penalties[.] . . . *I have reiterated to Boeing's leadership time and again that the company must prioritize safety and regulatory compliance*, and that the FAA will always put safety first in all its decisions." (emphasis added).

### E.    Boeing Rushes the Development of the 737 MAX.

108.    In 2010, Airbus began advertising its A320 Neo, which touted greatly increased fuel efficiency.  The A320 Neo ate into the profits of Boeing's 737 Next Generation (the "737 NG") aircraft, which had not been updated since the late 1990s.  The situation came to a head when a major customer, American Airlines, told Boeing's then-CEO James McNerney that it would split an order of hundreds of jets between Airbus and Boeing.

109.    Boeing considered two options to respond to the A320 Neo.  <u>First</u>, Boeing could develop a brand-new airplane.  This was the Company's original plan, but developing a new plane would take a decade.  <u>Second</u>, Boeing could redesign the 737 NG with larger, more efficient

engines.  That option would take six years.  A re-design would require fewer FAA certifications.

Because a redesigned 737 would be a "derivative plane" of the 737 NG, the FAA would limit its

certifications to the changes between the two models.  In a single weekend, Boeing abandoned its

plan to develop an entirely new plane and instead decided to update the 737 NG.

110.    In August 2011, the Board approved a re-design of the 737 NG, which became

known as the "737 MAX."  According to attendees at the Board meeting, no Board member asked

about the safety risks of a re-design.  Instead, the Board's primary concern was "how quickly and

inexpensively the Company could develop the 737 MAX model to compete with Airbus's

A320neo."

111.    According to *The New York Times*, Boeing moved at a "frenetic" pace in

developing 737 MAX, with engineers pushed to submit technical drawings and designs twice as

quickly as they normally would.  This pace resulted in designers producing "sloppy blueprints"

that left out important details, such as "instructions for the wiring" that Boeing planned to "clean[]

up later in the process."[2]

112.    As another iteration of the 737, the 737 MAX was a "patchwork plane" that lacked

important safety features.  For instance, while Boeing jet models have electronic checklists and

alert systems that explain what is malfunctioning and recommend solutions, Boeing 737 aircraft,

including the 737 MAX, came with hard-copy take-off checklists and paper manuals to diagnose

problems and find solutions.  The 737 MAX ultimately had only one all-purpose alert light to give

pilots a hint that something was wrong.  According to 737 MAX cockpit designer and nineteen-

---

[2] Even after the plane came into service, some of the designs were incomplete, such as "not specifying which tools to use to install a certain wire, a situation that could lead to a faulty connection."

year Boeing veteran Ryan Ludtke:  "Nobody was quite perhaps willing to say [the 737 MAX] was unsafe, but we really felt like the limits were being bumped up against[.]"

113.    Boeing executives emphasized that they would not allow any design change that would require significant pilot training—seeking to avoid simulator training that would add significant expenses to Boeing's customer base.  In some instances, Boeing had promised to offset any additional simulator expenses with cash rebates of $1 million *per plane* to its airline customers.  Limiting additional training could boost orders by reducing ongoing costs.  One Boeing engineer explained that, in developing the 737 MAX, Boeing "wanted to A, save money and B, to minimize the certification and flight-test costs."

114.    Maintaining "commonality" between the 737 MAX and the 737 NG helped to expedite FAA certification.  Limited by management's instructions, Boeing engineers decided to put larger, more fuel-efficient engines on the existing 737 NG body.  The larger engines were situated differently on the wings and changed the plane's center of gravity.  As a result, the plane tended to "pitch up"—i.e., tilt backward—in flight.  Ironically, months before Boeing began to develop the 737 MAX, BCA's then-CEO, Jim Albaugh, criticized Airbus's decision to upgrade the A320 with bigger engines, noting it would "be a design change that will ripple through the airplane" and suggesting Airbus would "find it more challenging than they think it will be[.]"

115.    Boeing responded to this pitch problem with new software—the Maneuvering Characteristics Augmentation System (the "MCAS").  The MCAS caused the horizontal stabilizer on the plane's tail to push the plane's tail up and the nose down.  The MCAS was written into the plane's operating system, so it operated automatically.[3]

---

[3] The MCAS was developed by Collins.  Ortberg, Boeing's CEO since August 8, 2024, and Gitlin, a member of the Demand Board in this Action, were senior executives at Collins.

116.    The MCAS did not operate continuously.  An external sensor determined whether operation was necessary based on the plane's angle of attack ("AOA")—i.e., how high the plane's nose pitched upward.  But the AOA sensor was highly vulnerable to false readings.  Lightning, freezing temperatures, and even general weather could make the sensor malfunction.  Software malfunctions and birds were also dangers.  The weaknesses of AOA sensors were well-known.  From 2004 through 2019, the FAA flagged 216 incidents that resulted from failed AOA sensors.

117.    Notwithstanding their history of failure, the MCAS depended on a *single* AOS sensor.  Due to the lack of redundancies, a single point of failure with the AOS sensor would cause the MCAS to push the plane's nose down when it was unnecessary.

118.    In 2013, Boeing engineers proposed that the 737 MAX implement a Dreamliner safety feature called "synthetic airspeed" to detect a false AOA signal.  Boeing management rejected that proposal due to additional cost and pilot training.  That rejection left the MCAS dependent on a single, fickle AOA sensor.  Boeing's engineers remained skeptical.  In late 2015, one queried: "[a]re we vulnerable to single AOA sensor failures with the MCAS implementation or is there some checking that occurs?"

119.    In 2014, Boeing submitted a System Safety Assessment (the "Assessment") to the FAA that, among other things, calculated the effect of possible MCAS failures.  The Assessment concluded that the MCAS was not a "safety-critical system."

120.    The MCAS was originally designed to kick in only if the plane quickly accelerated into a high AOA.  During flight testing in 2016, Boeing changed the MCAS to kick in at low speed, which meant a high AOA alone would automatically trigger the software.  Boeing did not update the Assessment for MCAS after this change.

121.    Boeing touted the purported similarities between the 737 MAX and the 737 NG to push for "Level B" pilot training on a tablet computer rather than costly flight simulator training.

Boeing put "tremendous pressure" on its Chief Technical Pilot, Mark Forkner ("Forkner"), to obtain Level B pilot training.  In August 2016, the FAA issued a provisional report establishing Level B training for the 737 MAX.  In November 2016, Forkner texted a colleague that the MCAS was "running rampant" in flight simulator training following the 2016 revision to the MCAS.  Forkner admitted: "so basically I lied to the regulators (unknowingly)."

122.    Nevertheless, Forkner continued to push for Level B training and even pushed the FAA not to reference the MCAS in its report.  In July 2017, the FAA published a final report providing for Level B training.  Based on Boeing's failure to submit a new Assessment on the revised MCAS and misrepresentation of MCAS's safety risks, the FAA deleted all information about MCAS from the July 2017 report.  Forkner emailed a Boeing colleague bragging that his "jedi mind tricks" had worked on the FAA.

123.    Boeing omitted any substantive description of the MCAS from the three documents for pilots flying new models: (i) the Flight Crew Operations Manual ("FCOM"), the primary pilot reference; (ii) the Quick Reference Handbook, a shorter emergency manual for abnormal flight situations; and (iii) the Flight Crew Training Manual, which provides general recommendations on flying maneuvers and techniques.

124.    In May 2017, Boeing began fulfilling orders for the 737 MAX—many of which came from airlines in emerging markets.  The 737 MAX became Boeing's fastest-selling plane.

125.    Serious problems with the 737 MAX quickly surfaced.  For example, according to a Boeing submission to the FAA, all 737 MAX airplanes were required to have an "AOA disagree alert" to identify any malfunctions in the airplane's AOA sensor.  In August 2017, Boeing learned that a software issue had rendered the AOA disagree alert inoperable in 80% of the 737 MAX planes it had delivered.  Boeing did not inform the FAA or its customers that this alert did not

work in a supermajority of its planes, and it viewed the $80,000 repair needed to make the alert work as an optional add-on.

126.    In 2018, the 737 MAX accounted for about 60% of Boeing's record $101.1 billion in annual revenue.  By the end of 2018, the backlog for the 737 MAX was more than 4,000 airplanes.

127.    The Board set a production and delivery target of *fifty-seven* 737 MAX airplanes a month.  Boeing's facilities and workforce could not meet the target.  In July and August 2018, Boeing delivered an average of *thirty-nine* 737 MAX airplanes a month.  The 737 MAX production facility became a "factory in chaos" as employees faced intense pressure to maintain production schedules.

128.    Boeing engineers and other employees tried to sound warning bells.  One engineer expressed to his manager that he had "seen larger operations shut down for far less safety issues . . . in the military and those organizations have national security responsibilities."  The manager responded, "The military isn't a profit-making organization."

129.    Some of the employee complaints rose to the level of senior management, but none made it to the Board.  The Board was completely unaware of the whistleblower complaints regarding airplane safety, compliance, workforce exhaustion, and production schedule pressure at the 737 MAX facility.

**F.    Boeing's Prioritization of Profits over Safety Results in Two Tragic 737 MAX Crashes.**

130.    Tragically, Boeing's prioritization of profits over safety led to two tragic crashes of the 737 MAX aircraft.  On October 29, 2018, Lion Air Flight 610 crashed—killing all 189 passengers and crew (the "Lion Air Crash").  On March 10, 2019, Ethiopian Airlines Flight 302

crashed—killing all 157 passengers and crew (the "Ethiopian Airlines Crash"). These two crashes of 737 MAX aircraft killed 346 people within five months of each other (the "MAX Crashes").

131.    The MAX Crashes resulted from the MCAS. Satellite data showed Lion Air Flight 610 rising and falling repeatedly, as the MCAS continually activated to force the airplane's nose downwards. The plane's black box data revealed that the pilots searched the Quick Reference Handbook's checklist for abnormal flight events, but it said nothing about the MCAS. The repeated activation of the MCAS also caused the Ethiopian Airlines Crash. The pilots on Ethiopian Airlines Flight 302 followed Boeing's recommended emergency procedures to deal with a malfunction of the MCAS, but the pilots could not gain control of the plane before the MCAS ran it into the ground.

**G.    The MAX Crashes Lead to a Regulatory Firestorm.**

132.    In January 2019—after the Lion Air Crash but before the Ethiopian Airlines Crash—the DOJ opened a criminal investigation into whether Boeing defrauded the FAA when obtaining certification of the 737 MAX. In February 2019, Boeing gave the DOJ a November 2016 text message from Boeing's Chief Technical Pilot Forkner admitting that he had lied to the FAA. *See supra* ¶¶ 121–22. Boeing did not provide that text message to the FAA until October 2019.

133.    On March 13, 2019, the FAA grounded the 737 MAX fleet in the United States, which quickly led to the grounding of the 737 MAX fleet worldwide. This grounding remained in effect for twenty months—until November 18, 2020.

134.    In September 2020, the majority staff of the House Committee on Transportation and Infrastructure released a report prepared for committee chair Peter A. Defazio of Oregon ("Defazio"). That report (the "House Report") identified "central themes that affected the design, development, and certification of the 737 MAX and FAA's oversight of Boeing." House Rep.

at 12.  The first theme was "Production Pressures."  *Id.*  Boeing's desire to compete with Airbus's A320 NEO "resulted in extensive efforts to cut costs, maintain the 737 MAX program schedule, and avoid slowing the 737 MAX production line."  *Id.* at 12–13.  The committee "identified several instances where the desire to meet these goals and expectations jeopardized the safety of the flying public."  *Id.* at 13.  Another central theme was Boeing's "Culture of Concealment."  *Id.*  "In several critical instances, Boeing withheld crucial information from the FAA, its customers, and 737 MAX pilots."  *Id.*  The House Report repeatedly noted Boeing management's "lack of transparency" to regulators and customers.  *Id.* at 6, 24, 32, 99, 125, 131, 192, 209.  The report also noted Boeing's "Culture of Omission," which resulted in key safety information known by multiple Boeing employees at multiple levels failing to go to regulators or customers.  *Id.* at 137.

135.   The House Report also discussed Boeing's negative response to dissent from or disagreement with management's policies.   According to one whistleblower, "the fear of retaliation is high, despite all official assurances that this should not be the case.  There is a suppressive cultural attitude towards criticism of corporate policy[.]"  *Id.* at 172.

136.   In a section of the House Report that highlights a litany of governance and compliance changes to come at Boeing, the House Report stated:

> The effectiveness of these organizational and procedural changes that have been recommended following its internal review will be dependent on Boeing's willingness to change.  However, Boeing does not appear to have fully accepted the lessons from the MAX accidents or taken responsibility for design errors.  Without that recognition it is hard to believe that Boeing will make the changes necessary to improve its safety culture.

*Id.* at 230.

137.   The House Report framed the failures related to the certification of the 737 MAX as a serious wakeup for Boeing.  In doing so, the House Report warned: "Unfortunately, serious

questions remain as to whether Boeing and the FAA have fully and correctly learned the lessons from the MAX failures." *Id.* at 237.  That warning proved prescient.

138.    On January 7, 2021, the DOJ charged Boeing with one count of conspiracy to defraud the United States by impairing, obstructing, defeating, and interfering with the lawful function of the FAA Aircraft Evaluation Group in connection with its evaluation of the pilot training required for the 737 MAX.  Specifically, the DOJ charged Boeing with deceiving the FAA about the speed range in which the MCAS could operate.  The same day, Boeing and the DOJ entered into the DPA.

139.    In connection with the DPA, Boeing admitted that it "did not timely and voluntarily disclose to the Fraud Section the offense conduct described in the Statement of Facts" and that its cooperation "was delayed and only began after the first six months of the Fraud Section's investigation, during which time the Company's response frustrated the Fraud Section's investigation."

140.    The DPA required Boeing to pay more than $2.5 billion, composed of a criminal monetary penalty of $243.6 million, compensation payments to Boeing's 737 MAX airline customers of $1.77 billion, and a $500 million fund to compensate the heirs, relatives, and legal beneficiaries of the 346 individuals who died in the MAX Crashes.

141.    The DPA also had non-monetary requirements.  Among other things, the DPA prohibited Boeing from:

- making any public statement, in litigation or otherwise, contradicting its acceptance of responsibility and admission of the facts set forth in the DPA's Statement of Facts;

- providing any deliberately false, incomplete, or misleading information in connection with the DPA;

- failing to fully cooperate as required by the DPA; or

- failing to implement a compliance program as required by the DPA.

142. The DPA required Boeing to establish and maintain "an effective compliance program that is designed, implemented, and enforced to effectively deter and detect violations of U.S. fraud laws."  Among other things, that program required Boeing to:

- ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its corporate policy against violations of U.S. fraud laws and the Company's compliance code, and demonstrate rigorous adherence by example;

- ensure that middle management, in turn, reinforced those standards and encouraged employees to abide by them;

- create and foster a culture of ethics and compliance with the law in its day-to-day operations;

- develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of U.S. fraud laws and the Company's compliance code;

- take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of U.S. fraud laws by personnel at all levels of the Company;

- notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the Company; and

- review its compliance policies and procedures regarding U.S. fraud laws no less than annually and update them as appropriate to ensure their continued

38

effectiveness, taking into account relevant developments in the field and evolving industry standards.

143.    The DPA also expressly required Boeing to extend its compliance program to its "contractors and subcontractors whose responsibilities relate to the Company's interactions with any domestic or foreign government agency (including the FAA), regulator, or any of its airline customers."

144.    In connection with its compliance program, the DPA instructed Boeing to "focus[] on the Company's interactions with domestic or foreign government agencies (including the FAA), regulators, and any of its airline customers."

145.    To monitor the Company's ongoing compliance with the DPA, the DPA imposed certain reporting and meeting requirements between the Company and the DOJ.  Specifically, the Company agreed to design a work plan for remediation of its compliance program and report to the DOJ on three separate occasions.  The first report was due within sixty days of the DPA, the second report was due no later than one year after the first report was due, and the third report was due no later than thirty days before the end of the term of the DPA.  All written work plans were required to identify with reasonable specificity the activities the Company planned to undertake in execution of the enhanced self-reporting obligations.  The second and third report required the Company to incorporate the views of the Fraud Section on the Company's prior reviews and reports, to further monitor and assess whether the Company's compliance program was reasonably designed, implemented, and enforced so that it was effective at deterring and detecting violations of U.S. fraud laws.

146.    The Company also agreed to meet with the DOJ within thirty days of the delivery of each report, and meet periodically, but no less than quarterly, with the DOJ to discuss the status

of the review and enhanced self-reporting obligations, and any suggestions, comments, or improvements the Company wished to discuss with or propose to the DOJ.

147.    The Board had express notice of the DPA.  According to the DPA, the Board had been "extensively briefed on discussions with the Fraud Section regarding an agreement to resolve" the criminal investigation, including by being "informed of the principal terms of the [DPA] by the Chief Legal Officer of the Company and agreed that the Company should enter into an agreement on those terms."

148.    In the press release announcing the DPA, the DOJ made clear that the Company suffered from a toxic corporate culture that prioritized profit over safety and candor, leading to the deaths of hundreds of innocent victims.[4]  Acting Assistant Attorney General ("AAG") David P. Burns of the DOJ's Criminal Division stated that "[t]he tragic crashes of Lion Air Flight 610 and Ethiopian Airlines Flight 302 exposed fraudulent and deceptive conduct by employees of one of the world's leading commercial airplane manufacturers."  AAG Burns continued: "Boeing's employees chose the path of profit over candor by concealing material information from the FAA concerning the operation of its 737 Max airplane and engaging in an effort to cover up their deception."

149.    During an October 15, 2021 hearing before the House Transportation and Infrastructure Committee, DeFazio explained: "Senior leaders throughout Boeing are responsible for the culture of concealment that ultimately led to the 737 MAX crashes and the death of 346 innocent people[.]"  The same day, an article in *The New York Times* stated: "The very culture at

---

[4] The Company's toxic culture was engrained in the Company's corporate DNA—from production to securities filings.  On September 22, 2022, Boeing agreed to pay $200 million to settle SEC allegations that Boeing and its former CEO, Muilenberg, misled investors regarding the 737 MAX. Muilenberg personally paid $1 million.

Boeing appears to be broken, with some senior employees having little regard for regulators, customers and even co-workers."

### H.    The MAX Crashes Lead to Meritorious Shareholder Derivative Litigation.

150.    The MAX Crashes led to shareholder derivative litigation in the Delaware Court of Chancery (previously defined as the "Court of Chancery") in the matter styled *In re Boeing Co. Derivative Litigation*, Consol. C.A. No. 2019-0907-MTZ (previously defined as "*Boeing I*").    In *Boeing I*, Boeing shareholders alleged that the Boeing directors were liable for failing to fulfill their oversight duties under the standards set forth in *In re Caremark International Inc. Derivative Litigation*, 698 A.2d 959 (Del. Ch. 1996), as applied in *Marchand v. Barnhill*, 212 A.3d 805 (Del. 2019).

151.    The defendants moved to dismiss *Boeing I*.    The defendants argued that a pre-suit litigation demand on the Board would not have been futile because the Board supposedly could have determined in a fair and disinterested manner whether to bring fiduciary litigation related to the two crashes.    The Court of Chancery rejected that argument.    In a September 7, 2021 memorandum opinion, the Court of Chancery held that the Boeing directors faced a substantial likelihood of liability under *Caremark* for their "complete failure to establish a reporting system for airplane safety, [and for] turning a blind eye to a red flag representing airplane safety problems."    *In re Boeing Co. Derivative Litig.*, No. 2019-0907-MTZ, 2021 WL 4059934, at *1 (Del. Ch. Sept. 7, 2021).

152.    The Court of Chancery recognized that, as part of their duty of oversight, the Boeing directors had to "make a good faith effort—i.e., try—to put in place a reasonable board-level system of monitoring and reporting."    *Id.* at *25.    "This oversight obligation is designed to ensure reasonable reporting and information systems exist that would allow directors to know about and prevent wrongdoing that could cause losses for the Company."    *Id.* (internal quotation

marks and footnote omitted).   The plaintiffs adequately alleged a breach of this "prong one" *Caremark* obligation because:

- The Board had no committee charged with direct responsibility to monitor airplane safety;

- The Board did not monitor, discuss, or address airplane safety on a regular basis;

- The Board had no regular process or protocols requiring management to apprise the Board of airplane safety; instead, the Board only received *ad hoc* management reports that conveyed only favorable or strategic information; and

- Management saw red, or at least yellow, flags, but that information never reached the Board.

*See id.* at *26–32.[5]

153.   The Court of Chancery also recognized that, as part of their duty of oversight, the Boeing directors were required to act in good faith to address any corporate misconduct that came to their attention.   *Id.* at *33.   To state a claim for violation of this "prong two" *Caremark* obligation, "Plaintiff must plead particularized facts that the board knew of evidence of corporate misconduct—the proverbial red flag—yet acted in bad faith by consciously disregarding its duty to address that misconduct. . . .   A classic prong two claim acknowledges the board had a reporting system, but alleges that system brought information to the board that the board then ignored." *Id.*

---

[5] The Court of Chancery found that these four deficiencies were enough to support a reasonable inference that the Board acted in bad faith in failing to establish adequate information systems. *See Boeing I*, 2021 WL 4059934, at *32.   In addition, there was evidence in the record that Boeing insiders themselves recognized that the Company lacked adequate information systems regarding airplane safety.   *Id.*

(internal quotations marks and footnotes omitted).  The plaintiffs adequately alleged a prong two *Caremark* claim based on the Board's failure to adequately address safety issues in the period between the Lion Air Crash and the Ethiopian Airlines Crash.  *Id.* at *34.

154.    Importantly, the Court of Chancery explained that occasional or *ad hoc* reporting of a mission-critical compliance risk was not sufficient to meet a director's *Caremark* obligations. *Id.* at *27, *30.  Likewise, "passive invocations of quality and safety, and use of safety taglines, f[e]ll short of the rigorous oversight [Delaware law] contemplates." *Id.* at *28.  Furthermore, discussions about issues that affected safety or legal compliance did not show a good-faith attempt to meet the *Caremark* standards when the discussions focused on how the issue affected profitability.  *Id.* at *28; *see also id.* at *6 (explaining how enterprise risk assessments did not emphasize "airplane safety" but instead "focused on production and financial risk").

155.    The Court of Chancery emphasized that Boeing's internal reporting systems left management with discretion about what it reported to the Board.  "[T]he Board did not have a means of receiving internal complaints about airplane safety. . . .  The SRB was Boeing's principal internal safety reporting process, but it had no link to the Board and no Board reporting mechanism." *Id.* at *7.  Moreover, that reporting system:

> operated below the level of the most senior officers; the complaints and concerns . . . were handled by Boeing's mid-level management like the Program Functional Chief Design Engineer, the Chief Pilot, the Chief Project Engineer, and the Product Safety Chief Engineer and factory leaders.  Without a Board-level reporting mechanism, safety issues and whistleblower complaints reported to the [complaint reporting system] did not come to the Board's attention.  Neither the Audit Committee, nor any other Board committee, reviewed whistleblower complaints related to product safety.  [*Id.*]

> . . . .

> [T]he Board did not simply fail to assess safety itself; it also failed to expect or demand that management would deliver safety reports or summaries to the Board on a consistent and mandatory basis. . . .   [T]he Board received intermittent, management-initiated communications that mentioned safety in name, but were not

43

safety-centric and instead focused on the Company's production and revenue strategy. And when safety was mentioned to the Board, it did not press for further information, but rather passively accepted management's assurances and opinions. [*Id.* at *29.]

"Management's *ad hoc* reports were also one-sided at best and false at worst, conveying only favorable and optimistic safety updates and assurances that the quality of Boeing's aircraft would drive production and revenue." *Id.* at *31.

156.    The Court of Chancery found numerous well-pled facts that supported a reasonable inference of scienter. One notable example was "the Board's public crowing about taking specific actions to monitor safety that it did not actually perform." *Id.* at *32.

157.    After the Court of Chancery denied the defendants' motion to dismiss, the parties in the *Boeing I* engaged in mediation with retired federal Judge Layn R. Phillips.

158.    On November 5, 2021, the parties executed a settlement stipulation. On March 22, 2022, the Court of Chancery entered an order and final judgment approving the settlement of the *Boeing I* (the "Delaware Settlement"). The Delaware Settlement included a $237.5 million payment from Boeing's insurers to Boeing on behalf of the defendants. This was one of the largest monetary payments in any settlement of a derivative lawsuit in the Court of Chancery.

159.    The Delaware Settlement also included substantial corporate governance enhancements. Many of these enhancements related to a committee of directors the Board formed on August 26, 2019 (after the MAX Crashes) and named the Aerospace Safety Committee. Among other things, the Delaware Settlement required Boeing to:

- Appoint a new director with engineering or product safety oversight experience;

- Amend the Company's bylaws to require the Board Chair to be independent;

- Amend Boeing's corporate governance principles concerning director experience considerations, including adding a requirement that at least three directors have relevant aviation, engineering, or product safety oversight experience;

- Require reports to the Board from the Chief Aerospace Safety Officer, the Chief Compliance Officer, and the Chief Engineer to the Aerospace Safety Committee, which would include updates on significant safety events;

- Require an Aerospace Safety Report to the Board at least biannually;

- Require the Aerospace Safety Committee to consist of only independent directors;

- Require the Chief Engineer and the Chief Aerospace Safety Officer to report to the Aerospace Safety Committee at least biannually on aerospace safety performance, including information pertaining to the Company's "Speak Up" reporting system and significant communications with the FAA (including communications relating to ODA interference and transparency);

- Require management to provide original documentation to Aerospace Safety Committee members upon request;[6]

- Make safety a metric that affects executive compensation;

- Make public disclosures confirming that the Board received the required reports;

---

[6] Under Delaware law, the directors were already entitled to these documents. The fact that the Delaware Settlement found it necessary to emphasize management's obligation to provide information to directors highlighted the severe dysfunction in Boeing's reporting systems.

- Publicly disclose a report addressing Boeing's safety enhancement programs at least annually; and

- Form an Ombudsman Program that reported to the Chief Aerospace Safety Officer, with the right to communicate directly to the ASC Aerospace Safety Committee.

160.    Most of the corporate governance reforms in the Delaware Settlement remain in force until November 29, 2025.  The reform related to the Ombudsman Program remains in force for an additional year and is set to expire on November 29, 2026.

161.    *Boeing I* and the Delaware Settlement should have taught the Board important lessons.  As if there could be any doubt, *Boeing I* confirmed that aircraft safety is a mission-critical issue for Boeing that requires regular Board oversight.  *Boeing I* also confirmed that reporting on mission-critical issues *cannot* be discretionary.  Management must provide timely and balanced information to enable the Board to evaluate critical safety issues.  *Boeing I* further confirmed that the Board must discuss critical safety issues for the purpose of *ensuring safety*—not simply for the purpose of getting Boeing's airplanes back in the air as soon as possible and boosting profits.

162.    *Boeing I* and the Delaware Settlement highlighted a culture of hostility toward whistleblowers and others that identified and called out unsafe practices at the Company.  Going forward, the Speak Up program and the Ombudsman Program were supposed to ensure that all employees could identify safety issues without a fear of retaliation and in a manner that would allow the Board to identify and address critical safety issues.  As explained below, this did not happen.

163.    Notably, three of the eleven members of the Demand Board in this Action—Bradway, Calhoun, and Good—were directors for whom the Court of Chancery found demand futile in *Boeing I*.  Eight of the eleven members of the Demand Board in this Action were directors

that approved the Delaware Settlement.  Most of the corporate governance reforms in the Delaware Settlement were Board-level.  It is reasonable to infer that the Board understood them and was periodically reminded of them.

## I.   Additional Safety Issues with the Dreamliner Arise During the Pendency of *Boeing I*.

164.   After the MAX Crashes, as the FAA tightened scrutiny, Boeing found many flaws in the 787 Dreamliner.  In August 2019, Boeing identified a defect in the shims that filled gaps between the barrel-shaped sections of the Dreamliner's fuselage.  Instead of setting up a manual review to ensure that Boeing was not delivering defective planes, Boeing relied on a computerized quality check.  About a year later, an internal review identified another problem with the assembly of the Dreamliner.  The two defects together meant that composite sections would not fit together properly, causing minute imperfections that were hazardous in extreme flying conditions.

165.   In summer 2020, Boeing finally disclosed to its regulators that "nonconforming" sections of the Dreamliner's rear fuselage failed to meet Boeing's engineering standards.  Boeing also determined that eight Dreamliners in service did not meet structural-soundness "requirements for safe flight and landing."  This led to a partial grounding of the 787 fleet.

166.   As a result of these issues, the FAA considered enhanced inspections of 900 of the approximately 1,000 Dreamliners that had been delivered to date.  The FAA also announced publicly that it was "investigating manufacturing flaws affecting certain Boeing 787 jetliners" and that "it is too early to speculate about the nature or extent of any proposed airworthiness directives that might arise" from the investigation.

167.   One of the causes of the defective Dreamliner fuselages was Boeing's failure to test how it produced shims at its South Carolina factory.  According to the FAA, Boeing's process to

make shims was "not validated prior to implementation into the production process" and lacked a quality check to verify if the final product "meets the engineering requirements."

168.     Instead of resolving the defects quickly, Boeing requested more time from the FAA. The FAA questioned Boeing's request because any delay would "add[] to the risk of the fleet."

169.     The defects in the Dreamliner resulted in "a string of Dreamliner delays that have become headaches for both Boeing and the airlines waiting for delivery of scores of 787s worth more than $25 billion.  Production snafus have popped up one after the other.  Some of the latest involve titanium parts, glue and fasteners[.]"  Boeing partially shut down 787 production in April 2020.  Boeing stopped almost all 787 deliveries in October 2020 while Boeing worked through these and other issues.  This led to a delivery halt that spanned almost two years.

170.     Heightened FAA scrutiny affected Boeing's *production* of the 787 aircraft, not just its *delivery* of the finished aircraft.  Boeing expected to produce fourteen Dreamliners per month in 2020.  Boeing steadily reduced its production target—first to ten per month, then to seven per month, then to six per month, then to five per month.  By October 2021, Boeing was producing only two Dreamliners per month.

171.     In February 2022, the FAA instituted a policy of checking each new Dreamliner individually, rather than letting Boeing make the final safety checks, which the FAA had previously allowed for years.  In April 2022, Boeing submitted a plan to the FAA that it hoped would address all the problems with the Dreamliner, and Calhoun expressed hope that this would provide a resolution: "It's been a long, hard run, but I feel really good about where we are[.]"  In July 2022, the FAA approved Boeing's plan, by which time Boeing had accumulated 120 undelivered Dreamliners.

172.     In August 2022, Boeing finally resumed deliveries of the Dreamliner, almost two years after they were mostly halted.[7]  The Dreamliner issues caused Boeing to rack up more than $6.3 billion in "abnormal costs."

173.     In October 2022, Boeing reported that it was producing Dreamliners "at a low rate" and expected to return to five Dreamliners per month over time.

**J.     Additional Safety Issues with the 737 MAX Arise During the Pendency of *Boeing I*.**

174.     On April 9, 2021, several U.S. airlines had to ground certain 737 MAX planes due to an electrical issue resulting from a "production change made in the installation process" after the 737 MAX grounding in March 2019.  Subsequent investigation into the issue found similar electrical issues in other parts of the plane.

175.     In January 2022, former Boeing Senior Manager Ed Pierson (previously defined as "Pierson")[8] publicly raised concerns about 737 MAX production quality, asking:  "Warning Bells are Ringing – Is Anyone Paying Attention?"  Pierson pointed out that, as of December 2020, there had been at least forty-two reports of equipment malfunctions occurring inflight on 737 MAX planes in the United States.  Since only 167 of those planes were in service in the United States as of January 1, 2022, that implied that *one-in-four* 737 MAX airplanes in the United States had already experienced an inflight malfunction within its first year of returning to service.  By

---

[7] Boeing delivered planes in May 2021.  On May 28, 2021, the FAA halted deliveries again due to concerns about Boeing's inspection method.

[8] Until August 2018, Pierson was a Senior Manager at the 737 MAX production facility in Renton, Washington.  Prior to the first 737 MAX crash, Pierson implored the 737 General Manager to shut down the factory due to production problems and airplane safety risks.  Pierson was ignored and marginalized, which led to his early retirement.  Since his retirement, Pierson has spent significant time monitoring and reporting on the 737 MAX program, including testifying before Congress.  Current Boeing employees often reach out to Pierson to express safety concerns when they are marginalized.

comparison, during the twenty-two months from the time the 737 MAX first entered service in May 2017 until the Ethiopian crash in March 2019, airline personnel in the United States submitted only fifteen reports of inflight malfunctions.  As Pierson put it:  "These reports on individual airplanes are laser beams that point directly back to one common characteristic: the 737 Factory and its history of chaotic production operations and undue schedule pressure."

176.    On June 26, 2022, The Australian Broadcasting Corporation ("ABC") reported on more than sixty mid-flight problems reported by pilots in the United States alone in the twelve months after the 737 MAX began flying again.  According to the report: "Former employees of both Boeing and the FAA characterized the reports—which included engine shutdowns and pilots losing partial control of the plane—as serious and with the potential to end in tragedy.  The report detailed several concerning incidents, including one in December 2021, in which a United Airlines flight declared mayday "after the system controlling the pitch and altitude of the plane started malfunctioning."  During an April 2021 American Airlines flight, "multiple systems including both autopilot functions stopped working soon after take-off.  On landing, the crew found the backup power unit, considered vital for safe flight, had failed and was emitting a strong electrical smell."  An Alaskan Airlines 737 MAX-9 plane was "grounded seven times over five months due to malfunctions with its navigation or communication equipment."

177.    The ABC investigation identified a mechanic who "observed sub-standard manufacturing and testing of the planes, which resulted in wires being left exposed and debris such as rubbish, metal slivers and washers lodging itself [sic] inside various parts of the plane, which could lead to electrical short circuits or fires."  When asked why this would be the case, an engineer on a test flight team informed ABC that Boeing "did not have enough equipment" for the aircraft it was producing, and "faced schedule pressures to certify the airworthiness of the planes faster."

**K.      Boeing Makes Surface Changes, But the Tone at the Top Remains the Same.**

178.    During the pendency of *Boeing I* and thereafter, the Board had numerous opportunities to address Boeing's broken corporate culture.  That broken culture included, among other things: (i) rampant concealment and omissions in reporting to regulators, including the knowing failure to keep required documentation and the purposeful deletion of required records; (ii) undue pressure to meet production schedules; (iii) widespread retaliation against those who raised safety or quality issues, including Boeing employees deputized to act on behalf of the FAA; and (iv) unsustainable cost-cutting.  Boeing professed its commitment to improving safety and quality, but the Company seemed more interested in restoring its image than in making its airplanes safer.  As one commentator described the situation:  "Obviously, Boeing has a safety problem.  Unfortunately, that doesn't seem to be obvious to Boeing.  Instead, the company seems to think it has a communications problem and a public image problem."[9]

179.    Boeing was at a crossroads.  The Board was responsible to change the Company's culture so the tone at the top was strict regulatory and safety compliance, with everything else being secondary.  Unfortunately, the Board was more concerned about profits and quickly getting Boeing's planes back in the air.

180.    The MAX Crashes and *Boeing I* exposed the Board's need to change from reactive to proactive.  The motion to dismiss opinion in *Boeing I* specifically criticized the Boeing directors for being passive recipients of discretionary management updates on safety issues.  *Boeing I*, 2021 WL 4059934, at *29–30.  Despite the clear instructions in *Boeing I*, during the Relevant Period,

---

[9] Minda Zetlin, *Boeing Replaces CEO Dennis Muilenburg With Board Chairman David Calhoun. But That's Not Enough*, INC. (Dec. 24, 2019), https://www.inc.com/minda-zetlin/boeing-new-ceo-david-calhoun-former-ceo-dennis-muilenburg-is-fired.html.

the Board failed to implement a mandatory reporting system regarding manufacturing issues that created material safety risks.

181.    In 2019, during the pendency of *Boeing I*, Boeing started the Speak Up program, which would supposedly give employees a more effective way to report concerns without fear of retaliation.  Boeing presented Speak Up as the primary method for reporting safety concerns within the SMS.  But Speak Up had no mandatory procedure for raising safety concerns to the Board level.  Management retained complete discretion in elevating Speak Up reports to the Board.  This explains why—despite employees submitting hundreds of Speak Up reports during the Relevant Period—management raised only a handful of cherry-picked and already-closed Speak Up reports to the Aerospace Safety Committee, presenting them as "examples," not substantive issues for the committee's attention.

182.    No other policy or system at Boeing provided for mandatory reporting to the Board of manufacturing safety issues that were discovered at Boeing's factories.  The only procedure for mandatory reporting was ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████.

183.    On May 10, 2023, Boeing memorialized ████████████████████████████ ███████  ███████  ███████  █████  ████████████  ████████  ████████████  ███  ███████ ████████████████████████.  The BPG addressed ███████████████████████████████ █████████████████████████████████.  As explained in the BPG, ███ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████

52

██████████████████████████ The criteria for reporting an event confirmed

the BPG's focus on in-service events:

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

██████████████████████

184.    Moreover, the BPG required ███████████████████████████████

█████████████████████████████████████████████████████   █████

██████████████████████████████.  The BPG did not provide for mandatory

reporting of manufacturing safety issues or of in-service safety issues that met the "criteria" for

mandatory reporting but purportedly did not meet the "intent" for mandatory reporting.

185.    The lack of a mandatory reporting process for manufacturing safety issues was

consistent with the Board's reactionary posture.  It was also a failure of oversight.  An illustration

using the facts of *Marchand v. Barnhill*, 212 A.3d 805 (Del. 2019)—the authority on which the

motion to dismiss opinion in *Boeing I* primarily relied—hammers home the point.  A good-faith

oversight system must be directed at detecting listeria in the ice cream factory; it cannot be limited

to informing the board more quickly about deaths that occurred after tainted ice cream left the

factory.

186.    The appointment of a new CEO was one opportunity the Board had to change the tone at the top.  Boeing's CEO at the time of the MAX Crashes was Dennis Muilenburg ("Muilenburg").  Muilenburg joined Boeing in 1985.  He became CEO in 2015 and continued Boeing's prioritization of profits over safety.

187.    Muilenburg badly botched Boeing's response to the 737 MAX Crashes.  He became a caricature of Boeing's profits-at-all-costs mentality.  When the FAA instructed Boeing to revise its flight manuals for the 737 MAX following the Lion Air Crash, Muilenburg emailed another executive, writing: "[w]e need to be careful that the [airplane flight manual] doesn't turn into a compliance item that restricts near-term deliveries."  On October 29, 2019, he told Congress "[w]e don't 'sell' safety; that's not our business model."  As the Court of Chancery found: "Muilenburg's comments were not geared toward taking action to address and improve the 737 MAX's safety.  Nor were they made in response to any Board inquiry as to the airplane's safety.  Instead, Muilenburg addressed the Board's objectives for the 737 MAX: 'ongoing production operations,' revenue, and reputational achievement."  *Boeing I*, 2021 WL 4059934, at *16 (footnote omitted).

188.    Muilenburg had to go.  Lawmakers, regulators, the press, and the public would not stand for Muilenburg's in-your-face avarice.  Muilenburg's successor would have an opportunity to change the tone at the top.

189.    Tellingly, the Board chose a private equity executive—Calhoun—to replace Muilenburg.[10]  The Board did not choose an engineer.  It did not choose a pilot.  It did not choose a regulatory safety expert.

---

[10] In 2013, Calhoun left his position as CEO of Nielsen Holdings N.V. ("Nielsen") to join Blackstone as a Senior Managing Director.  Calhoun was working at Blackstone when he became Board Chairman in October 2019.

190.    Calhoun became Boeing's CEO in January 2020.  He came to the job already tarnished by the MAX Crashes.  While serving as a Boeing director, Calhoun made several false representations to major newspapers concerning the Board's actions in connection with the MAX Crashes.  *See Boeing I*, 2021 WL 4059934, at *19.  The Board's appointment of Calhoun was a missed opportunity to return Boeing to its engineering and quality roots.[11]

191.    Far from being the safety-focused CEO Boeing publicly portrayed, Calhoun was just as focused on production speed as Muilenburg, and not as safety focused.  After Calhoun became CEO, in the middle of the grounding of the entire 737 MAX fleet, Calhoun *decreased* safety oversight at the executive level.  Calhoun shifted Executive Committee meetings from monthly to quarterly sessions, and thus, decreased his and senior management's ability to detect problems in a timely manner and report them to the Board.

192.    The reforms required by the DPA and the Delaware Settlement also gave the Board and management an opportunity to address Boeing's broken culture—especially with regard to the Company's treatment of people who slowed down production schedules by raising safety concerns.  But time would show that Boeing did not comply with the DPA and that the Delaware Settlement reforms were merely window-dressing.

193.    The MAX Crashes exposed the need for Boeing to implement the SMS company-wide.  After the 2015 Settlement, the SMS was Boeing's primary safety program with the stated goal of ensuring: "the safety, quality, and compliance of our products and services for the people who entrust Boeing with their lives[.]"  In practice, the SMS took a backseat to

---

[11] Boeing also had the opportunity to make changes at the Dreamliner facility.  On May 22, 2019, the vice president of 787 Dreamliner operations, who ran the South Carolina factory, announced his departure from the Company.  But the new head of the 787 Program kept things business as usual.

production schedules.  A government panel of experts would later identify major deficiencies in the SMS.  *See infra* ¶¶ 367–78, 499.

194.    In May 2022, Boeing announced that it was moving to Arlington, Virginia—just outside of Washington, D.C.  This move reflected Boeing's attempt to cozy up to its regulators rather than being a sign of real change.  Thus, in the face of criticism that Boeing improperly sought to capture regulators, Boeing management doubled down.  They moved Boeing's headquarters even closer to its regulators and even farther from its main manufacturing facilities in Washington state.

**L.    Boeing Quickly Returns to Business as Usual—Pursuing Profits over Safety.**

195.    The MAX Crashes, the worldwide grounding of the 737 MAX, and the halt in Dreamliner deliveries had a significant impact on Boeing's bottom line.  The COVID-19 pandemic made matters worse.

196.    On March 11, 2020, the World Health Organization declared the outbreak of the novel coronavirus, COVID-19, a pandemic.  For a time, Boeing was forced to shut down its U.S. factories.  The COVID-19 pandemic also essentially shut down global air travel.  Airlines no longer needed new planes.  The pandemic also disrupted Boeing's supply chain—resulting in part and material shortages.

197.    The slowdown from the COVID-19 pandemic should have been used to improve quality and safety.  As Calhoun stated on a July 28, 2021 earnings call concerning Dreamliner production: "Here's the good news.  If we ever had a window to get this behind us once and for all, it's now.  We're producing at the lowest rate ever.  Customers are not knocking down our door to get their airplanes in light of the COVID impact on international traffic."  But instead of directing all its resources to improving its manufacturing, Boeing shed much of its experienced

workforce.  To save money in the short-term, Boeing encouraged workers with ten, fifteen, and even twenty or more years of experience to retire.

198.    On May 27, 2020, Boeing announced that it had resumed production of the 737 MAX "at a low rate."  Boeing resumed delivery of the 737 MAX on December 8, 2020.  Having shed a significant number of experienced workers at the beginning of the pandemic, Boeing was forced to hire 8,000 new employees in 2020 for "critical skills."  In 2021, Boeing hired 9,800 new employees for "critical skills."  In 2022, Boeing hired a whopping 23,000 new employees for "critical skills."  More than ███████████████████████████████████████████ ███████████████████████████████████████████.  A December 9, 2022 Compliance and Ethics Update presented to the Board noted ████████████████████ ████████████████████████████████████.  Boeing skimped on training for new employees so they could get to work more quickly.[12]

199.    Despite the relative inexperience of Boeing's workforce, the Board approved a highly aggressive production schedule.  In July 2021, Boeing produced sixteen 737 MAX planes. On April 29, 2022, BCA management presented a ████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████ ████████    By July 2022, Boeing had almost doubled its production rate compared to the previous twelve months and was producing thirty-one planes a month.

---

[12] The lack of proper training has been particularly acute at the Dreamliner factory in South Carolina.  According to reports, a disparity in training resulted in Boeing's South Carolina workforce producing planes at one-fifth to one-third the rate of Boeing's Everett, Washington workforce.

200.     In November 2022, Boeing's CFO, Brian West ("West"), laid out Boeing's plans to "get this place back to normal" and achieve free cash flow of $10 billion by 2025/2026.  West explained that, to do so, Boeing would have to deliver *fifty* 737 MAX aircraft a month.  By comparison, in July and August 2018, Boeing unsafely delivered an average of *thirty-nine* 737 MAX airplanes a month.  Boeing management repeatedly reiterated their plans to significantly increase 737 MAX production, including at Boeing's November 2022 investor day.

201.     On December 9, 2022, BCA management provided an  .  Boeing management reiterated its plan to increase 737 MAX production at the May 2023 Wolfe Global Transportation & Industrials Conference, at the September 2023 Jefferies Industrial Conference, and on Boeing's October 25, 2023 earnings call.  By December 8, 2023, Boeing management .

202.     In 2022, Boeing expected its normalized free cash flow to be approximately $3 billion.  Boeing's plans contemplated more than tripling its free cash flow—to $10 billion—in only three or four years.  In addition to requiring an exponential increase in 737 MAX production, achieving Boeing's $10 billion annual free cash flow target would also require more 787 deliveries.

203.     Boeing's auditor, Deloitte, was .

204.     Tellingly, even stock analysts questioned Boeing's free cash flow targets and highly aggressive production schedule.  During Boeing's October 26, 2022 earnings call, an analyst

questioned Boeing's focus on free cash flow: "You mentioned on the call that your primary focus metric is going to be free cash flow. *In the past, focusing on free cash flow got the company to where it is today. It didn't end very pretty.* How are you viewing that differently than how it was viewed in the past?" (emphasis added). Calhoun responded unapologetically that Boeing would continue to focus on free cash flow: "I do have confidence that we are doing exactly what we need to be doing, and the free cash flow metric is a very clear indicator of performance not just in the near term, but also the medium and long term. *So, sorry, but that's the answer.*" (emphasis added). At the February 2023 Cowen Aerospace/Defense & Industrials Conference, an analyst again questioned Boeing's speed: "So your plan is to go from 31 to 38 later this year. Is there an interim step? Because that's a pretty big step-up percentage wise. Usually, I think before you've been going up in increments of something like 5." West acknowledged "that the increase is sporty," but he insisted "that's the right number."

205.    As explained below, Boeing's workforce could not safely meet the Company's highly aggressive production schedule. Nor could Boeing's subcontractors.

206.    Boeing relied on broad networks of subcontractors to produce components for its airplanes, including the 737 MAX. Spirit was one of Boeing's most important subcontractors. For the 737 family of airplanes, Spirit was the sole supplier of the entire fuselage, and most of the rest of the airplane. According to Spirit, it produced approximately 70% of the 737 aircraft for Boeing.

207.    Quality control was a major issue at Spirit. Santiago Paredes (previously defined as "Paredes"), a Spirit employee who conducted final inspections on 737 MAX fuselages before they were shipped to Boeing, told CBS News it was "rare" to "not find any defects" and that he would find "hundreds" of defects every day. But Spirit management pressured Paredes to keep quiet about the numerous defects, even nicknaming him "Showstopper" because his defect reports delayed deliveries.

208.     Spirit auditors found numerous serious defects in fuselages slated for delivery, including an alarming amount of foreign object debris ("FOD") in fuselages being shipped to Boeing.  One auditor found that a shocking 40% of the fittings attached to the fuselages' vertical tail fins had cracks.  Another auditor found torque wrenches in mechanics' toolboxes that were improperly calibrated, which meant that fasteners were not being tightened correctly.  Almost 10% of toolboxes audited had this problem.

209.     These defects had serious safety implications.  For example, the failure to properly fasten parts threatened their structural integrity.  Paredes offered a dire assessment:  "*Everything I was seeing was like a ticking time bomb.*" (emphasis added).

210.     Joshua Dean (previously defined as "Dean"), a former quality inspector at Spirit, similarly noted widespread quality control problems at Spirit's plant.  He told *National Public Radio*: "We're having a pizza party because we're lowering defects. . . .  *But we're not lowering defects.  We just ain't reporting them, you know what I mean*?" (emphasis added).  According to Dean, there was a "culture" of pressuring employees not to report defects so that planes could leave the factory more quickly, and that, while he wasn't "saying they don't want you to go out there and inspect a job[,]" management also did not want quality inspectors to "make too much trouble[.]"

211.     Dean was fired in April 2023 in retaliation for flagging improperly drilled holes in the aft pressure bulkhead of fuselages.  Though Spirit denied Dean's allegations, Boeing later announced that fifty jets with Spirit fuselages had improperly drilled holes, the very issue that Dean had flagged.  Dean mysteriously died from a sudden illness in May 2024.

212.     Dean's account was confirmed by his auditing teammate, Lance Thompson (previously defined as "Thompson").  Thompson disclosed to the *Seattle Times* that Spirit management prioritized meeting production deadlines over safety and quality, and that managers

wanted fewer defects to be flagged, which led to mechanics not disclosing them.  According to Thompson, "[t]he culture is just really sick. . . .  I almost quit because I was being asked to rush through the audits so we can stay on schedule . . .  I was getting to a point where I was going to have to tell my management – you know, be insubordinate – because I couldn't rush through that fast."

213.    According to Thompson, Spirit's culture discouraged addressing the root cause of manufacturing flaws.  Spirit management wanted mechanics to fix individual errors rather than recording them as recurring flaws.  Dean took a more hands-on inspection approach that caught specific problems.  After Dean was fired, others became even more reluctant to point out manufacturing flaws.  As noted in the complaint in another lawsuit involving Spirit,[13] one anonymous Spirit auditor reported observing many inspectors performing only a cursory review of the mechanics' work.

214.    Despite Spirit's attempt to discourage reporting, the pervasive defects in Spirit's fuselages made it impossible to hide all the defects from Boeing.  For example, Paredes often found FOD in Spirit's finished fuselages, and Boeing "provid[ed] frequent feedback about the occurrence of FOD in the delivered fuselages."

215.    Boeing placed Spirit on probation in 2018 because of its pervasive quality problems.  During Spirit's probationary period, Boeing sent Spirit daily or weekly emails with pictures of defects Boeing found on fuselages received from Spirit.  Boeing cared about the defects only because the defects were slowing down Boeing's production process—not because the defects created safety or compliance risks.

---

[13] *See* Complaint, *Li v. Spirit Aerosystems Holdings, Inc.*, No. 1:23-cv-03722-PAE, 2023 WL 9502836 (S.D.N.Y. Dec. 19, 2023).

216.    Nevertheless, Boeing's reliance on Spirit to make fuselages and Boeing's unwavering insistence on unsafe production schedules meant that Boeing did not press Spirit too hard to improve its practices.  In many areas, Boeing just let the defects slide.  Paredes believed that Boeing's years-long tolerance of Spirit's defective fuselages was "a recipe for disaster" where "it was just a matter of time before something bad happened."

217.    Boeing's directors and officers knew that quality control was a major issue at Spirit:

- According to the FAA, Spirit warned Boeing in September 2018 about defective slat tracks that guided the movements of the panels that provide additional lift during takeoff and landing.

- In December 2019, the FAA announced a proposed civil penalty of $3.9 million against Boeing for installing nonconforming components supplied by Spirit on approximately 133 planes.  In January 2020, the FAA proposed an additional $5.4 million penalty against Boeing for installing nonconforming parts supplied by Spirit on approximately 178 737 MAX planes.

- In 2021, Boeing had to halt production of the 737 MAX when various quality issues arose during the manufacturing process.  Boeing blamed those manufacturing problems on Spirit.

- In April 2023, Boeing warned the public that production and delivery of a "significant" number of 737 MAX planes could be delayed because of problems with Spirit's production of fuselages.  Spirit had found that two of its suppliers for fittings on the vertical stabilizer used non-standard manufacturing processes and, thus, created flawed fittings.  Calhoun mentioned the issue on Boeing's April 26, 2023 earnings call.  According

to Calhoun, he "happened to take a look at [the defect], . . . along with the rest of [his] board."

- In August 2023, Boeing identified another manufacturing defect—improperly drilled fastener holes in the aft pressure bulkhead of some 737 MAX fuselages from Spirit.  Boeing claimed that the manufacturing defect did not affect safety, and that 737 MAX planes already in service could keep flying.  But the aft pressure bulkhead is responsible for maintaining pressure when planes are at a cruising altitude and thus is a key component of safe flying.  Calhoun referenced the issue on Boeing's October 25, 2023 earnings call.  He emphasized that the issue would not change Boeing's production plans.  He stated: "We are keeping our suppliers hot according to the master schedule."  On the same earnings call, West stated that "suppliers are continuing with planned rate increases[.]"

218.    The Board had a duty to implement and maintain a compliance program to ensure proper oversight of Boeing's contractors and subcontractors.  Specifically, the DPA's mandate to implement a compliance program extended to Boeing's "contractors and subcontractors whose responsibilities relate to the Company's interactions with any domestic or foreign government agency (including the FAA), regulator, or any of its airline customers."

219.    The Section 220 Production confirms that Boeing's directors knew about the serious manufacturing defects at Spirit.  For example, on April 17, 2023, Calhoun ███████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████ Calhoun ████████████████████████████████████████████

████████████████████████████████████████

220.    Despite express knowledge of defects representing a serious fraud risk, the Board utterly failed to monitor Spirit from a compliance perspective.  This failure was in spite of the DPA's clear requirements to the contrary.

221.    Spirit's lack of quality controls came into further question when, on June 14, 2024, it was revealed that falsely certified titanium made its way into the fuselage manufacturing process at Spirit.  Spirit and the FAA are both investigating this problem, which arose when one of Spirit's suppliers found small holes in the material from corrosion.  Substandard titanium, which could affect the structural integrity of the planes, could be in planes that were built between 2019 to 2023, including Boeing 737 MAX and 787 Dreamliner planes.  This titanium was used in 787 Dreamliner passenger entry doors, cargo doors, and a component that connects the engine to the plane's frame.  For the 737 MAX, affected parts include a heat shield that protects a component connecting a jet's engine to a frame.  Troublingly, Boeing never detected this issue.  The first time the    Board    █████████ █ ███████████ ██ ██ ███ ███ ██ ██ ██ ███ ████████████████████████████.

222.    In October 2023, Boeing and Spirit entered into a Memorandum of Agreement that modified several important aspects of Boeing and Spirit's relationship (the "Spirit MOA").  Section 5 of the Spirit MOA required Spirit to create and implement a stability plan that "demonstrates reductions in nonconformances, foreign object debris, customer sensitive items, significant repair log items, and sub tier shortages" and that "increases staffing (as jointly agreed)

---

[14] These repair stations would eventually handle other rework and become known as "shadow factories."  *See infra* ¶¶ 244–47.

in support functions, including engineering, quality, lean, and supply chain[.]"  This aspect of the Spirit MOA reflected Boeing's knowledge of significant manufacturing defects at Spirit.  But most of the Spirit MOA addressed issues necessary to get Spirit to produce fuselages faster.  Calhoun explained on the Company's October 25, 2023 earnings call that the Spirit MOA "gives [Spirit] the resources and the breathing room they need *to get ahead of our rate forecast*." (emphasis added).  As part of the MOA, Boeing also granted broad releases to Spirit.

223.    That was the key problem—at a time when Boeing and Spirit *should have slowed down* to fix systemic manufacturing and quality issues, Boeing *pushed for everyone to speed up*.  This is because Spirit and Boeing depended on increased delivery speeds to stabilize Spirit's shaky financial condition.  As Calhoun explained on the Company's October 25, 2023 earnings call: "As Spirit becomes stable and we get to our [production] rates, rates solve most of the supply chain's problems.  We got to get to those rates so that they can make the kind of money that they associate with those rates and we get to where we need."  Given the unsafe production schedules, Boeing (and Spirit) simply would not tolerate anyone who slowed down production to address safety issues.  Boeing and Spirit paid lip-service to safety, but their actions spoke louder than words.

**M.    After the MAX Crashes and the Delaware Settlement, Boeing Continues to Cut Corners to Pursue Unsafe Production Schedules.**

224.    Even after the MAX Crashes and the Delaware Settlement, Boeing's workforce continued to engage in numerous unsafe practices to meet unreasonable production schedules.  Merle Meyers (previously defined as "Meyers"), a Boeing quality manager who worked at the Company for more than three decades, explained that, while quality was a top priority at Boeing for years, "Now, it's schedule that takes the lead."  Meyers cited Boeing's acquisition of McDonnell Douglas as the turning point when Boeing's engineering-first mentality gave way to a stronger focus on profits.

225.     Meyers is not a disgruntled employee.  Meyers' mother worked at Boeing before him, as did his wife's father and grandfather.  According to Meyers, "The Boeing Co. has done everything for me, and I will never be able to do enough for them[.] . . .  We love the company fiercely.  That's why you fight for it."[15]

226.     Joe Jacobsen, an engineer, safety expert, and aerospace safety advocate who worked for Boeing from 1984 to 1995 and at the FAA from 1995 to 2021 described the situation at Boeing this way in testimony before Congress: "There's a lot of areas where things don't seem to be put together right in the first place. . . .  The theme is shortcuts everywhere – not doing the job right[.]"  Another whistleblower summarized management's approach this way:  "We don't have time to follow processes; we're building airplanes."

227.     Boeing management stuck to production schedules even when defects were revealed that required major rework.  For example, in April 2023, Spirit warned Boeing of defects that would require rework on hundreds of planes.  On Boeing's April 26, 2023 earnings call, CFO West boasted that "we have not changed the master schedule, and that's a big deal."

228.     Boeing whistleblowers have identified numerous ways in which Boeing employees cut corners to meet production schedules.  Boeing employees who engaged in these unsafe practices were rewarded because they moved planes through the production process more quickly.  Boeing got paid as planes reached assembly milestones.  Senior management at Boeing's factories received progress reports twice a day, allowing them to track the progress of specific planes and teams.  First and second line managers were financially incentivized not to stop aircraft inside the factory, thus halting operations on the line.  Keeping on schedule resulted in higher compensation.

---

[15] Meyers backed up his claims about Boeing with hundreds of pages of documents and emails.

Getting behind schedule resulted in lower compensation, regardless of whether the delay was necessary for safety reasons. As Meyers explained, "What gets rewarded gets repeated."

### 1.   Boeing Management Permits "Out-of-Sequence" or "Traveled" Work.

229.   Many major safety and quality problems at Boeing during the Relevant Period were due to management's practice of permitting work on planes to occur "out-of-sequence" from the regular manufacturing process. Boeing's instructions for aircraft assembly required assembly to occur in a particular sequence. When a sequenced step could not be performed, Boeing management chose to keep the planes moving down the assembly line on schedule—leaving the unfinished work to be performed later in the manufacturing process.

230.   Out-of-sequence work during the Relevant Period occurred for several reasons. Parts might be unavailable due to Boeing's production schedule being too aggressive for the pandemic-constrained supply chain. Boeing might accept an unfinished part from a subcontractor, which meant work "traveled" from the subcontractor to Boeing.[16] Boeing might accept a defective part from a subcontractor—such as the defect-plagued Spirit—which meant Boeing had to "rework" the part and fix the flaws. If Boeing did not identify the defects until late in the assembly process, rework would require a number of other parts to be removed and reinstalled to open space for the rework. In many instances, it took Boeing more time to fix shoddy work from Spirit or other subcontractors than it took to assemble a new plane.

231.   Boeing management was incentivized to allow out-of-sequence work. Boeing got paid when planes reached various points in the assembly line, and management received increased incentive compensation when the planes met these milestones. Compounding this problem,

---

[16] At Boeing, "out-of-sequence work" and "traveled work" eventually became interchangeable terms.

Boeing's executives were unwilling to change the master schedule for production, which was necessary to maintain the Board-approved budgets.

232.     But out-of-sequence work greatly increased the chance of work being missed or performed incorrectly.  Each station on Boeing's assembly line had employees with different tools, training, and experience.  Crews further down the assembly line sometimes lacked the tools or experience to perform the traveled work.  Assembling the planes out-of-sequence often required workers to remove and reinstall other parts.  Furthermore, as explained below, Boeing engaged in numerous noncompliant recordkeeping practices that could make it difficult or impossible to track all the work that still needed to be done.  *See infra* Section IV.M.3.  By the same token, out-of-sequence work itself increased the chances of recordkeeping fraud and regulatory noncompliance.  Because out-of-sequence work occurred outside Boeing's normal assembly process, it increased the chances of Boeing employees failing to complete required paperwork or including false information on paperwork.

233.     The Board knew that Boeing's practice of out-of-sequence work created unreasonable safety and regulatory risks.  Yet the Board repeatedly ignored red flags leading up to the Door Plug Blowout in January 2024 and Boeing's admission that it violated the DPA in July 2024.

234.     On February 19, 2019, Pierson notified the Board of serious compliance issues at the Company's Renton manufacturing plant, including out-of-sequence work.  In an NBC News article, dated December 9, 2019, Pierson noted that "some of the steps" at the Renton plant were being performed at places and times different from the initial plans, and he grew concerned that a corner may be cut, or a crucial step overlooked.  According to Pierson, "[f]or the airplane, you want to build it a certain way. . . .  I don't know of any work that's more detailed."  The NBC News article says Pierson "likened out-of-sequence work to building a house and deciding after

the floors were put down to rip them up to finish electrical and plumbing work." Despite clear indications as of 2019 that out-of-sequence work posed serious compliance issues, the Board permitted management to continue it.

235. During Boeing's July 28, 2021 earnings call, Calhoun referenced Boeing's efforts to "strengthen first-time quality, *eliminate traveled work*, and drive stability and predictability." (Emphasis added.)

236. Numerous Board presentations █████████████████████████████████████████ ████████████████:

- On February 15, 2022, Calhoun reported to the Board on ████████████████ ████████    ██████████████████████████████████████████ ██████████████████████████    ██████████████████████████ ████████.

- On August 30, 2022, Calhoun reported to the Board on his ████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████    ██████████████████████████ ████████.

- On December 8, 2022, Calhoun reported to the Board ██████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████.

- On June 26, 2023, Calhoun reported to the Board in executive session. His presentation identified ████████████████████████████████████████ ████████████████████████████████████████████████████.

- On August 28, 2023, Calhoun reported to the Board in executive session. His presentation again listed ███████████████████████ ████████████████████████████.

- On December 7, 2023, Calhoun reported to the Board on his ██████ ███████████████████████████████ ███ ███ ████ █ ███ █ ██████ ██████ ████████████████.

237. ██████████████████████████████████ ███, it is clear that the Board knew throughout the Relevant Period that traveled work was continuing. The Board and its committees received other red flags showing that traveled work was continuing:

- The draft Form 10-K for the year ended December 31, 2021 reviewed by the Board flagged that ████████████████████ ██████████████████████████████ ██████████████████████████████ ████████████████████.

- On December 8, 2022, the Aerospace Safety Committee received a presentation ████████████████████████ ██████████████████████████████ ██████.

- The draft Form 10-K for the year ended December 31, 2022 reviewed by the Board flagged that ████████████████████ ██████████████████████████████



- On June 27, 2023, the Board received a BCA Update explaining that ███ ███████████████████████████████████████████ ████████████████████.

- On December 7, 2023, the Aerospace Safety Committee received a presentation referencing ███████████████████ ██████████████████████████████████.

238.   Throughout the Relevant Period, the Board and its committees received numerous red flags concerning the extensive rework Boeing was performing on 787 aircraft.   Numerous documents contained these red flags.

- The draft Form 10-K for the year ended December 31, 2021 reviewed by the Board flagged that Boeing ████████████████ ██████████████████████████████████████████ ██████████████████████████.

- A January 28, 2022 presentation from Boeing's Controller to the Audit Committee flagged as ██████████████████████ ██████████████████████████████████████████ ██████████████████████████.

- A January 28, 2022 draft letter from Deloitte to the Audit Committee flagged that, ██████████████████████████████

71

███████████████████████████████████

███████████████████████████████████

████████████████████████.

- A January 31, 2022 final letter from Deloitte to the Audit Committee flagged that, ████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████.   The letter also referenced

███████████████████████████████████

████████████████████████.

- Deloitte's audit plan, dated February 9, 2022, flagged for the Audit Committee that ████████████████████████

███████████████████████████████████

████████████████████████.

- A February 15, 2022 presentation to the Audit Committee flagged as ██████

███████████████████████████████████

███████████████████████████████████

██████    ██████    ██████  ███  ██████    ██████

████████████████████████.

- A draft Form 10-Q for the quarter ended March 31, 2022 reviewed by the Audit Committee, flagged ████████████████████████,

including that ████████████████████████

███████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████.

- An April 27, 2022 letter from Deloitte to the Audit Committee flagged:

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████.

- A July 27, 2022 letter from Deloitte to the Audit Committee flagged: ████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████.

- A draft Form 10-Q for the quarter ended July 31, 2022 reviewed by the Audit Committee, flagged the ███████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████.

- An October 26, 2022 letter from Deloitte to the Audit Committee flagged:

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████.

- A draft Form 10-Q for the quarter ended October 31, 2022 reviewed by the Audit Committee, flagged that, with respect to 787 aircraft, Boeing

████████████████████████████████████████████

███████████████████████████.

- A draft Form 10-K for the year ended December 31, 2022 reviewed by the Audit Committee, flagged that, with respect to 787 aircraft, Boeing

████████████████████████████████████████████

███████████████████████████.

- The draft Form 10-K for the year ended December 31, 2022 reviewed by the Board flagged that ██████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████. The document also flagged that

Boeing ████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████.

- A January 27, 2023 presentation from Boeing's Controller to the Audit Committee identifying ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███   █████████   █████████   ████   ███████   ████████

███████████████████████████.

- A draft Form 10-Q for the quarter ended March 31, 2023 reviewed by the Audit Committee, flagged that, with respect to 787 aircraft, Boeing

████████████████████████████████████████████



██ ████████ ██████ ██████ ███████ ██ ███ ██████
████████████████████████ .

- A draft Form 10-Q for the quarter ended July 31, 2023 reviewed by the Audit Committee, flagged that, with respect to 787 aircraft, Boeing ████████████████████████████████████████████ ██ ████████ ██████ ██████ ███████ ██ ███ ██████ ████████████████████████ .

239.    Between August 2022 and August 2023, the Aerospace Safety Committee received several In-Service Safety Reports that discussed a ██████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████ .  Other presentations to the Board and Aerospace Safety Committee specifically discussed how ████████████████████████████████ ████ :

- An April 17, 2023 Executive Session presentation to the Board by Calhoun concerning a ██████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████ .

- An April 18, 2023 BCA Update to the Board by Deal disclosed management's ██████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████ .  The update further disclosed regarding 787 production that ████████████████████████████████

█████████████████. The update further explained that ███████████

█████████████████████████████.

- An April 24, 2023 Audit Committee Review Significant Disclosures 1Q 2023 presentation by Michael J. Cleary, SVP and Controller, disclosed Boeing's ████████████████████

  ████████████████████████████████

  ██ ██ █ ██ ███ █ ██ █ ███ ████

  ████████████████. Two days later, a draft news release sent to the Audit Committee addressed ████████████

  ████████████████.

- An April 26, 2023 letter from Deloitte to the Audit Committee disclosed that, █████████████████████████

  ████████████████████████████████

  ███████████████████████. The letter also disclosed █████████████████████████

  ████████████████.

- A June 27, 2023 BCA Update by Stan Deal and Elizabeth Lund to the Board disclosed ████████████████████████.

- An August 2023 Watch Items list presented to the Audit Committee for its August 28, 2023 meeting disclosed █████████████████████

  ████████████████████████████████

  ████████████████████████████████

  ███ ███ █ ██ █ ███████ ██████

  ████████████████.

- An October 2023 Watch Items list presented to the Audit Committee for its October 16, 2023 meeting disclosed that ██████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████ .

- An October 17, 2023 BCA Update by Deal and Lund updated the Board on ████████████████████████████████████ ███████ ▌ ██████████ ▌ ██ ██ ████ █████████ ███ ████████████████████████████████████ ████████████████████████████████████ ███████

- An October 23, 2023 "Significant Disclosures 3Q 2023" presentation by Cleary to the Audit Committee disclosed, ████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ██████ ██ ██████ ▌ ████ ████ ███████ ████████████████████ .

- An October 25, 2023 draft press release reviewed by the Audit Committee disclosed: ███████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ██ ██████ ██████ ███████ █████████ ██ ███████ ██████████████████████ .

240.   The Dreamliner and 737 MAX aft dome problems were not the only defects requiring rework flagged for the Board:

- A February 10, 2022 presentation to the Aerospace Safety Committee regarding ███████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ .

- A June 26, 2023 SMS Implementation presentation to the Aerospace Safety Committee referenced ███████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████ .

- A June 26, 2023 presentation on several topics for ████████████ to the Aerospace Safety Committee disclosed that █████████████████ ███████████████████████   ███████████████████████ █████ . Another slide noted that ███████████████████████████ █████████████████████████████████████████████ .

- A June 27, 2023 BCA Update by Deal and Lund to the Board flagged a problem with ██████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████ . The same presentation flagged that ██████  ██████  ██████  █████████  █  ████  ████████   ██ ███████████████████████ .

- An October 17, 2023 Financial Update by West to the Board identified ██████████████████████████████████████████ ██████████████████████████████████████████.

- A draft Form 10-Q for the quarter ended September 30, 2023 reviewed by the Audit Committee flagged ██████████████████████ ██████████████████████████.

241.    The Section 220 Production indicates that the Board passively accepted management's reports on the pervasiveness of out-of-sequence work and rework at Boeing's factories without taking any steps to correct those issues. The minutes for the Board and committee meetings corresponding to the presentations cited above do not report *any* specific discussion or pushback against management on these topics.

242.    Beyond creating unacceptable safety and compliance risks, Boeing's approach to out-of-sequence work violated the DPA. According to a July 2024 plea agreement between Boeing and the DOJ, *see infra* ¶¶ 451–53, "[b]etween 2021 and 2023, Boeing conducted several Safety Risk Management assessments that identified out-of-sequence work as a risk factor that could cause the delivery of an 'unairworthy' or non-conforming aircraft to Boeing's customers." Plea Agreement, Attachment A-1 (Factual Basis for Breach) ¶ 9. Despite this identified risk, the Safety Risk Management assessments did not even consider measures to reduce out-of-sequence work. That was because management sought to prioritize speed and profit over compliance. According to the Plea Agreement (defined below), "Boeing senior executives prioritized the movement of aircraft through Boeing's factories over reducing out-of-sequence work to ensure production quality." *Id.*

243.    Worse yet, Boeing's Global Compliance function was not even involved in the Safety Risk Assessments. In other words, Boeing kept the entirety of its out-of-sequence work

practices outside the purview of its compliance function.  Thus, the Board never ensured that the Company's out-of-sequence work practices complied with the DPA.  Similarly, no documents produced by the Company show that the Board or its committees reviewed, oversaw, or otherwise discussed the Safety Risk Assessments.  This is so despite the Board having express knowledge of the risks associated with out-of-sequence work as of 2019.  Indeed, the Plea Agreement (defined below) found that Boeing never evaluated the fraud risks associated with out-of-sequence work, including the risk of incomplete, inaccurate, false, and/or fraudulent statements to the FAA, and therefore it is clear the Board utterly failed to oversee and ensure compliance with the DPA during the three-year term.

### 2. Boeing's Unsafe Practices Lead to the Creation of "Shadow Factories."

244.    The pervasiveness of out-of-sequence work at Boeing meant make-up work might not be completed until the "flight line," when the plane had left the factory and was parked and awaiting delivery.  Moreover, the late discovery of defects in supplier products (especially Spirit's products) required repairs on already assembled and even in-service planes.  These circumstances led to a significant number of planes requiring make-up work out-of-doors at any given time.  This led to the rise of "shadow factories"—large outdoor manufacturing areas outside the Washington plants.

245.    Shadow factories required Boeing employees to take equipment and parts into the elements, including equipment and parts that could not withstand it.  It was common for tools, equipment, and other parts to get damaged after being out in the weather.

246.    As explained in the prior section, the Board and its committees passively accepted management's reports on rework with no discussion on the issue.  This passivity continued, even after management flagged the problems with the shadow factories.

- A December 8, 2023  presentation by West to the Board referenced ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

- The same day Deal and Lund presented the ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ prominently flagged that a ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

- Management routinely referenced the need to shut down shadow factories during Boeing's earnings calls, including calls on April 26, 2023, July 26, 2023, October 25, 2023, and January 31, 2024.

247.    But the Board was unwilling to slow production long enough to make meaningful progress on this issue.

### 3.    Boeing Employees Skip Federally Mandated Record-Keeping and Even Falsify Required Records.

248.    One way Boeing employees cut corners to meet production schedules was by skipping federally mandated recordkeeping.  By keeping informal records, or no records at all, employees could work more quickly.  But doing so made it impossible for Boeing or FAA inspectors to perform adequate safety checks.  It also violated federal law and Boeing's own policies.

249.    Even more troubling, many Boeing employees outright falsified federally mandated records.  According to one whistleblower, the widespread falsification of records occurred because "manufacturing was so pressured to get their bean count."

250.    Because accurate recordkeeping was so important to regulatory compliance, noncompliance with recordkeeping requirements was considered fraud and subject to harsh penalties.  The Compliance Risk Management Annual Report to the Audit Committee of the Board

of Directors from December 2022 (the "2022 CRM Report")[17] described the potential consequences for regulatory noncompliance as follows:



.

251.    One important recordkeeping practice was "stamping."  Throughout the build process, Boeing mechanics and inspectors affirm (or "stamp") that they completed work in conformance with requirements.  Stamped manufacturing and quality records are important for Boeing's certification to the FAA that an aircraft is airworthy.  Boeing relies on those build and quality stamping records to certify to the FAA that an aircraft is airworthy.  False statements in Boeing's build records undermine the completeness, accuracy, and truthfulness of Boeing's representations and certifications to the FAA regarding its aircraft, among other issues.  During the Relevant Period, Boeing received hundreds of reports of stamping noncompliance through its internal reporting channels, which, as alleged below, were shared with the Aerospace Safety Committee.

252.    Boeing Compliance also identified stamping as a fraud risk during the DPA term on at least two occasions and shared its findings with the Audit Committee.  While management issued training and communications throughout the Company in response to the risk, management repeatedly told the Audit Committee that stamping noncompliance remained high for years, with no signs of abating.  As confirmed by the Plea Agreement (defined below), despite awareness of

---

[17]  The 2022 CRM Report appears in the Section 220 Production in ▆▆▆▆▆▆▆▆▆▆▆▆, with the report starting at ▆▆▆▆▆▆▆▆▆▆.

stamping noncompliance reports, the Company did not conduct sufficient testing to evaluate whether its stamping integrity communications and training efforts were effective at reducing or eliminating stamping issues.[18]

253.    In or around April 2024, Boeing finally disclosed to the DOJ Fraud Section false stamping during the DPA term at the Boeing 787 manufacturing facility in Charleston, South Carolina—a fact the Audit Committee had known since at least November 2023.  The false stamps caused Boeing's quality management systems to show that all required steps were complete, when they were not.  Employees involved in the false stamping did not understand Boeing's stamping policy, were not familiar with its requirements, and were not effectively trained on it.

254.    The reported stamping issues highlighted several shortcomings in Boeing's anti-fraud compliance program with respect to stamping integrity.  According to the DOJ, Boeing failed to implement additional or sufficient controls concerning the risk that certifications of airworthiness to the FAA could be incomplete, inaccurate, false and/or fraudulent and that aircraft delivered to its customers "conform[] to its type design and is in a condition for safe operation."

255.    The Section 220 Production shows that, during the three-year term of the DPA, the Aerospace Safety Committee and the Audit Committee received repeated red flags notifying their members of process noncompliance related to stamping, failed to follow up with management to ensure noncompliance issues were being resolved, and, as a result, allowed the issues to continue unabated, resulting in a breach of the DPA, *see infra* ¶¶ 451–54 (Stamping).  For example:

---

[18] According to an interview on Pierson's podcast, in response to a hotline report made by a Boeing whistleblower, the FAA determined in April 2022 that Boeing's business process instructions were inadequate and manufacturing personnel had not received the training, skill, education, or experience necessary to perform their daily task.

- On February 10, 2022, the Aerospace Safety Committee met and received a Boeing Commercial Aircraft Quality Management System Process presentation from management. During the presentation, management noted that ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ ████████████████████████████████. To address compliance gaps, management informed the Aerospace Safety Committee that ████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ ██████████.

- On April 28, 2022, the Aerospace Safety Committee met and received a Boeing Commercial Aircraft Quality Management System Process presentation from management. During the presentation, management noted again that ████████████████████████████ ███████████████████████████████████. The presentation stated that, ████████████████████ ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████



- On June 27, 2022, the Aerospace Safety Committee met and received a Boeing Commercial Aircraft Quality Management System Process presentation from management.  During the presentation, management noted again that ███████████████████████████████████████. The presentation now ████████████████████████████████ ██████████████████████████████ ████████████████████████████ Management also informed the Aerospace Safety Committee that the ███████████████████ ████████████████████████████████████ ███████████████████████████████. Once again, the Aerospace Safety Committee ██████████████████████ ████████████████████████████████████ ███████ ███ ███████ ████ ████ ██ ████████████████ ██████████████████.

- On August 29, 2022, the Aerospace Safety Committee met and received an update on the Boeing Commercial Aircraft Quality Management System Process.  During the presentation, management noted again that ███████ ██████████████████████████████████████████████████████ ████████████████████████████████████.  The presentation once again ████████████████████████████████████ ██████████████████████████████████████████████████████ █████████████████████ Management then informed the Aerospace Safety Committee ██████████████████████████████████ ██████████████████████████████████████████████████████ ████████.  Once again, the Aerospace Safety Committee ████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████.

- On December 8, 2022, the Aerospace Safety Committee met and received an update on ██████████████████████████████████████████ ████████████████████████ ████████████████████████████████ ████████.  Unlike prior presentations, the Aerospace Safety Committee ██ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████.  The Aerospace Safety Committee ████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████ .

- Also on December 8, 2022, the Audit Committee received an update from management on ███████████████████████████████

████████████████████████████████  ████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████



██████████████████████████████████████ .

- From December 2022 to November 2023, the Aerospace Safety Committee and the Audit Committee ██████████████████████████████ ███████████████████████████████████████████████ ███████████████████████.   After nearly a year of silence, on December 7, 2023, the Audit Committee received ███████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████.   In an accompanying Compliance Risk Management Report, dated November 2023 (the "2023 CRM Report"), management █████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████████



256.     Fraudulent stamping was not the only recordkeeping problem at Boeing.  False, incomplete, or non-existent records were also a widespread problem.

257.     To ensure accurate certification of airworthiness, Boeing was required to maintain complete and accurate records of all build records and the effectiveness of related manufacturing and quality processes.  If installed parts were removed during manufacturing or repair, Boeing policy required Boeing employees to document the removal in certain records.  The creation of a removal record initiated a process to ensure proper reinstallation of the part and record the individuals involved in removal, reinstallation, and reinspection.  If a removal record was not completely resolved in Boeing's computer systems, including reinstallation and reinspection, Boeing employees could not honestly certify an aircraft as airworthy to the FAA.

258.     Failing to comply with Boeing's removal record policy resulted in Boeing being unable to verify the accuracy and completeness of its processes and certify that its planes were airworthy.  Without information on the scope of the work performed or who performed it, Boeing could not effectively respond to, investigate, and remediate potential violations of U.S. law and Boeing policies and procedures.  In 2024, Boeing admitted to the DOJ that it "received numerous reports of incidents of noncompliance with its policy governing removals throughout the terms of the DPA."

259.     The Company also received numerous red flags regarding the ineffectiveness of its policies governing removals during the term of the DPA.  Specifically, the Plea Agreement (defined below) states that, "since 2019, the FAA has issued numerous formal or informal actions to Boeing related to Boeing's policy governing removals."  The Board and Audit Committee had notice of the existence of these formal and information actions, yet never inquired into the substance of the actual investigations.  For instance, the 2022 CRM Report informed the Audit Committee ████████████████████████████████████████████████████

██████████████████████████ In producing the 2022 CRM Report, the Company redacted the description of those investigations for privilege. Despite the redactions, the 2022 CRM Report makes clear that █████████████████████████████████████████████████████ ████████████████████████. However, Boeing would later admit that "[c]ompliance was not sufficiently involved in root cause analysis, remediation, or risk mitigation related to [Boeing's policy governing removals], notwithstanding the (1) impact non-compliance with Boeing's policy governing removals could have on Boeing's representations regarding its aircraft, and (2) recordkeeping consequences."

260.    The Section 220 Production also shows that, during 2022, the Audit Committee received repeated red flags █████████████████████████████████████████████ █████████████████████████████████████████. On April 28, 2022, June 27, 2022, August 29, 2022, October 17, 2022, and December 8, 2022, the Audit Committee met and ████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████ ████ ██████ █████ ██████████████████████ ██ ████ █████████████████████ █ ██████ █████████████████████ ██ ████ ████████████████████████████████████████████████.

261.    The numbers were not good. In 2020 and 2021, Boeing reported █████████ ████████████████████████████████████████████████████████████ █████. In 2022, Boeing reported ███████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████.

262.    The presentations to the Audit Committee that reported on the ████████████ ████████████████████████████████████████████████████████████



In other words, management did not like what the numbers were showing.  Rather than solving the problem, the Audit Committee ignored the numbers until management stopped reporting on the issue.  The problem had not gone away.  Whistleblowers and the DOJ would later confirm that falsification of records remained a major problem at Boeing.  Instead of dealing with the problem, the Audit Committee was content to bury its head in the sand and ignore it.

263.    The directors' approach to the widespread falsification of records at Boeing reflected the same unacceptably passive approach the Court of Chancery called out in *Boeing I*.  The directors gave management full discretion over what management reported, and the directors passively accepted it.

264.    In addition to their passivity in connection with the Substantiated Case Trends reports, the Audit Committee members took a passive approach to the reports they received concerning the DPA.  In meeting after meeting, the Audit Committee received a truncated, three- or four-page Deferred Prosecution Update presentation from management, during which the Audit Committee was informed of a startling number of potential instances of fraud occurring at the Company over the term of the DPA.

265.    As of November 27, 2023, the Company had reported ███████████████████████
████████████████████████████████████████████████████████████████████

███████████████████████████████████. The Audit Committee reports

showed ██████████████████████████████████████████████

████████████████.



████████████████████████████.

266.     Many of the alleged incidents of fraud were substantiated.  The 2022 CRM Report

disclosed  that ████████████████████████████████████████████



267.    Management did not provide the Audit Committee with the reports it provided to the DOJ.  Instead, management simply asserted in the DPA update presentations that ███████ ████████████████████████████████████████████████████ Those reports left completely within management's discretion ████████████████████████ The Section 220 Production contains no evidence that the Audit Committee members pressed management for more details concerning the content of the DOJ disclosures or what management ████████████████ That passive approach remained even after the reports started showing t████████████████████████████████████████████████████████████ ███████.

268.    The Audit Committee, along with the Board, knew that its recordkeeping practices required strict compliance.  Any recordkeeping error that broke a strict chain of custody for all build and manufacturing records could result in a finding of fraud, even though the recordkeeping error was not deemed "significant" by management.

269.    Yet, despite having knowledge of a consistent pattern of noncompliance at the Company, the Board and Audit Committee utterly failed to inquire into the substance of the alleged violations, the reasons for why the sustained instances of alleged fraud continued unabated, and the actual steps being taken to ensure compliance with the DPA.  Simply put, the Audit Committee, and the Board, knew of known instances of allege fraud, as well as a continuing pattern of noncompliance with its removals policy, yet did nothing to intervene, leading to a breach of the DPA, *see infra* ¶¶ 451–54 (Completeness of Records).

### 4. Boeing Management Eliminates Inspector Positions and Reduces the Overall Number of Inspections.

270.    Another way Boeing cut corners to meet production schedules was by reducing the total number of inspections.  In January 2019, *The Seattle Times* reported that Boeing aimed to eliminate a total of 900 inspector positions across their Washington state factories in 2019 and 2020—a nearly one-third reduction in inspector headcount.  At the time, Boeing claimed that new, automated tools were so accurate that they made quality inspections unnecessary.  Boeing's manufacturing union, District 751 of the International Association of Machinists and Aerospace Workers, on the other hand, argued that Boeing had artificially depressed the number of recorded defects in order to justify eliminating inspections by pressuring inspectors to approach mechanics informally to repair defects rather than formally document them, "essentially masking defects."  By 2019, the FAA had substantiated several instances of Boeing failing to document defects.

271.    Boeing's Vice President of Quality, Ernesto Gonzales-Beltran, spearheaded Boeing's inspection removal effort, which aimed to shift from having inspectors "check every airplane" to only "check once every 100 parts or every 1,000 parts."  These efforts eliminated approximately 3,200 inspections from the 737 MAX line.

272.    The reduction in inspectors and inspector positions was particularly pronounced at Boeing's South Carolina plant.  Whistleblower Barnett explained that, while a quality inspector in a Washington factory would cover nine mechanics, a quality inspector in the South Carolina inspector might cover 50–100 mechanics on two airplanes.  At one point, Barnett's supervisor told him the quality inspection team would only "inspect the parts that engineering called out" even though the quality management system "has hundreds of different inspection requirements that are required, that the FAA's approved" that "[Boeing] can't just eliminate[.]"

273.     In 2021, the FAA sent another letter stressing several problems with Boeing's systemic push to reduce quality inspections, which Boeing called "Verification Optimization." The problems the FAA pointed out included that:

- "Boeing procedures [were] not adequate for determining the required inspections and tests used to ensure the product conforms to its approved design";

- A program that removed inspections by quality inspectors and instead had manufacturing employees perform inspections did "not meet Boeing quality system requirements or FAA regulatory requirements";

- "The FAA found no process that describe[d] how Boeing determine[d] appropriate business decisions to justify the removal of mandatory Quality inspections";

- When certain procedures allowed in-person quality inspection to be removed, "[t]he FAA determined Quality [could not] accept a completed function test[] by relying on document review alone.  If the Quality organization [did] not witness the functional test, then it could not verify the accuracy of the information collected";

- "The FAA found evidence that Boeing inappropriately delegated inspection authority to Manufacturing personnel who did not have the appropriate training or certification, inappropriately delegated Quality inspections associated with certain engineering requirements to Manufacturing personnel, and allowed the indication of production verification and

acceptance with a Manufacturing stamp, in violation of the Boeing quality system requirements."

274.    While many of these inspections were eventually reinstated, nothing was ever done to address the hundreds of airplanes that were built without the inspections and are flying today.

### 5.    Boeing Employees Use Non-Conforming or Scrapped Parts.

275.    Another way Boeing employees cut corners to meet production schedules was through the unauthorized use of nonconforming or scrapped parts.  Components were usually scrapped because they were substandard or defective, including due to rust.  Scrapped parts were supposed to be identified and quarantined so they could no longer be used before being disposed. However, Meyers confirmed that Boeing employees routinely use a "bootleg form" to recover scrapped parts from the "reclamation area" and install them on new planes.  Using the proper parts would have been more expensive or take more time.  As a pretext, the unauthorized form would often state that the parts were sent to reclamation "in error."  According to Meyers, this "bootleg" process circumvented a "robust, documented process . . . for removing scrapped parts from reclamation."  Meyers estimated that, in the ten years before he was effectively discharged from Boeing in 2023, more than 50,000 parts that "escaped" quality control were used to build planes. Management incentivized this behavior.  Meyers explained that "[p]eople get promoted by hustling parts."

276.    Other Boeing whistleblowers reported similar dynamics.  According to Sam Mohawk (previously defined as "Mohawk"), a Boeing quality assurance investigator at the Material Review Segregation Area (the "MRSA") in Renton, Washington, handling nonconforming parts became more complex and demanding after the FAA recertified the 737 MAX.  Mohawk claimed that the MRSA experienced a 300% increase in records of nonconforming parts ("NCRs") and approximately 300–400 non-conforming 737 MAX parts were

lost.  Mohawk feared that the disappearance and apparent use of non-conforming parts would lead to a "catastrophic event."

277.     In early spring, 2023, Mohawk raised his concerns with his managers.  Instead of fixing the problem, factory management "ordered the majority of the parts that were being stored outside to be moved to another location to intentionally hide improperly stored parts from the FAA."  Furthermore, instead of attempting to reduce the number of nonconforming parts, Boeing management ordered Mohawk and others to eliminate or "cancel" the NCRs.[19]  This was not just an order from factory management.  According to Mohawk, during an August 2023 meeting, the *head of Boeing's Material Review Board for the 737 MAX program* "reiterated his order for everyone to cancel and delete NCRs, and not to keep a written record of non-conforming parts."  This instruction violated Boeing's policies and federal regulations.  Predictably, management refused to write a process for cancelling NCRs into the Boeing Process Instructions (the "BPI").  The FAA had to authorize any changes to the BPI, and the whole purpose of cancelling the NCRs was to hide problems from the FAA.

278.     In October 2023, Mohawk filed a Speak Up report about these problems.  He never received a direct response.  Instead, management proposed a "material return to stores (MRS) procedures" that was "never intended to control non-conforming."  Mohawk's Speak Up report was never presented to the Board.  This is not surprising, as Mohawk's report was received by the same group of managers his report complained about.  Even after the Senior Manager that was originally responsible for Mohawk's Speak Up left the Company, the New Senior manager brushed aside Mohawk's concerns.  In fact, the new Senior Manager made clear that Boeing

---

[19] The internal aircraft build record system at the Renton, Washington factory was known as CMES.  According to Mohawk, there is a backup system known as DCAC where deleted records can sometimes be retrieved.

employees "were to move the parts regardless of compliance."  Mohawk asked human resources to move his Speak Up to another management group that lacked a conflict of interest, but it was apparently never moved.

279.    This was a long-standing issue.  John Barnett (previously defined as "Barnett") was a Boeing quality manager responsible for disposing of non-conforming parts placed in the MRSA in the South Carolina plant between 2015 to 2017.  According to Barnett, Boeing's overriding priority was to push production quickly.  Plant workers felt pressure to use nonconforming parts even though they violated FAA regulations and Boeing's own policies.  The quarantine area for scrapped parts became a "parts store."  Manufacturing employees obtained and copied keys to the MRSA—enabling them to remove parts without the approval of MRSA staff.  According to Barnett, unauthorized removal of scrap parts was widespread and "just totally out of control."

280.    Barnett knew that scrap parts were being used because they were tagged or painted red, and he saw red-painted or tagged parts in the production line.  Management told Barnett not to report these issues to the FAA.

281.    The FAA substantiated some of Barnett's allegations in 2017.  According to the FAA's report, a review of only 20.3% of the relevant nonconforming part records (45 out of 221 total) led the FAA to conclude that Boeing "personnel did not follow approved quality system processes to track and disposition nonconforming parts.  As a result, 53 nonconforming parts are known to have been lost."[20]

282.    The Aerospace Safety Committee and management knew that the use of unauthorized parts was a problem at Boeing.  For example, on August 28, 2023, the Aerospace

---

[20] This FAA report was quoted in the "PSI Memorandum," which is discussed below.  *See infra* ¶¶ 416–19.  The bolding and italics the PSI Memorandum added to the FAA report has been removed in this Amended Complaint.

Safety Committee heard about ██████████████████████████████████

But neither the committee nor management reported the issue to the full Board or took action to end the practice.

### 6.      Boeing Employees Borrow Parts Assigned to Other Planes.

283.   Another way Boeing employees cut corners to meet production schedules was by taking parts assigned to other planes.  If a part had not yet been delivered that was necessary for a certain test, Boeing employees would sometimes take the same type of part from another plane, perform the test, and then return the part to its assigned plane.  In this way, planes underwent testing using different parts than the ones ultimately delivered.

### 7.      Boeing Employees Use Parts Before They Are Inspected or Logged.

284.   Another way Boeing employees cut corners to meet production schedules was by sending newly delivered parts straight from the receiving area to the assembly line before inspectors could inspect or log the components.  This practice prevented inspectors from ensuring that parts met quality standards before they were used.

285.   This practice is continuing.  In July 2024, Meyers told *CNN* that, based on conversations with current employees since he left the Company, unapproved parts are still being used in manufacturing: "Now they're back to taking parts of body sections – everything – right when it arrives at the Everett site, bypassing quality, going right to the airplane[.]"

### 8.      Boeing Employees Go "Inspector Shopping" to Obtain Certifications.

286.   Another way Boeing employees cut corners to meet production schedules was through "inspector shopping"—either by asking only lax inspectors to review work or by seeking out multiple opinions from different inspectors until workers received the certification they wanted.

### 9.      Boeing Employees Inspect Their Own Work.

287.    Another way Boeing employees cut corners to meet production schedules was by inspecting and approving their own work.  As reported in the Senate PSI Memorandum, which is discussed below, *see infra* ¶¶ 416–19, Boeing has been cutting down on quality inspections for almost a decade, even though the FAA has warned Boeing against this practice.

288.    The FAA requires Boeing to maintain a quality management system "that ensures that each product and article conforms to its approved design and is in a condition for safe operation."  14 C.F.R. § 21.137.  Quality inspections and tests are supposed to be handled by trained quality inspectors, who serve as a second set of eyes on work before the plane moves down the assembly line.  But beginning in 2015, Boeing increasingly shifted those duties to the very mechanics who did the assembly work.  Self-inspections decreased the number of trained quality inspectors needed, increased speed, and decreased cost.  With self-verification, "wait time [was] eliminated."  However, self-verification also eliminated a key part of the inspection process.

289.    In 2016, the FAA sent Boeing a formal compliance action request following an FAA audit that alleged that a Boeing policy adopted in 2015 "creat[ed] a process that bypasse[d] the Quality organization and allow[ed] . . . Manufacturing Technician[s] to accept" certain tests of airplanes' functionality without holding the requisite authority to do so.  Boeing promised to correct the problem and blamed it on "unclear" language in its policy documents.  Yet in November 2017, the FAA again sent multiple letters to Boeing raising similar concerns about quality inspections.  A November 8, 2017 letter observed that two new Boeing policies seemed to "modify and/or **circumvent**" the requirement that planes be properly inspected and tested in part by replacing quality inspections—which involve direct, physical examinations of planes—with "verifications"—which instead involve "[i]ndirectly demonstrating" compliance "by the use of data and analytical tools."  The November 8 letter also raised concerns about allowing employees

without the required training (and thus without the appropriate authority) to perform product acceptance. The FAA stated: "Grant[ing] acceptance responsibility without appropriate training is unacceptable to the Quality requirements. . . . [R]emoving inspections and replacing them with verifications . . . is not acceptable and does not meet the minimum requirements of [FAA regulations]."

290.    A November 17, 2016 FAA letter explicitly rebuked Boeing's practice of using non-FAA approved practices to contravene the policies the FAA did approve. The FAA noted that, in 2015, Boeing promised to take corrective actions in response to a 2015 FAA audit of the Everett factory that identified documents that appeared to circumvent approved policies. But just five months after the FAA accepted Boeing's corrective actions, in a subsequent 2017 audit, "the FAA again discovered important safety documents that Boeing had not cleared with the agency, and thus the FAA informed Boeing of its **'failure to implement' and** [its] **'unsatisfactory implement[ation]' of its promised actions**." The FAA "identified similar problems" in a subsequent November 20, 2017 letter.

291.    Over time, Boeing employees modified their practice of self-inspection slightly. According to an anonymous whistleblower in the South Carolina factory, since late 2022, Boeing managers have permitted mechanics to inspect each other's work rather than inspecting their own work. Of course, an inspection performed by a peer who lacked the proper qualifications and training was extremely suspect.

292.    Boeing's practice of self-inspection extended beyond Boeing's internal inspections. Through Boeing's ODA program, certain Boeing employees could be deputized to provide certifications that only the FAA normally would provide. Most of Boeing's ODA representatives performed ODA work only part time. The rest of the time, they worked as normal Boeing employees. This created a conflict of interest because Boeing management conducted the

performance reviews for, and set most of the compensation of, the employees who were supposed to be acting independently as representatives of the FAA.

293.    Boeing's ODA program had to be effective for the FAA's oversight to be effective. Commentators have noted that the FAA often lacks the resources necessary to understand and regulate new technology.   ODA representatives often have more expertise with the new technologies.  If the ODA program functions correctly, it can provide necessary and effective oversight in new areas.   But if ODA representatives are captured or cowed by non-ODA management, the process fails.  At Boeing, the ODA program failed.  *See infra* ¶¶ 318–21, 369, 377–78.

### 10.    Boeing Employees Accept Defective Parts from Suppliers.

294.    Another way Boeing employees cut corners to meet production schedules was by accepting defective parts from suppliers, including Spirit.  Instead of demanding that suppliers correct their mistakes, Boeing tried to correct the mistakes itself as the planes went through assembly.

295.    Sometimes, Boing just ignored the defects.  Boeing's policies nominally required Boeing to vet suppliers and verify their work.   However, certain managers pushed quality inspectors to simply ensure the suppliers stamped paperwork correctly, without the inspectors even looking at the suppliers' work.

### 11.    Boeing's Unsafe Practices Lead to a Crisis in Tool Management.

296.    The rush to finish planes created additional problems with tool management. Specific tools, including measuring, inspection, and test equipment, were needed at specific places on the assembly line.  Effective tool management was necessary to ensure that tools were in good working order, available at the required places on the assembly line, and removed before the plane

moved to the next station.[21]   Boeing's workforce and the Company's tool storage system, CribMaster, could not keep up with the frenetic production schedule in the factory—let alone with Boeing taking tools outside to work in the shadow factories.

297.   Boeing's directors and management knew that tool management was a significant issue.



- In 2022 and 2023, Deloitte's audits identified ███████████ ███████████.

- The summary of the 2022 CRM Report the Audit Committee received identified ███ ██████ █ █ ██████ ██████ █████████████████████.

- On April 17, 2023, the Aerospace Safety Committee received ██████ ████████████████████████████ ███████████████████████████.

- On June 26, 2023, the Aerospace Safety Committee received ██████ ████████████████████████████ ██████████████████████████.

298.   The summary of the 2022 CRM Report the Audit Committee received identified ███████████████████████████████.   Importantly, however, neither the Board nor management was willing to slow down production long enough to solve the problem.

---

[21] Misplaced tools were a common category of FOD.

### 12. Boeing Directors and Executives Participated in Boeing's Culture of Cutting Corners.

299.     Boeing's culture of cutting corners started at the top.  The production schedules set by management left workers with no choice but to cut corners if the schedules were to be maintained.  Rather than changing the schedules, Boeing executives rewarded employees who maintain the schedules through unsafe practices.

300.     Calhoun personally cut corners in his work.  He rarely appeared at Boeing's headquarters or its manufacturing facilities.  He spent most of his time at his homes in South Carolina and New Hampshire.  West worked from an office the Company built for his use in Connecticut

301.     Boeing directors were content to review presentations and hear management's plans without pushing for real change or exercising meaningful oversight.

302.     For example, on December 8, 2023, BCA management made a presentation to the Board that identified ████████████████████████████████████████████████ ████████████████████████████████████████.  The presentation did not identify what the potential safety items and non-compliances were, and the Board did not push management to quickly address these issues.

### N. Boeing Retaliates Against Those Who Hold Up Production Schedules.

303.     Because "schedule t[ook] the lead" at Boeing, employees who tried to hold up production to ensure that safety and compliance issues were addressed were ignored, marginalized, and even threatened.  Retaliation against employees who flagged safety issues was a long-standing problem at Boeing.

304.     In June 2014, a quality inspector at the Dreamliner factory—Roy Irvin (previously defined as "Irvin") told news media that his supervisors reprimanded him for being

"insubordinate" when he flagged safety and quality issues on the 787 Dreamliners he inspected. The quality issues Irvin flagged involved both missing parts and parts that were installed improperly. Almost every day, Irving had to push back on serious safety and quality issues he found in planes on the "flight line"—i.e., planes that left the factory floor and should have been thoroughly checked already.

305.   As mentioned above, in 2016, Hobek was fired for repeatedly reporting manufacturing defects in Boeing 787 aircraft. *See supra* ¶ 100.

306.   In 2017, Boeing quality inspector Barnett left Boeing after he was retaliated against at Boeing's South Carolina plant. According to Barnett, while Boeing nominally encouraged employees to "speak up . . . when you actually do it is when you start getting actions that, you know, you're a troublemaker or you're . . . just trying to hold up production." When Barnett pushed for adequate time to perform inspections, management "chew[ed] [him] out about stopping production" and management "put [him] in the corner. . . . And there's about five of them standing over [him] with their arms crossed. Where does it say we can't do this?" Barnett faced hostile retaliatory actions, meetings, or speeches nearly every week. His supervisor told him he would "push [him] until [he] broke." In one instance, management gave him two days to complete an investigation of 400 non-conforming parts that required weeks to perform correctly. In other instances, they gave him a large volume of work that would require a team to do and then pulled members off of Barnett's team to work on other matters.

307.   Barnett knew of one employee who opposed management's self-inspection proposal that was put on a performance improvement plan and survived without being terminated only when he "took a downgrade back to Washington to get out of Charleston." Notwithstanding the fact that Boeing employees could be charged with a felony for violating the FAA's

documentation rules, management told employees to transfer parts from one production line to another, without completing the required documentation.

308.    Barnett knew of another female employee who was physically assaulted for raising safety concerns.  Barnett explained that a male colleague "actually put his arm against her and pushed her against the wall and was pointing in her face and telling her to get on board and this was a good ol' boys' program, or something like that."

309.    Barnett's supervisor told him in an email to "learn the ar[t] of working in the gray areas and help find a way, while maintaining compliance or the intent of the procedure."  He also instructed Barnett "not to document defects, not to put quality concerns in writing."  Barnett was also told in writing, "we need to be flexible to do what is necessary, regardless of the swim lane." Once, he received a performance review stating that "leadership would give hugs and high fives [upon] his departure[.]"

310.    Barnett filed an OSHA complaint against Boeing for retaliation and a safety complaint with the FAA.  Barnett's retaliation lawsuit continued into 2024.  On March 7 and 8, 2024, Barnett was deposed.  The next morning, before what was supposed to be Barnett's third day of deposition, Barnett was found dead in his truck in the parking lot outside his hotel.  Barnett's death was purportedly a suicide.  Investigators found notes in Barnett's notebook attributing his death to the stress from his efforts to hold Boeing accountable.  He wrote: "I CAN'T DO THIS ANY LONGER!!!   ENOUGH!!!   F[**]K   BOEING!!!   WHISTLEBLOWERS   [sic] PROTECTION IS F[***]KED UP TOO!!  FAMILY [AND] FRIENDS I LOVE YOU ALL."

311.    Another Boeing whistleblower who was in litigation against the Company, Dean, died suddenly in May 2024.  Only 45 years old, he was diagnosed with a MRSA bacterial infection. His death shocked his family because Dean was known for being extremely healthy.  According to Dean's mother:

The doctor said he'd never seen anything like it before in his life.  His lungs were just totally . . . gummed up, and like a mesh over them. . . .  We're not sure what he died of. . . .  We know that he had a bunch of viruses.  But you know, we don't know if somebody did something to him, or did he just get real sick[?]

312.    Salehpour has been a Boeing engineer for more than four decades.  Since 2007, he has worked for Boeing in various engineering capacities for the Boeing 747, 767, 777, and 787 programs.  Most recently, he was a Quality Engineer responsible for monitoring production activities for defects and developing processes and corrective actions to ensure defects were addressed and prevented.

313.    When Salehpour pressed Boeing officials to hear and respond to safety issues he observed and raised over the course of years, he was met with "increasingly hostile" responses from his supervisor and other managers.  Salehpour explained, "the more I pushed for answers, the greater the retaliation would be."  He was "ignored," "told not to create delays," "told, frankly, to shut up," physically threatened, and subsequently reassigned in retaliation for raising serious safety issues.  According to Salehpour, the attitude at Boeing "from the highest level is just push the defective parts regardless of what it is," creating a culture where employees are quite reluctant to come forward.  Salehpour communicated his concerns to Mark Stockton, the senior director for 787 engineering, and Lisa Fahl, a BCA Vice President of Engineering, to no avail.

314.    Salehpour recounted one incident where his supervisor took him aside to reprimand him after he raised safety concerns at a meeting.  The supervisor said, "I would have killed anyone who said what you said[;] if it was from some other group, I would tear them apart."  In another incident, someone purposefully punctured the tire on Salehpour's car with a large nail.

315.    Salehpour concluded that, when a Boeing employee expressed safety concerns, Boeing's response was to "threaten you, sideline you, transfer you" and to "retaliate to make your

life miserable[.]"  Salehpour suffered nightmares of getting stabbed and sought psychological help as a result of the constant retaliation and physical threats he faced.

316.    Meyers was relatively "lucky" in the retaliation he faced for trying to stop the unauthorized use of non-conforming parts.  *See supra* ¶¶ 224–25, & n.15, 275.  Meyers "merely" received a written reprimand for his purported "defective work product, service or output[.]"  Notably, the written reprimand provided no details about what this three-decade Boeing employee had allegedly done wrong.  Meyers felt that his quality concerns were not being taken seriously and that, if he stayed at Boeing, he would eventually be pushed out.  When Boeing offered him a buyout to quit, he took it.

317.    Boeing's culture of retaliation extended to Boeing's suppliers, including Spirit.  Richard Cuevas (previously defined as "Cuevas"), who worked for a Spirit subcontractor in Boeing's Everett, Washington facility, observed "critical drilling and sealant issues" on 787 Dreamliners, where fastener holes located in the plane's forward pressure bulkhead were drilled to be slightly larger than they were supposed to be.  Those improper fasteners could have "devastating consequences" because they could "compromise power and air pressure on the planes."  After Cuevas complained to Spirit, and then to Boeing, Spirit fired him in 2024.

318.    Retaliation was an open secret at Boeing.  In May 2022, Boeing commissioned an external company to conduct a survey of the more than 1,000 Boeing employees who participated in the ODA program and thereby acted as FAA deputies in providing certain certifications.  Approximately 71% of the ODA representatives responded to the survey.  The survey showed that 13.9% of the ODA representatives perceived interference by Boeing management with their work on behalf of the FAA.  Another 24.1% of the ODA representatives were concerned about retaliation if they reported concerns.

319.    This survey was important.  Of the 71% of the ODA representatives who even felt comfortable responding to the survey, 38% either perceived or were concerned about retaliation. Instead of taking this unacceptable statistic as a wakeup call, Boeing management touted the survey as a success.

320.    In the 2023 Chief Aerospace Safety Officer Report, Boeing paraded the fact that 49.9% of the survey respondents reported "[s]eeing improvement" in the culture around interference and integrity.  Notably, the 2023 Chief Aerospace Safety Officer Report did not disclose how much improvement the ODA members purportedly saw (e.g., improvement from 5% less retaliation to 10% less retaliation would be unacceptable, but it would still be an improvement).   The report did not disclose whether the 49.9% of respondents "seeing improvement" believed Boeing's current culture created an acceptable environment for their ODA work.  The report did not even explain why it disclosed the survey results for only 87.4% of the respondents (i.e., 49.9% for those seeing improvement, 24.1% for those feeling concerned about retaliation, and 13.9% for those perceiving interference, totals only 87.4% and leaves 12.6% unaccounted for).  News reports from around the time of the survey disclosed that 5.6% of the survey respondents saw the retaliation situation getting *worse*.  Management did not include █ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ .

321.    Despite the clear evidence that retaliation was a major problem at Boeing, the Board passively accepted management's reports without ensuring that Boeing's culture of retaliation was changing.  The Aerospace Safety Committee even adopted management's rosy spin on the ODA survey.  According to the minutes for the August 30, 2022 Board meeting, the Aerospace Safety Committee Chair ███████████████████████████████████████████████ ████████████████████████████████████ .

322.     On July 7, 2023, Boeing issued a revised Business Process Instruction related to the Speak Up program.  The new version of ███████████████████████ stated that ███

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████.  On December 7, 2023, the Aerospace Safety Committee received a report ███████████████████████████████████████████

██████████████████████████████.  This was a clear indication that Speak Up was not being effective in encouraging more reporting.

323.     As late as June 2024, management was reporting to the Audit Committee that retaliation was a ████████████████████████████████████████████████

██████     As late as July 2024, the DOJ was insisting that Boeing ███████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████   ██   ████   ███   ████   █████   ██████   ████████

██████████████████████.  The DOJ's insistence on this point indicated that the Board had still not addressed Boeing's culture of retaliation as of the middle of this year.

**O.     Boeing's Unsafe Production Schedules Result in a Steady Drumbeat of Safety Issues.**

324.     Predictably, Boeing's unsafe production schedules led to numerous safety incidents.  In January 2023, Boeing halted delivery of the 787 Dreamliner after the FAA expressed concern that Boeing had not properly documented structural issues.  Boeing stated, "In reviewing certification records, Boeing discovered an analysis error by our supplier related to the 787 forward pressure bulkhead[.]"  The FAA emphasized: "Deliveries will not resume until the FAA is satisfied

that the issue has been addressed. . . .  The FAA is working with Boeing to determine any actions that might be required for recently delivered airplanes." This delivery halt lasted until March 2023.

325.   In February 2023, a new Southwest Airlines Boeing 737 MAX plane, on one of its first commercial flights, experienced an automatic stabilizing system malfunction.  The pilots were forced to make an emergency landing shortly after takeoff.

326.   In April 2023, an Alaska Airlines 737 MAX plane, with eight hours of total flight time, was grounded due to a problem with a fire detection system.

327.   In June 2023, Boeing announced another Dreamliner delivery delay (this time lasting approximately one month) due to a "nonconforming condition related to a fitting on the horizontal stabilizer."

328.   On August 7, 2023, the FAA issued an airworthiness directive for the 737 MAX due to "inadequate electrical bonding and grounding which can lead to unreliable operation of aircraft systems *and potential loss of the aircraft*" (emphasis added).  As referenced above, later in August, Boeing identified "hundreds of misaligned and duplicated holes" in Spirit fuselages. *See supra* ¶ 217.

329.   In November 2023, an engine on a just-delivered United Airlines 737 MAX plane failed at 37,000 feet.

330.   In December 2023, Boeing issued a Multi-Operator Message ("MOM") "urging operators of 737 MAX planes to inspect the tie rods that control rudder movement for possible loose hardware."  Boeing issued the directive after learning that an operator had discovered a "bolt with a missing nut" during maintenance on the aircraft.  Boeing subsequently "discovered an additional undelivered aircraft with a nut that was not properly tightened."

**P.      Boeing Continues to Minimize Safety Issues and Rush to Get Its Planes Back in the Air.**

331.    In response to the MAX Crashes, Boeing—disturbingly—attempted to minimize the ongoing safety risks the crashes had revealed and pushed the FAA to quickly clear the 737 MAX to resume flying.  Troublingly, Boeing maintained this approach even after the Delaware Settlement.

332.    In June 2023, the FAA received evidence that the anti-icing system on 737 MAX planes could overheat.  According to the FAA's airworthiness directive, this condition could lead to forced off-airport landing and injury to passengers.

333.    Instead of fixing the issue (which affected planes currently in operation) or grounding any 737 MAX planes, Boeing asked pilots to limit the use of the anti-icing system in some conditions to avoid damage that "could result in loss of control of the airplane."  Boeing's response led some pilots to use sticky notes to remind them of the de-icing system issue and cell phones as timers to tell them when to turn the de-icing system off.  Below is a picture of such a sticky note used by one pilot.



334.    Boeing also sought a safety exemption from the FAA for the de-icing problem.  As part of the public comment process on that exemption, the Foundation for Aviation Safety (which

is affiliated with Pierson's prior work) raised serious concerns about Boeing's safety exemption request.  As the Foundation explained:

> The engine inlets are constructed of composite material that could be overheated within 5 minutes by the engine inlet anti-ice system, resulting in loss of structural integrity during normal operating conditions within the flight envelop of the airplane.  If the composite material is damaged, the engine inlet can depart the airplane and cause catastrophic damage to the airplane, or cause excessive drag that could result in an off field landing, possibly in the ocean on an extended range flight.  The FAA has previously determined this failure condition is "Catastrophic" as shown in an Immediately Adopted Airworthiness Directive1 (AD) published in August of 2023, intended to address the same design flaw that is the subject of the exemption request.  **The unsafe condition is present in over 1,300 MAX airplanes currently in service.**

335.    Richard Conover, a former U.S. Navy pilot, concluded that Boeing's proposed recommendation of turning off the de-icing system rather than fixing the issue was "flippant" and "another catastrophe waiting to happen."

336.    Boeing ultimately caved to intense public scrutiny and agreed to withdraw the exemption request.  But the Company did not ground any planes with the defectively designed anti-icing system.

337.    The Board knew about the problems with the 737 MAX's anti-icing system.  On December 8, 2023, BCA management gave the Board a presentation that identified ███████████ ████████████████████████████████████████████████████.

**Q.    A Door Plug Blowout Brings Boeing's Ongoing and Extensive Quality and Safety Issues to the Fore.**

338.    As explained in the prior section, in 2022 and 2023, Boeing's production-first culture led to a steady stream of safety incidents.  On January 5, 2024, Boeing's culture of non-compliance exploded back into the headlines.  At 5:07 p.m. PST (1:07 a.m. UTC on January 6, 2024), Alaska Airlines Flight 1282 left Portland International Airport, bound for Ontario,

California.[22]  The plane for the flight was a Boeing 737 MAX 9, registered as "N704AL."  The flight had 171 passengers and 6 crew.

339.    Shortly after takeoff, while the plane was at approximately 16,000 feet, there was a loud bang.  A gaping hole opened in the cabin when the left mid-cabin door plug blew out (previously defined as the "Door Plug Blowout").  This led to a rapid decompression of the cabin.  The cockpit door blew off its mountings toward the cabin.  The rapid outflow of air from the flight deck pushed the captain's head into the heads-up display.  His headset pushed up, nearly falling off his head.  The first officer's headset came off completely.  Seven passengers and one flight attendant were injured.  Thankfully, no one was sitting in the row where the door plug blew out, and all passengers and crew survived the incident.  Boeing's reputation was not so fortunate.

340.    The plane made an emergency landing back in Portland, where a passenger took the following picture of the missing door plug.

---

[22] To more clearly show the time between events, this Amended Complaint uses UTC for certain events.



341.   The Door Plug Blowout was the direct result of Boeing's culture of pushing production over safety.  Specifically, Spirit's ever-present quality issues and Boeing's practice of traveled work were major contributors to the Door Plug Blowout.  Spirit made the defective fuselage for N704AL.  Boeing workers spotted damaged rivets soon after the fuselage entered Boeing's plant.  However, because of the highly managed timing sequence of the aircraft assembly process, there was not adequate time or resources to perform an immediate fix because the fuselage was destined for its initial assembly sequence.  Nineteen days later, other Boeing workers eventually removed the door plug and repaired the rivets.  When this later group of Boeing workers reinserted the door plug, they did not replace the large bolts that secured the door plug.

342.    After the door plug blew out, it fell 16,000 feet into an Oregon backyard. Investigators recovered the door plug.[23]



They did not find any bolts—because the bolts were not on the plane when it took off.

343.    Boeing employees who worked at the 737 MAX factory around the time of the Door Plug Blowout later revealed the state of dysfunction that led to the Door Plug Blowout. According to safety advocate Pierson, "people that we talk to are telling us that unfortunately the factory is in . . . worse shape than it was[,] you know[,] before the planes were built that crashed [i.e., the planes involved in the MAX Crashes]." Another anonymous whistleblower stated that the 737 MAX production system was a "rambling, shambling, disaster waiting to happen." Similarly, a retired Boeing employee who worked with the 737 MAX and was on the factory floor stated that employees were under "immense pressure which affected staff morale and work quality."

---

[23] Investigators found that the door plug was lubricated with petroleum jelly, instead of an approved lubricant. When the NTSB visited Spirit's factory on January 17, 2024, regulators learned that Spirit employees regularly used petroleum jelly and dish soap to lubricate parts— neither of which were FAA approved.

344.    Approximately four hours after the Door Plug Blowout, at 5:10 UTC on January 6, the FAA announced that the National Transportation Safety Board NTSB would investigate the Door Plug Blowout.  Less than three hours later, at 7:55 UTC, Alaska Airlines (not Boeing) announced that it would temporarily ground its fleet of sixty-five Boeing 737-9 aircraft for inspections.  At 17:54 UTC, the FAA (again, not Boeing) ordered the grounding of 171 Boeing 737 MAX 9 aircraft operated by U.S. airlines or in U.S. territory.  The FAA also announced that it would soon issue an Emergency Airworthiness Directive requiring operators to inspect aircraft before further flight.  The FAA issued its initial Emergency Airworthiness Directive later that day.  Also on January 6, 2024, United Airlines suspended service of all its 737 MAX 9 aircraft.

345.    Consistent with its approach to the MAX Crashes and the June 2023 de-icing issue on the 737 MAX, Boeing worked frantically to get/keep its planes in the air.  Boeing did not recommend that operators ground any planes beyond those the FAA or the operators themselves had grounded.  On January 8, at *2:12 a.m.* local time from where it was issued, Boeing issued a MOM with instructions for inspecting the 737 MAX 9 fleet before returning the planes to service. ██████████████████████████████.  Boeing initially thought the Door Plug Blowout might have been caused by loose bolts—presumably because Boeing had discovered a loose bolt issue the month before.

346.    The FAA swiftly put the brakes on Boeing's plans to rush the 737 MAX 9 back into service.  On January 9, 2024, the FAA announced:

> Every Boeing 737-9 MAX with a plug door will remain grounded until the FAA finds each can safely return to operation.  To begin this process, Boeing must provide instructions to operators for inspections and maintenance.  Boeing offered an initial version of instructions yesterday which they are now revising because of feedback received in response.  Upon receiving the revised version of instructions from Boeing the FAA will conduct a thorough review.

347.    On January 10, Boeing's CEO admitted that Boeing made a "mistake" that led to the Door Plug Blowout.  Calhoun later described the Door Plug Blowout as a "quality escape," as if this major safety failure were a small and routine problem.

348.    The same day, the FAA wrote a letter to Boeing disclosing that it had launched a formal investigation into Boeing's quality control practices due to the Door Plug Blowout and "additional discrepancies."  According to the FAA, those problems indicated "that Boeing may have failed to ensure its completed products conformed to its approved design and were in a condition for safe operation in accordance with quality system inspection and test procedures."

349.    On January 11, the FAA publicly announced its investigation.  In response, Boeing announced that it would cooperate with the FAA and NTSB investigations, but it did not identify any additional steps the Company planned to take to address the issue.

350.    On January 12, the FAA announced "new and significant actions to immediately increase its oversight of Boeing production and manufacturing" due to its concerns Boeing lacked sufficient quality oversight.  The FAA went on to state:

> It is time to re-examine the delegation of authority and assess any associated safety risks. . . .  The grounding of the 737-9 and the multiple production-related issues identified in recent years require us to look at every option to reduce risk.  The FAA is exploring the use of an independent third party to oversee Boeing's inspections and its quality system.

351.    On January 13, Alaska Airlines announced it had "engaged in a candid conversation with Boeing's CEO and leadership team to discuss their quality improvement plans to ensure the delivery of the highest quality aircraft off the production line for Alaska."  Alaska Airlines further announced it would "initiate and enhance [its] own layers of quality control to the production of [its] airplanes."  Alaska Airlines CEO Ben Minicucci told the press: "We're sending our audit people to audit their quality control systems and processes to make sure that every aircraft that

comes off that production line, that comes to Alaska has the highest levels of excellence and quality."

352.     On January 15, Boeing admitted that the Door Plug Blowout and "recent customer findings make clear that we are not where we need to be" with respect to quality control.  Boeing then disclosed some limited steps it planned to take to address the Company's quality control systems.  Notably, Boeing did not identify any plans to slow 737 MAX production.

353.     On January 16, 2024, Boeing appointed Admiral Kirkland H. Donald, USN (Ret.), as a "special advisor to Boeing President and CEO Dave Calhoun" to review Boeing's quality control systems.

354.     The regulatory, media, and public scrutiny following the Door Plug Blowout emboldened certain current and former Boeing employees to expose their experiences with Boeing's toxic culture.  On January 16, an anonymous Boeing employee identified the likely true reason for the issue: as the NTSB suspected, the Door Plug Blowout occurred because Boeing failed to install bolts on the door plug.  The whistleblower's anonymous comment on a Leeham News and Analysis article described how Boeing's decision to repeatedly put speed over safety led to the Door Plug Blowout.  The post stated in part:

> Current Boeing employee here—I will save you waiting two years for the NTSB report to come out and give it to you for free: the reason the door blew off is stated in black and white in Boeings own records.  It is also very, very stupid and speaks volumes about the quality culture at certain portions of the business.
>
> [W]hy did the left hand (LH) mid-exit door plug blow off of the 737-9 registered as N704AL?  Simple- as has been covered in a number of articles and videos across aviation channels, there are 4 bolts that prevent the mid-exit door plug from sliding up off of the door stop fittings that take the actual pressurization loads in flight, and these 4 bolts were not installed when Boeing delivered the airplane, our own records reflect this.

355.     On January 19, a lawyer representing an undisclosed Boeing Quality Engineer wrote a letter to FAA Head Mike Whitaker ("Whitaker").  The letter detailed the shortcuts Boeing

took to increase production rates of the Dreamliner and 777 airplanes.  Those shortcuts created "serious safety issues" that allowed for potentially "catastrophic" structural flaws on almost 1,000 Dreamliners and 400 777s currently flying.  The Quality Engineer "repeatedly reported" to Boeing management "serious concerns" about Boeing's current production and quality control processes, but Boeing "dismissed and ignored" his safety complaints.  The letter further stated that Boeing's response, or lack thereof, to the Quality Engineer's grave safety concerns were "reflective of a company-wide pattern of prioritizing speed of production and delivery over the investigation and remediation of significant safety risks and of discouraging employees from raising safety concerns."  The Boeing whistleblower wished to remain anonymous in addressing his allegations to the FAA until protections were in place, as he had already faced harassment and retaliation from Boeing officials in response to raising safety concerns.

356.    On January 21, the FAA announced that several operators (again, not Boeing) had identified additional issues with Boeing aircraft.  The FAA announced: "some operators have conducted additional inspections on the 737-900ER mid-exit door plugs and have noted findings with bolts during the maintenance inspections."  As a result, the FAA recommended that operators inspect the fuselage plug assembly in Boeing 737-900ER aircraft.

357.    On January 24, the FAA announced its final 737-9 MAX door plug inspection criteria and increased oversight measures related to Boeing's quality control.  In addition, the FAA stalled Boeing's plans to increase 737-9 MAX production.  FAA Administrator Whitaker stated:

> However, let me be clear: This won't be back to business as usual for Boeing.  We will not agree to any request from Boeing for an expansion in production or approve additional production lines for the 737 MAX until we are satisfied that the quality control issues uncovered during this process are resolved.

By refusing to authorize an expansion in Boeing's 737 MAX production, the FAA effectively capped Boeing's 737 MAX production at thirty-eight planes a month.

358.    Notwithstanding the seriousness of the Door Plug Blowout and the FAA's response, Boeing management went right back to its production-first playbook.  Management told the Board to .  Management also predicted .

359.    The Door Plug Blowout turned the public's eyes back to Boeing's toxic culture.  A headline in a January 30 *Vox* article stated: "**Boeing's biggest defect?  Its corporate culture.**"

360.    In the aftermath of the Door Plug Blowout, numerous additional problems with Boeing planes soon came to light.  On February 4, Boeing disclosed the presence of manufacturing flaws in rivet holes in approximately fifty undelivered 737 MAX planes.  Boeing blamed Spirit, but the disclosure showed Boeing's failure to oversee Spirit and ensure quality.  On February 6, pilots reported stuck rudder pedals on a 737 MAX 8 when they attempted to land—leading to an NTSB investigation of the 787 MAX 8.

361.    On February 19, the Audit Committee met.



362.    On February 20, 2024, the Board met to review a "Financial Update" presentation.  The presentation flags potential delays in Boeing's production rate increase as the biggest risk for the Company, not quality or safety issues.  BOEINGAA220OH_00007934, at -7938.

363.     On March 7 and 8, Barnett was deposed in connection with his retaliation lawsuit. Barnett testified that the Door Plug Blowout vindicated his attempts to push for safety because the Door Plug Blowout related to safety issues that he addressed while at Boeing.

364.     On March 11, Calhoun addressed Boeing employees.   In his address, Calhoun recognized Boeing's routine use of traveled work.   Calhoun admitted: "It's uncomfortable.   It creates opportunities for failure."

365.     The same day, a Boeing 787 was involved in another major incident.   LATAM Airlines Flight 800 was traveling from Sydney, Australia, to Santiago, Chile, with a stop in Aukland, New Zealand, when it suddenly went into a midair nosedive.   The dive threw passengers around the cabin.   Some hit the ceiling, breaking overhead panels.   Some flew back four or five aisles.   Upon landing, dozens of passengers were rushed to the hospital.   One was in serious condition.   Approximately fifty passengers were injured.   There were no fatalities.

366.     Regulators preliminarily concluded that the dive on Flight 800 was caused by a flight attendant hitting an exposed switch while serving a meal to the pilot.   The switch activated a motorized feature to push the pilot's seat closer to the controls.   The switch was supposed to be covered and was not supposed to be used when the pilot was sitting.   This appeared to be yet another quality issue because the switch was likely left uncovered during manufacturing. Reminiscent of the information deficit that occurred with the MCAS, Boeing had not informed airlines or pilots of this potential problem before the incident.   According to commentators, this incident "came at a horrible time for a company grappling with some severe damage to its already-battered reputation."

**R.      The Door Plug Blowout Leads to Heightened Scrutiny from Lawmakers and Regulators.**

367.     In the aftermath of the MAX Crashes, Congress passed the 2020 Aircraft Certification, Safety, and Accountability Act.  Section 103 of the Act provided for the creation of expert panels to review the safety management processes and their effectiveness for each holder of an ODA for the design and production of transport airplanes (like Boeing).  From March 2023 through February 2024, one such expert panel evaluated Boeing's processes (the "FAA Expert Panel").  The FAA Expert Panel reviewed Boeing documents, visited Boeing facilities, and interviewed Boeing employees.  On February 26, 2024, the panel issued its report (the "FAA Expert Report").

368.     The FAA Expert Report identified twenty-seven areas in which Boeing had notable safety issues, including: (i) the fact that managers who determined employees' compensation also oversaw their safety concerns; (ii) at every level, Company employees were ignorant of the Company's safety practices and procedures, did not understand their roles in ensuring safety, and were skeptical that Boeing's safety programs would last; (iii) the absence of a consistent and clear process for employees to report safety concerns; (iv) SMS documentation that was complex and constantly changing; and (v) turnover of key staff who were responsible to oversee Boeing's certification processes.

369.     The FAA Expert Panel found that, despite senior management paying lip service to safety, Boeing employees (including ODA representatives) "questioned whether Boeing's safety reporting systems would function in a way that ensures open communication and non-retaliation."

> The Expert Panel learned managers that are authorized to oversee employee performance evaluations, salary decisions, promotions, and disciplinary actions might also be tasked with investigative duties in the SMS framework.  This arrangement could lead to a manager investigating a report within their own reporting chain, potentially compromising Boeing's commitment to a non-retaliatory and impartial environment.  This dual responsibility and authority create,

among some employees, hesitation in reporting safety concerns for fear of retaliation.

Importantly, the FAA Expert Panel found that Boeing's ODA program created "opportunities for retaliation to occur, particularly with regards to salary and furlough ranking." "Some [ODA representatives] reported changes in behavior from their leadership and unrequested changes in assignments" when they raised safety concerns that resulted in unfavorable decisions for the Company. "Some interviewees indicated discussions between [ODA representatives] and the applicant were perceived as interference when the conversation around the showing of compliance became contentious."

370.    The FAA Expert Panel also found that "Boeing SMS procedures are not structured in a way that ensures all employees understand their role in the company's SMS. The procedures and training are complex and in a constant state of change, creating employee confusion especially among different work sites and employee groups." Given the complexity of Boeing's reporting systems and employee distrust in the anonymity of the Speak Up program,[24] Boeing employees typically defaulted to reporting safety issues to their managers. However, "[w]hen employees report through the management chain, the reports are not consistently submitted into Boeing's SMS." The complexity of Boeing's SMS program also led FAA employees and managers to express concerns to the FAA Expert Panel "about the sustainability of Boeing's SMS."

371.    The FAA Expert Panel criticized Boeing for "a lack of awareness of safety-related metrics at all levels of the organization, and significant skepticism expressed by Boeing employees regarding the lasting power of the SMS implementation." According to the panel, an effective

---

[24] Boeing does not permit employees to submit Speak Up reports "outside" of the Company's firewall. Accordingly, employees must swipe their ID badges at a computer terminal to submit a Speak Up report. This practice, coupled with the negative treatment employees received after filing a report, contributed to the perception that Speak Up was not anonymous.

SMS required, at a minimum, employee awareness of their role in the SMS and "a proficiency adequate to perform their SMS-related roles and responsibilities, even if their daily activity doesn't use SMS or safety culture terminology." However, "Boeing's SMS documents [did] not effectively result in [an] understanding by the average employee of their role in Boeing's SMS." The FAA Expert Panel "*could not identify a consistent and clear safety reporting channel or process* within the business unit, nor a successful process in which the employee is informed of the outcome of the report." (Emphasis added.) The lack of awareness of safety-related metrics was present *at all levels of the organization*. In other words, the Individual Defendants failed to implement the foundational component of a SMS—ensuring that Boeing's employees had a baseline understanding of their SMS responsibilities.

372. Although the FAA Expert Panel was tasked with investigating Boeing's culture rather than specific safety incidents, "serious quality issues with Boeing products became public" during the panel's investigation. "These quality issues amplified the Expert Panel's concerns that the safety-related messages or behaviors are not being implemented across the entire Boeing population."

373. The FAA Expert Panel found that Boeing leadership focused its cultural efforts on "Speak, with little or no attention given to Seek or Listen." The panel was available to make specific recommendations on Boeing's safety culture, SMS, and ODA; Boeing declined. This decision showed that Boeing was willing to promote safety only if it did not interfere with Boeing's existing systems. The panel explained: "During interviews, Boeing employees highlighted that SMS implementation was not to disrupt existing safety program or systems."

374. Boeing also focused on counting the number of employees who received SMS training rather than whether they really learned: "No measures of competency were included in the training measures." The Company's proxy statement for the annual meeting of shareholders

exemplified this finding. The first "safety-related goal" listed for each of Boeing's business segment leaders in that document was the percentage of employees in that person's business segment who "completed Safety Management System training[.]" *See* The Boeing Co., Definitive Proxy Statement (Schedule 14A) at 64–65 (Apr. 5, 2024).

375.    The FAA Expert Report commented on the negative effects of the employee turnover Boeing promoted to save money during the COVID-19 pandemic: "Similarly, sufficient, relevant, and/or current experience in the manufacturing and engineering arenas decreased as the more seasoned staff left or took retirement during the pandemic."

376.    The FAA Expert Report also commented on Boeing policies that created a disconnect between Boeing's products and those who would use them:

> [In BCA's earlier planes,] BCA's human factors in flight deck design and operations were the gold standard with pilots, engineers, product support, and human factors specialists. These human factors specialists worked closely and collectively in the Seattle area. Since then, the role of human factors and its influence eroded due to a series of administrative decisions at Boeing, which includes reorganization, decentralization, downsizing, and relocating the company's headquarters.

"Concerns were expressed during interviews that the chief pilot position does not reside within the organizational structure affording it the authority and responsibilities commensurate with the position equivalent to the chief engineer."

377.    The FAA Expert Panel raised concerns that certain purported safety measures existed only on paper with no attempts at actual implementation and/or with no evaluation to determine whether the measures are succeeding. According to the FAA Expert Report:

> Boeing undertook many measures to ensure the capability of its ODA unit to make reasonable and appropriate decisions regarding its delegated functions. However, Boeing did not provide the Expert Panel with metrics or KPIs relative to those initiatives when asked for such data. Boeing did not produce quantifiable measures which led Expert Panel members to conclude Boeing is not actively monitoring the efficacy of these initiatives. Consequently, the Expert Panel cannot ascertain the tangible impact of Boeing's measures or to what degree Boeing instilled a

commitment to safety above all other priorities among its employees supporting ODA functions.

The FAA Expert Report expressed concern that, while Boeing made certain reporting structure changes on paper in a purported attempt to insulate ODA representatives from operational manager interference, in practice, the ODA representatives continued to report to the same operational managers.

378.    The FAA Expert Panel also raised concerns that Boeing was striking agreements with FAA personnel to overrule negative determinations by ODA representatives without the representatives' knowledge.  According to the report, "instances were described where Boeing, as the applicant, had agreements with FAA management personnel that overruled the OMT and UM decision without their consultation."

379.    On March 4, the FAA disclosed a summary of its audit findings related to the Door Plug Blowout.  The FAA "found multiple instances where [Boeing and Spirit] allegedly failed to comply with manufacturing quality control requirements."  It also found "non-compliance issues in Boeing's manufacturing process control, parts handling and storage, and product control."

380.    *The New York Times* reviewed a presentation of these still-not-public audit findings, and reported that out of 89 product audits specific to Boeing, the FAA found that Boeing failed 33 of them—more than one-third.  The FAA also conducted thirteen product audits for Spirit, which failed seven of them.  FAA Administrator Whitaker explained at a news conference:

> It wasn't just paperwork issues, and sometimes it's the order that work is done. . . . Sometimes it's tool management—it sounds kind of pedestrian, but it's really important in a factory that you have a way of tracking tools effectively so that you have the right tool and you know you didn't leave it behind.  So it's really plant floor hygiene, if you will, and a variety of issues of that nature.

381.   *The New York Times* further reported that the failure to replace bolts that caused the Door Plug Blowout may have exemplified a systemic problem.  Boeing failed the FAA's product audit related to that part of the manufacturing process.

382.   The audit also found that Spirit used unorthodox methods, such as dish soap as a lubricant or hotel key cards to check a door seal, which were not documented in the production order, but which were approved by Boeing.

383.   On March 6, U.S. Senator Maria Cantwell of Washington ("Senator Cantwell"), the Chair of the Senate Committee on Commerce, Science and Transportation, convened a full committee hearing to receive testimony from NTSB Chair Jennifer Homendy ("Homendy").  At the hearing, Homendy expressed frustration with Boeing's lack of cooperation with the NTSB's investigation.  She noted that, while the work relating to door plugs was performed by a team of twenty-five people and a manager at Boeing's Renton, Washington facility, Boeing had not given NTSB the names of these personnel, despite repeated requests.  Moreover, despite repeated requests, Boeing had not provided the documentation showing how the door plug was installed or how the work was carried out.  Homendy also stated that NTSB had been unable to interview the team's manager, who was allegedly out on medical leave.  Homendy testified, "We don't have the records. . . .  We don't have the names of the 25 people in charge of doing that work in that facility. It is absurd that two months later, we don't have that."

384.   Senator Cantwell noted that Boeing's lack of cooperation was inconsistent with Calhoun's pledge to her to "work transparently with" regulators.  U.S. Senator Ted Cruz of Texas demanded that Boeing provide the names of the relevant team members within a week.  After the hearing, Boeing stated that, "in response to a *recent* request," it "provided the full list of individuals on the 737 door team" (emphasis added).  Boeing claimed that the NTSB first requested the names on March 2.  Even if that were true—and the NTSB stated that it requested the information two

months earlier—there was no reason Boeing could not have provided the requested names during the four days between the request and the hearing.  Although Boeing eventually gave the names of all twenty-five workers on the Door Plug Team, Boeing did not identify the specific employees who worked on N704AL.

385.    Boeing did not provide regulators with video or documents concerning the work Boeing performed on N704AL.  Boeing claimed the video footage was overwritten as part of a standard practice to maintain video recordings on a rolling 30-day basis.  Boeing did not explain why it failed to provide the footage before it was overwritten, given that the NTSB requested it on January 9—four days after the Door Plug Blowout.  Boeing also claimed there were no written records related to the work performed on N704AL, even though FAA regulations and Boeing's own processes required such documentation.

386.    On March 12, the DOJ opened an investigation into the Door Plug Blowout.

387.    On April 9, Salehpour disclosed publicly that he was the Boeing whistleblower behind the January 19 letter to the FAA.  At a press conference, Salehpour described flaws in the Dreamliner program dating back to 2020 and continuing thereafter.  According to Salehpour, Boeing's answer to excessive gaps between sections of the Dreamliner fuselage was to "make it appear like the gaps didn't exist"—in other words, to "hid[e] rather than fix[] the problem." Instead of properly shimming between fuselage sections, Boeing workers used excessive force to close gaps.  This was quicker and cheaper, but it created excessive wear on the parts that could cause premature failure of the structure and "catastrophic failure."

388.    On April 10, the *Washington Examiner* published an article about Boeing's "culture of secrecy."  But while Boeing kept many secrets from regulators and customers, Boeing's broken culture was no secret.  According to the article, "[t]he rotten culture of Boeing has been known for sometime."

389.   On April 17, U.S. Senator Richard Blumenthal of Connecticut ("Senator Blumenthal"), the Chair of the U.S. Senate Permanent Subcommittee on Investigations (the "Senate PSI"), convened a hearing to "examine Boeing's broken safety culture, focusing on firsthand accounts[.]"  Salehpour testified at the hearing.  He explained: "the safety problems I have observed at Boeing, if not addressed, could result in a catastrophic failure of a commercial airplane that would lead to the loss of hundreds of lives."

390.   Based on what Salehpour personally observed while working on 787 and 777 airplanes, he concluded there was a "broad[] pattern of Boeing ignoring and suppressing safety and quality issues."  Salehpour observed "Boeing workers using improper and untested methods to align parts in the 777, such as using cranes and inappropriate heavy equipment, and in one instance *even jumping on pieces of the airplane to get them to align*" (emphasis added).  While industry engineering standards required Boeing to shim gaps using minimal force to avoid causing deformities, Salehpour stated Boeing disregarded these requirements, increasing the force used to "*approximately 165 times the recommended level*" (emphasis added).  Ignoring the industry accepted shimming standards expedited the assembly process and significantly reduced cost.  But it disregarded the reality that excessive force creates excessive wear and causes premature failure of the structure that "could result in a catastrophic failure."

391.   Senator Roger Marshall of Kansas asked Salehpour if he believed there was a culture of retaliation at Boeing.  Salehpour responded: "Absolutely."

392.   The Senate PSI hearing on April 17 also included testimony from the FAA Expert Panel.  In written testimony, panel member Javier de Luis ("de Luis") wrote that he found it "distressing" that Boeing's leadership had not "gotten it" that safety should be a priority over production speed after the MAX Crashes, but rather, after the Door Plug Blowout, Boeing's CFO admitted that speed was a priority "over getting it done right."

393.    de Luis stressed the "disconnect" between Boeing's management's verbal commitment to safety and the lived experience of Boeing's workforce that was "present at almost all levels and almost all worksites."  He explained that Boeing workers:

> [H]ear "safety is our number one priority," but they see that that is only true as long as you meet your production milestones.  They hear "speak up if you see anything unsafe", but they see that when they do, there's little feedback, and if they insist, they may find themselves on the short end of the stick next time raises are distributed, or worse.

In his oral testimony, de Luis added that among Boeing workers who raised safety concerns, "there was a very real fear of payback and retribution if you held your ground."

394.    On April 29, the Aerospace Safety Committee met and received



.

395.    On May 6, the FAA announced it was investigating whether Boeing failed to complete required inspections on its 787 aircraft.  According to the FAA, Boeing "voluntarily informed us in April" that it may not have completed required inspections to confirm that there was adequate bonding and grounding where the wings join the carbon fiber fuselage on certain 787 jets.  The FAA announced that it was "investigating whether Boeing completed the inspections and whether company employees may have falsified aircraft records[.]"  The FAA ultimately required Boeing to reinspect all 787 Dreamliner planes still in its production system and to create a plan to address the fleet that was already in service.  Notably, Boeing's "voluntary" disclosure, and the April 29, 2024 internal memorandum that led to it, came less than two weeks after Salehpour's explosive testimony to the Senate PSI concerning the problems with Boeing's 787 program.

396.    On May 9, the SEC opened an inquiry into whether Boeing executives made misstatements regarding the Company's safety practices, both before and after the Door Plug Blowout.

397.    On May 18, the FAA sent a letter to Boeing disclosing the FAA's preliminary audit findings concerning Boeing's Verification Optimization, Process Surveillance, Manufacturing Assurance and Process Surveillance, and Functional Test Surveillance programs.  The FAA found numerous areas in which Boeing was violating FAA regulations and the Company's own policies. For example, the letter explained that:

- With respect to the Dreamliner, Boeing improperly replaced in-process quality inspections with a different process that was authorized only for auditing and not for product verification and acceptance to ensure conformance to FAA-approved design data.  Boeing's actions violated FAA regulations and "circumvent[ed]" Boeing's own policies "by enabling the removal of in-process and end-item inspections performed by Quality Inspectors and assign[ing] in-process inspections to manufacturing personnel for acceptance."

- With respect to several programs, Boeing improperly assigned conformance decisions, product inspection, and acceptance to manufacturing personnel who lacked the authorization, qualification, and training to perform those tasks.  Boeing's actions violated FAA regulations and Boeing policies.

- Boeing's policies permitted the replacement of inspections without a defined process for determining when doing so was acceptable.

- Certain Boeing policies and procedures were inconsistent with or contradicted each other, resulting in one policy "circumvent[ing]" another procedure and other policies creating ambiguity.

- Boeing quality personnel signed off on tests that they did not witness based solely on a review of documents prepared by workers that purportedly conducted the tests.

398.     On May 24, Boeing released its third Chief Aerospace Safety Officer Report.  The report showed a 500% increase in 2024 Speak Up submissions after the Door Plug Blowout as compared to the same period in 2023.

399.     Meanwhile, Boeing planes continued to experience major safety incidents.  On May 25, a Southwest Airlines Boeing 737 MAX plane dropped at a rate of more than 4,000 feet per minute and came within 400 feet of slamming into the ocean off the coast of Hawaii, before pilots pulled the plane back up safely.  This incident was not widely reported until June 2024, when news reports stated that the FAA was investigating the incident to see what caused the incident, which included rocking movements that damaged the plane, called a "Dutch roll."  The incident was the result of a pilot attempting to land during inclement weather, when he accidentally pushed forward the control column.  Normally, a plane's yaw dampener would correct the rocking movement that leads to the "Dutch roll," but this plane's dampener apparently did not do so.  The FAA and NTSB began investigating the issue, presumably to determine if a manufacturing flaw contributed to this incident.

400.     On May 23, Boeing's CFO, West, disclosed the Company's expectation of a $4 billion cash burn in the fourth quarter of 2024.

401.     On May 30, Boeing submitted a proposed safety plan to the FAA but offered only a few scant details to the public.  At a press conference announcing receipt of the safety plan, FAA

Administrator Whitaker emphasized: "The 90-day plan . . . is not a finish line. . . .  We will not approve production increases beyond the current cap until we're satisfied," which he estimated would take at least a few months.

402.    Whitaker also emphasized how the FAA would continue to provide enhanced oversight, including meeting with Boeing every week "to review their performance metrics, progress and any challenges they're facing in implementing the changes."  Whitaker further emphasized: "We need to see a strong and unwavering commitment to safety and quality that endures over time.  This is about systemic change, and there's a lot of work to be done."

403.    The FAA's enhanced oversight, however, maintained a feature that caused previous problems—Boeing would set the targets by which it would be measured.  Whitaker confirmed at the press conference that Boeing set six key performance indicators (the "KPIs") by which the FAA would measure improvements.[25]  When asked about details, Whitaker demurred and stated it would be up to Boeing.

404.    In describing the safety plan, COO and BCA CEO Pope stated that it "includes major investments to expand and enhance workforce training, simplify manufacturing plans and processes, eliminate defects at the source, and elevate our safety and quality culture, along with specific measures to monitor and manage the health of our production system."  Pope's email to employees, also published by Boeing, included some details, such as that Boeing added 300 hours of training material and deployed trainers and coaches to the production lines; cleared more time for managers to spend more time on the factory floor by reducing their meetings and tasks; as well as "simplifying 400 quality-related command media[,]" "[i]mplement[ing] quality inspection and

---

[25]  Boeing disclosed the KPIs on its July 31, 2024 earnings call—(i) employee proficiency; (ii) notice of escapes; (iii) supplier shortages; (iv) rework hours; (v) travelers at factory rollout; and (vi) ticketing performance.

approval of 737 fuselages before shipment from supplier," "[r]e-establish[ing] daily compliance sweeps[,]"instituting a "[p]ilot program to make sure airplanes are 'move ready' as way to manage traveled work," and "[r]e-launch[ing] Employee Involvement Teams."

405.   The specific steps Boeing detailed raised more questions, such as why Boeing eliminated "daily compliance sweeps" or "Employee Involvement Teams" in the first place. Similarly, even though the quality issues with Spirit were known for years, Boeing's decision to wait until 2024 to implement inspection and approval of 737 fuselages before shipment from the supplier is troubling.

406.   The FAA's press release regarding what steps it required Boeing to perform also raised further questions, because it indicated that many basic safety measures at Boeing were not implemented before.  For example, the FAA stated, "Boeing is now required to have a mandatory Safety Management System, which will ensure a structured, repeatable, systematic approach to identifying hazards and managing risks."   But this begged the question why an SMS was considered optional before.  Furthermore, the "actions" Boeing was required to take should have been taken beforehand, because they include such elementary items as:

- "Strengthening its Safety Management System, including employee safety reporting";

- "Simplifying processes and procedures and clarifying work instructions";

- "Enhanc[ing] supplier oversight";

- "Enhanc[ing] employee training and communication"; and

- "Increas[ing] internal audits of production system[.]"

407.   On June 1, the *Guardian* reported on the significant safety issues affecting the 787 aircraft that were flown from South Carolina, where they are built, to the Everett facility, where

they are fixed.  One mechanic told the *Guardian*: "There is no way in God's green earth I would want to be a pilot in South Carolina flying those from South Carolina to here. . . .  Because when they get in here, we're stripping them apart."

408.  In early June, Boeing disclosed that it would conduct additional inspections of certain undelivered Dreamliners because fasteners on their fuselages may have been incorrectly installed.

409.  On June 13, 2024, the *Seattle Times* published an article titled "The Rot at the Heart of Boeing."  According to the article:

> Boeing is a great American company, but it is rotting. The rot comes directly from its leadership, leadership that got rich *not* because they are committed to building great airplanes, but by cutting costs and pushing out the skilled engineers who are the lifeblood of the company. Boeing claims to be turning a corner, but its actions betray any real commitment to safety.

410.  On June 14, the FAA announced that it had received 126 whistleblower tips to date in 2024—approximately more than eleven times more than the eleven tips the agency received during the same period in 2023.

411.  On June 18, Calhoun testified before the Senate PSI.  Family members of the victims who died in the MAX Crashes were sitting behind Calhoun in the gallery.  While Calhoun acknowledged that the MCAS was an "engineering" mistake and that the AA Flight 1282 incident resulted from a "manufacturing" mistake, he steadfastly maintained that Boeing had done its utmost to improve safety since the MAX Crashes.  Calhoun insisted that Boeing listened to complaints and did not retaliate against whistleblowers—notwithstanding the numerous whistleblowers that have stated the exact opposite.  Calhoun admitted that Boeing did not adequately cooperate with the congressional investigation.   When Senator Blumenthal characterized Boeing's production to Congress as "gobbledygook," Calhoun agreed with the characterization and admitted that he "can't justify it."

412.    Incredibly, Calhoun testified he was "proud of our safety record" and "proud of every action we've taken." Ignoring the stark evidence to the contrary, Calhoun baldly proclaimed, "I don't think we could have taken any more dramatic steps than we've taken." That statement was knowingly false. Shortly before his testimony, at the end of May, Boeing had presented a safety plan to the FAA identifying far more "dramatic" steps Boeing needed to take.

413.    During the hearing, Senator Blumenthal showed a poster comparing proposed actions in Boeing's new safety plan to the plan it submitted as part of its 2015 settlement with the FAA. Senator Blumenthal excoriated Boeing for doing "virtually nothing" except for "recycling old ideas." Despite the hundreds of lives lost in the MAX Crashes, Boeing had just been churning water for almost a decade.

414.    Senator Blumenthal described Boeing's culture as:

A culture that continues to prioritize profits, push limits, and disregard its workers. A culture where those who speak up are silenced and sidelined while blame is pushed down to the factory floor[.] . . . "A culture that enables retaliation against those who do not submit to the bottom line. A culture that desperately needs to be repaired.

415.    As if to punctuate the jarring disconnect between Calhoun's testimony and Boeing's actual safety record, Boeing planes quickly experienced two more major safety incidents.

- On June 19, a Southwest Airlines Boeing 737-800 came within 525 feet of crashing into an Oklahoma town before regaining altitude, an incident that the FAA is currently investigating.

- On June 23, a Korean Air 737 MAX (series 8) dropped 25,000 feet in five minutes, approximately half-an-hour after takeoff, when it experienced a problem with its pressurization system. Though the plane returned safely, thirteen passengers were hospitalized for injuries.

416.    On June 18, the same day as the hearing, the Senate PSI publicly released a memorandum prepared by its staff (the "PSI Memorandum") that described troubling systemic problems at Boeing.  Among other things, the PSI Memorandum detailed evidence of Boeing: (i) "improperly documenting, tracking, and storing parts that are damaged or otherwise out of specification, and that those parts are likely being installed on airplanes"; (ii) "conceal[ing] evidence from the FAA"; (iii) using a "bootleg form" to track "nonconforming" parts taken from a reclamation area; and (iv) eliminating quality inspections and instead relying on workers building the planes to check their own work.

417.    The PSI Memorandum explained:

Documents and accounts provided by whistleblowers familiar with Boeing's production at facilities in Washington state and Charleston, South Carolina, paint a troubling picture of a company that prioritizes speed of manufacturing and cutting costs over ensuring the quality and safety of aircraft.  These misplaced priorities appear to contribute to a safety culture that insufficiently values and addresses the root causes of employee concerns and insufficiently deters retaliation against employees that speak up.

418.    The first major area the PSI Memorandum highlighted was Boeing's "alarming mismanagement of nonconforming parts."  The PSI Memo explained:

Whistleblower reports spanning more than a decade raise questions about Boeing's ability to timely source and track aircraft parts and ensure that damaged or inadequate parts ("nonconforming parts") are not used in aircraft production.

. . . .

The tracking and disposition of aircraft parts that do not conform to their quality or design specifications is heavily regulated, and criminal penalties apply to knowing or intentional falsification, concealment, or materially fraudulent misrepresentation in connection with records documenting the disposition of aircraft parts.  Aircraft manufacturers are required to maintain a written quality system that includes "[p]rocedures to ensure that only products or articles that conform to their approved design are installed on a type-certificated product.  These procedures must provide for the identification, documentation, evaluation, segregation, and disposition of nonconforming products and articles.  Only authorized individuals may make disposition determinations."  Aircraft manufacturer quality systems must also prescribe "[p]rocedures to ensure that discarded articles are rendered unusable."  At

Boeing, when parts are deemed "nonconforming," they are marked with a red tag or red paint and stored in a secure area of the factory called the Material Review Segregation Area ("MRSA").

419.    In support of these findings, the PSI Memorandum cited evidence provided by Boeing whistleblower Mohawk.  *See supra* ¶¶ 276–78.

420.    On June 27, 2024, the NTSB sanctioned Boeing after Defendant Lund disclosed investigative information concerning the Door Plug Blowout in violation of Boeing's written agreement with the NTSB.  According to Lund, the Door Plug Blowout resulted from a failure to create required paperwork.  When the last crew closed the door plug, they did not know the retaining pins had not been installed because there was no paperwork indicating they should insert the pins.  As a sanction, the NTSB barred Boeing from having further access to the agency's investigative information and prohibited Boeing from asking questions at the NTSB hearing that was scheduled for August.

421.    Lund's unauthorized statements to the press contained a startling admission.  Lund claimed that MAX Crashes led Boeing to reform its engineering practices, and the Door Plug Blowout spurred improvements in the Company's production process.  According to Lund: "When this accident came along, it gave us a chance to look at a different area[.]"  Of course, nothing prevented Boeing from "looking at" this area on its own.  Lund's statement revealed the harsh reality that Boeing was unwilling to make changes to its processes absent a safety incident that garnered major regulatory and press attention.

422.    On July 8, the FAA issued an airworthiness directive requiring the inspection of 2,600 Boeing 737-NG and MAX planes for an issue relating to passenger oxygen masks.  The FAA received multiple reports that these units were shifting out of position, which could keep the units from providing oxygen to passengers in the event of a depressurization.

423.     On August 6 and 7, the NTSB held investigative hearings concerning the Door Plug Blowout.  Highlights from the hearing included the disclosures that:

- In evaluating proposed increases in production rates, Boeing tolerated a "moderate" risk of regulatory action;

- Out-of-sequence work was so common at Boeing that it had its own Business Process Instruction, or BPI;

- Boeing never produced thirty-eight 737 MAX aircraft per month, despite public disclosures to the contrary;

- Boeing did not formally track its employees' training before the Door Plug Blowout;

- Boeing did not require specific training before its employees could remove airplane parts;

- Notwithstanding at least four FAA communications rejecting the practice, Boeing continued to assign quality inspections to manufacturing personnel; and

- Alaska Airlines and the pilots of Flight 1282 did not know the cockpit door would blow off its hinges in the event of a cabin depressurization.

424.     On September 26, the NTSB issued an urgent safety recommendation to Boeing and the FAA concerning defective rudder control components that Collins had delivered to Boeing. Since 2017, Collins had delivered 323 actuators that were assembled in less-than-dry environments.  In the freezing conditions of flight, water in the actuators could freeze—locking the rudders in place.  This phenomenon caused the February 6, 2024 incident where the rudder pedals on a United Airlines 737 MAX 8 stuck during landing.

### S.   Faced with Crushing Regulatory and Public Scrutiny, Boeing Finally Makes Some Long-Overdue Changes.

425.   With lawmakers, regulators, airlines, the public, and even Boeing's largest union (the International Association of Machinists District 751)[26] watching the Board's and management's every move, Boeing finally started to make some long overdue changes.

426.   On January 25, 2024, Boeing's 737 MAX factory teams in Renton, Washington held a "Quality Stand Down."   As Calhoun described it on the Company's January 31, 2024 earnings call, "more than 10,000 teammates across Renton, Seattle and Moses Lake stopped to focus on safety and quality, and only, safety and quality.   This was a quality stand down at a scale we have never done before[.]"   On the same earnings call, Calhoun stated, "We will go slow to go fast and we will encourage and reward employees for speaking up to slow things down if that's what's needed."   West further stated that the FAA's production cap would "allow us to have any of our suppliers that might have been at the line, may have been short of the line, they get a chance to catch up."

427.   On February 1, management reported to the Aerospace Safety Committee that ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████.   Similarly, a February 10 presentation by Pope and Deal to the Board reiterated ██████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████.   A

---

[26] On March 25, 2024, the International Association of Machinists District 751, which represents 32,000 workers at Boeing's factories in Washington, announced it would be seeking a seat on the Board.

February 20 BCA Update to the Board by Deal included ███████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████. Boeing should have made

these changes much earlier.

428.     On February 20, the Board and the Executive Committee members made a site visit

to the Renton, Washington factory that produced the 737 MAX.  According to the Section 220

Production, ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████.

429.     The itinerary for the February 2024 site visit indicates that ███████████████

███████  ███████  ████  ████  ████  ████  ███████  ███████  ███████  ████

██████████████████████████████. Notably, it was not until after this site visit that Boeing

started to get serious about eliminating out-of-sequence work.  This should have occurred much

earlier.

430.     On February 21, Boeing fired Clark, an eighteen-year Company veteran who led

the 737 MAX program.  The same day, Boeing appointed Defendant Lund to serve in the newly

created position of "Senior Vice President Overseeing Quality Control and Quality Assurance

Efforts."  Lund's complicity in the previous problems with the 737 MAX and the Dreamliner raises

questions about her selection to fill this role.  But the role itself was long overdue.

431.     On March 25, Boeing announced that Calhoun would be stepping down as

Company CEO by the end of the year.  Boeing also announced that Defendant Pope had replaced

Defendant Deal as BCA's CEO.

432.     On the same day, Calhoun told CNBC in an interview that Boeing needed to "slow

things down."  Calhoun admitted that Boeing had a "bad habit" of being too focused on moving

planes through the assembly line, which signaled to employees that "the movement of the airplane is more important than the first-time quality of the product." "We have got to get that in way more balance, without a doubt," he added. According to Calhoun, the "premise for going forward" was that "everybody has to be able and capable of raising their hand and stopping a line if they—if they have to." Also in March 2024, Boeing's CFO, West, explained: "For years, we prioritized the movement of the airplane through the factory over getting it done right, and that's got to change[.]" Calhoun's and West's statements were admissions of the obvious—between the Delaware Settlement and the Door Plug Blowout, Boeing continued to prioritize profits over safety, and it did not respect those who tried to stand up for safety.

433.    After the Door Plug Blowout, Boeing was forced to change its tune.

- A February 20, 2024 presentation to the Board referenced ███████████
  ████████████████████████████████████████████████████████
  ██████████████████████████.

- On the Company's April 24, 2024 earnings call, Calhoun stated:

  > We held Quality Stand Downs across all of our production lines in BCA, and sought the advice and counsel of more than 70,000 employees to improve our factory disciplines and adherence to our quality standards. All in all, we collected over 30,000 ideas and the list continues to grow.
  >
  > We have categorized and prioritized all. Employee engagement has been energizing for all. Actions are being taken across all of our factories and areas of focus include: Training, particularly on the job, tacking advantage of our slowdown and adding hundreds of hours of training for each of our manufacturing employees. Tooling, more of it, and improved maintenance. Work instructions, simply, simplify, simplify. Compliance checks. Discipline. Traveled work controls, don't travel work. Incentive structures. Employee listening and maybe above all, culture improvement.

…

> We've extended our commitment to reduce traveled work across all of our assembly lines and deep into our supply chain.  While near-term delivery shortfalls hurt, and will affect our performance during our first half of the year, the long-term benefits from a synchronized supply chain will be substantial.

On the same earnings call, West announced that Boeing had "adjusted the master schedule at a supplier-by-supplier basis."  That was a significant change from 2023, when Calhoun and West repeatedly emphasized that Boeing was sticking to the master schedule notwithstanding supplier problems.

- On April 30, Pope made a presentation to the Board that reported ████ ███████████████████████████████████████████████ ████████████████████████████████████ .

- On the Company's July 31, 2024 earnings call, Calhoun explained that Boeing's production slowdown was reaping quality and safety benefits.

> Every metric gets better when you slow things down.  So, yeah, I don't want to kid anybody.  The step we took to slow things down, it was very deliberate, very straightforward, and every metric benefits from that moment.  So, we've had a step change improvement, traveled work, of course, being the big one.[27]

On the same earnings call, West stated, "we're taking the time now to ensure that our BCA factories are positioned to ramp production in a stable fashion for years to come."

---

[27] On the same earnings call, Calhoun stated: "You'll know when we get out of kilt on any one of those metrics. . . .  Probably the one we'll all just keep our eye on is the traveled work scenario. We cannot allow ourselves to get back into a scenario where we're traveling things too far down the line, and we've got a lot of controls in place, so that won't happen."

434.    The Compensation Committee belatedly adjusted executive compensation metrics somewhat to incentivize quality.  After the change, operational performance (which includes safety and quality metrics) made up 60% of the score to determine annual bonuses in the commercial planes division.  Prior to the Door Plug Blowout, operational performance made up only 25% of the score, with 75% of incentive compensation tied to financial incentives.

435.    The compensation metrics for 2024 included ████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ .

436.    Boeing also ratcheted up pressure on Spirit to produce non-defective fuselages.  In March 2024, Boeing moved an inspection and rework team to Spirit's factory, which reduced the number of non-conformities in Spirit's work product by about 80%.  In April 2024, management estimated for the Board that ████████████████████████████████████████ ███████████████████████████████████████████████████████████████ . On April 29, Pope and Galantowicz explained to the Aerospace Safety Committee that ████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████ .  On the Company's July 31, 2024 earnings call, Calhoun reported that "[o]n-site Boeing inspectors at Spirit increased by almost 3 times the number that we had before January, and defects we initially caught and reworked in Renton are now caught and reworked in Wichita."

437.    Spirit apparently could not survive financially without cutting corners.  On June 25, 2024, Boeing management made a presentation telling the Board that ███████████████████ ███████████████████████████████████████████████████████ .  On July 1, Boeing announced that it would acquire Spirit for approximately $4.7 billion in Boeing stock, as well as assumption of Spirit's debt (for a total of approximately $8.3 billion).  This

acquisition is an important step in undoing the ill-conceived outsourcing bonanza that started with the Dreamliner.  This also should have occurred much earlier.

438.    Boeing's plan to acquire Spirit was an about-face.  When quality issues at Spirit were widely reported in April and August 2023, Calhoun stated: "I don't think you acquire a company to solve it[.]"  In his June 2024 Senate testimony, Calhoun changed his tune and touted how Boeing would better supervise Spirit by acquiring it.  On the Company's July 31, 2024 earnings call, Calhoun asserted that the acquisition of Spirit "would course-correct the decision made decades ago. . . .  By bringing in critical manufacturing work back within our four walls, we can unify our safety and quality management systems, and ensure our engineers and mechanics are working together as one team day in and day out."

439.    The Board and committee materials after the Door Plug Blowout contained significantly more detail on quality and safety issues than the pre-Door-Plug-Blowout materials. For example:

- On April 30, 2024, the Board received a presentation showing that ██████ ████████████████████████████████████████████ ██████████████████████   ██████████████████ ██████. This ██████ metric was not reported to the Board before the Door Plug Blowout.  Nor did the pre-Door-Plug-Blowout reports use the concept of ██████████████████

- Prior to the Door Plug Blowout, Boeing management tracked the KPIs—i.e., (i) employee proficiency; (ii) notice of escapes; (iii) supplier shortages; (iv) rework hours; (v) travelers at factory rollout; and (vi) ticketing performance—internally and reported them to Calhoun.  After the Door

146

Plug Blowout, Lund began reporting the KPIs to the Aerospace Safety Committee.  Boeing also began reporting the KPIs to the FAA.

440.    Prior to the Door Plug Blowout, Boeing employees were not required to receive training on removing and replacing parts before they were authorized to do so.  In fact, Boeing did not formally track the training each of its employees had received before the incident.  After the Door Plug Blowout, Boeing instituted formal training tracking.

441.    On the Company's July 31 earnings call, Calhoun explained that Boeing's first action to improve safety and quality "was to slow things down and control travel work, allowing our supply chain to catch up and provide the buffer we need to improve quality and stabilize deliveries going forward."

442.    The same day, Boeing's incoming CEO—Ortberg—announced that he would base his office in Washington state.  This announcement has led to speculation that Boeing might return its headquarters to Washington state—a move that could be seen as figuratively (and literally) returning the Company to its engineering roots.

443.    The changes above are baby steps.  They may or may not make a significant difference in changing Boeing's broken safety culture.  Retaliation against whistleblowers remains a huge problem at Boeing.

444.    For example, even after the Door Plug Blowout, Boeing managers at the South Carolina factory continued to retaliate against whistleblower Mohawk.  Management made Mohawk the focus of what was "not working" in his department and took actions that were apparently intended to lead to his resignation or firing.  Among other things, management demanded that Mohawk investigate his own allegations of wrongdoing within two days—while he was expected to meet his normal job responsibilities.  Mohawk completed the investigation over the following weekend.  On Monday, the Senior Manager called Mohawk in with a union

steward and accused him of "insubordination" for not completing the investigation by the previous Friday.  "Insubordination" was grounds for termination.  However, the Senior Manager was forced to drop his accusations.  These events occurred in April 2024, well after the Door Plug Blowout.

445.    On May 17, 2024, management issued Mohawk a disciplinary Corrective Action Memo, or "CAM."  Based on Mohawk's warnings that his group's non-compliance could lead to an FAA audit and possible penalties, management accused Mohawk of an "Unacceptable/Disruptive Behavior or Communication" and stated that he failed to treat others "with respect, dignity and trust[.]"  Shockingly, management characterized Mohawks exhortations for regulatory compliance as behavior that caused people to be afraid and feel threatened.  As of June 11, 2024, the South Carolina factory continued to be out of compliance with respect to the loss of non-conforming parts.

446.    On June 1, 2024, the *Guardian* reported that management at Boeing's Everett, Washington, plant were in a "panic" and pressuring employees to keep quiet about quality concerns.

447.    At the NTSB hearings in August 2024, witnesses testified that the Boeing employees who performed the removal that led to the Door Plug Blowout were transferred to Building 421, a separate, smaller building where they were separated from their main teams with no computer access to continue their normal work.  The hearing attendees regarded this transfer to "Boeing Jail" as retaliatory.

448.    Traveled work also remains a problem at Boeing.  In a June 24, 2024 presentation to the Audit Committee, Hostetler, the Chief Compliance Officer, noted that ██████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████.  A June 25, 2024 ███████████ presentation to the

Board by Pope disclosed that ███████████████████████████████████████
████████████████████████████████████████████████████████████████████
███████████████████████████ .

**T.    Boeing Pleads Guilty to a Felony for Failing to Comply with the DPA.**

449.    The DPA was set to expire on January 7, 2024.  The Door Plug Blowout made blindingly clear that Boeing did not comply with it.

450.    On May 14, 2024, the DOJ informed the presiding judge in the DOJ's criminal lawsuit against Boeing (the "Federal Court") that the DOJ "has determined that Boeing breached its obligations under [the] DPA . . . by failing to design, implement, and enforce a compliance and ethics program to prevent and detect violations of US fraud laws throughout its operations."  On July 7, 2024, the DOJ informed the Federal Court that the DOJ and Boeing had reached a plea agreement under which Boeing would plead guilty to a felony charge.

451.    On July 24, the parties filed their proposed plea agreement (the "Plea Agreement"). According to the "Factual Basis for Breach" attachment to the Plea Agreement, Boeing failed to satisfy the DPA requirement to:

- "'create and foster a culture of ethics and compliance with the law in its day-to-day operations,' Attachment C ¶ 1, by failing to mitigate *known* manufacturing and quality risks";

- "implement 'compliance policies and procedures designed to reduce the prospect of violations of U.S. fraud laws and the Company's compliance code,' Attachment C ¶ 3, by failing to design a compliance and ethics program that included sufficient anti-fraud oversight of Boeing's quality and safety processes";

- "implement 'compliance policies and procedures designed to reduce the prospect of violations of U.S. fraud laws and the Company's compliance code,' Attachment C ¶ 3, by failing to implement sufficient controls concerning the risk that Boeing's airworthiness certifications to the FAA could be incomplete, inaccurate, false and/or fraudulent";

- "implement 'compliance policies and procedures designed to reduce the prospect of violations of U.S. fraud laws and the Company's compliance code,' Attachment C ¶ 3, by failing to implement sufficient controls concerning the risk of incomplete, inaccurate, false and/or fraudulent statements in Boeing's manufacturing records"; and

- "appropriately develop and adjust 'compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of the Company,' Attachment C ¶ 4, and to review and update such policies 'as appropriate to ensure their continued effectiveness,' Attachment C ¶ 5, in light of *known* manufacturing and quality risks, and the attendant risks of incomplete, inaccurate, false, and/or fraudulent statements to the FAA."  Plea Agreement, Attachment A-1 (Factual Basis for Breach) ¶ 6 (emphasis added).

452.    The "Factual Basis for Breach" attachment also outlined three areas in which Boeing failed to extend anti-fraud oversight to quality and safety processes: (i) out-of-sequence work; (ii) completeness of records; and (iii) stamping issues in build records.

453.    In addressing Boeing's out-of-sequence work (also known as traveled work), the Plea Agreement explained: "Boeing senior executives prioritized the movement of aircraft through Boeing's factories over reducing out-of-sequence work to ensure production quality."  Plea

Agreement, Attachment A-1 (Factual Basis for Breach) ¶ 9.  The Plea Agreement further explained that "Boeing did not implement sufficient policies or procedures to mitigate the risk posed by out-of-sequence work."  *Id.*  The Plea Agreement confirmed that Boeing management continued to prioritize profits over safety and compliance, a cultural issue that the Board had known about—yet failed to address—since the Company entered into the DPA in 2021.  The DOJ determined that Boeing's utter failure to identify and adjust its compliance program to address the anti-fraud risks associated with out-of-sequence work violated the DPA.

454.    In addressing Boeing's incomplete records, the Plea Agreement explained that "Boeing received numerous reports of incidents of non-compliance with its policy governing removals [of installed parts] throughout the DPA term."  Plea Agreement, Attachment A-1 (Factual Basis for Breach) ¶ 14.  "In addition, since 2019, the FAA has issued numerous formal or informal actions to Boeing related to Boeing's policy governing removals."  *Id.*  Notwithstanding the importance of this issue and the deficiencies, Boeing did not involve its Compliance department sufficiently "in root cause analysis, remediation, or risk mitigation[.]"  *Id.*

455.    In addressing Boeing's stamping issues, the Plea Agreement explained that Boeing:

- "failed to measure employee understanding of" its stamping policy;

- "did not effectively ensure compliance with its stamping policy"; and

- "did not implement enhanced or remedial controls to prevent or detect stamping policy violations."  Plea Agreement, Attachment A-1 (Factual Basis for Breach) ¶ 17.

456.    In the Plea Agreement, Boeing agreed to plead guilty to one count of "conspiracy to defraud the United States, specifically, the lawful function of the Federal Aviation Administration Aircraft Evaluation Group, in violation of Title 18, United States Code,

Section 371." If ultimately approved, the Plea Agreement would require Boeing to, among other things:

- pay a criminal fine of $243.6 million;

- be subject to a government-approved Independent Compliance Monitor for three years; and

- invest at least $455 million in its compliance, quality, and safety programs within three years, which represents an annual increase of 75% over the Company's previously-planned expenditures in this area.

By pleading guilty to a felony, Boeing runs the risk of being barred from federal contracts, which comprise approximately one-third to two-fifths of its total business.

457. On October 11, the Federal Court held a hearing on the Plea Agreement. Families of the MAX crash victims have repeatedly called on the DOJ to bring charges against Boeing and its executives, viewing the DPA and the Plea Agreement as a slap on the wrist. The families have asked the DOJ to seek or impose the maximum fine of almost $25 billion against Boeing, and only waive a portion of the fine if Boeing agrees to an independent corporate monitor and further improvements to its safety program.

**U.  The Proxy Defendants Violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 By Causing Boeing to File Materially Misleading Proxy Statements.**

458. The Director Defendants (except for Soussan) violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by causing Boeing to issue proxy statements that failed to disclose, among other things, grave safety and quality deficiencies in Boeing's airplane manufacturing processes, systemic problems with Boeing's safety culture, and Boeing's oversight failures.

1.     **The 2023 Proxy Defendants Caused Boeing to Issue the Materially False or Misleading 2023 Proxy Statement.**

459.     On March 3, 2023, Director Defendants Bradway, Calhoun, Doughtie, Gitlin, Good, Harris, Johri, Joyce, Kellner, Mollenkopf, Richardson, and Williams (the "2023 Proxy Defendants") caused Boeing to file its annual proxy statement with the SEC in connection with its upcoming annual meeting of shareholders (the "2023 Proxy").  In the 2023 Proxy, the 2023 Proxy Defendants solicited shareholder votes to, among other things, re-elect themselves to the Board and approve executive compensation.  With respect to each of these solicited votes, the 2023 Proxy Defendants issued materially false or misleading statements with knowledge of their falsity or reckless disregard for their truth.

460.     The 2023 Proxy included a section titled "Aerospace Safety and Quality[,]" which stated:

> In 2022, we achieved a series of milestones and extended existing efforts to strengthen our safety practices and culture.  We published our first Chief Aerospace Safety Officer Report, which highlighted significant actions taken on our safety journey—including strengthening our engineering function, enhancing oversight mechanisms, implementing an enhanced Safety Management System, creating a positive safety culture and collaborating with external stakeholders to improve the global aviation safety ecosystem.  We continued our Speak Up program that encourages employees to voice concerns, raise issues and share ideas, and we received twice as many inputs than we did the previous year.

461.     The 2023 Proxy also included a section titled "Compliant and Ethical Business[,]" which stated:

> We are working together to foster a culture of continuous improvement and enhance performance by creating an environment where employees are comfortable identifying gaps, seeking help and speaking up without fear of retaliation.  In 2022, we enhanced our employee reporting capabilities, redesigned high-priority compliance trainings, and emphasized and enforced the Company's anti-retaliation protections.  The Company continued localizing risk management and compliance engagements utilizing site-specific data to identify risk and drive mitigation.  As part of these efforts, we placed Site Compliance and Ethics Officers at major sites and expanded the Ethics Ambassador Program—comprised of emerging leaders

within the business—to listen to employee concerns and promptly elevate issues to site leadership.

462.    The statements outlined above concerning Boeing's enhanced focus on safety and quality control were materially false and misleading because they contradict undisclosed safety and quality failures in Boeing's plane manufacturing and safety culture as a whole, including that: (i) Boeing's SMS systems were ineffective and plagued by employee confusion and skepticism; (ii) the Speak Up program was defective because employees feared retaliation and distrusted the program's anonymity; and (iii) Boeing did not monitor the efficacy of its own safety initiatives with ascertainable performance metrics.

463.    Thus, the 2023 Proxy Statement contained materially false and omissive statements and facts, which deprived Boeing's shareholders of adequate information to make a reasonably informed decision.

### 2.    The 2024 Proxy Defendants Caused Boeing to Issue the Materially False or Misleading 2024 Proxy Statement.

464.    On April 5, 2024, Director Defendants Bradway, Calhoun, Doughtie, Gitlin, Good, Harris, Johri, Joyce, Kellner, Mollenkopf, Richardson, Soussan, and Williams (the "2024 Proxy Defendants") caused Boeing to file its annual proxy statement with the SEC in connection with its upcoming annual meeting of shareholders (the "2024 Proxy").  In the 2024 Proxy, the 2024 Proxy Defendants solicited shareholder votes to, among other things, re-elect themselves to the Board and approve executive compensation.  With respect to each of these solicited votes, the 2024 Proxy Defendants issued materially false or misleading statements with knowledge of their falsity or reckless disregard for their truth.

465.    The 2024 Proxy stated the following:

We continue to enhance oversight of our safety processes and procedures.

The Aerospace Safety Committee assists the Board in the oversight of the safety of company products and services.  The Chief Aerospace Safety Office, which was established in 2021, has developed a comprehensive strategy to strengthen Boeing's safety practices and culture and is collaborating with global regulators, airline operators and other industry stakeholders to improve the aerospace safety ecosystem.

The oversight mechanisms in place include formal lines of communication which ensure safety and potential safety issues are evaluated, discussed and addressed during Safety Reviews with business unit presidents, our Chief Engineer, functional and program leaders and members of the FAA. Nothing is more important at Boeing than safety—in the workplace and in the products we design, build and support.

466.    The statements outlined above concerning Boeing's enhanced oversight and focus on safety above all else were materially false and misleading because they contradicted undisclosed safety and quality failures in Boeing's plane manufacturing and safety culture as a whole, including because the 2024 Proxy Defendants failed to conduct any oversight into whether the Company's "strengthen[ed]" safety initiatives actually worked.  To the contrary, the FAA Expert Report issued a few months before the 2024 Proxy stated that it "could not identify a consistent and clear safety reporting channel or process within the business unit," and concluded that "Boeing is not actively monitoring the efficacy of these initiatives."

467.    Thus, the 2024 Proxy Statement contained materially false and omissive statements and facts, which deprived Boeing's stockholders of adequate information to make a reasonably informed decision.

**V.    The 10(b) Defendants Violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by Knowingly or Recklessly Issuing Materially False and Misleading Statements.**

468.    In violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5, Defendants Amuluru, Bradway, Calhoun, Clark, D'Ambrose, Deal, Delaney, Doughtie, Fava, Fleming, Galantowicz, Gitlin, Good, Harris, Hostetler, Johri, Joyce, Kellner, Lund, Martin, McKenzie, Mollenkopf, Pope, Richardson, Stocker, and Williams (previously defined as the "10(b)

Defendants") issued and/or caused Boeing to issue numerous false and misleading public statements to shareholders.  The 10(b) Defendants knowingly or with reckless disregard made false or misleading statements of material fact and omitted material information concerning the safety of Boeing's airplane manufacturing or stood idly by as Boeing disseminated false or misleading statements of material fact or omitted material information regarding issues over which they have oversight.  These false and misleading statements appeared in annual reports, other filings with the SEC, news media reports, and testimony to federal officials.[28]

469.    The numerous false and misleading statements are identified below.  With respect to the various public filings or other sources, Plaintiffs identify: (i) the materially false or misleading statements in those representations (which are bold and italicized); and (ii) why those statements were false or misleading when made, including the information 10(b) Defendants either misstated and/or failed to disclose.

### 1.    April 29, 2022 – Annual Shareholder Meeting

470.    On April 29, 2022, Defendant Calhoun made the following statements to shareholders during Boeing's Annual Shareholder Meeting:

> ***I often get asked if Boeing has a safety culture.  The answer is yes. It's always been yes.***  Safety absolutely requires culture, but it requires so much more.  It requires organization.  It requires a set of disciplines.  It requires a systematic approach to collecting data from everywhere at all times, and to make sense out of that data so that we can improve our products.  And it requires the humility needed to listen to and incorporate outside perspectives.
>
> It's more than just a desire to be safe.  It's more than just a commitment to put safety ahead of operational goals.
>
> ***It is a set of organizing principles that is real work. It is real engineering.  It is real program management, real systems management.***

---

[28] In a related case, this Court denied motion to dismiss claims under Section 10(b) of the Exchange Act based on the false statements alleged in this Amended Complaint, among others.  *See In re Boeing Co. Securities Litig.*, No. 1:24-cv-151-LMB (E.D. Va. Sept. 6, 2024) (Transcript).

*At Boeing, we've made profound and fundamental changes to our company at every layer and level to improve this type of safety ecosystem — and I'm proud of our progress.*

\* \* \*

The board of directors formed an Aerospace Safety Committee to increase the effectiveness of its oversight of safety in all aspects of our operations. The board has also brought on additional independent directors with deep safety, engineering, piloting and manufacturing experience. On our Executive Council, our management executive council, we established a Chief Aerospace Safety Officer position, and a team in 2021 that aligns critical safety functions under one organization, designed to be separate from day-to-day business operations, maintaining a higher-level focus on safety and driving end-to-end accountability throughout our safety ecosystem. We brought together more than 50,000 engineering teammates into a single, integrated organization to increase transparency, increase our collaboration and increase accountability, while strengthening engineering design practices and decision making. And we launched our four enterprise-wide operations councils focused on enhancing quality, manufacturing, supply chain and program management for each and every program.

*We are also advancing our enterprise-wide Safety Management System built on timely data, analysis and insights to embed safety in every aspect of how we design, how we build and support our products and our services. And we're driving the same focus now within our Quality Management System.*

*We also committed to promoting a Just Culture grounded in humility, inclusion and transparency that protects and treats people fairly and encourages the reporting of safety, quality and compliance concerns.*

As part of our efforts, we have rolled out new reporting tools, launched new efforts to *further enable compliant company performance and introduced our Seek, Speak & Listen habits to foster openness and transparency in all of our employee interactions.*

*We also incorporated product safety, employee safety and quality metrics into our primary annual incentive structures, further driving our focus on safety and quality across the enterprise at every level of the organization.*

471. The statements outlined above concerning Boeing's safety ecosystem, safety culture, and SMS metrics were materially false and misleading because, among other things: (i) Boeing's reporting systems did not function to ensure open communication and non-retaliation and therefore, discouraged identification and mitigation of risks before they became issues;

157

(ii) Boeing's employees did not have a baseline understanding of the Company's SMS systems or their obligations thereunder; (iii) Boeing failed to completely implement its SMS following the MAX crashes; and (iv) Boeing did not monitor the efficacy of its own safety initiatives.

**2.      May 24, 2022 – Boeing Safety Management System Policy**

472.    Around May 24, 2022, Boeing released its SMS policy executed by Defendant Calhoun.  The SMS Policy stated that Boeing's "***Safety Management System ensures the safety, quality and compliance of our products and services for the people who entrust us with their lives when they operate, maintain and fly on our products[,]***" which requires Boeing's "unyielding commitment" to:

> ***a Safety Management System to advance our goals for safety, quality and compliance.***
>
> ***foster a Positive Safety Culture that enables proactive identification and mitigation of risks in order to prevent accidents, injuries, or loss of life.***
>
> ***ensure all employees understand the requirement to report any safety hazard, incident, or concern.***
>
> ***promote a Just Culture that protects and treats people fairly when they openly report safety, quality and compliance concerns.***
>
> ***openly communicate safety actions being taken while appropriately protecting the safety of data and safety information driving those actions.***
>
> ***clearly define the responsibilities of all employees so that everyone understands their roles in ensuring the safety, quality and compliance of our products and services.***
>
> ***eliminate or mitigate potential safety, quality and compliance risks associated with our products and services which must include meeting all applicable requirements and regulations.***
>
> ***use actionable key performance metrics and targets that drive continuous improvement of our Safety Management System.***
>
> ***ensure all employees understand that we all have a daily obligation to pursue safety, quality and compliance as described in this safety policy.***

473. The statements outlined above concerning Boeing's SMS commitments were materially false and misleading because, among other things: (i) Boeing's reporting systems did not function to ensure open communication and non-retaliation and therefore, discouraged identification and mitigation of risks before they became issues; (ii) Boeing employees did not have a baseline understanding of the Company's SMS systems or their obligations thereunder; and (iii) Boeing did not monitor the efficacy of its own safety initiatives with ascertainable performance metrics.

### 3. November 2, 2022 – Boeing Investor Conference

474. On November 2, 2022, Boeing held its 2022 Investor Conference, during which Defendant Calhoun emphasized Boeing's focus on safety:

> *. . . . End of the day, always highest levels of quality and safety, I hope, I hope in light of the actions we've taken, we have given you proof points about how serious we are on safety and quality, our willingness to pause lines our willingness to self-disclose the most minute nonconformances you've ever seen that required the most aggressive rework to ultimately remedy so that we can restart the delivery of our 787s. All of those issues, all of them, self-disclosed, self-examination, post MAX, our willingness to go down that path, our willingness to deal with it and not complain about policies or how strict is strict. I think that's a testament to our determination to see through safety and quality in every way I can think of.*

475. Boeing's Chief Engineer and Executive VP of Engineering, Test & Technology, Gregory Hyslop, also participated in the conference and stated the following:

> *Every week, we have [a] schedule — we have safety reviews in each of the business units. . . . We learn from mistakes. We review the input that comes in from our employee speak up portal.*

476. The statements outlined above concerning Boeing's commitment to quality and safety reporting were materially false and misleading because, among other things: Defendants failed to implement an adequate safety reporting system at all and Boeing's employees declined to use the Company's preferred reporting system due to distrust in the anonymity and system complexity (as identified by the FAA Expert Panel).

### 4.     December 22, 2022 – Boeing "Voices of Safety" Video Series

477.     On December 22, 2022, Boeing published a video series titled "Voices of Safety."

Defendant Calhoun participated in the video series and stated the following:

> We do have an incredibly ambitious and impactful mission as a company: protect, connect, explore the world and beyond.  You can't do any of those things without a complete and total commitment to safety.  *All of us have a deep sense or a deep responsibility associated with safety.  Our job is to understand what that role is that we play and to make certain that we do it to the best of our abilities and that we obey every rule.  Every discipline, no shortcuts, no corners cut.*

478.     Michelle Low, a Senior Regulatory Affairs Engineer and Senior Program Manager at Boeing, also participated in the video series and stated the following on the Company's behalf:

> *Safety is at the heart of everything that we do.  So you can see that now in our improved focus on engineering excellence, in our increased focus on safety oversight, and the way we deal with regulators.  We just want to be open and transparent with them when it comes to safety.  We want to work with regulators hand in hand to enhance the safety of aviation as a whole.  We have taken many steps to improve safety across Boeing in the past few years because we always need to have that stretched target of zero safety accidents and incidents and that one incident is one incident too many.*

479.     The statements outlined above concerning Boeing's increased focus on safety oversight responsibilities were materially false and misleading because, among other things, the Individual Defendants and Boeing prioritized short-term profits and failed to implement or increase effective oversight of mission-critical airplane safety concerns and instead, took a reactive approach to red flags as they occurred.

### 5.     January 27, 2023 – Full Year 2022 Form 10-K

480.     On January 27, 2023, Boeing filed its Form 10-K with the SEC reporting the Company's financial and operational results for the full year 2022 (the "2022 Form 10-K"), which was signed by Defendants Bradway, Calhoun, Doughtie, Gitlin, Good, Harris, Johri, Joyce, Kellner, Mollenkopf, and Richardson.  The 2022 Form 10-K stated the following:

> *Safety, quality, integrity and sustainability are at the core of how Boeing operates. We aspire to achieve zero workplace injuries and provide a safe, open and accountable work environment for our employees. Employees are also required on an annual basis to sign the Boeing Code of Conduct to reaffirm their commitment to do their work in a compliant and ethical manner. We provide several channels for all employees to speak up, ask for guidance and report concerns related to ethics or safety violations. We address employee concerns and take appropriate actions that uphold our Boeing values.*

481.    The statements outlined above in the 2022 Form 10-K concerning Boeing's commitment to safety and positive employee reporting culture were materially false and misleading because, among other thing: (i) Boeing's reporting systems did not function to ensure open communication and non-retaliation and therefore, discouraged identification and mitigation of risks before they became issues; (ii) Boeing employees did not have a baseline understanding of the Company's SMS systems or their obligations thereunder; (iii) Boeing's SMS procedures were complex, in a constant state of change, and were not understood by Company employees—which contributed to employee skepticism over the effectiveness of SMS implementation. Moreover, these statements omitted that Boeing employees who did report such concerns were retaliated against or were not informed of the outcome of their report.

### 6.    April 2023 – Chief Aerospace Safety Officer Report

482.    In April 2023, Boeing published its 2022 Chief Aerospace Safety Officer Report. With respect to Boeing's SMS Policy, the 2022 Chief Aerospace Safety Officer Report stated the following:

> *Boeing is implementing an enterprise-wide Safety Management System (SMS) that is grounded in a positive safety culture that encourages employees to speak up and report hazards and concerns. . . .*

> *Boeing's SMS evaluates data from employee reporting, as well as from the design, build and operation of its products to identify and mitigate product safety risks. The Safety Management System helps the company have the right conversations with people at the appropriate levels to address risks before they become issues.*

*Embedding the SMS into the company's culture and processes involves training all employees on the value of an SMS, the approach to risk management and safety assurance, and the importance of a positive safety culture which is the foundation of this framework.*

483.    The 2022 Chief Aerospace Safety Officer Report also stated the following:

*To further promote a culture of learning and transparency, Boeing is developing a digital experience for employees and stakeholders that will provide an engaging and collaborative forum for discovering and sharing safety information.  This highly interactive and persona-based digital experience will include information on the company's safety journey, Safety Management System, safety assurance processes, and collaboration efforts to ensure the safety of the aerospace system.*

484.    The statements outlined above concerning Boeing's SMS integration are materially false and misleading because, among other things: (i) Boeing's reporting systems did not function to ensure open communication and non-retaliation and therefore, discouraged identification and mitigation of risks before they became issues; (ii) Boeing employees did not have a baseline understanding of the Company's SMS systems or their obligations thereunder; (iii) Boeing's SMS procedures were complex, in a constant state of change, and were not understood by Company employees—which contributed to employee skepticism over the effectiveness of SMS implementation.  Moreover, these statements omitted that Boeing employees who did report such concerns were retaliated against or were not informed of the outcome of their report.

**7.    April 18, 2023 – Annual Shareholder Meeting**

485.    On April 18, 2023, Boeing held its annual shareholder meeting.  At that meeting, Defendant Calhoun made statements intended to mitigate investor concerns regarding the safety of Boeing's airplanes, including the 737 MAX:

*[L]et me start with an update on the 737.  As we shared last week, our fuselage supplier notified us that a non-standard manufacturing process was used on two fittings in the aft fuselage section of certain 737 airplanes.  Once notified by our supplier, we immediately and transparently informed the FAA and focused first and foremost on making a safety determination.  This is not a safety of flight concern and the in service fleet can continue to operate safely . . . .  We are not changing the supplier master schedule, including any anticipated rate increases*

*— and we are comfortable holding buffer stock so that our supply chain can keep its pace.*

*Our commitment to safety transcends all this work.  Over the past three years, we made profound and fundamental changes to strengthen our Safety governance and leadership, including establishing a Chief Aerospace Safety Officer position.*

*We proactively advanced an enterprise-wide Safety Management System — or SMS — to embed safety into the way we design, build and support our products and our services.  We're doing the same within our Quality Management System and are committed to transparency in all that we do.*

486.     The statements outlined above concerning Boeing's increased prioritization of safety and implementation of enhanced safety and quality control processes, including with respect to 737 fuselages, were materially false and misleading because, among other things: (i) Boeing failed to implement safety-related messages and/or behaviors across the entire Company; (ii) Boeing and the Individual Defendants failed to respond to red flags concerning fuselages and waited until 2024 to implement the inspection and approval of 737 fuselages; and (iii) Boeing and the Individual Defendants failed to oversee its suppliers to ensure effective quality control, including Spirit, a supplier which Boeing knew had systemic quality failures because of problems with the 737 fuselages.

**8.     October 25, 2023 – Third Quarter 2023 Earnings Call**

487.     On October 25, 2023, Boeing released its third quarter financial results for 2023. In an earnings call accompanying the results, Defendant Calhoun stated the following:

*Over the last several years, we've added rigor around our quality processes. We've worked hard to instill a culture of speaking up and transparently bringing forward any issue; no matter the size; so that we can get things right for a bright future.*

As a result, we're finding items that we need to resolve.  *They're not newly created defects in the system.  Instead, thanks to the culture we're building, we identified items from the past that we now have the rigor and the focus to fix once and for all.*

488.    During the Q&A portion of the earnings call, Defendant Calhoun responded to a question regarding the constraints on increasing the rate of quality issues with Spirit-manufactured fuselages:

> *I feel like we took a major step forward on relieving that particular constraint, and as you know, that is mostly a conformance constraint.  I've got to tell you, these fuselages, man, they have been gone over with a microscope in light of what we've experienced here in the last 4 months.*

489.    The statements outlined above concerning Boeing's increased rigor of its quality processes and reporting culture, including with respect to 737 fuselages, were materially false and misleading because, among other things: (i) Boeing's reporting systems did not function to ensure open communication and non-retaliation and therefore, discouraged identification and mitigation of risks before they became issues; (ii) the Individual Defendants failed to implement an adequate safety reporting system at all and Boeing's employees declined to use the Company's preferred reporting system due to distrust in the anonymity and system complexity (as identified by the FAA Expert Panel); and (iii) Boeing and the Individual Defendants failed to oversee its suppliers to ensure effective quality control, including Spirit, a supplier which Boeing knew had systemic quality failures because of problems with the 737 fuselages.

### 9.    January 31, 2024 – Fourth Quarter 2023 Press Release

490.    On January 31, 2024, Boeing released its fourth quarter financial results for 2023. In a press release accompanying the results, Defendant Calhoun stated the following:

> The company continues to cooperate transparently with the FAA following the Alaska Airlines Flight 1282 accident involving a 737-9.  Commercial Airplanes is taking immediate actions to strengthen quality on the 737 program, including requiring additional inspections within its factory and at key suppliers, supporting expanded oversight from airline customers and pausing 737 production for one day to refocus its employees on quality.

491.    The statements outlined above concerning Boeing's increased rigor of its safety and quality processes following the Alaska Airlines Flight 1282 accident were materially false and

misleading because, among other reasons: (i) Boeing and the Individual Defendants failed to oversee its suppliers to ensure (let alone increase) effective quality control, including Spirit, a supplier which Boeing knew had systemic quality failures because of problems with the 737 fuselages; and (ii) Boeing failed to strengthen the quality of its 737 program following the Alaska Airlines Flight 1282 incident, including because the Board identified additional, significant risk and fraud risk related to the 737 MAX program which was expected to evolve during 2024.

### W. The 10(b) Defendants Made the Statements with Scienter.

492. The facts, when viewed holistically and together with the other allegations in this Amended Complaint, establish a strong inference of scienter that each of the 10(b) Defendants knew or were severely reckless in not knowing that each of the alleged misrepresentations and omissions was false and misleading at the time it was made. The 10(b) Defendants had ultimate authority over Boeing's and/or their own materially false and misleading statements and, therefore, are culpable for the knowing and/or reckless issuance of the misstatements.

### 1. The 10(b) Defendants Were Aware of Boeing's Safety and Quality Control Issues Due to the Delaware Settlement, the DPA, and SMS.

493. Prior to any of the alleged misstatements, the March 22, 2022 Delaware Settlement provided all the 10(b) Defendants with notice of: (i) the mission-critical nature of airplane safety for Boeing; (ii) Boeing's directors' and officers' oversight responsibilities with respect to mission-critical airplane safety; and (iii) Boeing's systemic problems with airplane safety and safety culture. The 10(b) Defendants were reckless in ignoring this information. Indeed, even as additional red flags arose with respect to the 737 MAX during the pendency of *Boeing I*, the 10(b) Defendants failed to act in any prompt or immediate manner to address severe, near-fatal, and fatal safety issues. The 10(b) Defendants' singular focus on short-term profitability (i.e., keeping the

Company's planes in the air) at the expense of airplane safety and their indifference towards the legal, regulatory, and reputational consequences for Boeing gives rise to an inference of scienter.

494.    Boeing entered into the DPA with the DOJ on January 7, 2021—prior to any of the alleged misstatements.  The DPA required Boeing's directors and officers to, among other things: (i) establish and maintain an effective compliance program; (ii) demonstrate rigorous adherence to, and develop and promote compliance policies aligned with, a corporate policy against violations of U.S. fraud laws and the Company's compliance code; and (iii) foster a Company-wide culture of ethics and compliance.  Along with Defendant Calhoun (who executed the DPA), the remaining 10(b) Defendants were on notice of their responsibilities and the Company's deficiencies outlined in the DPA.  The DPA and the DOJ's determination that Boeing violated the DPA by failing to identify and adjust its compliance program to address anti-fraud risks associated with out-of-sequence work, supports an inference of scienter.

495.    According to the Company's SEC filings, Boeing's senior management—including many of the 10(b) Defendants—were required to report to the Aerospace Safety Committee regarding the performance of Boeing's SMS and additional significant safety initiatives.  This flow of information required Boeing's directors and officers—including the 10(b) Defendants—to receive reporting on Boeing's safety and quality issues and provide reporting on those issues to the Aerospace Safety Committee.  Therefore, the 10(b) Defendants were apprised of the systematic safety and quality issues at Boeing prior to the alleged misstatements, which supports an inference of scienter.

### 2.    The 10(b) Defendants Were Aware of the Mission-Critical Nature of Safety and Quality Issues and Increased Governmental Scrutiny.

496.    The 10(b) Defendants are well aware that aircraft safety is a mission-critical component of Boeing's business—the reputational and financial impact of an aircraft safety and

quality crisis is severe. Indeed, Boeing has more than 10,000 commercial jetliners currently in service with thousands of travelers relying on Boeing aircraft on any given day.

497.   In the first quarter of 2024, Boeing reported a $355 million loss, due in part to spending $4 billion in cash. A large portion of that $4 billion expense came as a result of the Door Plug Blow Out and its related fallout. Boeing's BCA division, which manufactures the 737 MAX and 787, also reported an operating loss of $1.1 billion. These losses came at a time when Boeing was carrying a massive $60 billion debt load and grappling with severe reputational damage as each new safety issue arises. Misrepresenting and omitting information concerning a mission-critical component of Boeing's business supports an inference of scienter.

498.   The significant (and increased) governmental scrutiny further supports an inference of scienter. Boeing's business is heavily regulated in most of the Company's markets. In the United States, Boeing is subject to numerous regulators and agencies, including the FAA. Boeing's commercial aircraft are required to comply with numerous FAA regulations governing design and manufacturing certifications, production and quality systems, airworthiness and installation approvals, repair procedures, and continuing operational safety. The DOJ first opened a criminal investigation into Boeing in January 2019. On January 7, 2021, the DOJ charged Boeing with conspiracy to defraud the United States related to the 737 MAX and simultaneously entered into a DPA with Boeing—which increased reporting and compliance scrutiny on the Company. Less than four years later, the DOJ announced that Boeing would plead guilty to defrauding the United States in violation of the DPA. On March 9, 2024, the DOJ opened yet another investigation into the 737-9 MAX Door Plug Blowout. The 737 MAX's renewed position at the center of a near-catastrophic safety issue brought additional congressional investigations and regulatory inquiries regarding safety and quality failures at Boeing. The 10(b) Defendants are well

aware of the safety and quality deficiencies underlying this increase in governmental scrutiny. Thus, these various investigations support an inference of scienter.

499.    The findings of the various investigations also support an inference of scienter.  On May 14, 2024, the DOJ announced that, in the three years following the MAX Crashes, Boeing had failed to implement the mandated corporate compliance program under the DPA.  Specifically, the DOJ determined that Boeing breached its obligations under the DPA and is now "subject to prosecution by the [United States] for any federal criminal violation of which the [United States] has knowledge[.]"  Additionally, on February 26, 2024, the FAA Expert Panel published its report which found that Boeing did not have a proper SMS and found Company-wide safety and quality control system deficiencies—in violation of federal requirements following the MAX Crashes. Despite a specific mandate by the DOJ, Boeing and the 10(b) Defendants failed to comply with the DPA and additional federal requirements following the MAX Crashes, which supports a strong inference of scienter.

## X.   The 10(b) Defendants' Misstatements and Omissions Cause Boeing To Repurchase Its Stock at Inflated Prices.

500.    As detailed herein, throughout the Relevant Period, the 10(b) Defendants made materially false and misleading statements and omissions which caused Boeing's common stock to become artificially inflated.  The 10(b) Defendants engaged in a scheme to deceive the market and embarked on a course of conduct that operated as a fraud or deceit on Boeing, which repurchased its shares at artificially inflated prices.  As a result of its purchases of Boeing stock during the Relevant Period, the Company suffered damages.

501.    During the Relevant Period, Boeing purchased shares from its employees in connection with its tax withholding obligations upon the vesting of Board-awarded restricted stock units.  According to the "Issuer Purchases of Equity Securities" disclosures in Boeing's SEC

filings,[29] in 2022, Boeing repurchased 207,479 shares of its common stock for $40,305,607.38 as follows:

| Month | Shares | Average Price | Total |
|---|---|---|---|
| January | 2,726 | $211.48 | $576,494.48 |
| February | 127,137 | $201.37 | $25,601,577.69 |
| March | 32,418 | $200.86 | $6,511,479.48 |
| April | 7,197 | $197.00 | $1,417,809.00 |
| May | 2,068 | $146.60 | $303,168.80 |
| June | 1,285 | $136.28 | $175,119.80 |
| July | 4,114 | $135.47 | $557,323.58 |
| August | 3,450 | $166.58 | $574,701.00 |
| September | 1,342 | $159.04 | $213,431.68 |
| October | 4,578 | $138.33 | $633,274.74 |
| November | 2,371 | $142.24 | $337,251.04 |
| December | 18,793 | $181.13 | $3,403,976.09 |
| **Total** | **207,479** | | **$40,305,607.38** |

502.    According to the "Issuer Purchases of Equity Securities" disclosures in Boeing's SEC filings,[30] in 2023, Boeing repurchased 1,745,873 shares of its common stock for $413,440,720.25 as follows:

---

[29] *See* Boeing, Form 10-Q, SEC (Apr. 27, 2022) at 51; Boeing, Form 10-Q, SEC (July 27, 2022) at 55; Boeing, Form 10-Q, SEC (Oct. 26, 2022) at 55; Boeing, Form 10-K, SEC (Jan. 27, 2023) at 19.

[30] *See* Boeing, Form 10-Q, SEC (Apr. 26, 2023) at 45; Boeing, Form 10-Q, SEC (July 26, 2023) at 51; Boeing, Form 10-Q, SEC (Oct. 25, 2023) at 51; Boeing, Form 10-K, SEC (Jan. 31, 2024) at 21.

| Month | Shares | Average Price | Total |
|---|---|---|---|
| January | 124,180 | $172.41 | $21,409,873.80 |
| February | 92,200 | $200.50 | $18,486,100.00 |
| March | 11,912 | $201.79 | $2,403,722.48 |
| April | 8,241 | $211.30 | $1,741,323.30 |
| May | 18,514 | $201.73 | $3,734,829.22 |
| June | 1,486 | $206.60 | $307,007.60 |
| July | 9,832 | $215.14 | $2,115,256.48 |
| August | 7,131 | $226.67 | $1,616,383.77 |
| September | 4,230 | $215.79 | $912,791.70 |
| October | 7,546 | $190.17 | $1,435,022.82 |
| November | 12,373 | $192.12 | $2,377,100.76 |
| December | 1,448,228 | $246.44 | $356,901,308.32 |
| **Total** | **1,745,873** | | **$413,440,720.25** |

503.    Boeing purchased these shares at a time when its stock price was inflated by the false and misleading disclosures described above.  *See supra* Section IV.U–V.  As the 10(b) Defendants' omissions and misrepresentations became apparent to the market, the price of Boeing's common stock fell as its artificial inflation deflated.

504.    On January 5, 2024, immediately before the Door Plug Blowout, Boeing's common stock closed at $249.00.  On January 8, 2024, the next trading day, Boeing's common stock closed at $229.00 per share—reflecting a one-trading-day drop of 8%.  The Door Plug Blowout and the press reporting the incident revealed Boeing's ongoing, major safety issues and caused this stock drop.  The numerous safety issues revealed after the Door Plug Blowout drove down Boeing's stock price even further.

505.    On January 14, 2024, the *Wall Street Journal* reported that the Door Plug Blowout would cause further delays in Boeing's delivery of the 737 MAX aircraft to China Southern Airlines.  Prior to the MAX Crashes and the pandemic, sales to Chinese companies had exceeded

20% of Boeing's total commercial aircraft revenue.  This news caused Boeing's stock to drop from a closing price of $217.70 per share on Friday, January 12, 2024 to an opening price of $210.07 per share on Tuesday, January 16, 2024 and a closing price of $200.52 per share the same day.[31]

506.   Before the market opened on January 30, 2024, news outlets reported that Boeing had withdrawn a request to the FAA for a safety exemption which would permit certification of the 737 MAX 7 despite an issue with the plane's engine de-icing system.  Boeing reportedly withdrew its exemption request due to public pressure following the Door Plug Blowout.  This news caused Boeing's stock to drop from a closing price of $205.19 per share on January 29, 2024 to an opening price of $203.65 per share on January 30, 2024 and a closing price of $200.44 per share the same day.

507.   On March 4, 2024, the FAA announced that its six-week audit of Boeing and Spirit prompted by the Door Plug Blowout had identified multiple instances of Boeing failing to comply with manufacturing quality control requirements.  This news caused Boeing's stock to drop from an opening price of $199.50 per share on March 4, 2024 to a closing price of $196.92 per share the same day.

508.   On March 10, 2024, *Forbes* reported that the DOJ would investigate whether Boeing had complied with the DPA.  The next day, a Jefferies analyst tied the DOJ investigation to the FAA's six-week audit following the Door Plug Blowout.  These reports caused Boeing's stock to drop from a closing price of $198.49 per share on Friday, March 8, 2024, to an opening price of $194.21 per share on Monday, March 11, 2024, and a closing price of $192.49 per share the same day.

---

[31] Due to Martin Luther King, Jr. Day, January 16, 2024 was the first trading day after January 12, 2024.

509.    On March 11, 2024, the *New York Times* reported that it had reviewed a source document related to the FAA's six-week audit of Boeing.  The *New York Times* further reported that Boeing had failed 33 of 89 product audits, with Spirit failing 7 of 13 product audits.  The next day, analysts unpacked the import of this new information, including in analyst reports from RBC and Jefferies.  This news caused Boeing's stock to drop from a closing price of $192.49 per share on March 11, 2024 to an opening price of $188.24 per share on March 12, 2024 and a closing price of $184.24 per share the same day.

510.    After the markets closed on May 9, 2024, news outlets reported that the SEC was investigating Boeing's disclosures about its safety practices in light of the Door Plug Blowout.  This news caused Boeing's stock price to drop from its closing price of $181.25 per share on May 9, 2024 to a closing price of $178.51 per share on May 10, 2024.

511.    After the markets closed on May 14, 2024, news outlets reported that the DOJ had determined that Boeing had breached the DPA.  This news caused Boeing's stock price to drop from its closing price of $180.76 per share on May 14, 2024 to a closing price of $176.99 per share on May 15, 2024.

512.    The Compensation Committee expressly recognized the relationship between the revelation of Boeing's broken safety culture and the drops in the Company's stock price.  The proxy statement for the 2024 annual meeting of shareholders disclosed that the Compensation Committee chose to reduce each Boeing "executive's long-term incentive award by the percentage decline in the Company's stock price between January 5, 2024 (the day of the Alaska Airlines Flight 1282 accident) and the grant date."   The Boeing Co., Definitive Proxy Statement (Schedule 14A) at 67 (Apr. 5, 2024).  The proxy statement further explained: "This decision was implemented to hold our leadership team accountable for the decline in our stock price following

the accident, and resulted in an approximately 22% reduction in long-term incentive grant values as compared to target values for our senior leadership team." *Id.*

513.    Boeing was harmed by repurchasing Company common stock at artificially inflated prices.  Notably, many of the restricted stock units Boeing bought back were held by the Individual Defendants.  The Individual Defendants unjustly benefitted when Boeing repurchased their shares at inflated prices.

### Y.    The Individual Defendants' Breaches of Fiduciary Duty Lead Directly to the Latest Boeing Corporate Trauma.

514.    The Individual Defendants' bad-faith failures to adequately oversee Boeing's quality and safety functions led directly to the Door Plug Blowout and the resulting fallout.  As described by Nell Minow ("Minow"), vice chair of ValueEdge Advisors and noted authority on corporate governance, Boeing is a "serial offender" that "doesn't learn from past mistakes." Minow further explained, "[i]t's a bad board, and it has been a bad board for a long time."

515.    Glass Lewis advised against electing Defendant Kellner to the Board in 2021 and 2022, given his role as Audit Committee Chair during the MAX Crashes.  However, Kellner remained the Board Chair through the Door Plug Blowout.

516.    As a result of the Individual Defendants' bad-faith failure of oversight, Boeing suffered hundreds of millions of dollars in harm.  The Door Plug Blowout—and the broken culture that led to it—damaged Boeing's all-important relationship with its regulators.  Following the Door Plug Blowout, the FAA capped Boeing's production at thirty-eight 737 MAX planes per month.  That cap is still in place.  The FAA has made clear that Boeing's quality control monitors "need to be in the green" before the FAA will permit increased production.

517.    In June 2024, FAA Administrator Whitaker admitted to Congress that, previously, "the FAA's approach was too hands-off, too focused on paperwork audits and not focused enough

on inspections. . . .   We have changed that approach over the last several months, and those changes are permanent."   The FAA has increased the number of personnel performing in-person inspections at Boeing and Spirit factories.   The sorry state of compliance at Boeing, coupled with the FAA's tightened scrutiny, has prevented Boeing from getting close to the production cap.   In July 2024, Boeing produced only ███████ 737 MAX planes.[32]

518.    Boeing should have been deliberate after the MAX Crashes—slowing down its production to address its manifest and serious manufacturing issues.   That approach would have allowed Boeing to safely ramp up its 737 MAX production, and Boeing likely would be at higher production levels today.   While Boeing does not publicly disclose the per-plane profitability of the 737 MAX, in 2019, Moody's estimated that Boeing makes as much as $15 million per plane delivered.   Thus, for every ten fewer 737 MAX planes Boeing delivers, Boeing likely loses out on more than $150 million in profits.

519.    The Door Plug Blowout—and the broken culture that led to it—damaged Boeing's relationships with its customers.   Orders for the 737 MAX plummeted after the Door Plug Blowout.   In January 2024, Boeing had zero net orders for 737 MAX planes.   This had not occurred since January 2021, during the COVID-19 pandemic.   In contrast, in the prior month (December 2023), Boeing booked 301 sales of 737 MAX planes.   Lurching from crisis to crisis caused Boeing to lose ground to Airbus.   According to United Airline's CEO, "I think the MAX 9 grounding is probably the straw that broke the camel's back for us . . . . We're going to build a plan that doesn't have the MAX 10[.]"

---

[32] A February 20, 2024 management presentation estimated ████████████████████████ ██████████████████████████████████.   That estimate was about a month-and-a-half after the door plug blowout and preceded many of the FAA's most serious statements about Boeing.

520.    The Door Plug Blowout—and the broken culture that led to it—caused, and will cause, Boeing to burn significant cash.  Boeing paid Alaskan Airlines more than $150 million for the temporary grounding of its planes after the Door Plug Blowout.  If approved, the Plea Agreement will require Boeing to pay a $243.6 million fine and spend at least $455 million on its compliance program over three years.

521.    The Door Plug Blowout—and the broken culture that led to it—damaged Boeing's relationship with its lenders.  After the Company announced its 2024 first-quarter results, Moody's downgraded its debt to its lowest investment-grade rating, Baa3.  In fact, all three of the major credit rating agencies—S&P Global Ratings, Moody's, and Fitch Group—have reduced Boeing's credit rating to Baa3 or BBB-minus since April 2024.  And all three have lowered their outlooks for Boeing to "negative."  In May 2024, Boeing issued $10 billion in new debt.

522.    The Door Plug Blowout—and the broken culture that led to it—damaged Boeing's effectiveness at attracting top talent.  On March 25, 2024, Boeing announced that Calhoun would step down as CEO.  Boeing approached various candidates, including General Electric CEO Larry Culp and current Board member David Gitlin, but they declined to take over as the Company's CEO.  It is reasonable to infer that the toxicity of Boeing's brand caused these candidates to pass.  The candidate that finally accepted the job—Ortberg—came from the company that developed the MCAS that caused the MAX Crashes.

523.    The Door Plug Blowout—and the broken culture that led to it—damaged Boeing's image with the flying public.  Certain travelers have lost so much faith in Boeing that they arrange their schedules to avoid flying on Boeing planes.

524.    The public's concern about Boeing's safety record made every negative event involving a Boeing plane a newsworthy event.  Before the Door Plug Blowout, some of the incidents with Boeing planes—like the March 11 Dreamliner nosedive that threw passengers into

the ceiling, the May 25 dive that almost smashed a 737 MAX into Hawaii, the June 23 incident that hospitalized thirteen people, and the June 19 incident that almost smashed a 737 MAX into an Oklahoma town *see supra* ¶¶ 365, 415—might have made national headlines. But after the Door Plug Blowout, almost any incident involving a Boeing plane made national headlines. These incidents included:

- On January 14, 2024, an ANA Boeing 737 plane had to turn around and land in Japan after a crack was found on the cockpit window midair;

- On February 6, after landing at Newark Liberty International Airport, United Airlines Boeing 737 MAX pilots experienced failure of rudder controls, and pedals on the plane were stuck as they tried to keep the plane in the center of the runway during landing;

- On February 21, a United Airlines Boeing 757 had to land in Denver due to wing damage. Boeing officials said the plane landed to "address an issue with the slat" on one of its wings;

- On March 15, a United Airlines Boeing 737 plane landed in Medford, Oregon, where it was discovered that a panel from the plane was missing. The panel is believed to have fallen off the plane mid-flight;

- On March 7, a United Airlines Boeing 777 plane lost a tire after takeoff that same day, forcing the pilot to make an abrupt landing at Los Angeles International Airport;

- On March 18, an Alaska Airlines Boeing 737 plane landed and cracked its windshield in Portland, Oregon;

- On April 7, a Southwest Airlines Boeing 737 MAX plane experienced an engine cover fly off and strike a wing flap during takeoff. The plane was forced to immediately return to Denver International airport and was placed out of service for maintenance review;

- On May 22, a United Airlines Boeing 737 MAX plane made an emergency landing at Denver International Airport due to a potential mechanical problem;

- On May 27, a Virgin Atlantic Boeing 787-9 was forced to turn back mid-flight after its windscreen cracked at 40,000 feet. At that altitude, the plane could not have been hit by a bird; instead, this appears to be a manufacturing or design defect where the glass could not withstand the cold temperature at that altitude;

- On June 14, a Sun Country Airlines Boeing 737's engine shut down on a flight from Seattle to Minneapolis St. Paul. The shutdown forced the aircraft to divert to Spokane for an emergency landing; and

- On June 23, a KLM Boeing 777 returned to Amsterdam after taking off because of unspecified technical problems.

The widespread reporting of those incidents showed the public's grave concerns about the safety of Boeing's planes.

525. In addition to the regulatory, settlement, borrowing, reputational, and other costs mentioned above, Boeing incurred significant costs for maintaining and reworking its defective planes. According to *Fortune*, Boeing still has 200 737 MAX aircraft and 50 Dreamliners in inventory. According to Calhoun, those planes take more time to maintain than to manufacture.

This large inventory is in large part due to Boeing constantly having to pause production and delivery to fix repeated quality issues.

526.    Boeing's strategy of rushing production to increase profits was ostensibly intended to help shareholders.  In reality, rushing helped only the Company managers and employees who received incentive compensation based on speed.  While Company managers and employees who cut corners received significant incentive compensation, the Company and its shareholders paid the price.  At the June 18, 2024 PSI hearing, Calhoun acknowledged that Boeing had produced no profits since he became CEO.  In response to a question, he could not explain why he deserved a $33 million compensation package in 2023—a 45% increase over 2022.  The other Individual Defendants—especially the other Officer Defendants—also received unjustified compensation by sacrificing safety and compliance in the pursuit of profits.

527.    In the first quarter of 2024, Boeing reported a loss of $355 million, due in part to spending $4 billion in cash.  A large portion of those expenses was resulted from the Door Plug Blowout and its related fallout.  Boeing's BCA division, which manufactures the 737 MAX and the 787 (among other planes), reported an operating loss of $1.1 billion.

528.    Boeing's struggling financial performance comes at a time when Boeing is carrying a heavy $60 billion debt load.  On October 1, 2024, *Bloomberg* reported that Boeing was considering raising at least $10 billion by selling new stock.  This report followed statements from Boeing's CFO on the Company's last earnings call that Boeing wanted "to prioritize the investment grade credit rating."  On October 14, the *Financial Times* reported that Boeing planned to bolster its balance sheet with up to $35 billion in new liquidity—consisting of a $10 billion credit facility and up to $25 billion of new equity.

529.    Damages to the Company could total several billion by the time this latest scandal runs its course.  In April 2024, management estimated that ███████████████████████████



██████████████████████████████████████. Management later ████████████████████████████████████████. In August 2024, management explained to the Board that ███████████████ ████████████████████████████████████████████████ ████████████████████████████. One financial stress test presented to the Board assumed ███ ██ █ ██ █ █ ██ █ █ ██ ██ ██ ████ ████████████████████.

## V.   DERIVATIVE ALLEGATIONS

530.   Plaintiffs bring this action derivatively in the right and for the benefit of Boeing to redress the breaches of fiduciary duty and other violations of law committed by the Individual Defendants, as alleged herein.

531.   Plaintiffs have named Boeing solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

532.   Plaintiffs will adequately and fairly represent the interests of Boeing and its shareholders in enforcing and prosecuting the Company's rights, and Plaintiffs have retained counsel experienced in prosecuting this type of derivative action.  Plaintiffs have continuously held Boeing stock throughout the Relevant Period and will continue to hold Boeing stock through the resolution of this Action.

## VI.   DEMAND FUTILITY ALLEGATIONS

533.   Plaintiffs did not make a pre-suit litigation demand on the Board asserting the claims alleged herein because such a demand would have been futile and, therefore, is excused as a matter of law.

534.   Boeing is a Delaware corporation, so Delaware law governs what constitutes a demand and when the demand requirement should be excused.  *See, e.g.*, *Garnitschnig v. Horovitz*,

48 F. Supp. 3d 820, 829 (D. Md. 2014); *see also Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 101–07 (1991).

535.    The Demand Board consists of eleven of the Director Defendants: (i) Bradway; (ii) Calhoun;   (iii) Doughtie;   (iv) Gitlin;   (v) Good;   (vi) Harris;   (vii) Johri;   (viii) Joyce; (ix) Mollenkopf; (x) Richardson; and (xi) Soussan.  The Demand Board lacks a disinterested and independent Board majority that could impartially consider a litigation demand concerning any of the claims alleged in this Amended Complaint.

536.    Delaware law applies a director-by-director "three-part test as the universal test for assessing whether demand should be excused as futile." *Zuckerberg*, 262 A.3d at 1057–58.  The three-part test asks with respect to each director on the Demand Board: "(i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand; (ii) whether the director would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand; and (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that is the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand." *Id.* at 1058.  "If the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile." *Id.* at 1059.

537.    Here, demand is futile with respect to each count of this Amended Complaint because each director on the Demand Board faces a substantial likelihood of liability on the relevant claims under the second prong of the *Zuckerberg* demand futility test.  To understand why, it is important to understand the fiduciary duties the directors owed.

538.    As directors of a Delaware corporation, the directors on the Demand Board owed fiduciary duties of loyalty (including its subsidiary element of good faith) and care to Boeing and

its shareholders.  In overseeing the Company, the directors were required to pursue the best interests of Boeing and all of its shareholders, without regard to their personal interests or any other motivation.

539.   Delaware does not charter lawbreakers.  The Delaware General Corporation Law limits a Delaware corporation to pursuing only "lawful business" through "lawful acts."  *See* 8 *Del. C.* §§ 101(b), 102(a)(3).  Accordingly, a Delaware corporation may not operate a business plan that shirks regulatory compliance in favor of higher profits.  As a recent Chief Justice of the Delaware Supreme Court put it while serving as a Vice Chancellor on the Delaware Court of Chancery, "a fiduciary of a Delaware corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profit by violating the law."  *In re Massey Energy Co.*, C.A. No. 5430-VCS, 2011 WL 2176479, at *20 (Del. Ch. May 31, 2011) (Strine, V.C.).

540.   Corporate officers who pursue such a business plan intentionally or in a grossly negligent manner breach their fiduciary duties and are liable to the corporation and its shareholders for any resulting corporate trauma.  Likewise, corporate directors who in bad faith authorize or allow management to pursue such a business plan are liable to the corporation and its shareholders for any resulting corporate trauma.  When directors are on notice that management cannot pursue its business plan and still comply with the law, they must require management to change its business plan and bring the corporation back into compliance.

541.   Numerous federal laws and regulations govern Boeing's obligations with respect to ensuring aircraft safety and quality, as well as documenting its manufacturing process to ensure that aircraft were manufactured correctly and safely.  One important statute for Boeing's business is 18 U.S.C. § 38 – Fraud involving aircraft or space vehicle parts in interstate or foreign commerce.  That statute provides in relevant part:

a)    Offenses.—Whoever, in or affecting interstate or foreign commerce, knowingly and with the intent to defraud—

(1)

(A)    falsifies or conceals a material fact concerning any aircraft or space vehicle part;

(B)    makes any materially fraudulent representation concerning any aircraft or space vehicle part; or

(C)    makes or uses any materially false writing, entry, certification, document, record, data plate, label, or electronic communication concerning any aircraft or space vehicle part;

(2)    exports from or imports or introduces into the United States, sells, trades, installs on or in any aircraft or space vehicle any aircraft or space vehicle part using or by means of a fraudulent representation, document, record, certification, depiction, data plate, label, or electronic communication; or

(3)    attempts or conspires to commit an offense described in paragraph (1) or (2), shall be punished [with fines of up to $20 million per violation if the offender is an entity, such as Boeing].

542.    Another important statute for Boeing's business is 49 U.S.C. § 106, the statute creating the FAA.  Pursuant to its rulemaking authority, the FAA has established regulations that govern airplane manufactures like Boeing.  Key FAA regulations require that:

- Aircraft manufacturers maintain a quality management system "that ensures that each product and article conforms to its approved design and is in a condition for safe operation."  14 C.F.R. § 21.137.

- The quality management system include "[p]rocedures for inspections and tests."  14 C.F.R. § 21.137(e).  After a manufacturer designs these procedures and secures FAA approval for them, the manufacturer must "[m]aintain the quality system in compliance with" those procedures. 14 C.F.R. § 21.146(b).

- The quality management system include "[p]rocedures to ensure that only products or articles that conform to their approved design are installed on a type-certificated product. These procedures must provide for the identification, documentation, evaluation, segregation, and disposition of nonconforming products and articles. Only authorized individuals may make disposition determinations." 14 C.F.R. § 31.137(h)(1). Quality systems must also include "[p]rocedures to ensure that discarded articles are rendered unusable." 14 C.F.R. § 21.137(h)(2).

543. The Aircraft Certification Reform and Accountability Act of 2020 (H.R. 8408, 116th Cong. (2019-2020)) requires ODA holders like Boeing to, among other things, submit Safety Management Systems to be approved by the FAA and submit to an expert review of their safety management processes.

544. Title 49, Section 42121(a)(1) of the U.S. Code prohibits retaliation against employees of contractors of air carriers, such as Boeing, for complaints about activities that they reasonably believe violate an FAA order, regulation, or standard.

545. During the Relevant Period, Boeing's directors did not fulfill their fiduciary duty to ensure that Boeing was pursuing profits legally. They did not even make a good faith effort to do so.

546. Boeing's directors knew that Boeing had a history of pushing profits at the expense of regulatory compliance and safety. The MAX Crashes in 2018 and 2019—and the legal and regulatory firestorm that ensued—put a spotlight on Boeing's toxic culture of non-compliance and retaliation against those who pursued compliance. Six of the directors on the Demand Board— Bradway, Calhoun, Good, Johri, Mollenkopf, and Richardson—approved the DPA and its strict requirements regarding changes to Boeing's compliance approach. According to the DPA, the

Board had been "extensively briefed on discussions with the Fraud Section regarding an agreement to resolve" the criminal Information, including by being "informed of the principal terms of the [DPA] by the Chief Legal Officer of the Company and agreed that the Company should enter into an agreement on those terms."

547. Nine of the directors in the Demand Board—Bradway, Calhoun, Doughtie, Good, Harris, Johri, Joyce, Mollenkopf, and Richardson—approved the *Boeing I* settlement and its corporate governance changes. The Demand Board understood that Boeing had to strictly comply with the DPA and the *Boeing I* settlement agreement.

548. Instead of tracking the Company's compliance with the DPA, the directors sat on their hands and accepted management's vague statements about the Company's compliance efforts. Management was all too happy for the Board to remain supine. Management provided one set of reports to the DOJ, while providing slanted and insubstantial reports to the Audit Committee. The Audit Committee then presented a biased report to the Board. As a result of the Board's failure of oversight, Boeing breached the DPA and was forced to plead guilty to a felony.

549. The DPA and the corporate governance reforms in the *Boeing I* settlement agreement should have solved the problem. In fact, they merely led to Boeing's directors and officers paying lip service to safety and compliance. Management created new programs on paper and parroted safety buzzwords. The Board and its committees received more documents before meetings. Those documents took production quotas and financial performance very seriously, but they were biased and largely fluff when it came to safety and quality. When the documents actually presented substantive information on safety and quality, they showed that Boeing's paper programs were not solving serious problems. The directors consciously disregarded their duties and did not seriously attempt to respond to the red flags.

550.    The paper programs did not work because the tone at the top never changed.  Senior management never stopped pushing Boeing's employees to produce more and more planes on schedules that Boeing's workforce could not safely meet.  When significant quality and safety issues arose, senior management was never willing to let workers slow down long enough to fix them.  Instead, Boeing rewarded workers who kept production schedules by any means necessary, while retaliating against workers who tried to slow the process down to fix safety and quality issues.  Boeing kept the crazy cycle going by routinely cutting corners and violating the law.

551.    The Board let it happen.  It remained inactive despite repeated confirmations that Boeing could not meet management's profit goals and still comply with the law.  The DPA and the *Boeing I* settlement agreement by themselves could not fix Boeing's board rot.  The directors had to want to change.  They did not.  As one commentator described the situation in 2024, Boeing is a "serial offender" that "doesn't learn from past mistakes. . . .  It's a bad board, and it has been a bad board for a long time."

552.    Predictably, Boeing's recidivist behavior led to more serious safety incidents that damaged Boeing's relationship with regulators, lawmakers, lenders, the media, and the public.  Boeing's directors and officers kept the lucrative compensation they received, while Boeing and its shareholders footed the bill.

553.    In addition to their general common law fiduciary duties owed to the Company and its shareholders, the directors on the Demand Board were further bound by Company policies and guidelines.

554.    The Boeing Code of Conduct (the "Code of Conduct") states in relevant part:

> At The Boeing Company, our first commitment is to the people and customers who rely on our products and services to protect, connect, and explore our world and beyond.  We are each personally responsible for honoring that commitment and for serving as stewards of our company's legacy of aerospace excellence and innovation.  We do that by committing to our values, and by holding ourselves to

the highest standards of conduct in how we do our work, and how we treat one another. We understand that observing the highest ethical business standards is not only the right thing to do, but is critical to our long-term success as a company.

I commit that:

- *I will comply with all applicable laws, rules, and regulations.* If I do not understand them, I will seek guidance.

- *I will prioritize safety, quality, and integrity above profit, schedule, or competitive edge.* If I see something that raises a safety concern, I will speak up immediately.

- I will engage all regulators—including employees who act under delegated authority—and customers with candor, transparency, and respect at all times.

\*\*\*

- *I will promptly report any illegal, improper, or unethical conduct* to my management or through other appropriate channels.

(Emphasis added.)

555. The Boeing Company Code of Ethical Business Conduct for Members of the Board

of Directors states in relevant part:

This Code is intended to focus the Board and each Director on areas of ethical risk, provide guidance to help them continue to effectively recognize and deal with ethical issues, enhance existing mechanisms to continue the reporting of unethical conduct, and help to continue to foster and sustain a culture of honesty and accountability. *Each Director must comply with the letter and spirit of this Code.*

\*\*\*

No code or policy can anticipate every situation that may arise. Accordingly, this Code is intended to serve as a source of guiding principles. Directors are encouraged to bring questions about particular circumstances that may implicate one or more of the provisions of this Code to the attention of the Chair of the Board or the Chair of the Governance & Public Policy Committee, each of whom may consult with inside or outside legal counsel as appropriate.

\*\*\*

Compliance with Laws, Rules and Regulations; Fair Dealing

*Directors shall comply with all applicable laws, rules and regulations*, including insider-trading laws. Transactions in Company securities are governed by the Company's Insider Trading Procedure (Procedure 12). Directors shall deal fairly

with the Company's employees, customers, suppliers, regulators and competitors. Directors shall not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice.

Encouraging the Reporting of any Illegal or Unethical Behavior

*Directors shall continue to promote ethical behavior and take steps to ensure that the Company continues to (1) encourage employees to talk to supervisors, managers and other appropriate personnel when in doubt about the best course of action in a particular situation; (2) encourage employees to report actual or suspected violations of laws, rules, regulations or the Company's Code of Conduct and improper or unethical behavior to appropriate personnel or through other appropriate channels; and (3) inform employees that retaliation of any kind against anyone who speaks up to report a concern will not be tolerated.*

Compliance Procedures

Any suspected violations of this Code should be communicated promptly to the Chair of the Board or the Chair of the Governance & Public Policy Committee.

(Emphasis added.)

556.   The Board's Corporate Governance Principles state in relevant part:

The Board of Directors (the "Board") of The Boeing Company ("Boeing" or the "Company") has adopted the following corporate governance principles (the "Principles") to assist the Board in the exercise of its responsibilities and, along with Boeing's Certificate of Incorporation and By-Laws and charters of the committees of the Board, provide an effective framework for Boeing's governance.

\*\*\*

Boeing's business is conducted by its employees, managers and officers, led by the Chief Executive Officer ("CEO"), *subject to the oversight of the Board.* Directors' basic responsibility is to exercise their business judgment to act in what they reasonably believe to be the best interests of the Company and its shareholders. The Board selects the CEO and works with the CEO to both elect/appoint other officers and ensure that the long-term interests of the Company and its shareholders are being served. The Board and the officers recognize that the long-term interests of the Company and its shareholders are advanced when they take into account the concerns of employees, customers, suppliers and communities.

(Emphasis added.)

557.   During the Relevant Period, Demand Board members Gitlin, Harris, Joyce, and Richardson served on the Aerospace Safety Committee. Joyce served as committee Chair during

the Relevant Period.  The Aerospace Safety Committee Charter provides that the Aerospace Safety Committee is responsible to "assist[] the Board in the oversight of the safe design, development, certification, production, maintenance, and operations, of the aerospace products and services of the Company."   Among other things, the committee is responsible to review and make recommendations to the Board concerning Boeing's:

- Safety Management System;

- Quality Management System;

- Policies and processes for engaging with the FAA and other regulators;

- Engineering organization and processes;

- Product development programs as they relate to technical, compliance, or product safety considerations;

- Participation in regulatory investigations;

- ODA program, including the selection and removal of Boeing's ODA Ombudsperson;

- Speak Up program; and

- Instructions from, and communications with, the FAA.

558.    The Aerospace Safety Committee serves as a forum for directors to communicate directly with Boeing senior management.  It also consults with, and provides input to, the Compensation Committee on the annual performance evaluation of the CEO and other executive officers.  It also assesses the adequacy of, and need for, additional continuing director education programs relevant to the committee's responsibilities.

559.    During the Relevant Period, Demand Board members Doughtie, Good, and Johri served on the Audit Committee.  Johri served as Chair in 2021, 2022, and 2023.  Doughtie became

Chair in 2024. The Company's Audit Committee Charter provides that the Audit Committee is responsible to assist the Board in the oversight of, among other things:

- Boeing's internal control environment and compliance with legal and regulatory requirements; and

- Boeing's processes for assessing key strategic, operational, and compliance risks.

560. Among other things, the Audit Committee is to:

- "Review the effect of regulatory and accounting initiatives, as well as off-balance-sheet structures, on the financial statements of the Company";

- "Discuss with management the Company's policies, practices and guidelines with respect to risk assessment and risk management, including assessing key strategic, operational and compliance risks";

- "Meet with the [Chief Compliance Officer] to review the Company's ethics and business conduct programs and the Company's compliance with related laws and regulations"; and

- "Review significant pending and threatened litigation".

561. The Audit Committee is also to report to the Board on:

- Boeing's compliance with legal or regulatory requirements; and

- The implementation and effectiveness of the Company's ethics and compliance programs to support the Board's oversight responsibility.

562. Here, the Audit Committee received reports regarding the DPA. The committee also received annual written reports from Boeing's auditors. The committee also reviewed and discussed with management and the independent auditors the Company's Form 10-K and Form 10-Q filings with the SEC. The firm's internal quality-control procedures;

563.    The Governance and Public Policy Committee Charter provides that the Governance and Public Policy Committee is responsible to make recommendations to the Board concerning, among other things:

- The general responsibilities and functions of the Board and its members;

- The Board's procedures and operations; and

- The organization and responsibilities of the committees of the Board.

564.    During the Relevant Period, Demand Board members Doughtie, Good, Joyce, and Mollenkopf served on the Compensation Committee.  The Compensation Committee Charter provides that the Compensation Committee is responsible to:

- "[A]nnually review and approve, either as a Committee or together with the other independent directors as directed by the Board, the individual elements of total compensation for the Chief Executive Officer ('CEO') and other executive officers including base salary, incentive awards, equity-based awards, and any other long-term incentive awards";

- "Review and approve corporate goals and objectives relevant to CEO compensation and evaluate the CEO's performance in light of those goals and objectives (in each case, together with the Governance & Public Policy Committee), and after consultation with the Aerospace Safety Committee and together with the other independent directors, determine and approve the CEO's compensation based on this evaluation"; and

- "Review and, after consultation with the Aerospace Safety Committee in connection with the safety review portion of performance evaluations, approve individual performance scores for executive officers other than the CEO."

565.    The following chart shows the Demand Board members' service on the Audit, Compensation, and Aerospace Safety Committees during the Relevant Period.

| Demand Board | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|
| Bradway | | | | Compensation |
| Calhoun | | | | |
| Doughtie | Audit | Audit | Audit; Compensation | Audit; Compensation |
| Gitlin | | Aerospace Safety | Aerospace Safety | Aerospace Safety |
| Good | Audit; Compensation | Audit; Compensation | Audit; Compensation | Audit; Compensation |
| Harris | Aerospace Safety | Aerospace Safety | Aerospace Safety | Aerospace Safety |
| Johri | Audit | Audit | Audit | Audit |
| Joyce | Aerospace Safety; Compensation | Aerospace Safety; Compensation | Aerospace Safety; Compensation | Aerospace Safety |
| Mollenkopf | Compensation | Compensation | Compensation | Compensation |
| Richardson | Aerospace Safety; | Aerospace Safety | Aerospace Safety | Aerospace Safety |
| Soussan | | | Audit | Audit |

### A. The Demand Board Cannot Impartially Evaluate Count I, Which Alleges Breaches of Fiduciary Duty by the Director Defendants.

566. Count I of the Amended Complaint asserts claims against the Director Defendants for breaching their fiduciary duties to Boeing and its shareholders by failing to ensure that the Company carried out the essential and mission-critical component of its business: airplane safety.

567. No majority of the Demand Board could impartially consider a demand to bring claims for breaches of fiduciary duty because all the Demand Board Director Defendants face a substantial likelihood of liability for failing to oversee quality and safety at the Company in compliance with both federal aviation regulations and Boeing's own safety/quality control policies. Airplane safety is *the* central compliance, legal, and business concern of Boeing.

Therefore, the Demand Board Director Defendants could not impartially decide whether to bring an investigation and claims against themselves.

568.   <u>Bradway</u>:  Bradway joined the Board in 2016.  As a director in January 2021, Bradway was "extensively briefed on discussions with the [DOJ] Fraud Section regarding an agreement to resolve" the DOJ's charges against Boeing related to the MAX Crashes, including by being "informed of the principal terms of the [DPA] by the Chief Legal Officer[.]"  Bradway "agreed that the Company should enter into an agreement on those terms."  As a director during *Boeing I*, Bradway was aware of the Court of Chancery's description of director oversight duties under Delaware law.  As a director at the time of the Delaware Settlement, it is reasonable to infer that Bradway understood the corporate governance requirements of that settlement and was periodically reminded of them.  Bradway did not attempt to oversee the Company's strict compliance with the DPA and the Delaware Settlement in good faith.  Despite *Boeing I*'s teaching that an adequate corporate monitoring system requires mandatory reporting to the Board concerning mission-critical safety issues, Bradway did not ensure that Boeing implemented a policy requiring such mandatory reporting regarding manufacturing issues that threatened safety.  Moreover, Bradway participated in crafting and approving the wrongful disclosures challenged in this Amended Complaint.  For these reasons, Bradway could not impartially consider a pre-suit litigation demand, and demand concerning him is excused as futile.

569.   <u>Calhoun</u>:  Calhoun joined the Board in 2009.  Given his role as Boeing's CEO, Calhoun was the most aware of Boeing's toxic culture and the fact that management's programs were not complying with the DPA or bringing Boeing into regulatory compliance.  As the Company's CEO, Calhoun was the "Accountable Executive" under the SMS.  Calhoun's signature is the first one on Boeing's Safety Management System Policy.



**BOEING SAFETY MANAGEMENT SYSTEM POLICY**

In everything we do and in all aspects of our business, safety is our foundation. We strive for first-time quality, and hold ourselves to the highest ethical standards as set forth in our Code of Conduct and POL-2, "Advancing the Boeing Principles." Our Safety Management System ensures the safety, quality and compliance of our products and services for the people who entrust us with their lives when they operate, maintain and fly on our products.

**This requires our unyielding commitment to the following:**

- We commit to a **Safety Management System** to advance our goals for safety, quality and compliance.

- We foster a **Positive Safety Culture** that enables proactive identification and mitigation of risks in order to prevent accidents, injuries, or loss of life.

- We ensure all employees understand the **requirement to report** any safety hazard, incident, or concern, and can do so without fear of retaliation.

- We **promote a Just Culture** where everyone trusts they will be treated fairly, and understands there is a line between acceptable and unacceptable behavior where appropriate accountability lies.

- We **openly communicate safety actions** being taken while appropriately protecting the safety data and safety information driving those actions.

- We **clearly define the responsibilities** of all employees so that everyone understands their roles in ensuring the safety, quality and compliance of our products and services.

- We **eliminate or mitigate potential safety, quality and compliance risks** associated with our products and services which must include meeting all applicable requirements and regulations.

- We **respond to emergencies** with appropriate urgency and resources in accordance with our emergency response plans, to safely transition from normal to emergency operations and back.

- We use **actionable key performance metrics and targets** that drive continuous improvement of our Safety Management System.

- We **allocate sufficient resources** (people, processes, tools and training) to supporting this safety policy.

- We **ensure all employees understand** that we all have a daily obligation to pursue safety, quality and compliance as described in this safety policy.

As a director in January 2021, Calhoun was "extensively briefed on discussions with the [DOJ] Fraud Section regarding an agreement to resolve" the DOJ's charges against Boeing related to the MAX Crashes, including by being "informed of the principal terms of the [DPA] by the Chief Legal Officer[.]" Calhoun "agreed that the Company should enter into an agreement on those terms." As a director during *Boeing I*, Calhoun was aware of the Court of Chancery's description of director oversight duties under Delaware law. As a director at the time of the Delaware Settlement, it is reasonable to infer that Calhoun understood the corporate governance requirements of that settlement and was periodically reminded of them. Calhoun did not attempt

to oversee the Company's strict compliance with the DPA and the Delaware Settlement in good faith.   Despite *Boeing I*'s teaching that an adequate corporate monitoring system requires mandatory reporting to the Board concerning mission-critical safety issues, Calhoun did not ensure that Boeing implemented a policy requiring such mandatory reporting regarding *manufacturing* issues that threatened safety.   Calhoun knew that Boeing could not meet management's master schedule and still comply with all mandatory laws and regulations and the DPA.   Calhoun received reports on the KPIs showing that Boeing was not in compliance, but he maintained the master schedule anyway.   Calhoun was aware of Boeing's reports to the DOJ under the DPA which showed thousands of instances of alleged fraud at the Company.   After the Door Plug Blowout, Calhoun admitted that Boeing had a "bad habit" of rushing production.   He admitted that Boeing needed to slow down to resolve its quality, safety, and compliance issues.   Moreover, Calhoun participated in crafting and approving the wrongful disclosures challenged in this Amended Complaint.   For these reasons, Calhoun could not impartially consider a pre-suit litigation demand, and demand concerning him is excused as futile.

570.   <u>Doughtie</u>: Doughtie joined the Board in 2021.   As a director during *Boeing I*, Doughtie was aware of the Court of Chancery's description of director oversight duties under Delaware law.   As a director at the time of the Delaware Settlement, it is reasonable to infer that Doughtie understood the corporate governance requirements of that settlement and was periodically reminded of them.   Doughtie did not attempt to oversee the Company's strict compliance with the Delaware Settlement in good faith.   Despite *Boeing I*'s teaching that an adequate corporate monitoring system requires mandatory reporting to the Board concerning mission-critical safety issues, Doughtie did not ensure that Boeing implemented a policy requiring such mandatory reporting regarding *manufacturing* issues that threatened safety.   As an Audit Committee member throughout the Relevant Period, Doughtie failed to respond in good faith to

red flags showing that falsification of records was a serious issue at Boeing that was not improving—notwithstanding management's paper solutions. As an Audit Committee member throughout the Relevant Period, Doughtie passively accepted management's discretionary and subjective summaries of the Company's purported compliance with the DPA, notwithstanding red flags showing that Boeing was reporting thousands of instances of potential fraud to the DOJ. As an Audit Committee member throughout the Relevant Period, Doughtie passively accepted management's reports on Boeing's culture of retaliation, notwithstanding red flags showing that the culture was not changing. As a Compensation Committee member in 2023 and 2024, Doughtie knew that Boeing was not properly incentivizing senior executives to prioritize safety. Boeing's misplaced priorities are demonstrated by the fact that the Compensation Committee changed the incentive compensation metrics to be more heavily weighted toward safety factors after the Door Plug Blowout. Moreover, Doughtie participated in crafting and approving the wrongful disclosures challenged in this Amended Complaint. For these reasons, Doughtie could not impartially consider a pre-suit litigation demand, and demand concerning her is excused as futile.

571.    Gitlin: As a member of the Aerospace Safety Committee in 2022, 2023, and 2024, Gitlin passively accepted management's reports on safety issues. Those reports revealed that Boeing could not meet management's master schedule and still comply with all mandatory laws and regulations regarding safety, including the DPA requirement that Boeing ensure an adequate compliance program at its subcontractors, such as Spirit. For these reasons, Gitlin could not impartially consider a pre-suit litigation demand, and demand concerning him is excused as futile.

572.    Good: Good joined the Board in 2015. As a director in January 2021, Good was "extensively briefed on discussions with the [DOJ] Fraud Section regarding an agreement to resolve" the DOJ's charges against Boeing related to the MAX Crashes, including by being "informed of the principal terms of the [DPA] by the Chief Legal Officer[.]" Good "agreed that

the Company should enter into an agreement on those terms." As a director during *Boeing I*, Good was aware of the Court of Chancery's description of director oversight duties under Delaware law. As a director at the time of the Delaware Settlement, it is reasonable to infer that Good understood the corporate governance requirements of that settlement and was periodically reminded of them. Good did not attempt to oversee the Company's strict compliance with the DPA and the Delaware Settlement in good faith. Despite *Boeing I*'s teaching that an adequate corporate monitoring system requires mandatory reporting to the Board concerning mission-critical safety issues, Good did not ensure that Boeing implemented a policy requiring such mandatory reporting regarding manufacturing issues that threatened safety. As an Audit Committee member throughout the Relevant Period, Good failed to respond in good faith to red flags showing that falsification of records was a serious issue at Boeing that was not improving—notwithstanding management's paper solutions. As an Audit Committee member throughout the Relevant Period, Good passively accepted management's discretionary and subjective summaries of the Company's purported compliance with the DPA, notwithstanding red flags showing that Boeing was reporting thousands of instances of potential fraud to the DOJ. As an Audit Committee member throughout the Relevant Period, Good passively accepted management's reports on Boeing's culture of retaliation, notwithstanding red flags showing that the culture was not changing. As a Compensation Committee member throughout the Relevant Period, Good knew that Boeing was not properly incentivizing senior executives to prioritize safety. Boeing's misplaced priorities are demonstrated by the fact that the Compensation Committee changed the incentive compensation metrics to be more heavily weighted toward safety factors after the Door Plug Blowout. Moreover, Good participated in crafting and approving the wrongful disclosures challenged in this Amended Complaint. For these reasons, Good could not impartially consider a pre-suit litigation demand, and demand concerning her is excused as futile.

573.   <u>Harris</u>: Harris joined the Board in 2021.  As a director during *Boeing I*, Harris was aware of the Court of Chancery's description of director oversight duties under Delaware law.  As a director at the time of the Delaware Settlement, it is reasonable to infer that Harris understood the corporate governance requirements of that settlement and was periodically reminded of them. Harris did not attempt to oversee the Company's strict compliance with the DPA and the Delaware Settlement in good faith.  Despite *Boeing I*'s teaching that an adequate corporate monitoring system requires mandatory reporting to the Board concerning mission-critical safety issues, Harris did not ensure that Boeing implemented a policy requiring such mandatory reporting regarding manufacturing issues that threatened safety.  As a member of the Aerospace Safety Committee throughout the Relevant Period, Harris passively accepted management's reports on safety issues. Those reports revealed that Boeing could not meet management's master schedule and still comply with all mandatory laws and regulations regarding safety, including the DPA requirement that Boeing ensure an adequate compliance program at its subcontractors, such as Spirit.  Moreover, Harris participated in crafting and approving the wrongful disclosures challenged in this Amended Complaint.  For these reasons, Harris could not impartially consider a pre-suit litigation demand, and demand concerning her is excused as futile.

574.   <u>Johri</u>: Johri joined the Board in 2020.  As a director in January 2021, Johri was "extensively briefed on discussions with the [DOJ] Fraud Section regarding an agreement to resolve" the DOJ's charges against Boeing related to the MAX Crashes, including by being "informed of the principal terms of the [DPA] by the Chief Legal Officer[.]"  Johri "agreed that the Company should enter into an agreement on those terms."  As a director during *Boeing I*, Johri was aware of the Court of Chancery's description of director oversight duties under Delaware law. As a director at the time of the Delaware Settlement, it is reasonable to infer that Johri understood the corporate governance requirements of that settlement and was periodically reminded of them.

Johri did not attempt to oversee the Company's strict compliance with the DPA and the Delaware Settlement in good faith.  Despite *Boeing I*'s teaching that an adequate corporate monitoring system requires mandatory reporting to the Board concerning mission-critical safety issues, Johri did not ensure that Boeing implemented a policy requiring such mandatory reporting regarding manufacturing issues that threatened safety.  As an Audit Committee member throughout the Relevant Period, Johri failed to respond in good faith to red flags showing that falsification of records was a serious issue at Boeing that was not improving—notwithstanding management's paper solutions.  As an Audit Committee member throughout the Relevant Period, Johri passively accepted management's discretionary and subjective summaries of the Company's purported compliance with the DPA, notwithstanding red flags showing that Boeing was reporting thousands of instances of potential fraud to the DOJ.  As an Audit Committee member throughout the Relevant Period, Johri passively accepted management's reports on Boeing's culture of retaliation, notwithstanding red flags showing that the culture was not changing.  Moreover, Johri participated in crafting and approving the wrongful disclosures challenged in this Amended Complaint.  For these reasons, Johri could not impartially consider a pre-suit litigation demand, and demand concerning him is excused as futile.

575.  <u>Joyce</u>: Joyce joined the Board in 2021.  As a director during *Boeing I*, Joyce was aware of the Court of Chancery's description of director oversight duties under Delaware law.  As a director at the time of the Delaware Settlement, it is reasonable to infer that Joyce understood the corporate governance requirements of that settlement and was periodically reminded of them.  Joyce did not attempt to oversee the Company's strict compliance with the DPA and the Delaware Settlement in good faith.  Despite *Boeing I*'s teaching that an adequate corporate monitoring system requires mandatory reporting to the Board concerning mission-critical safety issues, Joyce did not ensure that Boeing implemented a policy requiring such mandatory reporting regarding

manufacturing issues that threatened safety.  As a member of the Aerospace Safety Committee throughout the Relevant Period, Joyce passively accepted management's reports on safety issues. Those reports revealed that Boeing could not meet management's master schedule and still comply with all mandatory laws and regulations regarding safety, including the DPA requirement that Boeing ensure an adequate compliance program at its subcontractors, such as Spirit.  As a Compensation Committee member in 2021, 2022, and 2023, Joyce knew that Boeing was not properly incentivizing senior executives to prioritize safety.  Boeing's misplaced priorities are demonstrated by the fact that the Compensation Committee changed the incentive compensation metrics to be more heavily weighted toward safety factors after the Door Plug Blowout.  Moreover, Joyce participated in crafting and approving the wrongful disclosures challenged in this Amended Complaint.  For these reasons, Joyce could not impartially consider a pre-suit litigation demand, and demand concerning him is excused as futile.

576.   _Mollenkopf_: Mollenkopf joined the Board in 2020.  As a director in January 2021, Mollenkopf was "extensively briefed on discussions with the [DOJ] Fraud Section regarding an agreement to resolve" the DOJ's charges against Boeing related to the MAX Crashes, including by being "informed of the principal terms of the [DPA] by the Chief Legal Officer[.]"  Mollenkopf "agreed that the Company should enter into an agreement on those terms."  As a director during _Boeing I_, Mollenkopf was aware of the Court of Chancery's description of director oversight duties under Delaware law.  As a director at the time of the Delaware Settlement, it is reasonable to infer that Mollenkopf understood the corporate governance requirements of that settlement and was periodically reminded of them.  Mollenkopf did not attempt to oversee the Company's strict compliance with the DPA and the Delaware Settlement in good faith.  Despite _Boeing I_'s teaching that an adequate corporate monitoring system requires mandatory reporting to the Board concerning mission-critical safety issues, Mollenkopf did not ensure that Boeing implemented a

policy requiring such mandatory reporting regarding manufacturing issues that threatened safety. As a Compensation Committee member throughout the Relevant Period, Mollenkopf knew that Boeing was not properly incentivizing senior executives to prioritize safety. Boeing's misplaced priorities are demonstrated by the fact that the Compensation Committee changed the incentive compensation metrics to be more heavily weighted toward safety factors after the Door Plug Blowout. Moreover, Mollenkopf participated in crafting and approving the wrongful disclosures challenged in this Amended Complaint. For these reasons, Mollenkopf could not impartially consider a pre-suit litigation demand, and demand concerning him is excused as futile.

577.     <u>Richardson</u>: Richardson joined the Board in 2019. As a director in January 2021, Richardson was "extensively briefed on discussions with the [DOJ] Fraud Section regarding an agreement to resolve" the DOJ's charges against Boeing related to the MAX Crashes, including by being "informed of the principal terms of the [DPA] by the Chief Legal Officer[.]" Richardson "agreed that the Company should enter into an agreement on those terms." As a director during *Boeing I*, Richardson was aware of the Court of Chancery's description of director oversight duties under Delaware law. As a director at the time of the Delaware Settlement, it is reasonable to infer that Richardson understood the corporate governance requirements of that settlement and was periodically reminded of them. Richardson did not attempt to oversee the Company's strict compliance with the DPA and the Delaware Settlement in good faith. Despite *Boeing I*'s teaching that an adequate corporate monitoring system requires mandatory reporting to the Board concerning mission-critical safety issues, Richardson did not ensure that Boeing implemented a policy requiring such mandatory reporting regarding manufacturing issues that threatened safety. As a member of the Aerospace Safety Committee throughout the Relevant Period, Richardson passively accepted management's reports on safety issues. Those reports revealed that Boeing could not meet management's master schedule and still comply with all mandatory laws and

regulations regarding safety, including the DPA requirement that Boeing ensure an adequate compliance program at its subcontractors, such as Spirit. Moreover, Richardson participated in crafting and approving the wrongful disclosures challenged in this Amended Complaint. For these reasons, Richardson could not impartially consider a pre-suit litigation demand, and demand concerning him is excused as futile.

578.   <u>Soussan</u>: Soussan joined the Board in 2023. As an Audit Committee member in 2023 and 2024, Soussan failed to respond in good faith to red flags showing that falsification of records was a serious issue at Boeing that was not improving—notwithstanding management's paper solutions. As an Audit Committee member in 2023 and 2024, Soussan passively accepted management's discretionary and subjective summaries of the Company's purported compliance with the DPA, notwithstanding red flags showing that Boeing was reporting thousands of instances of potential fraud to the DOJ. As an Audit Committee member in 2023 and 2024, Soussan passively accepted management's reports on Boeing's culture of retaliation, notwithstanding red flags showing that the culture was not changing. Moreover, Soussan participated in crafting and approving the wrongful disclosures challenged in this Amended Complaint. For these reasons, Soussan could not impartially consider a pre-suit litigation demand, and demand concerning her is excused as futile.

579.   The Board has a duty to oversee the central compliance concerns of the Company. Safety is the central compliance concern for Boeing. The Demand Board Director Defendants' repeated failure to address serious safety issues, and the substantial likelihood of liability they face as a result, make them incapable of independently considering a litigation demand concerning claims against the Director Defendants. Thus, demand is excused as futile.

**B.      The Demand Board Cannot Impartially Evaluate Count II, Which Alleges Breaches of Fiduciary Duty by the Officer Defendants.**

580.    Count II of this Amended Complaint asserts claims against the Officer Defendants for breaching their fiduciary duty of loyalty (including loyalty's subsidiary element of good faith) owed to Boeing and its shareholders by failing to exercise good faith oversight regarding the Company's mission-critical safety, quality, and compliance practices.  Count II also asserts claims against the Officer Defendants for breaching their fiduciary duty of care owed to Boeing and its shareholders.  The Officer Defendants were grossly negligent with respect to Boeing's safety, quality, and compliance practices, including with respect to the DPA.

581.    The Demand Board could not impartially consider a litigation demand against the Officer Defendants.  The Board was ultimately responsible to oversee the Company's mission-critical safety, quality, and compliance practices, including with respect to the DPA.  One of the pieces of evidence that the Board failed to meet its oversight obligations in good faith was the directors' failure to ensure that the Officer Defendants were faithfully and competently fulfilling their respective duties.  Among other things, the Board permitted management to pursue a business plan that pursued profits by violating the law.  The Officer Defendants' liability and the Director Defendants' liability implicate and is intertwined with the same oversight failures.  Thus, a finding of liability against the Officer Defendants would expose the Director Defendants, including the Demand Board directors, to increased liability risk for their own fiduciary breaches and statutory violations.  Accordingly, the Demand Board directors could not bring their business judgment to bear on a demand to investigate or prosecute derivative claims against the Officer Defendants because such litigation would implicate their own wrongdoing.  Therefore, a conflict exists, and a pre-suit litigation demand on the Demand Board would have been futile and useless.

582.    The futility of demand regarding Count II is particularly evident with respect to Demand Board member Calhoun.  Calhoun is an Officer Defendant, and he could not fairly consider a pre-suit demand for the Board to institute litigation against himself.

**C.    The Demand Board Cannot Impartially Evaluate Count III, Which Alleges Violations of Section 14(a) of the Exchange Act and SEC Rule 14A-9 by the Proxy Defendants.**

583.    Count III of the Amended Complaint asserts derivative claims against Bradway, Calhoun, Doughtie, Gitlin, Good, Harris, Johri, Joyce, Mollenkopf, Richardson, Soussan, Kellner, and Williams (i.e., the "Proxy Defendants") for violating Section 14(a) of the Exchange Act and SEC Rule 14a-9 by issuing, causing to be issued, or participating in the issuance of false or misleading proxy statements which induced stockholders to vote to elect and re-elect Boeing directors, approve director compensation, and vote on additional proposals at annual shareholder meetings.  Eleven out of the thirteen Proxy Defendants are members of the Demand Board.

584.    During their respective tenures on the Board, each of the Proxy Defendants exercised control over Boeing and either negligently or knowingly issued, caused to be issued, and participated in the issuance of materially false and misleading statements to shareholders in the 2023 and 2024 proxy statements.  As part of soliciting shareholder votes for Boeing's directors' election and/or re-election (among other shareholder proposals), these proxy statements each falsely and misleadingly: (i) stated that Boeing maintained sufficient safety processes and regulatory compliance; (ii) stated that Boeing maintained sufficient risk controls, review, and reporting programs to identify and address safety concerns; (iii) highlighted safety, regulatory compliance, aerospace industry experience, product quality, and risk management qualifications for Boeing directors; and (iv) omitted the facts showing the Individual Defendants' inadequate oversight of mission-critical airplane safety and product quality.  The Proxy Defendants knew or

should have known that these proxy statements violated Section 14(a) of the Exchange Act when they were issued.

585. The violations of Section 14(a) create a disabling conflict for a majority of the Demand Board. Ten of the eleven Demand Board members—Bradway, Calhoun, Doughtie, Gitlin, Good, Harris, Johri, Joyce, Mollenkopf, and Richardson—reviewed and approved Boeing's 2023 proxy statement filing and therefore face a substantial likelihood of personal liability for violating Section 14(a) of the Exchange Act. Each Demand Board member reviewed and approved Boeing's 2024 proxy statement filing and therefore faces a substantial likelihood of personal liability for violating Section 14(a) of the Exchange Act. Thus, demand is excused as futile with respect to Count III.

### D. The Demand Board Cannot Impartially Evaluate Count IV, Which Alleges Violations of Section 10(b) of the Exchange Act and SEC Rule 10B-5 by the 10(b) Defendants.

586. Count IV of the Amended Complaint asserts derivative claims against Bradway, Calhoun, Doughtie, Gitlin, Good, Harris, Johri, Joyce, Mollenkopf, Richardson, Kellner, Williams, Amuluru, Clark, D'Ambrose, Deal, Delany, Fava, Fleming, Galantowicz, Hostetler, Lund, Martin, McKenzie, Pope, and Stocker (i.e., the "10(b) Defendants") for violating Section 10(b) of the Exchange Act and SEC Rule 10b-5 by disseminating false and misleading statements about Boeing in connection with Boeing's share repurchases. As discussed above, *see supra* Section IV.V, during their respective tenures, including service on Boeing's Board, the 10(b) Defendants issued, and participated in the issuance of, materially false and misleading statements in annual reports, other filings with the SEC, news media reports, and testimony to federal officials, which were disseminated to Boeing shareholders and artificially inflated Boeing's stock price. Then, the same 10(b) Defendants caused Boeing to repurchase its own common stock from

employees, including themselves, at artificially inflated stock prices caused by their false and misleading statements.

587.    Ten 10(b) Defendants are members of the eleven-person Demand Board.  As a result, the Demand Board cannot impartially consider a litigation demand to pursue claims concerning violations of Section 10(b) against the 10(b) Defendants.  Thus, demand is excused as futile with respect to Count IV.

## COUNT I
### Breach of Fiduciary Duty
### (Against the Director Defendants in Their Capacities as Directors)

588.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully set forth herein.

589.    By virtue of their positions as Directors of Boeing, the Director Defendants owed fiduciary duties of care and loyalty to Boeing and its stockholders.

590.    The Director Defendants breached their fiduciary duties when, among other things, they failed to (i) systematically monitor mission-critical issues related to airplane safety, airplane quality control, and Boeing's legal obligations related to those subjects; and/or (ii) respond in good faith to red flags showing potential deficiencies in any of those mission-critical areas.

591.    The Director Defendants further breached their fiduciary duties by causing Boeing to make materially false and misleading statements regarding these failures in public filings with the SEC.

592.    As a result of the Director Defendants' actions and/or inactions, Boeing has suffered damages, pecuniary and otherwise, in an amount and nature to be proven at trial.  Those damages, including substantial losses to Boeing, were caused by the Director Defendants' breaches of their fiduciary duties.

593.    As a result of the nature of those breaches of fiduciary duty, the Director Defendants are liable to the Company for the damages thereby caused.

### COUNT II
**Breach of Fiduciary Duty**
**(Against the Officer Defendants in Their Capacities as Officers)**

594.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully set forth herein.

595.    By virtue of their positions as Officers of Boeing, the Officer Defendants owed fiduciary duties of care and loyalty to Boeing and its stockholders.

596.    The Officer Defendants breached their fiduciary duties when, among other things, they failed to (i) systematically monitor mission-critical issues related to airplane safety, airplane quality control, and Boeing's legal obligations related to those subjects; and/or (ii) respond in good faith to red flags showing potential deficiencies in any of those mission-critical areas.

597.    The Officer Defendants further breached their fiduciary duties by causing Boeing to make materially false and misleading statements regarding these failures in public filings with the SEC.

598.    As a result of the Officer Defendants' actions and/or inactions, Boeing has suffered damages, pecuniary and otherwise, in an amount and nature to be proven at trial.  Those damages, including substantial losses to Boeing, were caused by the Officer Defendants' breaches of their fiduciary duties.

599.    As a result of the nature of those breaches of fiduciary duty, the Officer Defendants are liable to the Company for the damages thereby caused.

## COUNT III
### Violation of Section 14(a) of the Exchange Act
**(Against Proxy Defendants Bradway, Calhoun, Doughtie, Gitlin, Good, Harris, Johri, Joyce, Mollenkopf, Richardson, Soussan, Kellner, and Williams)**

600.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully set forth herein.

601.    SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a-9(a).

602.    During their respective tenures on the Board, the Proxy Defendants had control over Boeing, and used that control to either negligently or knowingly cause Boeing to disseminate the false and misleading proxy statements described in the foregoing amended complaint, which include: (i) the 2023 Proxy's statements concerning Boeing's purportedly enhanced focus on safety and quality control and improvements to the Company's safety culture and (ii) the 2024 Proxy's statements concerning Boeing's purportedly enhanced oversight and focus on safety above all else.

603.    These statements materially misrepresented Boeing's managerial approach to, and business situation regarding, airplane safety, quality control, and legal compliance with respect to those categories.  Further, those statements misrepresented the Board's conduct in overseeing safety and quality, materially omitting the Board's failure to implement adequate safety oversight.

604.     As alleged herein, Boeing's proxy statements contained false statements of material facts and omitted material facts necessary to make the remaining statements *not* false and misleading in violation of 17 C.F.R. § 240.14a-9(a).   These misleading disclosures regarding airplane safety, quality control, legal compliance, and the oversight associated with those categories are material because airplane safety and quality control are mission-critical to Boeing's business.   Therefore, those disclosures and nondisclosures would be a material factor that shareholders considered in voting whether to elect or re-elect director nominees, and thereby, they induced shareholders to vote to elect or re-elect the director nominees on material incomplete or false information.

605.     As alleged herein, the Proxy Defendants violated 17 C.F.R. § 240.14a-9(a) by preparing and authorizing written communications which were materially false and/or misleading, providing them to the public in at least a negligent manner.

606.     At all relevant times to the dissemination of the materially false and/or misleading proxy statements, the Proxy Defendants were aware of, and/or had access to, the facts concerning Boeing's airplane safety record, quality control, legal compliance, and the oversight associated with those categories.

607.     As a result, Boeing has been injured and is entitled to damages and equitable relief, in an amount and nature to be demonstrated at trial.

## COUNT IV
### Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5
**(Against the 10(b) Defendants Bradway, Calhoun, Doughtie, Gitlin, Good, Harris, Johri, Joyce, Mollenkopf, Richardson, Kellner, Williams, Amuluru, Clark, D'Ambrose, Deal, Delany, Fava, Fleming, Galantowicz, Hostetler, Lund, Martin, McKenzie, Pope, and Stocker)**

608.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully set forth herein against 10(b) Defendants Bradway, Calhoun, Doughtie, Gitlin,

Good, Harris, Johri, Joyce, Mollenkopf, Richardson, Kellner, Williams, Amuluru, Clark, D'Ambrose, Deal, Delany, Fava, Fleming, Galantowicz, Hostetler, Lund, Martin, McKenzie, Pope, and Stocker.

609.    During the Relevant Period, the 10(b) Defendants disseminated and/or approved false or misleading statements about Boeing related to its airplane safety record, quality control, legal compliance, and the oversight associated with those categories.  The 10(b) Defendants knew or recklessly disregarded that those statements were false or misleading, and they were disseminated with knowing intent to deceive, manipulate, or defraud.  In doing so, the 10(b) Defendants aimed to artificially inflate the price of the Company's stock.

610.    While the Company's stock would have been inflated as a result of those false or misleading statements, the 10(b) Defendants caused the Company (in their various capacities as Officers and Directors) to repurchase at least $463 million of shares of its own common stock at prices that were artificially inflated due to the effect of those false or misleading statements.

611.    The 10(b) Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Boeing in connection with the Company's repurchases of its stock during the Relevant Period.

612.    The 10(b) Defendants, individually, and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mails: (i) engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; (ii) made various false or misleading statements of material facts and omitted material facts; (iii) made the foregoing statements intentionally or with a severely reckless disregard for the

truth; and (iv) employed devices and artifices to defraud in connection with the purchase and sale of Boeing stock, which were intended to, and did, inflate and maintain the market price of Boeing common stock.

613.    The 10(b) Defendants were the senior members of management and the directors of the Company, and were therefore directly responsible for, and are liable for, the materially false or misleading statements made during the Relevant Period, as alleged above.

614.    As described in the foregoing, the 10(b) Defendants acted with *scienter* throughout the Relevant Period, in that they acted either with intent to deceive, manipulate, or defraud, or with recklessness to those false or materially misleading statements.  The misstatements and omissions of material facts set forth in this Amended Complaint were either (i) known to the 10(b) Defendants or (ii) were so obvious to individuals in the 10(b) Defendants' positions that the 10(b) Defendants should have been aware of them.   Throughout the Relevant Period, the 10(b) Defendants further were obliged to disclose novel information that came to their attention and rendered their prior statements to the market materially false or misleading.

615.    As a direct and proximate result of the 10(b) Defendants' wrongful conduct, the Company suffered damages in connection with its purchases of Boeing stock during the Relevant Period.  By reason of such conduct, the 10(b) Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

616.    Plaintiffs brought this claim within two years of their discovery of the facts constituting the violation and within five years of the violation.

## VII.    REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment in the form of an order:

A.    Holding the Director Defendants derivatively liable for breaching Section 14(a) of the Exchange Act;

B.      Holding the Director Defendants derivatively liable for breaching Section 10(b) of the Exchange Act in connection with the Company's stock repurchases;

C.      Declaring that Plaintiffs and Plaintiffs' counsel have fairly and adequately represented the Company's interests in litigating the derivative claims in this action;

D.      Declaring that Defendants breached their fiduciary duties to the Company;

E.      Awarding the Company damages in an amount to be determined at trial;

F.      Awarding the Company restitution from Defendants and requiring Defendants to disgorge all profits, compensation, and other benefits they unjustly received, including all wrongfully received incentive compensation (whether in the form of cash bonuses, stock awards, stock option grants, or otherwise) and stock sale proceeds;

G.      Awarding Plaintiffs their reasonable fees and expenses in the Action, and pre- and post-judgment interest on all out-of-pocket fees and expenses;

H.      Awarding pre- and post-judgment interest on all damages awards;

I.      Declaring that each Defendant is jointly and severally liable for all damages, fees, expenses, and interest;

J.      Granting such equitable relief to remediate the Company's flawed governance as this Court deems just and proper; and

K.      Granting such other and further relief as this Court deems just and proper.

## VIII.  JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

Dated:  October 21, 2024

Respectfully submitted,

*/s/ Susan R. Podolsky*

Susan R. Podolsky (VA Bar No. 27891)
**LAW OFFICE OF SUSAN R. PODOLSKY**
1800 Diagonal Road, Suite 600
Alexandria, Virginia 22314
Telephone: (571) 366-1702
Facsimile:  (703) 647-6009
spodolsky@podolskylaw.com

*Local Counsel for Plaintiffs Ohio Public*
*Employees Retirement System and State*
*Teachers Retirement System of Ohio*

**BLEICHMAR FONTI & AULD LLP**

Derrick B. Farrell (*Pro Hac Vice*)
3411 Silverside Rd.
Baynard Building, Suite 104
Wilmington, Delaware 19810
Telephone: (302) 499-2158
Facsimile: (302) 691-1331
dfarrell@bfalaw.com

Lesley E. Weaver (*Pro Hac Vice*)
1330 Broadway, Suite 630
Oakland, California 94612
Telephone: (415) 445-4004
Facsimile: (415) 445-4020
lweaver@bfalaw.com

**GRANT & EISENHOFER P.A.**

Christine M. Mackintosh (*Pro Hac Vice*
*Pending*)
123 Justison Street
Wilmington, Delaware 19801
Telephone: (302) 622-7000
Facsimile: (302) 622-7100
cmackintosh@gelaw.com

*Counsel for Plaintiffs Ohio Public Employees*
*Retirement System and State Teachers*
*Retirement System of Ohio*

/s/ Charles L. Williams
Charles L. Williams (VA Bar No. 23587)
**WILLIAMS & SKILLING, P.C.**
7104 Mechanicsville Turnpike, Suite 204
Mechanicsville, Virginia 23111
Telephone: (804) 447-0307
Facsimile: (804) 447-0367
cwilliams@williamsandskilling.com

*Local Counsel for Plaintiff Oklahoma
Firefighters Pension and Retirement System*

**SCOTT + SCOTT ATTORNEYS
   AT LAW LLP**

Geoffrey M. Johnson (*Pro Hac Vice*)
12434 Cedar Road, Suite 12
Cleveland Heights, Ohio 44106
Telephone: (216) 229-6088
Facsimile: (216) 229-6092
gjohnson@scott-scott.com

Donald A. Broggi (*Pro Hac Vice Pending*)
Jing-Li Yu (*Pro Hac Vice*)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, New York 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
dbroggi@scott-scott.com
jyu@scott-scott.com

Maxwell R. Huffman (*Pro Hac Vice*)
600 W. Broadway, Suite 3300
San Diego, California 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
mhuffman@scott-scott.com

Justin O. Reliford (*Pro Hac Vice*)
222 Delaware Avenue, Suite 1050
Wilmington, Delaware 19801
Telephone: (302) 578-7345
jreliford@scott-scott.com

213

*Counsel for Plaintiff Oklahoma Firefighters*
*Pension and Retirement System*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

| | | |
|---|---|---|
| OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM, OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM, and STATE TEACHERS RETIREMENT SYSTEM OF OHIO, Derivatively on Behalf of Nominal Defendant THE BOEING COMPANY, | )<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 1:24-cv-1200 (LMB/WEF) |
| | ) | |
| Plaintiff, | )<br>) | |
| | ) | |
| v. | )<br>) | |
| DAVID L. CALHOUN, STEVEN M. MOLLENKOPF, LAWRENCE W. KELLNER, ROBERT A. BRADWAY, LYNN M. DOUGHTIE, LYNN J. GOOD, DAVID L. GITLIN, STAYCE D. HARRIS, AKHIL JOHRI, DAVID L. JOYCE, JOHN M. RICHARDSON, SABRINA SOUSSAN, RONALD A. WILLIAMS, STANLEY DEAL, STEPHANIE POPE, BRETT C. GERRY, HOWARD MCKENZIE, MICHAEL DELANEY, MIKE FLEMING, ELIZABETH LUND, DARRIN A. HOSTETLER, UMA M. AMULURU, MIKE FAVA, ELIZABETH MARTIN, TOM GALANTOWICZ, MICHAEL D'AMBROSE, KIMBERLY PASTEGA, SCOTT A. STOCKER, and DAVID LOFFLING, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| | ) | |
| Defendants, | )<br>) | |
| - and - | )<br>) | |
| THE BOEING COMPANY, | )<br>)<br>) | |
| Nominal Defendant. | ) | |

**VERIFICATION OF OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM TO VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

I, Eric Harrell, on behalf of Plaintiff Ohio Public Employees Retirement System (the "System"), hereby verify that the System is a beneficial owner of nominal defendant The Boeing Company ("Boeing"), and that the System has continuously owned Boeing stock since at least 2010. I have reviewed the allegations in this Consolidated Amended Verified Shareholder Derivative Complaint (the "Complaint") on behalf of the System. I further verify that this action is not a collusive action to confer jurisdiction that the court would otherwise lack. As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon the System's counsel and counsel's investigation and believe them to be true. Having received a copy of the Complaint and having reviewed it with counsel, I authorize its filing on behalf of the System.

I have not received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this action except: (A) the indirect benefit from any damages or other relief that the Court may award to Boeing, (B) a ratable share of any damages or other relief that the Court may award; (C) any fees, costs, or other payments that the Court expressly approves to be paid to or on behalf of the System; or (D) reimbursement from the System's attorneys of actual and reasonable out-of-pocket expenditures incurred in prosecuting the action.

[Signature on Following Page]

2

I declare under penalty of perjury that the foregoing is true and correct.

_____                    10/21/24
Eric Harrell                                         Date
General Counsel

Ohio Public Employees Retirement System


Dated: 10/21/2024

State of OHIO                County of FRANKLIN

This record was acknowledged before me on 10 / 21 / 2024 by Eric Harrell, on behalf of

the Ohio Public Employees Retirement System.


Signature of notarial officer _____

Stamp:

**JENNIFER E. HARRELL**
Notary Public, State of Ohio
My Commission Expires 03-15-26

3

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

OKLAHOMA FIREFIGHTERS PENSION )
AND RETIREMENT SYSTEM, OHIO )
PUBLIC EMPLOYEES RETIREMENT )
SYSTEM, and STATE TEACHERS )
RETIREMENT SYSTEM OF OHIO, )
Derivatively on Behalf of Nominal )   Civil Action No. 1:24-cv-1200 (LMB/WEF)
Defendant THE BOEING COMPANY, )
)
           Plaintiff, )
)
     v. )
)
DAVID L. CALHOUN, STEVEN M. )
MOLLENKOPF, LAWRENCE W. )
KELLNER, ROBERT A. BRADWAY, )
LYNN M. DOUGHTIE, LYNN J. GOOD, )
DAVID L. GITLIN, STAYCE D. HARRIS, )
AKHIL JOHRI, DAVID L. JOYCE, JOHN )
M. RICHARDSON, SABRINA SOUSSAN, )
RONALD A. WILLIAMS, STANLEY )
DEAL, STEPHANIE POPE, BRETT C. )
GERRY, HOWARD MCKENZIE, )
MICHAEL DELANEY, MIKE FLEMING, )
ELIZABETH LUND, DARRIN A. )
HOSTETLER, UMA M. AMULURU, MIKE )
FAVA, ELIZABETH MARTIN, TOM )
GALANTOWICZ, MICHAEL )
D'AMBROSE, KIMBERLY PASTEGA, )
SCOTT A. STOCKER, and DAVID )
LOFFLING, )
)
           Defendants, )
)
   - and - )
)
THE BOEING COMPANY, )
)
         Nominal Defendant. )

**VERIFICATION OF THE STATE TEACHERS RETIREMENT SYSTEM OF OHIO TO VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

I, Stacey L. Wideman, on behalf of the State Teachers Retirement System of Ohio (the "System"), hereby verify that the System is a beneficial owner of nominal defendant The Boeing Company ("Boeing"), and that the System has continuously owned Boeing stock since at least 1994. I have reviewed the allegations in this Consolidated Amended Verified Shareholder Derivative Complaint (the "Complaint") on behalf of the System. I further verify that this action is not a collusive action to confer jurisdiction that the court would otherwise lack. As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon the System's counsel and counsel's investigation and believe them to be true. Having received a copy of the Complaint and having reviewed it with counsel, I authorize its filing on behalf of the System.

I have not received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this action except: (A) the indirect benefit from any damages or other relief that the Court may award to Boeing, (B) a ratable share of any damages or other relief that the Court may award; (C) any fees, costs, or other payments that the Court expressly approves to be paid to or on behalf of the System; or (D) reimbursement from the System's attorneys of actual and reasonable out-of-pocket expenditures incurred in prosecuting the action.

[Signature on Following Page]

I declare under penalty of perjury that the foregoing is true and correct.

_Stacey L. Wideman_

Stacey L. Wideman
Chief Legal Officer

_October 21, 2024_

Date

The State Teachers Retirement System of Ohio

Dated: _October 21, 2024_

State of _Ohio_    County of _Franklin_

This record was acknowledged before me on __10 / 21 / 2024__ by Stacey L. Wideman, on

behalf of the State Teachers Retirement System of Ohio.

Signature of notarial officer _____

Stamp:

NOTARIAL SEAL
STATE OF OHIO

MARK D. MAXWELL, Attorney At Law
NOTARY PUBLIC   STATE OF OHIO
My Commission has no expiration date
Section 147.03 R.C.

**VERIFICATION OF OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM TO AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

I, Chase Rankin, on behalf of Plaintiff Oklahoma Firefighters Pension and Retirement System ("Oklahoma"), hereby verify that Oklahoma is a shareholder of record of nominal defendant The Boeing Company ("Boeing"), and that the Oklahoma has continuously owned Boeing stock since at least 2017. I have reviewed the allegations in this Amended Verified Shareholder Derivative Complaint (the "Amended Complaint") on behalf of Oklahoma. I further verify that this action is not a collusive action to confer jurisdiction that the court would otherwise lack. As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon Oklahoma's counsel and counsel's investigation and believe them to be true. Having received a copy of the Amended Complaint and having reviewed it with counsel, I authorize its filing on behalf of Oklahoma.

I have not received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this action except: (A) the indirect benefit from any damages or other relief that the Court may award to Boeing, (B) a ratable share of any damages or other relief that the Court may award; (C) any fees, costs, or other payments that the Court expressly approves to be paid to or on behalf of the Oklahoma; or (D) reimbursement from the Oklahoma's attorneys of actual and reasonable out-of-pocket expenditures incurred in prosecuting the action.

[Signature on Following Page]

I declare under penalty of perjury that the foregoing is true and correct.

_____     _____ 10/21/24

Chase Rankin                                            Date
Executive Director
Oklahoma Firefighters Pension and
Retirement System

Dated: _10/21/2024_

State of _Oklahoma_ County of _Oklahoma_

This record was acknowledged before me on _21 Oct 2024_ by Chase Rankin, on behalf

of the Oklahoma Firefighters Pension and Retirement System.

Signature of notarial officer _____

Stamp:

TERRI L. WILLIAMS
NOTARY PUBLIC, STATE OF OKLAHOMA
# 11001494
EXP. 02/22/27

2